UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAFARGE CANADA INC. and LAFARGE NORTH AMERICA, INC., | |
| Plaintiffs, | No. 15 Civ. _____ |
| - against - | **COMPLAINT** |
| AMERICAN HOME ASSURANCE COMPANY, AIG INSURANCE COMPANY OF CANADA, and LEXINGTON INSURANCE COMPANY, | **ECF CASE** |
| Defendants. | |

Plaintiffs Lafarge Canada Inc. ("LCI") and Lafarge North America, Inc. ("LNA") bring this Complaint for declaratory and all other appropriate relief against defendants American Home Assurance Company ("American Home"), AIG Insurance Company of Canada ("AIG Canada"), and Lexington Insurance Company ("Lexington"). Plaintiff alleges as follows on actual knowledge with respect to itself and its own acts and on information and belief as to all other matters:

## <u>NATURE OF THE ACTION</u>

1.      This dispute concerns insurance coverage for LCI's potential liability in mass civil litigation arising from alleged construction defects pending before the Superior Court of Québec in the judicial district of Trois-Rivières, Québec, Canada (the "*Trois-Rivières* Litigation").

2.      Defendants American Home, AIG Canada, and Lexington are all wholly-owned subsidiaries of American International Group Inc. ("AIG"), and all provide coverage to LCI for the *Trois-Rivières* Litigation during periods triggered by the claims set forth in this Complaint under policies issued to LCI and to LNA. On information and belief, American Home, AIG

1

Canada, and Lexington intend to assert coordinated coverage positions so as to minimize or eliminate their combined exposure to the plaintiffs' claims, notwithstanding the obligations to their insureds that each has under the insurance policies it issued.

3.      Plaintiff LCI, a manufacturer and seller of cement and other building materials, and its corporate parent, LNA, which purchased insurance policies at issue in this action, seek a declaration confirming that (i) umbrella policies issued by Lexington and AIG Canada cover potential liabilities of LCI and one of its employees (for whose actions LCI is liable and whom LCI is indemnifying) arising from the *Trois-Rivières* Litigation and (ii) such liabilities constitute a single occurrence.

4.      LCI also seeks a declaration confirming that all *Trois-Rivières* Litigation liabilities are treated as a single occurrence under primary "fronting" policies issued by American Home and AIG Canada, which do not provide real insurance, but rather merely transfer nominally covered losses from American Home and AIG Canada to LCI or LCI's affiliate, Mountain Prairie Insurance Company ("Mountain Prairie").  Mountain Prairie is a Vermont captive insurer that insures LNA and certain of its subsidiaries and directly or indirectly reinsures liabilities of certain of LCI's commercial insurers, including American Home and AIG Canada.

5.      LCI further seeks a declaration that such primary policies may not be used to avoid Lexington's and AIG Canada's true coverage obligations by parceling the *Trois-Rivières* liabilities into numerous occurrences, each so small that no one occurrence is large enough to attach to Lexington's and AIG Canada's umbrella policies and that all such losses instead must be reimbursed by LCI or Mountain Prairie.

6.      LCI's potential losses arising from the *Trois-Rivières* Litigation might be material, and accordingly LCI desires a prompt determination as to whether or not any such losses will be insured.  Most immediately, LCI has been invited to engage in settlement discussions with plaintiffs and third-party plaintiffs in the *Trois-Rivières* Litigation, and confirmation of coverage would provide LCI with an understanding of its net economic burden

for any possible resolution.  In addition, a ruling that losses arising from the *Trois-Rivières* Litigation constitute only one occurrence under the primary policies issued by American Home and AIG Canada would protect LCI from demands by those insurers for excessive security to guarantee repayment of their coverage obligations.

## THE PARTIES

7.      Plaintiff LCI is a Canadian corporation with its principal place of business at 6509 Airport Road, Mississauga, Ontario, L4V 1S7.  LCI formerly maintained its principal place of business at 606 Cathcart Street, Suite 800, Montreal, Québec H3B 1L7, where it was headquartered at all relevant times.  LCI is, and at all relevant times was, a wholly-owned subsidiary of plaintiff LNA; LCI and LNA are sometimes referred to collectively as "Lafarge."

8.      Plaintiff LNA is a Maryland corporation with its principal place of business at 8700 W. Bryn Mawr Ave., Suite 300, Chicago, Illinois, 60631.  LNA formerly maintained its principal place of business at 12950 Worldgate Dr., Suite 500, Herndon, Virginia 20170, where it was headquartered at all relevant times.

9.      Defendant American Home is a New York corporation with its principal place of business at 175 Water Street, 18th Floor, New York, New York 10038.  American Home sells contracts of insurance, is admitted to do business in this District, and does business in this District.

10.     Defendant AIG Canada, which was formerly known as Chartis Insurance Company of Canada, and prior to using that name was known as AIG Commercial Insurance Company of Canada, is a Canadian federally incorporated insurance company pursuant to the Insurance Companies Act (Canada) with its principal place of business at 120 Bremner Blvd., Suite 2200, Toronto, Ontario, Canada M5J 0A8.  AIG Canada sells contracts of insurance, is admitted to do business in Canada, and has consented to submit to the personal jurisdiction of this Court for purposes of this action in its Service of Suit clause in policy 20418478 issued to LCI.

