UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————x
:
LAFARGE CANADA INC. and LAFARGE :
NORTH AMERICA INC., :
:
               Plaintiffs, :
:
              v. :    15-CV-8957 (RA)
:
AMERICAN HOME ASSURANCE COMPANY, :
AIG INSURANCE COMPANY OF CANADA, :
and LEXINGTON INSURANCE COMPANY, :
:
       Defendants. :
:
———————————————————x

# DECLARATION OF OLIVIER THERRIEN

1. I am a partner at the law firm of Gowling WLG (Canada) LLP. I work in Montreal and have been a member of the Bar of the Province of Quebec since 1999.

<u>The Trois-Rivières Litigation</u>

2. Since 2011, I have served as one of the two lead counsels for Lafarge Canada Inc. ("LCI") and its former employee Marie de Grosbois in connection with lawsuits brought before the courts of Quebec by owners of properties situated in or near the City of Trois-Rivières, Quebec, as well as by their assignees (the "*Trois-Rivières* Litigation").

3. The claims at issue in the *Trois-Rivières* Litigation seek compensation for alleged damage to and loss of use of residential and commercial buildings or to other concrete structures.

4. The buildings and structures at issue in the *Trois-Rivières* Litigation allegedly involved use of concrete in which aggregate sourced from B&B Quarry, located near Trois-Rivières ("B&B Quarry"), was a component.

5. The *Trois-Rivières* Litigation plaintiffs allege that loads of aggregate from B&B Quarry contain concentrations of the mineral pyrrhotite, which can damage, and has damaged, the concrete in their buildings and structures.

6. Property owners first began reporting alleged concrete defects in the Trois-Rivières region due to pyrrhotite in aggregate sourced from the B&B Quarry in approximately 2008, and they began filing claims in the *Trois-Rivières* Litigation in 2009.

7. In 2001, B&B Quarry came to be co-owned by concrete suppliers Béton Laurentide ("Laurentide") and Construction Yvan Boisvert. From a date shortly thereafter, Laurentide incorporated B&B Quarry aggregate into concrete for structures in the Trois-Rivières region; Construction Yvan Boisvert had been doing the same from a date years earlier. These suppliers contend that they have not since approximately 2008 been using aggregate sourced from B&B Quarry to produce concrete.

8. Approximately 240 separate lawsuits have been filed in the *Trois-Rivières* Litigation by property owners and their assignees, covering approximately 1,400 buildings and structures in the Trois-Rivières region.

9. The defendants in these cases are general contractors, concrete suppliers, B&B Quarry, and others, including, as described below, LCI.

10. In addition, because Quebec is a "direct action" jurisdiction, in which principal plaintiffs can sue the defendants' insurers directly, the plaintiffs have sued the insurers of most of the defendants except the insurers of LCI.

11. Plaintiffs in the *Trois-Rivières* Litigation have generally alleged that the property damage is sufficiently severe that the foundations of the buildings or the other concrete structures must be replaced.

2

12. That means, typically, for single-family homes, that the occupants have generally been forced to move out while contractors lift the home, demolish the foundation, pour a new foundation, and reassemble the home and foundation.

13. For larger multi-family dwellings and commercial buildings, more intricate and expensive repair and replacement methods have been applied or may be required.

14. The *Trois-Rivières* Litigation is of intense public interest in Quebec as a result of the social and economic implications affecting not only the community of Trois Rivieres, but also parts of the Mauricie regional administrative district. Governmental bodies have had to intervene financially to help property owners while they await final determination by the courts.

15. The Quebec court has consolidated the TR Claims into two "waves."

16. In 2012, the Quebec court consolidated the initial lawsuits that were ready for trial into a "first wave" and conducted a hearing limited to those claims. LCI was not a party to that hearing.

17. The court is consolidating all other claims, including subsequent claims, into a "second wave."

18. LCI was initially named as a third party defendant in six cases that were not determined by the first wave judgment and subsequently in more cases as a principal defendant and third party defendant.

19. Other than LCI, no other Lafarge entity, including Lafarge North America, has been named as a party in the *Trois-Rivières* Litigation.

20. LCI's insurers have not been sued in the *Trois-Rivières* Litigation.

3

The First Wave

21. Trial of the first-wave cases resulted in a judgment, rendered in June 2014, of approximately C$168 million ("First Wave Judgment"). The First Wave Judgment, translated into English, is attached as Exhibit 1.

22. The First Wave Judgment is on appeal.

23. The First Wave Judgment apportioned liability among the defendants on a percentage basis.

24. The largest share was allocated to SNC Lavalin, a firm that allegedly tested B&B Quarry aggregate between 2003 and 2007 and certified periodically over that period that the aggregate was suitable for use in concrete. Specifically, Lavalin was apportioned approximately 70% of the liability, or approximately C$114 million. Lavalin's share could increase because of the expected insolvency or insufficiency of insurance of other defendants. Moreover, post-judgment interest has begun to accrue.