3

11.     Defendant Lexington is a Delaware corporation with its principal place of business at 99 High Street, Floor 23, Boston, Massachusetts 02110.  Lexington sells contracts of insurance, is admitted to do business in this District, and does business in this District.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(3).  The amount in controversy exceeds $75,000, and there is complete diversity of citizenship among the American parties, with a foreign plaintiff (LCI) and a foreign defendant (AIG Canada) as additional parties.

13.     Defendants Lexington and American Home are subject to personal jurisdiction in this District and are deemed to reside in this District under 28 U.S.C. § 1391(c).  Defendant AIG Canada is subject to personal jurisdiction in this District pursuant to its Service of Suit clause. Venue in this District is proper under 28 U.S.C. § 1391 (b)(2).

## FACTS ENTITLING PLAINTIFF TO RELIEF

A.     **The *Trois-Rivières* Litigation**

14.     Between January 2012 and September 2015, LCI and Marie De Grosbois, a geologist employed by LCI, were named as defendants and third-party defendants – and continue to be the subject of proceedings attempting to implead them as third-party defendants – in the *Trois-Rivières* Litigation.  Ms. De Grosbois is a Canadian national.

15.     All conduct of Ms. De Grosbois alleged in the *Trois-Rivières* Litigation was within the scope of her work as an employee of LCI, and LCI is responsible for any liability of Ms. De Grosbois under the law governing that litigation.  In addition, LCI has agreed to indemnify Ms. De Grosbois for any such liability.  Accordingly, where this Complaint refers to claims against or liabilities or conduct of LCI in or relating to the *Trois-Rivières* Litigation against LCI, it refers to claims against or liabilities or conduct of LCI and/or Ms. De Grosbois.

16.     Although defendants in the *Trois-Rivières* Litigation other than LCI performed the construction and supplied the construction materials alleged to be defective, plaintiffs and third-party plaintiffs in the *Trois-Rivières* Litigation allege that LCI is liable for actions of these other defendants based on purportedly failing to warn of risks, failing to control a concrete-supplier defendant, and telling that particular defendant that locally-quarried materials were safe to mix into its concrete, as described in paragraphs 17 through 23.

17.     The *Trois-Rivières* Litigation comprises claims (the "Underlying Claims") asserted in over 160 separate lawsuits respecting over 1,800 residential and commercial buildings and concrete structures (the "Subject Buildings") in the region of Trois-Rivières, Québec.  The plaintiffs in the Underlying Claims, who are owners of Subject Buildings and their subrogees (the "Underlying Claimants"), allege that, between about 1994 and 2010, the Subject Buildings were constructed with defective concrete in foundations, retaining walls, and other structures.

18.     Concrete is generally produced by mixing cement, water, "aggregate," and, in some cases, other substances.  Cement, also known as Portland cement, is a powdery substance manufactured in commercial quantities in processing plants such as those owned and operated by LCI and its affiliates.  "Aggregate," in connection with concrete, often consists of sand, gravel, or crushed rock sourced from quarries.

19.     The Underlying Claimants allege that concrete in the Subject Buildings incorporated unsuitable aggregate sourced from a quarry in the Trois-Rivières region operated by Carrière B&B, Inc. ("B&B Quarry").  Generally, the Underlying Claimants allege that the B&B Quarry aggregate contained pyrite and/or pyrrhotite (sulfur-containing minerals) and that, as a result, the aggregate should not have been sold for use in concrete.  Specifically, they allege that such sulfur-containing constituents in aggregate trigger a gradual chemical reaction in concrete that is known to result, and may result, in gradual deterioration of concrete.

20.     The Underlying Claimants further allege that some Subject Buildings have already suffered property damage due to such alleged concrete deterioration and that other

5

Subject Buildings are damaged merely by incorporation of B&B Quarry aggregate in their concrete, regardless of whether concrete deterioration has been detected.

21.     Although LCI sold to one of the concrete supplier defendants, Béton Laurentide, Inc. ("Laurentide"), cement that is alleged to have been incorporated in defective concrete in some of the Subject Buildings, none of the Underlying Claimants has alleged that LCI's cement was defective in any way or that LCI is liable to them or others as a result of LCI's supplying cement incorporated in concrete used in the Subject Buildings.

22.     Instead, the Underlying Claimants allege grounds for the purported liability of LCI in the *Trois-Rivières* Litigation based on (a) a purported statement to Laurentide that it was safe to use B&B Quarry aggregate in concrete, (b) their purported failure to warn Laurentide and others of risks of using B&B Quarry aggregate in concrete, and (c) LCI's purported failure to exercise its alleged control over Laurentide to prevent Laurentide from using B&B Quarry aggregate in concrete.

23.     The damages asserted in the Underlying Claims vary among the Subject Buildings, but in general they range from approximately US$20,000 to US$200,000 per residential building and more for commercial structures.[1]   The total damages asserted by the Underlying Claimants may amount to hundreds of millions of dollars.

### 1.     First-Wave *Trois-Rivières* Proceedings

24.     Early in 2012, the court presiding over the *Trois-Rivières* Litigation (the "*Trois-Rivières* Court") consolidated proceedings for 70 of the most developed Underlying Claims. Termed the "first wave," these Underlying Claims were filed between 2007 and 2012 and concerned about 900 Subject Buildings.