25. In December 2014, Lavalin sued LCI for contribution and alleged that LCI should be held liable for all or part of the award against Lavalin. Attached as Exhibit 2 is a memorandum to Lafarge's insurers dated February 19, 2015 that my firm prepared and that included my firm's translation into English of SNC Lavalin's contribution claim against LCI. The allegations concerning LCI's allegedly unlawful conduct are representative of the allegations against LCI in all other lawsuits in which LCI has been named as a third party defendant by Lavalin.

26. Lavalin's first-wave contribution claim against LCI is still pending in the Trois-Rivières court and constitutes a significant portion of all the claims in the Trois-Rivières Litigation pending against LCI ("TR Claims").

4

27. LCI's potential liability to Lavalin with respect to the first-wave litigation is an undetermined share of Lavalin's total liability.

28. LCI has been incurring substantial legal fees and costs for its defense of Lavalin's contribution claim.

29. LCI maintains that it is not liable to Lavalin, and LCI has not been subject to any judgment or entered any settlement with Lavalin.

The Second Wave

30. In the second wave, LCI has been named as direct defendant by approximately 33 underlying property owners or their assignees for damage to and loss of use of their properties and as a third-party defendant in contribution claims brought by Lavalin and other defendants.

31. Attached as Exhibit 3 is a memorandum to Lafarge's insurers dated May 21, 2015 that my firm prepared and that included my firm's translation into English of claims in which LCI has been named as a direct defendant. The allegations concerning LCI's allegedly unlawful conduct are representative of the allegations against LCI in all other lawsuits in which LCI has been named as a direct defendant.

32. LCI has not been subject to any judgment or entered any settlement in the second wave and maintains that it is not liable.

33. LCI has been incurring substantial legal fees and costs for its defense of these second-wave claims.

34. 

5

35. Second wave lawsuits are in preliminary stages and continue to be filed. No trial date has been set.

36. I understand that the policy periods of the insurance policies at issue in this action run from April 1 to the following April 1 for the six years from 2001 to 2007; from April 1, 2007 to July 1, 2007; and from July 1 to the following July 1 for the five years from 2007 to 2012. For each of these policy periods, there are one or more properties subject to a TR Claim for which the period from the date of pouring of concrete for the property to the date of manifestation of damage at the property overlaps with the policy period by at least one day.

Nature of Allegations Against LCI

37. None of the claims against LCI or Ms. de Grosbois in the *Trois-Rivières* Litigation alleges that LCI's cement, or any other product manufactured or supplied by LCI, was defective or contributed to property damage.

38. Instead, the TR Claims allege that LCI and Ms. de Grosbois erroneously informed Laurentide that B&B Quarry aggregates were suitable for use in concrete, that they failed to warn Laurentide and others that such aggregates were not suitable for use in concrete, and that they otherwise failed to prevent Laurentide and others from using B&B Quarry aggregates.

39. The grounds for LCI's alleged joint and several liability include the following allegations:

- In February 2002, Laurentide was provided with a one-page chemical analysis spreadsheet by a Lafarge representative and the following day a representative of Laurentide spoke by telephone with Marie de Grosbois of Lafarge. The statements of claims are alleging that Ms. de Grosbois would have assured Laurentide that the aggregate was suitable for use in concrete.

- In May 2002, after having received an independent expert's report characterizing the B&B Quarry aggregate as being similar to aggregate from another nearby quarry as to which issues had been raised, the statements of claims contend that Laurentide faxed the report to LCI with a request for a position in light of LCI's February 2002 communications about aggregate chemical composition. The statements of claims

6

contend that LCI never responded to the fax, and thereafter continuously failed to warn about B&B Quarry aggregate notwithstanding allegedly having knowledge of the contents of the report.

- After agreeing in September 2005 to perform a technical comparison of B&B Quarry aggregate samples with samples from a nearby quarry known to cause concrete defects, the statement of claims alleges that LCI negligently delayed (until early 2006) warning Laurentide that continued use of B&B Quarry aggregate was risky.

- After determining that continued use of B&B Quarry aggregate was risky, notwithstanding an alleged power to control Laurentide, the statement of claims alleges that LCI failed to cause Laurentide to cease use of the aggregate.

- After determining that continued use of B&B Quarry aggregate was risky, the statement of claims alleges Laurentide failed to warn all parties that might be involved in use of such aggregate.

40. LCI disputes these allegations and maintains that it not liable for any of the TR Claims.

41. In addition, despite the fact that LCI warned Laurentide about the risks of using B&B Quarry aggregates in 2006, Laurentide and Construction Yvan Boisvert continued using the aggregates for approximately two years.

7

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 8, 2017 in Montreal, Quebec, Canada.

_____
Oliver Therrien