---

[1]     This Complaint refers to monetary amounts in both Canadian and U.S. dollars and adopts the abbreviations C$ and US$ to distinguish between the two.  Where amounts are stated in both currencies, LCI has for both simplicity and convenience made the conversion at the hypothetical exchange rate of C$1.00 to US$0.80, which is roughly the exchange rate as of the date of this Complaint.

25.     Defendants in the first wave of Underlying Claims included (a) general contractors, (b) ready-mix concrete supplier Laurentide, which was 30% owned by LCI, (c) another ready-mix concrete supplier, Construction Yvan Boisvert Inc. ("Boisvert"), (d) other subcontractors to the general contractor defendants, (e) building developers, (f) B&B Quarry, which was owned equally by Laurentide and Boisvert and was a supplier of aggregate to both of them, and (g) SNC Lavalin Inc. ("SNC Lavalin"), which conducted assays of the mineral content of the B&B Quarry aggregate and reported to Laurentide on the suitability of B&B Quarry aggregate for use in concrete.  Neither LCI nor any of LCI's affiliates had been named as direct defendants in the Underlying Claims at the time of such consolidation of proceedings.

26.     Also in early 2012, Constructions Fré-Jean Inc., a defendant in certain Underlying Claims that had provided general contracting services to some of the Underlying Claimants, unsuccessfully sought to join LCI as a third-party defendant.  LCI obtained a dismissal of these third-party proceedings on the ground that its due process rights would be violated if it were forced to defend the first-wave claims in view of the advanced stage of the first-wave litigation, including the discovery conducted in their absence.

27.     The first-wave Underlying Claims were heard in a consolidated trial, resulting in a judgment rendered in two parts by Justice Richard of the *Trois-Rivières* Court against all first-wave defendants in June and November 2014 (both parts collectively, the "Richard Judgment").

28.     The Richard Judgment held all first-wave defendants liable in varying proportions for claims of the first-wave Underlying Claimants; the largest share of the liability was attributed to SNC Lavalin, which Justice Richard held liable for about 70% of the damages sustained by the first-wave Underlying Claimants.  In total, Justice Richard awarded damages in excess of C$168 million (about US$130 million).

29.     SNC Lavalin has appealed the judgment against it, as have all other defendants against which the Richard Judgment was rendered.

### 2.      SNC Lavalin's First-Wave Third-Party Claims Against LCI

30.      In October 2012, SNC Lavalin and its geologist Alain Blanchette (collectively. "SNC Lavalin" in this context) instituted litigation against LCI in the *Trois-Rivières* Court, separate from the consolidated first-wave proceedings, seeking to hold LCI liable in whole or in part for any liability that SNC Lavalin might face in connection with six individual first-wave Underlying Claims.  SNC Lavalin alleges that LCI, due to its own conduct, is liable to the Underlying Claimants and that some or all of the judgment against SNC Lavalin should be LCI's liability instead.

31.      In January 2015, two months after Justice Richard issued the last part of the Richard Judgment, SNC Lavalin commenced additional, similar proceedings in the *Trois-Rivières* Court against LCI, seeking to hold LCI liable in whole or in part for any amounts payable by SNC Lavalin with respect to all first-wave Underlying Claims not at issue in the claims previously asserted by SNC Lavalin against them.

32.      On information and belief, SNC Lavalin's damage claim against LCI, based on SNC Lavalin's first-wave liability, may be for as much as C$114 million, or about US$85 million.

33.      SNC Lavalin's third-party claims against LCI arising from the first-wave Underlying Claims remain pending before the *Trois-Rivières* Court and are the only third-party proceedings against LCI based on the pending first-wave Underlying Claims.

### 3.      Second-Wave *Trois-Rivières* Proceedings

34.      Proceedings concerning a so-called "second wave" of Underlying Claims — *i.e.*, the Underlying Claims not included in the first wave — are in their early stages, and LCI expects them to be administered by the *Trois-Rivières* Court on a consolidated basis.

35.      Between January and October 2015, LCI was named as a direct defendant by three of the second-wave Underlying Claimants, and LCI anticipates that it will be named as a direct defendant in other second-wave Underlying Claims.

36.     During the same period, LCI was named as a third-party defendant by other second-wave defendants, including SNC Lavalin (collectively, "Third-Party Plaintiffs"), with respect to the second-wave Underlying Claims for which such defendants may be liable.

  **4.**   **LCI's Potential Liability in Connection with the *Trois-Rivières* Litigation**

37.     LCI thus faces civil liability as a third-party defendant with respect to first-wave Underlying Claims and both as a direct and third-party defendant with respect to second-wave Underlying Claims.

38.     LCI has incurred and will continue to incur legal fees and other costs for its defense of the *Trois-Rivières* Litigation.

39.     LCI denies liability in connection with the *Trois-Rivières* Litigation, and LCI has not been found liable in any respect in connection with that Litigation; nor has LCI paid any judgment or entered any settlement with respect to any claim against it in that proceeding. Accordingly, LCI has not yet incurred "indemnity" costs (*i.e.*, payments for settlements and judgments) in connection with those proceedings.

40.     Given the conclusion of the Richard Judgment that property damage to the Subject Buildings occurs progressively from the date of pouring concrete to manifestation of damage, and given the findings in that judgment regarding those relevant dates, LCI anticipates that the vast majority of any claimed property damage that Underlying Claimants and Third-Party Plaintiffs (collectively "Claimants") might seek to attribute to LCI is likely to have occurred from about 2002 to 2012.

  **B.**   **The Umbrella Policies**

41.     For the period from 2004-12, Lafarge's true insurance coverage is provided by (a) Lexington, which issued and delivered nine umbrella general liability ("GL") policies to LCI's parent corporation, LNA, running for nine consecutive policy periods from April 1, 2004 to July 1, 2012 (the "Lexington Policies"), and (b) AIG Canada, which issued and delivered an umbrella

GL policy to LCI for the period July 1, 2011 to July 1, 2012 (the "AIG Canada Umbrella Policy") (collectively, the "Umbrella Policies").  Each Lexington Policy was issued for a one-year period except for the 2007-08 policy, which was issued for the 15-month period April 1, 2007 to July 1, 2008, subject to termination after three months on July 1, 2007 and renewal with a reinstatement of policy limits for the period July 1, 2007 to July 1, 2008.  The Umbrella Policies are identified in Exhibit A to this Complaint.

42.     In connection with coverage for Canadian claims such as those in the *Trois-Rivières* Litigation against LCI, each Umbrella Policy is subject to a self-insured retention of C$2 million (about US$1.6 million) of indemnity cost per occurrence.  In other words, C$2 million of indemnity cost must be incurred by LCI for a single occurrence before the Umbrella Policies become available to provide coverage for loss, so that self-insured retention functions essentially as an insurance deductible.

43.     Furthermore, as explained below, underlying the Umbrella policies are so-called "fronting" policies that ostensibly cover the self-insured amount but provide no real economic risk transfer.

44.     The Lexington Policies cover both LNA and its subsidiaries, including LCI, and the AIG Canada Umbrella Policy covers LCI.

45.     For purposes of this action, all relevant terms of the Umbrella Policies are substantially the same, except as to policy period and except as to the tie-in of limits of the final Lexington Policy and the AIG Canada Umbrella Policy, due to the unity of policy periods and policy limits provided in those two Umbrella Policies.

46.     In connection with coverage for Canadian claims, each Umbrella Policy applies to the portion of any loss arising from property damage during the policy period that (a) exceeds the Umbrella Policies' self-insured retention of C$2 million (about US$1.6 million) of indemnity cost per occurrence, (b) is a kind of loss for which the Umbrella Policies provide coverage, regardless of size of loss, and (c) does not exceed US$50 million of indemnity cost per occurrence in excess of self-insured retention.  The Umbrella Policies attach (for Canadian

claims) at the point that loss for an occurrence equals C$2 million (about US$1.6 million) in indemnity costs, without regard to (x) whether such loss may be covered under any underlying insurance, (y) whether any such loss has in fact been paid by underlying insurance, and (z) whether any underlying policy limit has been exhausted.

47.     The Umbrella Policies have been in full force and effect at all relevant times.

48.     LNA, on behalf of LCI, timely notified the Umbrella Insurers (which, for purposes of this Complaint, shall mean Lexington and AIG Canada, as issuer of the AIG Canada Umbrella Policy) of the claims asserted against LCI in the *Trois-Rivières* Litigation and has otherwise satisfied all conditions precedent to coverage under the Umbrella Policies for LCI's alleged liabilities in the *Trois-Rivières* Litigation, apart from the condition that an insured incur loss in the amount of C$2 million (about US$1.6 million) in indemnity cost for a single occurrence.

49.     The Umbrella Insurers have not accepted coverage for the *Trois-Rivières* Litigation claims under the Umbrella Policies and have instead reserved their rights to deny coverage for all such claims.

50.     As discussed in paragraphs 90 through 93, the Umbrella Insurers have failed to acknowledge that claims against LCI in the *Trois-Rivières* Litigation are covered under the Umbrella Policies.

51.     On information and belief, the Umbrella Insurers will deny coverage for LCI's losses in the *Trois-Rivières* Litigation under the Umbrella Policies, when and if LCI incurs such losses, although all such losses in excess of C$2 million (about US$1.6 million) in indemnity loss are covered under the Umbrella Policies, subject to policy limits.

52.     On information and belief, LCI and the Umbrella Insurers disagree as to the number of occurrences under the Umbrella Policies that the claims against LCI constitute.  As discussed in paragraphs 79 through 83 below, resolution of that issue in LCI's favor will ensure that coverage will be available to LCI under the Umbrella Policies.

C.      **The Primary Policies**

53.      As described in paragraph 42 above, for purposes of the coverage claims of LCI at issue in this action, the Umbrella Policies are subject to a self-insured retention of C$2 million (about US$1.6 million) of indemnity loss per occurrence.

54.      LCI is nominally insured under first-dollar primary GL insurance from insurers admitted in Canada in an amount equal to or in excess of the Umbrella Policies' self-insured retention for all relevant periods.  LCI entered into these primary insurance agreements for purposes of satisfying Canadian regulatory requirements and assuring LCI's Canadian customers and business partners of the availability of first-dollar GL insurance.  These policies are discussed below in paragraphs 59 through 64.

55.      Under this primary insurance and other agreements entered with the primary insurers, LCI is effectively self-insured.  In particular, losses paid under LCI's primary insurance are ultimately due to be paid either by Mountain Prairie or by LCI itself.

56.      Where the term "occurrence" is used in this Complaint in connection with one or more Umbrella Policies, it refers to the definition of that term in the corresponding Umbrella Policies, all of which have adopted the same definition.

57.      Where "occurrence" is used in this Complaint in connection with one or more of the Primary Policies (as defined below), it refers to the definition of that term in the Primary Policies, all of which have adopted the same definition.

58.      Although the definition of "occurrence" in the Umbrella Policies differs in some respects from the definition in the Primary Policies, as explained below, LCI seeks confirmation that, under either definition, the *Trois-Rivières* claims against LCI constitute a single occurrence.

1.      **American Home Policies and AIG Canada Primary Policies**

59.      For the period April 1, 2001 to July 1, 2008, LCI is nominally insured under seven Canadian primary GL insurance policies issued to LCI by American Home from its Canadian branch office (the "American Home Policies").  Each American Home primary policy

12

covers a one-year period except for the last one, which covers the 15-month period April 1, 2007 to July 1, 2008.  The limit of the American Home Policies applicable to property damage claims, such as those in the *Trois-Rivières* Litigation, varies with the policy period as follows:  the policies for the first three annual periods each have a limit of C$1 million (about US$800,000) per occurrence; the policy for the April 1, 2004 to April 1, 2005 period has a limit of C$2 million (about US$1.6 million) per occurrence; the limit of the next two American Home Policies is C$5 million (about US$4 million) per occurrence; and the final American Home Policy, which has a policy period of fifteen months, is C$5 million (about US$4 million) per occurrence for the first three month only, and the same amount for the final twelve-month period.  Although the American Home Policies cover both defense and indemnity costs, their limits are eroded only by indemnity payments.  The American Home Policies are identified in Exhibit A to this Complaint.

60.     For the period July 1, 2008 through July 1, 2012, LCI is nominally insured under four policies (the "AIG Canada Primary Policies") issued to LCI by AIG Canada.  The four AIG Canada Primary Policies  each provide coverage for one-year periods.  The limit of each AIG Canada Primary Policy is C$5 million (about US$4 million) of indemnity cost per occurrence through July 1, 2011 and is C$2 million (about US$1.6 million) of indemnity cost per occurrence for the final (2011-2012) AIG Canada Primary Policy.  Although the AIG Canada Primary Policies cover both defense and indemnity costs, their limits are eroded only by indemnity payments.

61.     Except for the identity of the issuers, the policy periods, and the policy limits as just described, for purposes of this action all relevant terms of the seven American Home Policies and four AIG Canada Primary Policies (collectively, the "Primary Policies") are substantially the same.  The policy periods of the Primary Policies are contiguous with the corresponding periods of the Umbrella Policies from 2004-12.

62.     The Primary Policies have been in full force and effect at all relevant times.

63.     Although LCI has real insurance coverage immediately excess to the three American Home Policies in force over the period April 1, 2001 through April 1, 2004, the issuers

of such excess coverage, which are foreign insurers, have not been named as defendants in this Complaint.  Nevertheless, the reasons stated in paragraph 94 for LCI seeking the relief demanded herein as to the 2004-12 Primary Policies are equally applicable to the three 2001-04 American Home Policies.

### 2. Fronting

64.    The Primary Policies constitute a so-called "fronting" program that provides no real economic risk transfer and instead shifts LCI's nominally insured losses from LCI to Mountain Prairie or reverts those losses back to LCI under a repayment obligation to the Primary Insurers (which, for the purposes of this Complaint, shall mean American Home and AIG Canada as issuers of the AIG Canada Primary Policies).  In particular, Mountain Prairie has agreed to reinsure, directly or indirectly, all insured risk under the Primary Policies under reinsurance certificates issued to the Primary Insurers (the "Reinsurance Certificates").  Moreover, LCI has entered into agreements (collectively, the "Payment Plan") with the Primary Insurers under which LCI has agreed to indemnify both Primary Insurers for any losses payable under the Primary Policies with respect to LCI or any other insured and to post security for its obligations under the Payment Plan.  In addition to paying all losses insured under the Primary Policies, LCI paid premiums, and pays administrative and other costs, to the Primary Insurers.

65.    On information and belief, the Primary Insurers intend to treat LCI's *Trois-Rivières* losses (including, but not limited to, any losses that the Primary Insurers may pay as direct action claims, as described in paragraphs 74 through 77) as so many separate occurrences under the Primary Policies that all or substantially all of LCI's potential losses would be absorbed by LCI or reinsured, directly or indirectly, by Mountain Prairie, notwithstanding that such losses should constitute one occurrence under both the Umbrella Policies and the Primary Policies.

66.    On information and belief, the Primary Insurers intend to treat LCI's *Trois-Rivières* losses as separate occurrences to benefit their fellow AIG subsidiary Lexington and to

benefit AIG Canada (as issuer of the AIG Canada Umbrella Policy). Specifically, if LCI's liability arising from each Subject Building is deemed a separate occurrence, all of LCI's damages will be absorbed in the primary fronting layer for which LCI (or Mountain Prairie) is ultimately liable, thus shielding the Umbrella Insurers, whose Umbrella Policies do not respond to occurrences involving indemnity costs below C$2 million (about US$1.6 million).

67.     Such treatment would deprive LCI of the benefit of the coverage under the Umbrella Policies that it purchased and furthermore could result in LCI being required to post excessive security to guarantee the repayment and reinsurance obligations of LCI and Mountain Prairie.

### 3.     LCI's Entitlement to Treat Its *Trois-Rivières* Losses as a Single Occurrence

68.     LCI has timely notified the Primary Insurers of the claims asserted against LCI in the *Trois-Rivières* Litigation and has otherwise satisfied all conditions precedent to coverage under the Primary Policies for LCI's alleged liabilities in the *Trois-Rivières* Litigation.

69.     On information and belief, the Primary Insurers regard LCI's liabilities in the *Trois-Rivières* Litigation as covered under the Primary Policies.

70.     As discussed in paragraphs 90 through 93, however, the Primary Insurers have failed to respond to Lafarge's request that they acknowledge that claims against LCI in the *Trois-Rivières* Litigation constitute a single occurrence under the Primary Policies.

71.     Although the definition of "occurrence" in the Umbrella Policies differs from the definition of that term in the Primary Policies, under either definition, the claims against LCI in the *Trois-Rivières* Litigation all constitute a single occurrence.

72.     Even if these *Trois-Rivières* claims are found to constitute a single occurrence under the Umbrella Policies, on information and belief the Primary Insurers would maintain that they are separate, small-value occurrences under the Primary Policies.

73.     LCI disagrees with the position on information and belief the Primary Insurers will take as to the number of occurrences under the Primary Policies. Although a primary layer

insurer such as American Home or AIG Canada would ordinarily take the position that the claims against LCI constitute a single occurrence so as to pass on responsibility for coverage to the excess insurers as quickly as possible, the Primary Insurers have no economic incentive to do so here given that their Primary Policies are mere fronting policies.  To the contrary, the Primary Insurers have an incentive to take a multi-occurrence position that works to the advantage of the Umbrella Insurers, their sister AIG companies.  As discussed in paragraphs 84 through 89 below, resolution of the number of occurrences issue in LCI's favor would substantially protect LCI and its affiliate Mountain Prairie from the risks of the Primary Insurers parceling direct action claims in the *Trois-Rivières* Litigation into occurrences sufficiently small so as to be susceptible of diversion, directly or indirectly, to LCI and Mountain Prairie.  Moreover, such a determination would protect LCI from demands by the Primary Insurers for excessive security to guarantee repayment of their coverage obligations under the Primary Policies.

### D.    Potential Direct Action Claims in the *Trois-Rivières* Litigation

74.    In a direct action, a plaintiff may bypass collection from the defendant and may instead collect directly from the defendant's insurer(s).

75.    Although in most U.S. jurisdictions, a claimant against an insured defendant does not have a right to file a direct action against the defendant's insurer, Québec applies a different rule:  Section 2501 of the Québec Civil Code provides that an injured person may bring an action directly against the insured or against the insurer or against both.

76.    The *Trois-Rivières* Litigation creates the prospect of direct action by the Underlying Claimants against LCI's Canadian-admitted insurers, which are subject to personal jurisdiction in Québec, including both of the Primary Insurers, American Home and AIG Canada.  Indeed, the first-wave Underlying Claimants all asserted direct actions against the insurers of the first-wave defendants as part of the consolidated first-wave proceedings.

77.    Moreover, even if this Court were to  conclude that the *Trois-Rivières* claims constitute a single occurrence under the Umbrella Policies, if such claims were asserted as direct

action claims against the Primary Insurers under the Primary Policies, and collected from those insurers, in the absence of a single-occurrence ruling with respect to the Primary Policies, the Primary Insurers might divert LCI's losses from the Umbrella Insurers and toward Mountain Prairie and LCI itself, as described above in paragraphs 65 through 67. On information and belief, the Umbrella Insurers would deny that such diverted losses are covered losses under the Umbrella Policies, and accordingly they would deny LCI the coverage to which it is entitled under the Umbrella Policies.

### E.     Interplay between Self-Insurance with Umbrella Policies

78.     Solely for purposes of illustrating the interplay of the self-insurance with the Umbrella Policies and the critical role of the number of occurrences in the Umbrella Policies and the Primary Policies, this paragraph describes three hypothetical examples based on an assumed indemnity loss of C$10 million (about US$8 million) paid by LCI and covered by the 2004-05 American Home and Lexington Policies.

a)     First, if the hypothetical loss were treated as a single occurrence under both policies, ultimately Lexington would bear C$8 million (about US$6.4 million) of the indemnity loss and either LCI or Mountain Prairie would ultimately bear C$2 million (about US$1.6 million) of the indemnity loss, one or the other having reimbursed American Home directly or indirectly for its C$2 million share.

b)     Second, if the hypothetical indemnity loss were treated as five occurrences of C$2 million under each policy, C$2 million of each occurrence would be payable by American Home, which presumably would seek to recover all such amounts under either the Reinsurance Certificates or the Payment Plan, so that LCI or Mountain Prairie would ultimately bear the entire C$10 million loss.

c)     Third, and finally, if the hypothetical loss were to arise from claims asserted as direct actions against the Primary Policies, and if they should properly be classified as a single occurrence under the Lexington Policy, but American Home is

17

permitted to treat it as five separate occurrences of C$2 million each under the primary

policy, thereby ultimately diverting the loss to Mountain Prairie under the Reinsurance

Certificates or to LCI under the Payment Plan, American Home might avoid or delay any

recovery from that Lexington Policy, thereby denying LCI the benefits under the

Lexington Policies for which LNA paid.

**F.   Significance of Number of Occurrences Under the Umbrella Policies**

79.   Determining the number of occurrences that the claims against LCI in the *Trois-Rivières* Litigation constitute in LCI's favor would ensure that coverage will be available to LCI under the Umbrella Policies for such claims.

80.   Although the damages associated with any single Subject Building are likely to be less than C$2 million (about US$1.6 million) in most or all instances, LCI anticipates that, collectively, the damages associated with all Subject Buildings may amount to US$200 million or more.

81.   Moreover, as set forth in paragraph 32 above, although the damages associated with SNC Lavalin's claims against LCI with respect to first-wave Underlying Claims alone may be as much as about US$85 million, on information and belief, the Umbrella Insurers will unilaterally disaggregate these claims into separate occurrences for each Subject Building or propose another method of determining number of occurrences to parcel out LCI's losses into a large number of occurrences, the value for each of which is small relative to the self-insured retention of the Umbrella Policies.

82.   Because the attachment point of each of the Umbrella Policies is C$2 million (about US$1.6 million) per occurrence, unless the SNC Lavalin claims are deemed, and unless many or all other Underlying Claims are deemed, to be part of one and the same single occurrence under the Umbrella Policies, much, if not all, of LCI's loss may never be eligible for coverage under the Umbrella Policies due to a failure to satisfy the self-insured retention for those Policies.  Indeed, to pick the worst-case scenario for LCI, if each of the Subject Buildings

were deemed to constitute its own occurrence, and the SNC Lavalin claims were disaggregated into separate occurrences for each Subject Building, LCI might be unable to recover any losses from the *Trois-Rivières* Litigation from the Umbrella Policies which, as described above, provide the only true risk-transferring insurance to LCI from April 1, 2004 to July 1, 2012 (other than higher-layer excess insurance, not at issue in this action, which becomes available only after exhaustion of one or more Umbrella Policies).

83.     Although Lafarge submits that all claims against LCI in the *Trois-Rivières* Litigation constitute a single occurrence under the Umbrella Policies, on information and belief the Umbrella Insurers intend to and will in fact deny that the claims against LCI constitute a single occurrence.

### G.     Significance of Number of Occurrences Under the Primary Policies

84.     Determining the number of occurrences constituted by the claims against LCI in LCI's favor would substantially protect LCI and its affiliate Mountain Prairie from the risks of the Primary Insurers parceling direct action claims in the *Trois-Rivières* Litigation into occurrences sufficiently small so as to be susceptible of diversion, directly or indirectly, to LCI and Mountain Prairie.  Moreover, such a determination would protect LCI from demands by the Primary Insurers for excessive security to guarantee repayment of their coverage obligations under the Primary Policies.

85.     Although the damages associated with any single Subject Building are likely to be less than C$2 million (about US$1.6 million) in most or all instances, LCI anticipates that, collectively, the damages associated with all Subject Buildings may amount to US$200 million or more.

86.     Moreover, as set forth in paragraph 32 above, although the damages associated with SNC Lavalin's claims against LCI with respect to first-wave Underlying Claims alone may be as much as US$85 million, the Primary Insurers might unilaterally disaggregate these claims into separate occurrences for each Subject Building.

87.    Because the limit of each of the Primary  Policies is either C$1 million, C$2 million, or C$5 million per occurrence, unless the SNC Lavalin claims are deemed, and unless many or all other Underlying Claims are deemed, to be part of one and the same single occurrence under the Primary Policies, as a result of the anticipated direct action claims in the *Trois-Rivières* Litigation, the Primary Insurers might be able to divert all or substantially all of LCI's losses to Mountain Prairie and/or LCI under the Reinsurance Certificates and the Payment Plan.  Indeed, to pick the worst-case scenario for LCI, if each of the Subject Buildings were deemed to constitute its own occurrence, the SNC Lavalin claims were disaggregated into separate occurrences for each Subject Building, and the Claimants all were to file and succeed in their direct action claims against the Primary Insurers, the Primary Insurers would be able to divert substantially all of LCI's losses under the *Trois-Rivières* Litigation to Mountain Prairie and/or LCI under the Reinsurance Certificates and the Payment Plan.

88.    On information and belief, if circumstances permit, the Primary Insurers would seek to divert such losses, if any, to Mountain Prairie and/or LCI in an attempt to preclude or impede recovery from the policies issued by their affiliates, the Umbrella Insurers.

89.    Although Lafarge submits that all claims against LCI in the *Trois-Rivières* Litigation constitute a single occurrence under the Primary Policies, on information and belief the Primary Insurers intend to and will in fact deny that the claims against LCI constitute a single occurrence to divert such losses from its affiliates, the Umbrella Insurers, and to Mountain Prairie and/or LCI.

### H.    This Dispute

90.    By letters dated February 8, 2012, February 22, 2013, February 9, 2015, and November 2, 2015, the defendants acknowledged notice of the *Trois-Rivières* claims, asserted that they were reviewing the matter, and reserved all rights, including the right to deny coverage for the Trois-Rivières claims, under the Umbrella Policies.  Copies of the first three of these letters are attached as Exhibits B-D.

91.     By transmittal dated September 4, 2015, Lafarge informed its insurers, including all defendants herein, that the Underlying Claimants had asked LCI if it would consider participating in a global settlement of the *Trois-Rivières* Litigation.

92.     Following that transmittal, on October 9, 2015, Lafarge wrote the three defendants herein and asked that they provide a position on coverage and number of occurrences for liability arising from the *Trois-Rivières* Litigation under the Umbrella Policies and the Primary Policies.  Specifically, Lafarge asked the defendants to acknowledge that the claims against LCI in the *Trois-Rivières* Litigation would be covered, and would constitute one occurrence, under those policies.  A copy of this letter is attached as Exhibit E.

93.     On November 2, 2015, the three defendants responded with a letter declining to take a position on coverage for the *Trois-Rivières* Litigation.  Specifically, the letter concludes: "the Company reserves all rights, including the right to deny coverage for this claim under the above policies."  Moreover, the defendants' letter requests that Lafarge supply voluminous materials of types that imply that the defendant insurers are directing their efforts to finding excuses for denying or delaying coverage for LCI rather than engaging in a bona fide consideration of coverage for the *Trois-Rivières* Litigation.

94.     Resolution of these issues in LCI's favor would largely determine the insurance under the Umbrella Policies available to LCI to help fund any settlement of the *Trois-Rivières* Litigation and diminish the ability of the Primary Insurers (a) to divert losses from the Umbrella Insurers and toward LCI and Mountain Prairie and (b) to require excessive security from LCI to guarantee the obligations of LCI and Mountain Prairie under the Payment Plan and the Reinsurance Certificates.

95.     In the absence of an affirmative coverage determination by the three defendants and a favorable statement of their position on number of occurrences, LCI has no choice but to initiate this lawsuit.

## COUNT I

## DECLARATORY JUDGMENT
### (Umbrella Policies)

96.     The information and allegations set forth in paragraphs 1 through 95 above are incorporated as though fully set forth herein.

97.     An actual controversy of a justiciable nature exists between LCI and Lexington and AIG Canada regarding whether, and to what extent, the Umbrella Policies provide coverage for LCI's alleged liabilities in the *Trois-Rivières* Litigation.

98.     LCI is entitled to a declaration that:

a)      Each Umbrella Policy provides coverage to LCI for all claims against LCI in the *Trois-Rivières* Litigation arising from property damage that occurred during the period of such policy, subject only to the attachment point and applicable limit of such policy.

b)      Once LCI incurs an indemnity loss of C$2 million in the *Trois-Rivières* Litigation that triggers the period of an Umbrella Policy, coverage under such Umbrella Policy attaches with respect to all subsequent *Trois-Rivières* loss triggering such period up to the limit of such Umbrella Policy.

c)      Coverage for loss under the Umbrella Policies is not dependent upon exhaustion of any of the Primary Policies.

d)      Coverage for claims against LCI in the *Trois-Rivières* Litigation under the Umbrella Policies is not affected by any determination of the number of "occurrences" under the underlying Primary Policies.  All such loss arises from a single "occurrence" for purposes of the Umbrella Policies.

22

## COUNT II

## DECLARATORY JUDGMENT
### (Primary Policies)

99.     The information and allegations set forth in paragraphs 1 through 98 above are incorporated as though fully set forth herein.

100.    An actual controversy of a justiciable nature exists between LCI, American Home and AIG Canada regarding the number of "occurrences" that the liabilities of LCI in the *Trois-Rivières* Litigation constitute under the Primary Policies.

101.    LCI is entitled to a declaration that any and all claims against LCI in the *Trois-Rivières* Litigation constitute one and the same "occurrence" under the Primary Policies and that each Primary Policy provides coverage to LCI for all claims against LCI in the *Trois-Rivières* Litigation arising from property damage that occurred during the period of such policy, subject only to the applicable limit of such policy.

## PRAYER FOR RELIEF

WHEREFORE, LCI respectfully requests that this Court enter judgment:

A.      Granting all declarations to which LCI is entitled as alleged above;

B.      Awarding LCI court costs and legal fees and expenses incurred in bringing this action; and

C.      Awarding such other and further relief as this Court deems just and proper.

New York, New York
November 13, 2015

COVINGTON & BURLING LLP

By _____
Bert Wells
Neil K. Roman

The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
bwells@cov.com
nroman@cov.com

*Counsel for Plaintiffs Lafarge Canada Inc. and
Lafarge North America, Inc.*