UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————x
                              :

LAFARGE CANADA INC. and LAFARGE    :
NORTH AMERICA INC.,               :
                              :
                Plaintiffs,    :
                              :
                  v.        :    15-CV-8957 (RA)
                              :

AMERICAN HOME ASSURANCE COMPANY, :
AIG INSURANCE COMPANY OF CANADA,  :
and LEXINGTON INSURANCE COMPANY,   :
                              :
         Defendants.       :
                              :
————————————————x

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE EXPERTS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...................................................................................................... iv

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF THE CASE ..................................................................................................... 3

    A.    The TR Claims ........................................................................................... 3

    B.    Lafarge's Involvement In The TR Claims ............................................ 4

    C.    The *Trois-Rivières* Litigation .............................................................. 5

        1.    The First Wave ............................................................................ 5

        2.    The Second Wave ....................................................................... 6

    D.    The General Liability Insurance Policies That AIG Issued To Lafarge ................ 6

        1.    The Primary Policies .................................................................. 6

        2.    The Umbrella Policies ................................................................ 7

    E.    AIG's Response To LCI's Coverage Claims ....................................... 9

ARGUMENT .............................................................................................................................. 9

I.    UNDER NEW YORK CHOICE OF LAW RULES, QUEBEC SUBSTANTIVE LAW GOVERNS ALL POLICIES AT ISSUE. ................................................. 9

    A.    In A Single-Policy Coverage Dispute, The Governing Substantive Law Is That Of The Jurisdiction In Which The Owner Of The Policy Is Headquartered. ................................................................................ 10

    B.    In Multi-Liability Insurance Policy Coverage Actions, New York Courts Apply The Substantive Law Of Only One Jurisdiction. ...................... 11

    C.    Quebec Substantive Law Should Apply To All Policies. ..................... 14

II.     LAFARGE IS ENTITLED TO COVERAGE UNDER ALL AIG POLICIES FOR
        THE TR CLAIMS..................................................................................................... 15

        A.      The TR Claims Arise From Continuous And Progressive Property
                Damage, Which Triggers Every Policy In The Trigger Period. .......................... 15

                1.      ███████████████████████████████████
                        ████████████████.................................................................... 15

                2.      ███████████████████████████████████████
                        ██████............................................................................................. 17

        B.      The TR Claims Constitute A Single Occurrence. ................................................. 17

                1.      The TR Claims Constitute a Single Occurrence Under the
                        Umbrella Policies. ...................................................................................... 17

                        a)      The Number of of Plaintiffs and Alleged Incidents, Acts or
                                Omissions in the TR Claims Do Not Affect the Number of
                                Occurrences.................................................................................... 19

                        b)      Quebec, Like Almost All U.S. States, Looks to Cause of
                                the Damage to Determine Number of Occurrences. ...................... 21

                2.      The TR Claims Constitute a Single Occurrence under the Primary
                        Policies. ...................................................................................................... 24

        C.      Lafarge Is Entitled To Coverage For Each TR Claim Under Each *Primary
                Policy* In The Trigger Period. ........................................................................... 26

        D.      Lafarge Is Entitled To Coverage For Each TR Claim Under Each
                *Umbrella Policy* In The Trigger Period For Which Lafarge Has Satisfied
                The Retained Limit. .......................................................................................... 28

                1.      Lafarge's Exposure to Liability for any TR Claim Satisfies All
                        Conditions for Coverage Under Each Umbrella Policy in the
                        Trigger Period for Which the Retained Limit Is Satisfied. ....................... 28

                2.      Because the TR Claims Constitute A Single Occurrence, the
                        Umbrella Policies Apply When Lafarge Pays C$2 Million of
                        Indemnity Costs for TR Claims. ............................................................... 30

E.   The Amount Of Coverage That Each Policy Provides Is Based On The Amounts Of Loss For And The Trigger Periods Of The TR Claims, Subject Only to the Policy Limits. ............................................................ 32

    1.   Lafarge Is Entitled to Recover Indemnity and Defense Costs for TR Claims From Primary Policies in the Trigger Period. ...................... 33

        a)   Lafarge Is Entitled to Recover Defense Costs for a TR Claim from any Primary Policy in the Trigger Period ................ 33

        b)   Lafarge Is Entitled to Recover Indemnity Costs from Primary Policies by Spreading Such Expenses Evenly Among All Policy Periods in the Trigger Period. ....................... 34

    2.   LCI Is Entitled to Recover Costs for TR Claims from Umbrella Policies in the Trigger Period for Which the Retained Limit Is Satisfied. ................................................................................................ 35

        a)   LCI Is Entitled to Recover Indemnity Costs for a TR Claim from Umbrella Policies by Telescoping Such Expenses. ............. 36

        b)   LCI Is Entitled to Recover the Same Proportion of Defense Costs from Primary and Umbrella Policies As the Damages Demanded in the TR Claims Would Be Allocated between Primary and Umbrella Policies. ................................................... 37

    3.   Policy Limits Are Eroded by Insurer Payments According to Rules Set Forth in the Policies and Quebec Law. ............................................... 39

        a)   Policy Limits Are Eroded Only by Insurer Payment of Principal Settlement Amounts or Principal Judgment Amounts. ....................................................................................... 39

        b)   The Limit of Any Primary Policy Is Eroded When Any Amounts Are Paid for TR Claim Settlements and Judgments under Any Primary Policy. ......................................... 40

III.   AIG'S EXPERT REPORTS SHOULD BE STRICKEN. ................................................. 43

  A.   The Ahearn And Monteleone Reports Are Untimely. ........................................... 45

  B.   The Monteleone Report Is Not A Rebuttal Report. ............................................... 46

  C.   Mr. Monteleone's Opinions Are Improper. ........................................................... 47

    1.   Opinions about Custom and Practice Are Irrelevant. ................................ 48

    2.   Legal Opinions Are Inadmissible. ............................................................. 49

CONCLUSION .................................................................................................... 50

ATTACHMENT A ............................................................................................... 52

ATTACHMENT B ............................................................................................... 53

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16582 Canada Inc. v. Zurich du Canada Compagnie d'Indemnite* ...............................................22

*In re Allstate Ins. Co. (Stolarz),*
    81 N.Y.2d 219 (1993) ...........................................................................................10

*Appalachian Ins. Co. v. General Elec. Co.,*
    867 N.Y.S.2d 372, 2008 WL 2840354 (Sup. Ct. 2008)..........................................11

*Associated Indem. Corp. v. Dow Chemical Co.,*
    814 F. Supp. 613 (E.D. Mich. 1993).................................................................23, 24

*B... C... v. Canada Vie Compagnie d'Assurance* (Can. Que. Super. Ct.) ...................................48

*Bakalar v. Vavra,*
    851 F. Supp. 2d 489 (S.D.N.Y. 2011)..................................................................45

*Canadian National Railway Co. v. Chartis Ins. Co.*
    *of Canada,* 2013 QCCA 1271 (Can. Que. C.A.)..................................................39

*Certain Underwriters at Lloyd's v. Foster Wheeler Corp.,*
    36 A.D.3d 17 (1st Dep't 2006), *aff'd,* 9 N.Y.3d 928 (2007) ................................10, 11, 12, 13

*Chemstar, Inc. v. Liberty Mutual Insurance Co.,*
    41 F.3d 429 (9th Cir. 1994) ..............................................................................23, 24

*Comité Paritaire de L'industrie Des Services Automobiles De La Région de*
    *Montréal (CPA Montréal) v. Compagnie*
    *canadienne d'assurances générales Lombard,* 2014 QCCS 1747 (Can. Que.
    Super. Ct.)..........................................................................................................22

*Continental Ins. Co. v. Dalton Cartage Co.,*
    [1982] 1 SCR 164 (Can.) ..................................................................................25, 43

*Deguise v. Montminy,*
    2014 QCCS 2672 (Can. Que. Super. Ct. Jun 12, 2014) (appeal pending)...................... *passim*

*Design Strategy, Inc. v. Davis,*
    469 F.3d 284 (2d Cir. 2006)..............................................................................46

*Dorsey v. Yantambwe,*
    276 A.D.2d 108 (4th Dep't 2000) .......................................................................10

*Dragas Mgmt. Corp. v. Hanover Ins. Co.*,
   798 F. Supp. 2d 758 (E.D. Va. 2011) ...................................................................23

*Early v. State Farm Mut. Auto. Ins. Co.*,
   73 Va. Cir. 400 (Va. Cir. Ct. 2007).....................................................................23

*Eli Lilly & Co. v. Novopharm Ltd.*,
   [1998] 2 S.C.R. 129 (Can.) ................................................................................48

*Family Ins. Corp. v. Lombard Canada Ltd.*,
   [2002] 2 S.C.R. 695 (Can.) ................................................................................34

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*,
   822 F.3d 620 (2d Cir. 2016)............................................................................9, 11

*Hercules, Inc. v. AIU Ins. Co.*,
   784 A.2d 481 (Del. 2001) ...................................................................................35

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992)................................................................................49

*J.H. France Refractories Co. v. Allstate Ins. Co.*,
   626 A.2d 502 (Pa. 1993) .....................................................................................35

*Jimenez v. Monadnock Const., Inc.*,
   109 A.D.3d 514 (2d Dep't 2013) .........................................................................11

*Keene Corp. v. Insurance Co. of N. Am.*,
   667 F.2d 1034 (D.C. Cir. 1981) ..........................................................................35

*La prévoyance, compagnie d'assurance v. La Commission scolaire catholique de
   Montréal*, 1990, Nº AZ-900011211 (Can. Que. C.A.) ...........................................37

*In re Liquidation of Midland Ins. Co.*,
   16 N.Y.3d 536 (2011) ...................................................................................10, 11

*In re Liquidation of Midland Ins. Co.*,
   269 A.D.2d 50 (1st Dep't 2000) ..........................................................................42

*Marx & Co. v. Diners' Club, Inc.*,
   550 F.2d 505 (2d Cir. 1977)................................................................................49

*Md. Cas. Co. v. Continental Cas. Co.*,
   332 F.3d 145 (2d Cir. 2003)................................................................................12

*O-I Brockway Glass Container, Inc. v. Liberty Mut. Ins. Co.*,
   No. 90-2797, 1994 WL 910935 (D.N.J. Feb. 10, 1994) .......................................42

vi

*Osborne v. National Union Fire Ins. Co.*,
   465 S.E.2d 835 (Va. 1996)...................................................................................37, 39

*QBE Ins. Corp. v. Adjo Contracting Corp.*,
   121 A.D.3d 1064 (2d Dep't 2014) .............................................................................11

*Reid Crowther & Partners Ltd.* v. *Simcoe & Erie General Insurance Co.*,
   [1993] 1 SCR 252 (Can.) ...........................................................................................29

*Sabean v. Portage La Prairie Mut. Ins. Co.*, 2017 SCC 7 (Can.)....................................20

*S.E.C. v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................................49

*S. Ins. Co. of Virginia v. Williams*,
   561 S.E.2d 730 (Va. 2002).........................................................................................48

*Schwartz v. Liberty Mut. Ins. Co.*,
   539 F.3d 135 (2d Cir. 2008)........................................................................................11

*Softel, Inc. v. Dragon Med. & Sci Commc'ns, Inc.*,
   118 F.3d 955 (2d Cir. 1997)..................................................................................45, 46

*State of Cal. v. Continental Ins. Co.*,
   145 Cal. Rptr. 3d 1 (2012) .........................................................................................35

*Superstition Crushing v. Travelers Cas. and Sur. Co. of America*,
   360 F. App'x 844 (9th Cir. 2009) ...............................................................................42

*Title Ins. Co. of Richmond v. Howell*,
   164 S.E. 387 (Va. 1932).............................................................................................48

*Travelers du Canada v. Les Entreprises Cotenor Ltee*,
   1978 N° AZ-78011049 (Can. Que. C.A.) ..................................................................22

*Travelers Indem. Co. v. Obenshain*,
   245 S.E.2d 247 (Va. 1978)..........................................................................................38

*U.S. Fid. & Guar. Co. v. Cont'l Ins. Co.*,
   No. CV-04-29-BLG-RFC, 2010 WL 4102250 (D. Mont. Oct. 18, 2010) ................35

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991)...............................................................................49, 50

*United States v. Scop*,
   846 F.2d 135 (2d Cir.), *rehears on other grounds*, 856 F.2d 5 (2d Cir. 1988) .......49

*Matter of Viking Pump*,
   27 N.Y.3d 244 (2016) ......................................................................................35, 41, 42

*Weyerhaeuser Co. v. Commercial Union Ins. Co.*,
    15 P.3d 115 (Wash. 2000)...........................................................................................35

*Wills v. Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004).........................................................................................45

**Statutes**

Quebec Civil Code § 2503 ...............................................................................33, 37, 39

Quebec Civil Code § 2504 ...............................................................................................39

**Other Authorities**

Fed. R. Civ. P. 26(a)(2)...............................................................................................43, 44, 45

Fed. R. Civ. P. 37(c)(1).................................................................................................45, 46

Merriam-Webster Dictionary (2017), https://www.merriam-
    webster.com/dictionary/expose...............................................................................20

Rule 704 .........................................................................................................................49

PRELIMINARY STATEMENT

In this action, Lafarge Canada Inc. ("LCI") seeks a declaration that the defendant liability insurers, each an AIG company, provide coverage to LCI for mass tort litigation in the province of Quebec, Canada alleging property damage to concrete building foundations caused by the mineral pyrrhotite (the "*Trois-Rivières* Litigation").

Consistent with this Court's Order dated May 5, 2017 and the Order of Magistrate Judge Peck dated May 25, 2017, LCI and its corporate parent, Lafarge North America Inc. ("LNA" and, collectively with LCI, "Lafarge"), move:

1. for a ruling that Quebec substantive law governs interpretation of primary and umbrella general liability insurance policies that the defendant insurers ("AIG") issued to Lafarge (Section I below);

2. for summary judgment that AIG owes a duty to defend and indemnify Lafarge against the underlying mass tort litigation (the "TR Claims") (Section II below); and

3. to strike the reports of AIG's two proposed experts and exclude those witnesses from testifying at trial (Section III below).

(1)     In diversity actions like this one, the Court applies the choice-of-law rules of the forum, New York.  For liability insurance disputes, New York courts apply the substantive law of the jurisdiction of the named policyholder's headquarters.  The complication in this instance is that there were two headquarter jurisdictions during the relevant period:  (a) *Quebec*, home to LCI, to which fourteen of the policies were issued, and (b) *Virginia*, home to LNA, to which nine of the policies were issued, but which is participating in this action solely to assert LCI's rights to coverage under those policies as LNA's subsidiary, and not as the covered policyholder.

New York precedent also counsels that only one jurisdiction's substantive law should apply in a multi-policy dispute like this one, and because Quebec is the "center of gravity" of this dispute, Quebec substantive law should govern interpretation of all policies at issue.

(2)     Lafarge's motion for summary judgment addresses two issues: (a) the conditions

under which the AIG primary and umbrella policies (the "Policies") are obligated to respond to the TR Claims (*i.e.*, what "triggers" coverage) and (b) the amount of LCI's covered losses arising from the TR Claims, including defense costs, that the triggered Policies must cover (*i.e.*, allocation).

The most unusual aspect of this coverage action is the atypical function served by LCI's Primary Policies, twelve consecutive policies covering the period April 1, 2001 to July 1, 2012 issued by two AIG companies, defendants American Home Assurance Company ("American Home") and AIG Insurance Company of Canada ("AIG Canada"). Although the Primary Policies apply to the first dollar of loss, they provide no true risk transfer. Rather, all amounts AIG pays claimants or LCI under the Primary Policies are fully reimbursed to AIG by Lafarge affiliates under reinsurance and indemnity agreements, an arrangement known in commercial insurance as "fronting." LCI obtained the Primary Policies, which have limits ranging from C$1 million to C$5 million,[1] to satisfy Canadian statutory obligations as well as LCI's contractual promises to counterparties, which required LCI to obtain "first dollar" liability insurance coverage.

In contrast, the Umbrella Policies, eleven policies issued by AIG Canada and defendant Lexington Insurance Company ("Lexington"), covering the shorter period April 1, 2004 to July 1, 2012, provide for true risk transfer to AIG. To ensure that the fronting Primary Policies do not impede LCI's access to that transfer, each Umbrella Policy begins providing coverage once LCI has paid C$2 million of loss, exclusive of defense costs, of the type covered by the Policy (the "retained limit"). The Umbrella Policies for which this retained limit has been satisfied must then pay for the TR Claims, regardless of whether any Primary Policy limits are exhausted.

---

[1]      This memorandum refers to the Canadian and American currencies as "C$" and "US$."

(3)      Lafarge moves to strike AIG's expert reports because both reports were served almost seven weeks late – they address an AIG affirmative defense and therefore should have been served when affirmative, not rebuttal, expert reports were due under this Court's Scheduling Order – and because the opinions in one of them, the report of insurance company lawyer Joseph Monteleone, are neither rebuttal nor the proper subject of expert testimony.

## STATEMENT OF THE CASE

### A.      The TR Claims

Since 2009, hundreds of property owners in the Trois-Rivières region of Quebec have brought suit in local courts of the province seeking compensation for alleged property damage to residential and commercial buildings with concrete foundations or other concrete structures that incorporated aggregates sourced from the nearby B&B Quarry.  Lafarge's Statement of Undisputed Material Facts ("Stmt.") ¶¶ 8, 11.  Aggregates consist of crushed rock, gravel, or sand, which are added to a mixture of cement and water (and sometimes other additives) to produce concrete.  Stmt. ¶¶ 12, 13.

Beginning in 2008, Trois-Rivières property owners reported defects in concrete attributable to excessive concentrations of an iron sulfide mineral known as pyrrhotite in loads of B&B Quarry aggregate.  Stmt. ¶ 7. This property damage – structural deterioration caused by excessive cracking and disintegration of concrete – provides the basis for the *Trois-Rivières Litigation*, including the TR Claims (*i.e.*, those claims asserted against LCI).  ████████████

████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

███████████████████████████████████

██████████████████████████████████████████ Stmt.

¶¶ 23, 41. 

Stmt. ¶¶ 22, 24-25.

Stmt. ¶ 23.

Stmt.

¶¶ 23, 30.  As property owners discover damage, they are bringing new claims, including new TR Claims.  Stmt. ¶ 74.

For many of the buildings at issue, the claimed property damage is sufficiently severe that the foundations (or other concrete structures) must be replaced.  Stmt. ¶ 42.  That means, typically, for single-family homes, that occupants move out while contractors lift the home, demolish the foundation, pour a new foundation, and reassemble the home and foundation.  Stmt. ¶ 43.  For larger multi-family dwellings and commercial buildings, more intricate and expensive repair and replacement methods are necessary.  Stmt. ¶ 44.



Stmt. ¶ 45.

Stmt. ¶¶ 27, 46.

### B.    Lafarge's Involvement In The TR Claims

Although LCI sold cement used in the concrete at issue in some TR Claims, Stmt. ¶¶ 34, 36, no TR Claim alleges that LCI's cement, or any other product manufactured or supplied by Lafarge, was defective or contributed to property damage, Stmt. ¶ 36.

Instead, the TR Claims allege, among other things, that LCI and one of its former

employees, Marie de Grosbois, erroneously informed a concrete supplier, Béton Laurentide, that

B&B Quarry aggregates were suitable for use in concrete, that they failed to warn Laurentide and

others that such aggregates were not suitable for use in concrete, and that they could have

prevented, but failed to prevent, Laurentide and others from using B&B Quarry aggregates.

Stmt. ¶¶ 47-49.

C.    The *Trois-Rivières* Litigation

Property owners in the Trois-Rivières area and their assignees have filed approximately

240 separate actions, relating to approximately 1,400 buildings, against general contractors,

concrete suppliers (including Laurentide), the B&B Quarry, SNC Lavalin (which had tested

B&B Quarry aggregate for Laurentide from 2003 to 2007 and periodically certified that the

aggregate was suitable for use in concrete), and others seeking compensation because of property

damage allegedly arising from excessive concentrations of pyrrhotite in aggregate.  Stmt. ¶¶ 9,

56.  In addition, because Quebec is a "direct action" jurisdiction, in which plaintiffs can sue

defendants' insurers directly, plaintiff property owners have sued the insurers of most defendants

(although they have not yet sued LCI's insurers).  Stmt. ¶ 57.

The Quebec court divided the *Trois-Rivières* Litigation into two "waves."  Stmt. ¶¶ 58,

72.  In 2012, the court consolidated the initial lawsuits deemed trial-ready into a "first wave" and

conducted hearings limited to those claims (to which Lafarge was not a party).  Stmt. ¶¶ 58, 60.

The court is consolidating all other claims into a "second wave."  Stmt. ¶ 72.

1.    The First Wave

Trial of the first-wave cases resulted in a judgment, rendered in June 2014, of

approximately C$168 million, apportioned among the defendants.  Stmt. ¶ 59.  Most important,

the court apportioned approximately 70 percent (or about C$114 million) of that judgment to

Lavalin.  Stmt. ¶ 62.  The judgment against Lavalin could increase as a result of expected

insolvency or insufficiency of insurance of other judgment debtors.  Stmt. ¶ 64.  Moreover, post-judgment interest has begun to accrue.  Stmt. ¶ 65.

Lavalin sued LCI for contribution, alleging that LCI is jointly and severally liable for all or part of the award against Lavalin, but no other first-wave defendants have sued Lafarge for contribution to this judgment.  Stmt. ¶ 66.  Lavalin's first-wave contribution claims against LCI are still pending in the Trois-Rivières court and constitute a significant portion of the damages at issue in the TR Claims against LCI.  Stmt. ¶¶ 67-68.  LCI has incurred and will continue to incur legal fees and costs for its defense of Lavalin's first-wave contribution claims, even though LCI has not been subject to any judgment or entered into any settlement and maintains that it is not liable.  Stmt. ¶¶ 70-71.

### 2.    The Second Wave

In the second wave, Lafarge has been named both as a direct defendant by approximately 33 property owners for damage to and loss of use of their properties and as a third-party defendant in contribution claims brought by Lavalin and other defendants.  Stmt. ¶ 73.  The second-wave litigation is in its preliminary stages, and second-wave lawsuits, including contribution claims by Lavalin and other co-defendants, continue to be filed against LCI.  Stmt. ¶ 77.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

LCI has been incurring legal fees and costs for its defense of these second-wave claims, even though LCI maintains that it is not liable.  Stmt. ¶¶ 75-76.

### D.    The General Liability Insurance Policies That AIG Issued To Lafarge

### 1.    The Primary Policies

Although the twelve AIG Primary Policies are fronting policies that do not provide real

risk transfer,[2] each provides coverage for LCI's liability arising from property damage caused by an "occurrence."  Stmt. ¶¶ 109-10.  In particular, the applicable insurers agreed to pay "*all sums* which the Insured shall become obligated to pay by reason of the liability imposed upon the Insured by law . . . because of . . . [i]njury to, destruction or loss of tangible property or any loss of use of property caused by an occurrence hereinafter defined."  Stmt. ¶ 109 (emphasis added). No exclusion in the Primary Policies limits LCI coverage for the TR Claims.  Stmt. ¶ 115.

The limits of the Primary Policies range from C$1 million to C$5 million, depending on policy period, as summarized in Attachment A.  Stmt. ¶ 113.  Those limits are further restricted by a "non-accumulation" provision in each Primary Policy, under which erosion of the limits of *any* Primary Policy by payment of a TR Claim equally erodes the limits of *all other* Primary Policies, as described in Section II.E.3.b below.  *Id.*

## 2.      The Umbrella Policies

The Umbrella Policies protect against liability risks in excess of a stated "retained limit," which is Lafarge's maximum exposure for those risks:  C$2 million in the case of LCI and US$2 million in the case of LNA.  Stmt. ¶ 124.  Because the TR Claims are asserted against LCI and not LNA, the only applicable retained limit is C$2 million.  Stmt. ¶ 96.

AIG Canada issued Umbrella Policies directly to LCI in Quebec for two policy periods: April 1, 2004 through April 1, 2005 (in the amount of US$3 million) and July 1, 2011 through July 1, 2012 (in the amount of US$50 million).  Stmt. ¶ 82.

LCI also is an insured under LNA's Umbrella Policies for those two years, *i.e.*, the two

---

[2]      The first eight Primary Policies, covering the period April 1, 2001 to July 1, 2008, were issued by the Canadian branch of defendant American Home, and the subsequent four Primary Policies, covering the period July 1, 2008 to July 1, 2012, were issued by defendant AIG Canada. Stmt. ¶ 115.  Effective November 1, 2008, all American Home Primary Policies were novated to AIG Canada and thus are also enforceable by LCI against AIG Canada.  Stmt. ¶ 132.

Umbrella Policies issued by defendant Lexington for those periods, each of which is worded substantially identically to the concurrent AIG Canada Umbrella Policies, except that the Lexington Umbrella Policies in those years have limits of US$50 million.  Stmt. ¶¶ 83, 88.

Besides overlapping in time, LCI's concurrent policies partially overlap in limits:  AIG's payments to LCI under the AIG Canada Umbrella Policies also reduce the limits of the Lexington Umbrella Policies.  As a result, for example, the limit of the 2011-12 AIG umbrella coverage combined is US$50 million, not US$100 million.

Between those two policy periods (*i.e.*, April 1, 2005 through July 1, 2011) LCI's umbrella coverage at issue in this action is provided only by Lexington.[3]  Stmt. ¶ 80.  These Lexington Policies also have limits of US$50 million each.  Stmt. ¶ 88.  Attachment B summarizes the limits and periods of the Lexington and AIG Canada Umbrella Policies.

The relevant terms of all Umbrella Policies as they apply to the TR Claims are materially the same.  Each policy provides insurance for any loss arising from "property damage" "occurring during the policy period" upon satisfaction of a C$2 million retained limit for the occurrence, up to the applicable policy limit and subject to policy exclusions.  Stmt. ¶ 87.  "Property damage" is defined to include "physical injury to tangible property, including all resulting loss of use of that property."  Stmt. ¶ 91.  "Occurring during the policy period" is defined – counterintiutively – to include property damage that starts in and continues after the policy period, as explained in Section II.D.2 below.

Throughout the 2001-12 period, LNA and LCI obtained additional umbrella coverage under which LCI is insured, but all that coverage is excess to the Policies described and would

---

[3]     LCI purchased umbrella liability coverage between April 1, 2001 and April 1, 2004, but it was provided by non-AIG insurers and thus is not part of this action.  That coverage has its own requirements for becoming available which are outside the scope of this memorandum.

become available only after the limits of the AIG Umbrella Policies are "exhausted." *See* n.3; Stmt. ¶¶ 100-01.

### E.   AIG's Response To LCI's Coverage Claims

On November 15, 2011, Lafarge provided notice of potential TR Claims against LCI to its insurers, including AIG, but AIG has refused to provide a defense for or agreed to indemnify LCI. Stmt. ¶¶ 118-19. Notably, before filing this declaratory judgment action, Lafarge asked AIG to confirm that the Umbrella Policies cover LCI's potential liability in the *Trois-Rivières* Litigation. [4] AIG declined to provide such confirmation, contending, among other things, that the so-called "professional services" and "expected or intended" exclusions in the Umbrella Policies apply to LCI's claims and bar coverage. Stmt. ¶¶ 122-23.

## ARGUMENT

### I.   UNDER NEW YORK CHOICE OF LAW RULES, QUEBEC SUBSTANTIVE LAW GOVERNS ALL POLICIES AT ISSUE.

Because none of the Policies contains a choice of law provision, the Court must first address the law that governs this diversity case. To do that, the Court "must apply the choice of law rules of the forum state," New York. *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016) (internal quotation marks and citation omitted).

As discussed below, New York's choice-of-law rules require application of the substantive law of Quebec to this dispute.

---

[4]      Stmt. ¶ 121 (letter dated October 9, 2015 from John Shelonko, LNA's Vice President, Risk Management, to Melody Mahla of AIG Claims, asking AIG to "acknowledge that the allegations against Lafarge and its employee, Marie [d]e Grosbois, in the Trois-Rivières litigation, if proven or compromised, would be covered under the [AIG] policies . . . and that the actions against Lafarge and Ms. [d]e Grosbois would be part of a single occurrence under those policies").

A.   **In A Single-Policy Coverage Dispute, The Governing Substantive Law Is That Of The Jurisdiction In Which The Owner Of The Policy Is Headquartered.**

When, as is the case with the Policies at issue here, a liability insurance policy covers risks in multiple jurisdictions, New York requires that the jurisdiction in which the insured was domiciled at the time the policy was issued "be regarded as a proxy for the principal location of the insured risk" and, accordingly, the jurisdiction that is the source of the controlling substantive law. *Certain Underwriters at Lloyd's v. Foster Wheeler Corp.*, 36 A.D.3d 17, 24 (1st Dep't 2006), *aff'd*, 9 N.Y.3d 928 (2007) ("where the insured risk is scattered throughout multiple states, [New York] courts . . . deem the risk to be located principally . . . in the state of the insured's domicile[5] at the time the policy was issued") (internal quotation marks and citation omitted)).  That is because "[t]he state of the insured's domicile is a fact known to the parties at the time of contracting, and . . . application of the law of that state is most likely to conform to their expectations." *Id.* at 23.

More generally, in conflict of laws analysis in contract cases, New York applies the "center of gravity" or "grouping of contacts" theory to determine which law applies.  *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226 (1993).  This approach aims to give "the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation."  *In re Liquidation of Midland Ins. Co.*, 16 N.Y.3d 536, 543-44 (2011) (internal quotation marks and citation omitted).  Where, as here, the contract is a liability insurance contract, the jurisdiction with the greatest interest in

---

[5]     "The domicile of a corporation for choice-of-law purposes is the State where it maintains its principal place of business." *Dorsey v. Yantambwe*, 276 A.D.2d 108, 111 (4th Dep't 2000).

the dispute is generally the one "which the parties understood was to be the principal location of the insured risk unless with respect to the particular issue, some other jurisdiction has a more significant relationship." *Id.* at 544 (internal quotation marks, alterations, and citation omitted).[6]

Here, because the Primary and Umbrella Policies cover risks in multiple jurisdictions – indeed, they both provide worldwide coverage, Stmt. ¶¶ 93, 111-12, 118 – the law that governs interpretation of the Primary and Umbrella Policies is, at least presumptively, that of the domicile of the first-named insureds (LCI and LNA, depending on the policy) when the policy was issued. *Id.*[7] There are no contacts with any other jurisdiction that provide a basis for rejecting this presumption.

### B.   In Multi-Liability Insurance Policy Coverage Actions, New York Courts Apply The Substantive Law Of Only One Jurisdiction.

Although LCI and LNA were headquartered in different jurisdictions, New York courts do not apply different laws to different insurance policies in one program and all in a single coverage dispute and, instead, select the law of a single jurisdiction to apply across the board to all policies. *See Appalachian Ins. Co. v. General Elec. Co.*, 867 N.Y.S.2d 372, 2008 WL 2840354, at *5 (Sup. Ct. 2008) (in cases involving application of multiple insurance policies, it is

---

[6]       In addition to the place of the insured's domicile, "the spectrum of significant contacts . . . may be considered," including "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." *Fireman's Fund*, 822 F.3d at 642; *see also Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 152 (2d Cir. 2008) ("location of the insured risk" and principal place of business were arguably California, but New York law applied because of other factors).

[7]       *See also, e.g.*, *In re Liquidation of Midland Ins. Co.*, 16 N.Y.3d at 544 (examining *Foster Wheeler*); *QBE Ins. Corp. v. Adjo Contracting Corp.*, 121 A.D.3d 1064, 1078 (2d Dep't 2014) ("Because the subject policy covered risks in multiple states, and because Erie's and Penn National's named insured was domiciled in Pennsylvania, it is appropriate to apply that state's law."); *Jimenez v. Monadnock Const., Inc.*, 109 A.D.3d 514, 517 (2d Dep't 2013) ("New Jersey, as the state of [insured's] domicile, was properly regarded as a proxy for the principal location of the risks insured under the policy").

"well-established" that court should apply law of the "one [jurisdiction] with the most significant contacts to the dispute"); *see also Md. Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 163 (2d Cir. 2003) (affirming district court decision to apply single state's law in multiple-policy case involving sites in multiple states).

This action presents compelling circumstances for application of the substantive law of a single jurisdiction because there are at least two inconsistencies that would result from application of both Quebec law and the law of Virginia, the only other potentially applicable jurisdiction under *Foster Wheeler* and its progeny. The first is that it would result in different interpretations of identical policy language in the two pairs of concurrent Umbrella Policies according to whether the policy was issued in Quebec or Virginia. The second is creation of an untenable gap in LCI's coverage for defense costs arising from a conflict between Virginia and Quebec law.

The first inconsistency arises from the existence of the two pairs of Umbrella Policies issued in Virginia and Quebec in the policy periods 2004-05 and 2011-12, which have nearly identical wording. If the Court were to apply Quebec law to policies issued to LCI in Quebec and Virginia law to policies issued to LNA in Virginia, it would be forced to order enforcement of identical contract language in concurrent policies with overlapping limits in different ways.[8]

---

[8]     The substantive law of Virginia and Quebec differ in at least four ways that relate to this action. First, they differ as to allocation of defense costs between primary and umbrella policies, as discussed in the following text. Second, they differ as to whether payment of pre-judgment or post-judgment interest reduces (erodes) policy limits (Quebec law prohibits such erosion, regardless of policy language), as explained in Section II.E.3.a below. Third, they differ regarding allocation of losses among policies across time periods when the policies are silent as to allocation (Quebec applies equitable contribution, whereas Virginia has no settled law), as addressed in Section II.E.1.b. Fourth, and finally, Virginia and Quebec law differ in how the professional services exclusion and one or more other exclusions asserted by AIG are interpreted, a matter that Lafarge anticipates will be addressed in AIG's memorandum in support of its motion for summary judgment and in Lafarge's memorandum in opposition to that motion.

For example, as to the 2004-05 Umbrella Policies, LCI anticipates electing to recover any losses under the AIG Canada Umbrella Policy first, until the US$3 million limit of that Policy becomes exhausted, at which point LCI would direct its claims to the Lexington Umbrella Policy, a policy that has identical coverage wording but that would be subject to materially different, Virginia-based interpretation of that wording.

New York choice-of-law jurisprudence in the liability insurance context favors application of one law only precisely to avoid such inconsistencies. *Foster Wheeler*, 822 N.Y.S.2d at 30 ("making the insured's domicile the primary factor in selecting applicable law minimizes the likelihood that contemporaneous policies will be deemed governed by the laws of different states"). This challenge in implementing the Court's ultimate order would be magnified when trying to accommodate the erratic alternation of applicable law from 2004 to 2012 between Quebec law and Virginia law as claims are allocated across the coverage program.

A second inconsistency would arise from the jurisdictions' different approaches to allocation of defense costs as between primary and umbrella policies. Under Quebec law, defense costs are allocated in proportion to the amount of damages *demanded* by plaintiffs and are apportioned between primary and umbrella policies; because of the amount of damages demanded in the TR Claims, Quebec law would allocate the lion's share of defense costs to Umbrella Policies. Virginia has no such rule of allocation between primary and umbrella policies and, at least as AIG interprets Virginia law, little or none of the defense costs would be allocated to the Umbrella Policies.

Thus, if Quebec law were to apply to the LCI Policies and Virginia law to the LNA Policies, LCI could suffer the worst of all possible worlds – minimal allocation of defense costs to Primary Policies (under Quebec law) and minimal allocation of defense costs to the Lexington

Umbrella Policies (under Virginia law). The result would be allocation of less than 100% defense costs to LCI's coverage, whereas either substantive law, applied *uniformly*, would allocate 100% of defense costs among the Policies. Under a mixed-law interpretation, the availability of the Umbrella Policies would paradoxically subtract from overall defense coverage – more insurance should never result in less coverage.

####    C.    Quebec Substantive Law Should Apply To All Policies.

Because the laws of Quebec and Virginia conflict, and because Quebec is the "center of gravity" of this case, the law applied here should be that of Quebec. That province is the location of the underlying *Trois-Rivières* Litigation, where all of LCI's alleged conduct giving rise to potential liability took place, where all the defective concrete at issue was poured, and where the claimed property damage occurred. Moreover, the *Trois-Rivières* Litigation is the subject of intense public interest in Quebec not only in the community of Trois-Rivières, but also parts of the Mauricie regional administrative district, because of the displacement and financial harm caused by the property damage (among other things, the government has intervened to help property owners while they await final determination by the courts). Stmt. ¶¶ 54-55. Equally important, Quebec was the domicile of LCI throughout the period that all the Policies were issued; LCI was issued all twelve of the Primary Policies and two of the Umbrella Policies as the first-named insured, is a "named insured" under all nine other Umbrella Policies (*i.e.*, the Lexington Policies), and is the only Lafarge insured that has been sued in the *Trois-Rivières* Litigation. Stmt. ¶¶ 1, 5, 35, 83, 105, 112.

LNA, by contrast, faces no liability in the *Trois-Rivières* Litigation and has no involvement in the underlying TR Claims separate and apart from its interest in LCI as corporate parent. That LNA was domiciled in Virginia, and some Umbrella Policies were delivered to LNA there, simply cannot outweigh the fact that Quebec litigation involving Quebec-based

14

conduct and a Quebec-based company (LCI) is at the heart of this dispute.  Stmt. ¶ 3.

## II.   LAFARGE IS ENTITLED TO COVERAGE UNDER ALL AIG POLICIES FOR THE TR CLAIMS.

### A.   The TR Claims Arise From Continuous And Progressive Property Damage, Which Triggers Every Policy In The Trigger Period.

When property damage is continuous or progressive, Quebec has applied what is often called a "continuous trigger" of liability insurance coverage, that is, each liability insurance policy in effect on or after the beginning of the property damage is triggered.  *Deguise v. Montminy*, 2014 QCCS 2672, at ¶¶ 1917-1934 (Can. Que. Super. Ct. Jun 12, 2014) (appeal pending).[9]  As discussed below, the TR Claims involve continuous or progressive property damage, thus requiring all Primary and Umbrella Policies to respond to the TR Claims.



1.

Stmt. ¶ 33.  AIG has not contested this aspect of Dr. Thomas's opinions.

Stmt. ¶ 14.  As oxidation continues and more byproducts are formed, cracks and other visible manifestations of harm may appear and worsen.  Stmt. ¶ 15.

---

[9]     Although this case is part of the *Trois-Rivières* Litigation, because Lafarge was not a party to that case, Lafarge cites it here solely as a statement of Quebec law and not for any factual findings that the court made in that litigation.

One of the principal byproducts of oxidation of pyrrhotite is sulfuric acid, which gives rise to chemical reactions in concrete known collectively as "internal sulfate attacks," which likewise result in formation of deleterious chemical byproducts.  Stmt. ¶¶ 16-18.  These byproducts may cause concrete to crack, expand, or lose cohesion.  Stmt. ¶ 20.  Higher concentrations and/or larger quantities of these minerals cause greater degrees of concrete damage.  *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Stmt. ¶ 21.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Stmt. ¶ 22. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Stmt. ¶ 23.  More oxidation – and thus damage – occurs when pyrrhotite concentrations are high or the concrete has greater exposure to water and oxygen.  Stmt. ¶ 24. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Stmt. ¶¶ 25-26.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Stmt. ¶ 28. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ Stmt. ¶ 29. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

For these reasons, insured property damage begins on the date that concrete is poured and continues until the date that the loss of the structure becomes manifest and recognized.  Because

occurrence of such damage is a prerequisite to triggering a liability insurance policy in force at that time, the "trigger period" for a TR Claim refers to the period from the pour date through the date of manifestation of damage.



2.

Stmt. ¶¶ 33, 42-43.

Stmt. ¶ 33.

Stmt. ¶ 31.

Stmt. ¶ 32.  If damage manifests to the degree that replacement or abandonment of the concrete structure is necessary, as a practical matter, the property damage is complete, although other losses resulting from that property damage may later accrue, such as relocation costs and loss of use.

Stmt. ¶ 31.

**B.     The TR Claims Constitute A Single Occurrence.**

    **1.     The TR Claims Constitute a Single Occurrence Under the Umbrella Policies.**

All TR Claims against LCI arise out of a single occurrence:  LCI's allegedly culpable failure to prevent use of aggregate from the B&B Quarry in the construction of the underlying

17

plaintiffs' homes and other structures. This conclusion follows both from the plain language of the Umbrella Policies and from Quebec court decisions.

The Umbrella Policies not only define an "occurrence," but also provide rules for counting occurrences based on the number of "general harmful conditions" giving rise to plaintiffs' injuries:

> **Occurrence** means:
>
> 1.    as respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**.

Stmt. ¶ 99; *see, e.g.*, Roman Decl. Ex. 14 at LEX00000765 (boldface in original). The defining term "accident" expressly includes exposure to harmful conditions that are "continuous or repeated" – in other words, that *recur* over time, and the Policies provide that all such recurring exposures constitute a single occurrence.

Here, use of pyrrhotite-rich B&B Quarry aggregate in concrete constituted "substantially the same general harmful conditions" to which the TR Claim plaintiffs' properties were repeatedly exposed from 2002 to 2008. Indeed, that exposure was ongoing before any TR Claim alleges LCI's first involvement: Laurentide became co-owner of B&B Quarry in 2001, and beginning shortly thereafter incorporated B&B Quarry aggregate in concrete for structures in the Trois-Rivières region; Construction Yvan Boisvert ("Boisvert"), Laurentide's co-owner of B&B Quarry had been doing the same from a date years earlier. Stmt. ¶¶ 38-41. This use therefore preceded LCI's testing of that aggregate in 2002, and Laurentide and Boisvert continued using B&B Quarry aggregate in concrete for more than two years after LCI warned Laurentide about the risks of doing so in 2006. Stmt. ¶¶ 41, 52. LCI's potential liability springs from its alleged capacity to have disrupted that operational routine and its allegedly culpable failure to have done

18

so.  Use of aggregate from B&B Quarry in concrete – and LCI's failure to prevent such use –

occurred continuously and repeatedly and presented the same general risk of harm to structures

throughout the relevant period.

> **a)      The Number of Plaintiffs and Alleged Incidents, Acts or Omissions in the TR Claims Do Not Affect the Number of Occurrences.**

Although other factors or considerations might be held out as purported grounds for a

finding of multiple occurrences, none justifies such a finding.

First, the multiplicity of TR Claims or TR Claim plaintiffs does not mandate a finding of

multiple occurrences:  The "each Occurrence" limit of liability applies "regardless of the number

of . . . claims made or **Suits** brought . . . [or] persons or organizations making claims or bringing

**Suits**."  Stmt. ¶ 101; *see, e.g.*, Roman Decl. Ex. 14 at LEX00000747 (Paragraph IV.A.).

Moreover, no requirement for a single claim, suit, or plaintiff appears in the definition of

"Occurrence."

Second, allegations in the TR Claims of incidents in which LCI allegedly had an

opportunity to affect Laurentide's continuing use of B&B Quarry aggregate would not imply

multiple occurrences even if those stratagems ultimately succeed in establishing Lafarge's

liability in the underlying litigation.  These incidents are alleged as grounds for LCI's liability for

the consequences of Laurentide and Boisvert's use of B&B Quarry aggregate.  In other words,

they constitute purported proof that LCI should pay for all plaintiffs' exposure to aggregate from

the same problematic source.

More broadly, these incidents are not themselves the harmful conditions to which the

underlying plaintiffs or their property were exposed.[10]  None of the alleged incidents directly

involved the damaged property or property owners.  There is no allegation that LCI

misrepresented any fact to the parties who suffered property damage.  Nor were any of these

alleged incidents even known to any of those underlying plaintiffs before discovery in the first-

wave litigation.  Plaintiffs cannot have been "exposed" to matters unknown and unknowable to

them at the time damage to their property occurred.[11]  Nor do contribution claims brought

against LCI by co-defendants in the *Trois-Rivières* Litigation make LCI any less remote from the

_____

[10]     The grounds for LCI's alleged joint and several liability with the concrete producers for the TR Claims include the following *allegations*:

- In February 2002, Lafarge sent a one-page readout of an aggregate chemical composition analysis of B&B Quarry aggregate to Laurentide and the following day Ms. De Grosbois spoke by telephone with a Laurentide representative about it, assuring him that the aggregate was suitable for use in concrete.

- In May 2002, after having received an independent expert's report characterizing the B&B Quarry aggregate as being similar to aggregate from a quarry as to which issues had been raised, Laurentide faxed the report to LCI with a request for reaction in light of LCI's February 2002 communications about aggregate chemical composition.  LCI never responded to the fax, and thereafter continuously failed to warn about B&B Quarry aggregate notwithstanding having knowledge of the contents of the report.

- After agreeing in November 2005 to perform a technical comparison of B&B Quarry aggregate samples with samples from a nearby quarry known to cause concrete defects, LCI negligently delayed (until early 2006) warning Laurentide that continued use of B&B Quarry aggregate was risky.

- After determining that continued use of B&B Quarry aggregate was risky, notwithstanding an alleged power to control Laurentide, LCI failed to cause Laurentide to cease use of the aggregate.

- After determining that continued use of B&B Quarry aggregate was risky, Laurentide failed to warn all parties that might be involved in use of such aggregate.

[11]     The dictionary definition of "expose" is "to submit or make accessible to a particular action or influence[,] to make known[, or] to cause to be visible or open to view."  Merriam-Webster Dictionary (2017), https://www.merriam-webster.com/dictionary/expose.  None of these meanings describes incidents to which plaintiffs were not parties and of which plaintiffs became aware only as a result of discovery.  Dictionary definitions are relevant as a matter of Quebec law to interpretation of policy language.  *See, e.g., Sabean v. Portage La Prairie Mut. Ins. Co.*, 2017 SCC 7 (Can.) (relying on dictionary definitions in defining terms from insurance contract).

underlying property damage or its root cause, exposure to B&B Quarry aggregate.[12]

Third, other definitional language in the Umbrella Policies shows that an occurrence, at least with respect to claims for property damage, is not synonymous with acts that allegedly create tort liability for such property damage. Whereas the definition quoted at the outset of this subsection applies to claims involving bodily injury or property damage, the Umbrella Policies also cover a separate category of claims – for personal injury and advertising injury – for which "occurrence" is defined as "an *offense* arising out of your business that causes **Personal Injury and Advertising Injury**." Stmt. ¶ 92; *see, e.g.*, Roman Decl. Ex. 14 at LEX00000765 (italics added, bold face in original). The Umbrella Policies further state that for those claims, all damages arising from "the same, related or repeated injurious . . . *act*" are deemed to be one occurrence. Stmt. ¶ 92; *see, e.g.*, Roman Decl. Ex. 14 at LEX00000765 (emphasis added). Plainly AIG, the drafter of the Umbrella Policies, knew how to define number of occurrences in a manner that depends on the number of the insured's tortious acts, but did not do so in the case of claims arising from property damage, including the TR Claims. Accordingly, it is exposure to B&B Quarry aggregate that defines the single occurrence at issue under the Umbrella Policies, not the details or instances of LCI's alleged failure to prevent such exposure.

### b)   Quebec, Like Almost All U.S. States, Looks to Cause of the Damage to Determine Number of Occurrences.

Finally, in contrast to New York, which looks to number of injuries to determine number

---

[12]      Lavalin's contribution claim against LCI does not require a different analysis with respect to number of occurrences. In substance, Lavalin's contribution claim acts merely as an aggregator of property owner claims in the first wave of TR Claims. The gravamen of Lavalin's contribution claim is that but for the happenstance that LCI was *not* joined with Lavalin as a defendant in the first wave of claims, LCI would have been jointly liable with Lavalin and other defendants for these claims, which presumably would also have been asserted directly against LCI.

of occurrences, Quebec, like almost all U.S. states, looks to the cause of the injury. Most notably, in *Travelers du Canada v. Les Entreprises Cotenor Ltee*, 1978 N° AZ-78011049 (Can. Que. C.A.), involving a coverage claim for damage to 41 parked automobiles inadvertently spattered with paint by the insured contractor, the court affirmed that the underlying claims for property damage "stem from one and the same occurrence," which the court identified as "abnormal conditions" at the job site, namely "a gust of wind" that blew paint from where it was being sprayed. *Id.* at 5.

Notably, none of the following factors in *Travelers du Canada* convinced the court to find more than one occurrence: (i) 41 automobiles were damaged; (ii) multiple claimants had sought damages; and (iii) the claimants alleged at least two different tortious omissions on the part of the contractor – its failure to cover the vehicles or notify the owners to move them before painting. Instead, the court held, the fact that the same "abnormal conditions" at the job site – the wind gust – caused all the damage required a finding that a single occurrence caused all the harm. *Id.* at 9; *see also Comité Paritaire de L'industrie Des Services Automobiles De La Région de Montréal (CPA Montréal) v. Compagnie canadienne d'assurances générales Lombard,* 2014 QCCS 1747 (Can. Que. Super. Ct.) (loss resulting from similar, related acts is single occurrence); *16582 Canada Inc. v. Zurich du Canada Compagnie d'Indemnite* et al, 1999, N° AZ-99021523 (Can. Que. Super. Ct.) (multiple losses incurred as result of acts of single employee are one occurrence).

The TR Claims here are analogous to the underlying claims in *Travelers du Canada*. The abnormal condition of the aggregate sourced from the B&B Quarry, the use of which in concrete LCI allegedly failed to prevent, is the singular cause of the property damage for which LCI is allegedly responsible, however many plaintiffs, lawsuits, or alleged tortious acts or omissions on

22

LCI's part there may be.[13]

Although Quebec law applies to this case, the approach taken by U.S. courts that have addressed similar circumstances, including in the contexts of a failure to warn and construction defects, is instructive. In fact, for insurance law purposes, Quebec is a French-speaking civil law jurisdiction influenced by common law, including U.S. common law.

In *Chemstar, Inc. v. Liberty Mutual Insurance Co.*, 41 F.3d 429, 432 (9th Cir. 1994), for example, the court held that the insured Chemstar's failure to warn was one occurrence. Specifically, although Chemstar warned on bills of lading for shipments of its lime to distributors that the product was "for exterior use only," there was no warning for end buyers of individual packages of the product, many of whom sued Chemstar after using the lime on indoor surfaces. *Id.* at 430. The court in the coverage action reasoned that Chemstar's "failure to warn was a continuing cause" of the property damage that did not involve any particularized action with respect to the 28 homes damaged as a result of its negligence, all of which resulted from use of the lime in inappropriate locations. *See id.* at 432-33.

Similarly, in *Associated Indem. Corp. v. Dow Chemical Co.*, 814 F. Supp. 613 (E.D. Mich. 1993), the court held that 38 construction defect claims all resulted from the insured's

---

[13]    In the event that Virginia law were applied to the Umbrella Policies, the TR Claims would still constitute a single occurrence because Virginia uses the "cause approach" – the majority rule in the U.S. – to determine number of occurrences under a general liability policy. *Early v. State Farm Mut. Auto. Ins. Co.*, 73 Va. Cir. 400, at *2 (Va. Cir. Ct. 2007). Under the cause approach, "the court must look to the cause of the injury in deciding the number of occurrences." *Dragas Mgmt. Corp. v. Hanover Ins. Co.*, 798 F. Supp. 2d 758, 763 (E.D. Va. 2011). Virginia courts applying the cause approach have held that continuous exposure to the same general harmful conditions constitutes one occurrence. *See Early*, 73 Va. Cir., at *4 (where insured driver's negligence led to collision with another car, and third car subsequently crashed into vehicles involved in first collision, there was only one occurrence because there was "an unbroken, uninterrupted continuum until the second collision occurred"); *Dragas*, 798 F. Supp. 2d at 763 (distribution of defective product involves "no distinct action giving rise to liability for each" instance of harm, resulting in one occurrence).

production and sale of defective resin and so constituted a single occurrence under general

liability policies that, like those here, define "occurrence" as an "event, including continuous or

repeated exposure to conditions" resulting in property damage:

> The production of defective resin was the sole, proximate, uninterrupted, and continuing cause of all of the property damage in the case for which Dow Canada could be responsible.
>
> There is absolutely no basis on the record before the Court to rule that the damage to each co-op stemmed from a separate occurrence.

814 F. Supp. at 623.

The same result is compelled here.  The source of Lafarge's potential liability in the

*Trois-Rivières* Litigation, its alleged failure to prevent use of B&B Quarry aggregate in concrete,

is similar to the failure to prevent unsuitable use of lime in *Chemstar*.  Moreover, as in *Dow*

*Chemical*, the Umbrella Policies at issue in this case contain language that provides for

continuous or repeated exposure to substantially the same conditions to be treated as one

occurrence and thus provide coverage for damage to multiple structures arising from a single

hazardous condition.  Accordingly, LCI's alleged failure to prevent harm through an ongoing

course of conduct that was undifferentiated with respect to the particular instances of property

damage is a single occurrence under the Umbrella Policies.

### 2. The TR Claims Constitute a Single Occurrence under the Primary Policies.

The Primary Policies define "occurrence" differently from the Umbrella Policies, but the

definition and related provisions are worded similarly enough that TR Claims equally constitute

a single occurrence within the meaning of the Primary Policies.  That definition provides:

> With respect to Bodily Injury and Property Damage, 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions *which result in Bodily Injury or Property Damage during the Policy Period, neither intended nor expected from the standpoint of the insured.*

Stmt. ¶ 117; *see, e.g.,* Roman Decl. Ex. 5 at LEX_00001243 (emphasis added).

The italics indicate two additional requirements in the definition that do not appear in the Umbrella Policy wording. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Lafarge will postpone addressing the second requirement until its second memorandum of law is due, in opposition to AIG's motion for summary judgment, because it is AIG's burden to establish its affirmative defense that the "expected or intended" exclusion is applicable. *See, e.g., Continental Ins. Co. v. Dalton Cartage Co.*, [1982] 1 S.C.R. 164 ¶ 7 (Can.) ("A long standing line of authorities require an insurer, seeking solace in an exclusion . . . to show that the exclusion applies.").

Although the Primary Policies also lack the second sentence of the Umbrella Policy's occurrence definition, "[a]ll such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**," the missing sentence addresses the case of multiple "conditions," which are not present here. Roman Decl. Ex. 14 at LEX_00000765. Because the TR Claims arise from only one harmful condition – *i.e.*, pyrrhotite-rich aggregate sourced from the B&B Quarry – that omission does not lead to a different result than under the Umbrella Policies.

Although the Primary Policies lack the provision discussed in Section II.B.1.a addressing application of the per-occurrence limit to multiple claims that constitute a single occurrence, neither is there any requirement in the Primary Policies that an occurrence consist of a single claim, suit, or plaintiff. Rather, it is inherent in the definition of "occurrence" that the term encompass multiple claims, and we are not aware of any case law to the contrary where there is

comparable policy language.

Finally, it is clear from language elsewhere in Primary Policies that the number of occurrences for property damage claims is not inherently dependent on the number of incidents or acts of LCI.  Indeed, although such language is not used in the property damage occurrence definition, it is used elsewhere:  in the case of coverage for "Personal Injury," occurrence "means an *act* or series of *acts* of the same or similar nature committed during the Policy Period which results in a Personal Injury," showing that AIG could have drafted an occurrence definition for property damage liability based on the policyholder's acts rather than on "repeated exposure to substantially the same general harmful conditions."[14]

Because the definition of "occurrence" and related provisions in the Primary Policies does not differ from the Umbrella Policies' wording in any way that substantively changes the argument above with respect to the Umbrella Policies, the TR Claims also constitute a single occurrence within the meaning of the Primary Policies.

### C.     Lafarge Is Entitled To Coverage For Each TR Claim Under Each *Primary Policy* In The Trigger Period.

Lafarge's exposure to liability for any TR Claim satisfies all conditions for coverage under the Primary Policies in any portion of the trigger period.  The insuring clauses of the Primary Policies state:

> The Insurer agrees . . . [t]o pay on behalf of the Insured <u>all sums</u> which the Insured shall become obligated to pay by reason of the liability imposed upon the Insured by law . . . because of . . . Injury to, destruction or loss of tangible property or any loss of use of property caused by an occurrence hereinafter defined.

Stmt. ¶ 109; *see, e.g.,* Roman Decl. Ex. 5 at 2004-05 Primary Policy at LEX_00001241.

---

[14]     AIG's similar drafting of the definition of "occurrence" in connection with personal injury and advertising injury in the Umbrella Policies further supports this point.

Accordingly, for there to be coverage for a TR Claim under a Primary Policy, (i) the defendant must be an insured under the policy, (ii) the defendant must be legally obligated to pay damages by reason of liability imposed by law, (iii) the damages must be for "destruction . . . of tangible property or any loss of use of property" ("Property Damage"), and (iv) the Property Damage must be caused by an "occurrence."

All four elements are satisfied with respect to every Primary Policy that has a policy period overlapping with the trigger period of a TR Claim. *First*, LCI is the named insured under all Primary Policies. *Second*, if LCI is ultimately found liable for damages in the *Trois-Rivières* Litigation, such would plainly be "by reason of the liability imposed upon the Insured by law." *Third*, the claims in the *Trois-Rivières* Litigation are for physical injury and destruction of tangible property (*i.e.*, deterioration of concrete) and loss of use of property (*i.e.*, the structures that must be vacated). *Fourth*, LCI's alleged failure to warn of the risks of using B&B Quarry aggregate in concrete and other alleged negligence or misconduct constitutes an occurrence under the Primary Policies.[15]

Although this conclusion is evident from the policy language itself, Quebec law confirms as much: damage arising from pyrrhotitic aggregate in concrete triggers all policy periods between concrete pouring and manifestation of damage. *See Deguise v. Montminy*, 2014 QCCS 2672, ¶¶ 1919-1920. In *Deguise*, which was the judgment issued in 2014 following trial of the first-wave claims in the *Trois-Rivières* Litigation, including the insurance coverage claims asserted by underlying plaintiffs directly against the defendants' insurers, the court applied the "continuous trigger" of coverage for general liability insurance coverage for progressive property

---

[15]    Moreover, because the trigger periods for the TR Claims overlap with all policy periods, each of the Primary Policies at issue is triggered.

damage. *Id.* ¶ 1919. As to the continuous trigger methodology, the court stated that "all the insurers of the liable insureds covered by such insurance are held to contribute according to their coverage date, *i.e.*, between the time the concrete was poured and the date on which the damages appeared, the latter date considered by the parties as the date of the crystallization of the damages." *Id.* ¶ 1920.[16] Consequently, under Quebec law, each Primary Policy in effect during some or all of the trigger period for a TR Claim provides coverage for that claim.

**D.      Lafarge Is Entitled To Coverage For Each TR Claim Under Each *Umbrella Policy* In The Trigger Period For Which Lafarge Has Satisfied The Retained Limit.**

     **1.      Lafarge's Exposure to Liability for any TR Claim Satisfies All Conditions for Coverage Under Each Umbrella Policy in the Trigger Period for Which the Retained Limit Is Satisfied.**

The insuring clause of each Umbrella Policy states:

> We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of . . . **Property Damage** . . . to which this insurance applies.

> This policy applies, only if: the . . . **Property Damage** is caused by an Occurrence that takes place anywhere, and the . . . **Property Damage** occurs during the **Policy Period**.

Stmt. ¶ 93; *see, e.g.,* Roman Decl. Ex. 15 at LEX_00000866.

For there to be coverage for a TR Claim, then, (i) the defendant must be an insured under the Umbrella Policy, (ii) the defendant must be legally obligated to pay damages by reason of liability imposed by law, (iii) the damages must be in excess of the retained limit, (iv) the damages must be for property damage, (v) the property damage must be caused by an

---

[16]      The trial court in *Deguise* used the terms "crystallization" and "manifestation" interchangeably to refer to the first appearance of damages, which it found to be the end date for the trigger of coverage under the liability policies. *See, e.g., Deguise,* 2014 QCCS, ¶¶ 1920, 1928.

occurrence, and (vi) the property damage must occur during the policy period.

In addition, sub-paragraph C of the insuring agreement of each Umbrella Policy states that the policy applies only if (vii), before the policy period, Lafarge did not know that property damage had occurred.  Stmt. ¶ 98; *see, e.g.* Roman Decl. Ex. 15 at LEX_00000866.[17]  Under Quebec law (indeed, under Canadian national law, as set forth by the Canadian Supreme Court), this final element requires, for coverage of a claim, that Lafarge not know before the policy was issued that the claimant might seek to hold Lafarge liable for property damage that had occurred. *Reid Crowther & Partners Ltd.* v. *Simcoe & Erie General Insurance Co.*, [1993] 1 SCR 252 (Can.).

Each of these conditions for coverage is met here for a TR Claim if the Umbrella Policy period overlaps with the trigger period of the TR Claim and the retained limit has been satisfied. With respect to element (i), LCI is an insured under all Umbrella Policies.  As to elements (ii) and (iii), LCI seeks a declaration of coverage under this insuring clause of the Umbrella Policies only for payment of covered loss paid due to a judgment in or settlement of TR Claims (including ancillary categories of loss such as pre- and post-judgment interest), and only for such loss in excess of the retained limit.  Elements (iv) and (v) are satisfied because each TR Claim constitutes a claim for "Property Damage" as defined in the Umbrella Policies, and the TR Claims arise from an occurrence as explained above.  With respect to element (vi), for each TR Claim, progressive damage occurs from the date that concrete is poured until manifestation of damage to that structure, as explained in Section II.A.  Finally, with respect to element (vii), LCI had no knowledge of property damage for which it would be subject to a claim until November

---

[17]     Sub-paragraph C also states that if LCI has no such knowledge, "Property Damage which occurs during the Policy Period . . . includes any continuation, change or resumption of that . . . Property Damage after the end of the Policy Period."  Roman Decl. Ex. 15 at LEX_00000866.

2011, after two of its employees and one former employee were subpoenaed in the *Trois-Rivières* Litigation, which occurred after the 2011-12 Umbrella Policies were procured and in force.  Stmt. ¶ 124.

> ## 2. Because the TR Claims Constitute A Single Occurrence, the Umbrella Policies Apply When Lafarge Pays C$2 Million of Indemnity Costs for TR Claims.

As applicable to claims arising in Canada, such as the TR Claims, each Umbrella Policy is subject to a retained limit of C$2 million per occurrence, Stmt. ¶ 96; *see e.g.*, Roman Decl. Ex. 13 at LAF0000113072 ("Schedule of Retained Limits"), and specifies that the insurer "will not make any payment under this policy unless and until the total applicable **Retained Limit(s)** . . . have been exhausted by the payment of Loss to which this policy applies."[18]  *See, e.g.*, Roman Decl. Ex. 15 at LEX_00000840.  Notably, there is no requirement for any primary or other underlying insurance to be exhausted, as is typically the case for umbrella and other excess insurance policies.

"Loss" for this purpose means "those sums actually paid [by the Insured] as judgments or settlements," which, as seen in one of the attachments to the Umbrella Policies, does not include defense costs. Stmt. ¶ 97; *see, e.g.,* Roman Decl. Ex. 15 at LEX_00000842 ("Schedule Of Retained Limits").  Thus, for each Umbrella Policy, LCI satisfies the retained limit as soon as it pays C$2 million in "Loss" – judgments or settlements for TR Claims, or pre- or post-judgment

---

[18]     The wording of the 2004-05 Umbrella Policies differs slightly from the quoted language, but the effect is the same.  The corresponding provision in those policies replaces "total applicable Retained Limit(s)" with "total applicable limits of **Scheduled Underlying Insurance**." *See* Roman Decl. Ex. 13 at LEX_00113074; Roman Decl. Ex. 14 at LEX_00000789.  There is no Scheduled Underlying Insurance under those policies, but they state that "[t]he Retained Limits . . . will apply whether or not there is any available Scheduled Underlying Insurance . . ." *See* Roman Decl. Ex. 13 at LEX_00113024, LEX_00113071; Roman Decl. Ex. 14 at LEX_00000744, LEX_00000786.  Thus, the 2004-05 Umbrella Policies also apply upon exhaustion of their retained limits.

interest, for example – "to which this policy applies."

Each Umbrella Policy "applies" to amounts for damage that occurs during or after the period of that policy.  As noted above, the Insuring Agreement of each Umbrella Policy states that coverage applies to "Property Damage [that] occurs during the Policy Period" and also that "Property Damage which occurs during the Policy Period . . . includes any continuation, change or resumption of that . . . Property Damage after the end of the Policy Period."  Stmt. ¶ 98.  This language, termed a "telescoping" loss provision, provides coverage under a single policy period for loss that might otherwise be allocated into that period *and* one or more subsequent policy periods.  That is, each Umbrella Policy covers (a) all damage that occurs during the period and (b) all damage that occurs, whether as "continuation, change, or resumption" of the occurrence, "after the end of the Policy Period," as long as some damage occurred during the policy period.  Like collapsing a hand-held telescope from many segments into one segment, the telescoping loss provision makes all property damage occurring in multiple consecutive policy periods eligible for payment under a single policy.

Moreover, because the limits of each Umbrella Policy erode on the same basis – "payment of Loss to which this policy applies" – settlements and judgments for TR Claims paid by LCI separately erode the retained limit of every Umbrella Policy to which that settlement or judgment applies.  In other words, for each Umbrella Policy, the amount of any settlement or judgment paid by LCI and applicable to that policy erodes the retained limit, even if some or all of the same amount also erodes the retained limit of one or more other Umbrella Policies.

The following hypothetical illustrates the erosion of retained limits required under each Umbrella Policy.  If LCI were to pay a $2 million judgment for a TR Claim with a pour date within the 2004-2005 Umbrella Policy period allocable over ten years ("TR Judgment A") and a

31

$200,000 judgment for a TR Claim with a pour date within the 2005-2006 Umbrella Policy period allocable over ten years ("Judgment B"), upon making such payments, both the 2004-2005 and the 2005-2006 Umbrella Policies would attach.  This result is because (i) the entire $2 million of TR Judgment A would qualify as "Loss to which [the 2004-2005] policy applies," satisfying the full $2 million retained limit under the 2004-2005 policy, (ii) $1.8 million of TR Judgment A would also qualify as "Loss to which [the 2005-2006] policy applies," satisfying $1.8 million of the retained limit under the 2005-2006 policy, and (iii) the entire $200,000 of TR Judgment B would qualify as "Loss to which [the 2005-2006] policy applies," satisfying the remaining $200,000 of the retained limit under the 2005-2006 policy.

Nothing about the erosion mechanism required under the Umbrella Policies allows LCI a double recovery.  It simply constitutes the agreement of the contracting parties, reflected in the policies, regarding how the retained limit of each Umbrella Policy may be exhausted so that LCI can access its coverage.  Once exhaustion of the retained limit occurs and an Umbrella Policy attaches, LCI may recover any additional loss (along with any covered defense costs) applicable under the Umbrella Policy to the Policy's liability limits, but any such amounts would not be recoverable under any other policy's limits.

### E.    The Amount Of Coverage That Each Policy Provides Is Based On The Amounts Of Loss For And The Trigger Periods Of The TR Claims, Subject Only to Policy Limits.

Although the availability of multiple Policies with different wording creates intricacies as to overall application of coverage, in principle the amount of coverage provided by each Policy for any TR Claim depends on only two aspects of that claim:  the amount of loss and the trigger period of the TR Claim.

Each Policy is due to provide coverage when it is on the risk, that is, when the Policy limit has not yet been exhausted and, in the case of Umbrella Policies only, when the retained

limit has been satisfied.  By design of the Policies and the liability insurance program of which

they are part, multiple Policies may be on the risk and triggered by a single covered claim at the

same time, *i.e.*, multiple Policies could provide coverage for any one underlying claim.  Thus,

more potential coverage is available for any one underlying claim than LCI can use given that

LCI may not recover more from insurance than its actual loss.  As a result, LCI has choices as to

how to apply available coverage, some of which are restricted by applicable Quebec law, as

discussed below.  The overall subject of this section is "allocation" – that is, how LCI may, or

how LCI must, structure its recoveries from potentially available Policies.

The following subsections 1 and 2 explain how Primary and Umbrella Policy coverage

for a TR Claim is determined by the loss and trigger period and how recoveries may or must be

allocated among those Policies; subsection 3 sets forth how Policy limits are eroded and,

ultimately, exhausted by TR Claims.

        **1.**      **Lafarge Is Entitled to Recover Indemnity and Defense Costs for TR Claims From Primary Policies in the Trigger Period.**

                **a)**      **Lafarge Is Entitled to Recover Defense Costs for a TR Claim from any Primary Policy in the Trigger Period.**

Because LCI is defending the TR Claims itself with the consent of AIG, LCI is entitled to

reimbursement of its defense costs from any triggered policy.  Each Primary Policy provides for

AIG, among other things, to defend the TR Claims that allege property damage occurring during

the policy period:

> The Insurer also agrees to: (a) Defend any suit against the Insured alleging such . . . destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent.

Stmt. ¶ 114; *see, e.g.,* Roman Decl. Ex. 6 at LEX_00001300 (Section 2).  Even if this defense

obligation were not stated in the Policy, it would be required under Quebec law.  *See* Quebec

Civil Code § 2503 ("the insurer is bound to take up the interest of any person entitled to the

benefit of the insurance and assume his defen[s]e in any action brought against him"). Accordingly, as long as a Primary Policy is on the risk and triggered by a TR Claim, LCI is entitled to recover defense costs for the TR Claim from AIG under that Policy.

In respect of defense costs, LCI's dispute with AIG is not its failure to pay defense costs from the Primary Policies (it is doing so and then being reimbursed by a Lafarge affiliate), but rather AIG's refusal to allocate defense costs as between the Umbrella Policies and Primary Policies as required under Quebec law.  It is a declaration as to the proper allocation of defense costs between Primary and Umbrella Policies that, *inter alia*, LCI seeks in this action.

> **b)     Lafarge Is Entitled to Recover Indemnity Costs from Primary Policies by Spreading Such Expenses Evenly Among All Policy Periods in the Trigger Period.**

The Primary Policies themselves do not restrict how indemnity costs may be recovered when two or more Primary Policies are triggered by a single claim.  The Policies simply require AIG to pay "*all sums* which the Insured shall become obligated to pay by reason of the liability imposed upon the Insured by law" for property damage arising from an occurrence.  Stmt. ¶ 109; *see, e.g.,* Roman Decl. Ex. 6 at LEX_00001299 (Section 1, Coverage C) (italics added).

Under Quebec law (indeed, under Canadian national law, as set forth by the Canadian Supreme Court), where multiple policies provide coverage for loss, but are silent as to allocation of loss among policies, the principle of "equitable contribution" among insurers determines allocation.  *See, e.g., Family Ins. Corp. v. Lombard Canada Ltd.*, [2002] 2 S.C.R. 695, 696 (Can.) (in absence of policy language showing insurer's "intent[] to limit their obligation to contribute[,] . . . principles of equitable contribution demand that parties under a coordinate obligation to make good the loss must share that burden equally").

The judgment in the *Trois-Rivières* Litigation applies this principle to coverage under general liability policies for indemnity costs arising from the same property damage and loss for

which Lafarge may be found liable in the TR Claims, but in the context of the coverage programs of other defendants in the underlying litigation. *See Deguise*, 2014 QCCS 2672, ¶¶ 2192-94. In particular, when a claim in the first-wave litigation triggered multiple general liability policies, the court found that indemnity costs should be allocated proportionally among all triggered policies according to the policy period and the trigger period of the underlying claim, what is referred to as "allocation by years." *Id.* ¶¶ 1919-20.

Accordingly, should LCI incur indemnity cost for a TR Claim, if Primary Policies are the only triggered Policies on the risk, LCI would be entitled to recover a percentage of the indemnity cost for that TR Claim from each triggered Primary Policy equal to the ratio of the policy period to the trigger period.[19] Thus, for example, in the case of a hypothetical claim that has a five-year trigger period congruent with the periods of five consecutive annual policies on the risk, each of the five policies would be responsible for twenty percent of the indemnity costs for such claim (absent expressly contrary allocation wording in the insurance policy).

### 2. LCI Is Entitled to Recover Costs for TR Claims from Umbrella Policies in the Trigger Period for Which the Retained Limit Is Satisfied.

Due to the telescoping loss provision described above, any triggered Umbrella Policy on the risk when a TR Claim is presented for payment owes coverage to LCI not only for property

---

[19]    Virginia has not adopted a rule for allocation of liability for continuous, progressive property damage, but if Virginia law were found to apply, the Court should hold that LCI may require AIG to pay the entire indemnity cost for a TR Claim from any Primary Policy that such claim triggers based on the "all sums" language quoted above. There is precedent under U.S. law for such a finding. *See, e.g., Matter of Viking Pump, Inc.*, 27 N.Y.3d 44, 264 (2016); *State of Cal. v. Continental Ins. Co.*, 145 Cal. Rptr. 3d 1 (2012); *U.S. Fid. & Guar. Co. v. Cont'l Ins. Co.*, No. CV-04-29-BLG-RFC, 2010 WL 4102250, at *3 (D. Mont. Oct. 18, 2010); *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 493 (Del. 2001); *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115 (Wash. 2000); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502 (Pa. 1993); *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034 (D.C. Cir. 1981).

damage that occurs during its policy period, but for subsequent property damage, as long as some property damage occurs during the policy period.  This subsection 2 applies the allocation methodology just described to explain the resulting net allocation to any one Umbrella Policy that is on the risk, separately for indemnity costs and for defense costs.

a)      **LCI Is Entitled to Recover Indemnity Costs for a TR Claim from Umbrella Policies by Telescoping Such Expenses.**

Allocation of indemnity costs to an Umbrella Policy is straightforward when the pour date occurs during the policy period:  Because all property damage starts on and progresses continuously after the pour date, and the Umbrella Policy covers a liability arising from property damage occurring in or after the policy period, the "pour date" Umbrella Policy necessarily covers all indemnity cost for the TR Claim.

If, on the other hand, the pour date of a TR Claim precedes the period of the Umbrella Policy that it triggers, damage will have occurred before the period of the Umbrella Policy, and by the terms of the Policy, that portion of the damage, and ensuing liability, is not covered. Accordingly, apportionment of property damage must be made between that occurring before the policy period and that occurring during or after the policy period to determine the Umbrella Policy's share of liability for the TR Claim.

The judgment in the *Trois-Rivières* Litigation supports treating property damage caused by pyrrhotitic aggregate in concrete as occurring, at least for purposes of determining recovery from general liability policies, in an even, continuous fashion, so that costs may be apportioned to post-pour policy periods on a *pro rata* basis by year.  Accordingly, the proper allocation of liability for property damage where the pour date precedes the policy period is to allocate to the Umbrella Policy a percentage of the indemnity cost for the TR Claim equal to the ratio of (a) the

36

time from the start of the policy period to the end of the trigger period to (b) the trigger period.[20]

As long as LCI does not seek to recover more than once for the same loss, LCI may

recover its loss from one or more triggered, on-the-risk Umbrella Policies as it may elect.[21]

> b)   **LCI Is Entitled to Recover the Same Proportion of Defense Costs from Primary and Umbrella Policies As the Damages Demanded in the TR Claims Would Be Allocated between Primary and Umbrella Policies.**

Under Quebec law, if the amount demanded by the claimant is sufficiently large that it

would require contributions from both a primary insurer and an excess insurer to pay the

plaintiff's demand, both the primary and the excess policy must share in the cost of defense.  In

*La prévoyance, compagnie d'assurance v. La Commission scolaire catholique de Montréal*,

1990, N° AZ-900011211, at 4 (Can. Que. C.A.), the Quebec Court of Appeal ruled that it is the

damages claimed by the plaintiff, and not the amount of any ultimate settlement or judgment,

that determines whether the excess insurer's duty to defend has been triggered.  Similarly,

Section 2503 of the Quebec Civil Code provides that "the insurer is bound to take up the interest

of any person entitled to the benefit of the insurance and assume his defen[s]e in any action

brought against him"; the statute does not differentiate between primary coverage and excess

coverage.

---

[20]   For the sake of illustration, consider a hypothetical TR Claim for which LCI had $100,000 in indemnity cost with a trigger period from April 1, 2003 to April 1, 2008 and where a 2004-05 Umbrella Policy was on the risk when this TR Claim was presented for payment.  In such circumstances, LCI would be entitled to $80,000 of coverage from that Umbrella Policy because indemnity costs would be spread evenly at the rate of $20,000 per year over the five-year trigger period, and four of those years would be during or after the policy period.

[21]   Allocation of loss to Umbrella Policies under Virginia law should be the same because where, as here, insurance policy wording is unambiguous, Virginia law enforces the policy as written.  *Osborne v. National Union Fire Ins. Co.*, 465 S.E.2d 835, 837 (Va. 1996) ("When the terms of an insurance policy are clear and unambiguous, we give the words their ordinary meaning and enforce the policy as written.").

This rule matters here because the longest-pending TR Claim was brought by Lavalin for contribution of up to 100% of the damages awarded against Lavalin under the judgment in the *Trois-Rivières* Litigation, or up to approximately C$114 million or more. Stmt. ¶ 62.  Although appropriate allocation of that demand as between LCI's Primary and Umbrella Policies is uncertain (and in fact is a subject of this action), the lion's share of that demand would be payable by the Umbrella Policies and only a fraction of the demand would be payable under the Primary Policies.

The Policies themselves are silent as to appropriate methodology for allocating defense costs among them.  Given that each, accordingly, could be liable for the entire defense, the principle of equitable contribution under Quebec law should be applied.  *Deguise*, 2014 QCCS 2672, ¶ 1920.  Given the Court of Appeal's principle that triggering of the defense obligation is based on the claimant's demand, it follows that the Primary and Umbrella Policies should share reimbursement of LCI's defense costs in proportion to the amount to which each is exposed to the TR Claims as a whole.[22]

---

[22]    Under Virginia law, AIG has a duty to defend in the *Trois-Rivières* Litigation LCI based on the allegations and the amount of the underlying TR Claim under the relevant defense coverage provision in the Umbrella Policies. *Travelers Indem. Co. v. Obenshain*, 245 S.E.2d 247, 249 (Va. 1978) ("If the allegations state a case which may be covered by the policy, [the insurer] has a duty to defend.").  Each Umbrella Policy requires that AIG defend LCI when the "applicable limits listed in the Schedule of Retained Limits have been exhausted by payment of Loss to which this policy applies." Stmt. ¶ 142.  Because Virginia courts would enforce this language as written, at worst AIG must defend LCI – that is, fund 100% of LCI's defense costs – for the *Trois-Rivières* Litigation and to do so in addition to the relevant indemnity limits, from no later than the date on which LCI has incurred C$2 million in covered loss for all costs excluding defense costs.

3.      **Policy Limits Are Eroded by Insurer Payments According to Rules Set Forth in the Policies and Quebec Law.**

a)      **Policy Limits Are Eroded Only by Insurer Payment of Principal Settlement Amounts or Principal Judgment Amounts.**

Under Quebec law, all liability policy limits are "eroded," *i.e.*, reduced, only by payment of settlement amounts and judgments, regardless of policy language to the contrary.  Quebec Civil Code Section 2503 provides in pertinent part:

> Legal costs and expenses resulting from actions against the insured, including those of the defen[s]e, and interest on the proceeds of the insurance are borne by the insurer over and above the proceeds of the insurance.

Quebec case law clarifies that the phrase "over and above" means that costs identified in the statute, including defense costs and pre- and post-judgment interest on a damages award, must be paid by the insurer without reduction of remaining limits.  *See Canadian National Railway Co. v. Chartis Ins. Co.* of Canada, 2013 QCCA 1271, ¶ 32, 44-45 (Can. Que. C.A.).  In other words, the only payments by AIG that reduce limits of any Policy are payments of the claimant's actual damages, whether in the form of a judgment or a settlement.[23]

Because the TR Claims constitute a single occurrence and there were no prior claims that were part of this occurrence, the stated per-occurrence limit of each Primary Policy is the sole relevant limit for that Policy for purposes of this action.  As discussed, the limits of LCI's Primary Policies over the relevant period range from C$1 million to C$5 million.  For each

---

[23]      If Virginia law were found to apply, Policy limits would be eroded by all payments of indemnity costs.  Virginia law has no provision comparable to Quebec Civil Code § 2504, and accordingly Policy limits are to be eroded according to Policy terms.  *Osborne*, 465 S.E.2d at 56. Both the Umbrella Policies and the Primary Policies provide that their limits are not eroded by defense costs.  Stmt. ¶ 145; *see, e.g.*, Roman Decl. Ex. 6 at LEX_00001300; (2005-2006 Primary Policy); Roman Decl. Ex. 15 at LEX_00000840 & LEX_00000844 (2005-2006 Umbrella Policy).

Primary Policy, these limits are stated on a "per occurrence" basis; that is, a fresh limit is available for paying claims for each occurrence.

The Umbrella Policies also have per-occurrence limits that similarly limit payments under them.  The two AIG Canada Umbrella Policies have limits of US$3 million (in 2004-05) and US$50 million (in 2011-12).  The Lexington Umbrella Policies all have limits of US$50 million in each policy period.  None of these per-occurrence limits has been eroded for purposes of the TR Claims.[24]

> **b)** **The Limit of Any Primary Policy Is Eroded When Any Amounts Are Paid for TR Claim Settlements and Judgments under Any Primary Policy.**

Each underlying Primary Policy contains an endorsement entitled "Non-Accumulation of Limits of Insurance."  As found in substantially identical form in all the Primary Policies through July 2010, this provision states:

> It is agreed that in the event coverage for an occurrence is deemed to involve coverage under this policy or any other commercial general liability policy[,] the company's total limit of insurance for all damages because of bodily injury and property damage . . . shall not exceed [$5,000,000] for any occurrence . . . .

The amount in brackets varies from policy to policy according to the policy limit.  Stmt. ¶ 113; *see, e.g.,* Roman Decl. Ex. 6 at LEX_00001311.[25]

These provisions limit the potential liability of the primary insurer, whether American

---

[24]   Moreover, the Umbrella Policies are all subject to "aggregate" limits, meaning that regardless of the number of coverage claims or occurrences, the amount paid under the Policy may not exceed a specified amount.  The aggregate limit in each case equals the per-occurrence limit.

[25]   The Primary Policy incepting in July 2010 similarly limits coverage for an occurrence under "this Coverage Form or any other Coverage Form or policy issued to you by us or any of our affiliated companies" to "the highest applicable limit of insurance available under any one Coverage Form" and further clarifies that "[t]his condition does not apply to any other Coverage Form or policy issued by us or any of our affiliated companies specifically to apply as excess insurance over this Coverage Form."  Stmt. ¶ 123; Roman Decl. Ex. 11 at LEX_00001562.

Home or AIG Canada, for any occurrence to a single per-occurrence limit, even where coverage is found to "involve . . . any other commercial general liability policy." For decades, insurers issuing policies to an insured over multiple policy periods have used such wording, commonly called "non-cumulation" provisions, to avoid paying limits under multiple policies for a single loss triggering coverage in multiple years. *See Matter of Viking Pump*, 27 N.Y.3d at 259 (describing history and purpose of non-cumulation provision). In a fully-reinsured primary insurance program such as LCI's, non-cumulation clauses serve as a "stop-loss" provision, so that the amount LCI's affiliates would absorb under their reinsurance obligations (even if none of the Umbrella Policy retained limits were ever satisfied) would be, at most, the highest limit of any Primary Policy triggered by the occurrence.[26]

In the underlying first-wave litigation, at the request of an insurer, the court refused to enforce a similar non-cumulation provision. *Deguise*, 2014 QCCS 2672, ¶¶ 1963-1970. Acknowledging the absence of applicable Canadian precedent, the court held that the non-cumulation clause was unnecessary given the court's *pro rata* allocation approach, which ensured that each insurer would be assigned only damages occurring in its policy period, *id.* ¶¶ 2227-2228. The basis for the ruling was the court's recognition that it would maximize coverage available to the insured for the benefit of the claimants.

*Deguise* is not applicable here because maximization of ostensible coverage under the Primary Policies would have the opposite effect of the result that motivated the decision of the *Deguise* court. It would maximize reinsurance payments of the policyholder's affiliate.

---

[26]     As stated in the 2010-2011 Primary Policy and consistent with the reasonable expectations of the contracting parties, *e.g.,* LEX_00001562, the stop-loss effect built into the 100% LCI-reinsured Primary Policies applies only to the Primary Policies and does not limit or otherwise affect the hundreds of millions of dollars of real insurance limits purchased by LNA and available to LCI under the Umbrella Policies.

The provision is clear and forecloses such a result:  where more than one Primary Policy provides coverage for an occurrence, coverage under the Primary Policies is limited to a single per occurrence limit, which provides stop-loss protection to the policyholder.[27]  LCI arranged for self-insured primary coverage that includes this language and separately purchased general liability umbrella coverage providing it with real insurance for, among other things, defense costs.  Because LCI is entitled to the full benefit of this coverage, and because Quebec law is not to the contrary, the "Non-Accumulation of Limits of Insurance" provision found in each Primary Policy should be enforced as written and the limits of each Primary Policy should be deemed exhausted once LCI's payment of settlements and judgments on TR Claims exceeds the limits of that Primary Policy.[28]

---

[27]    Although use of the word "company" in the non-cumulation clause in the Primary Policies appears to refer to American Home only for the first eight Primary Policies and to AIG Canada only for the last four Primary Policies, as explained in n.2 above, American Home purports to have novated its Canadian Branch policies to AIG Canada, and thus "company" should be interpreted as referring to one and the same company – AIG Canada – across all twelve Primary Policies, at least for the purpose of applying the non-cumulation clause.

[28]    U.S. jurisdictions, including New York, enforce these provisions as written.  *See, e.g.*, *Matter of Viking Pump*, 27 N.Y.3d at 260-261 (enforcing non-cumulation language to require "all sums" allocation result); *Superstition Crushing v. Travelers Cas. and Sur. Co. of America*, 360 F. App'x 844, 846 (9th Cir. 2009) (applying Arizona law and enforcing non-cumulation provision and limiting coverage to single policy's limit);  *In re Liquidation of Midland Ins. Co.*, 269 A.D.2d 50, 63-64 (1st Dep't 2000) ("The [non-cumulation provisions] clearly provide that [the later policy's limits] would be reduced by any sums owed to [the insured] by other excess policies on the same risk"); *O-I Brockway Glass Container, Inc. v. Liberty Mut. Ins. Co.,* No. 90-2797, 1994 WL 910935, at *2–3 (D.N.J. Feb. 10, 1994) ("the only reasonable interpretation of the Non-Cumulation clause does not permit stacking of policy limits for the same occurrence"). Although no Virginia case specifically addresses enforcement of non-cumulation clauses, consistent with the foregoing U.S. decisions and with Virginia's emphasis on enforcing unambiguous policy language, under Virginia law the provision would likely be enforced as written.

### III.   AIG'S EXPERT REPORTS SHOULD BE STRICKEN.

Section II above does not address one of the defenses to coverage that AIG has raised, the

Twenty-Fourth Affirmative Defense, which invokes the so-called "professional services"

exclusion in the Umbrella Policies' "Contractor's Excluded Hazards Endorsement."  That

endorsement provides that "[t]his insurance does not apply to . . . any liability arising out of the

rendering of, or the failure to render, professional services . . . performed by . . . the insured."

Stmt. ¶ 95.  AIG retained two experts to opine on issues related to its professional services

exclusion defense:  David Ahearn and Joseph Monteleone.

But even though AIG indisputably bears the burden of proving its affirmative defense

that the exclusion bars coverage, *see Continental Ins. Co. v. Dalton Cartage Co.*, [1982] 1 SCR

164 ¶ 8, 11-12,  AIG did not disclose its experts on the date set by this Court  for experts

supporting claims and affirmative defenses, like the exclusion.  Accordingly, both expert reports

should be stricken as untimely.

In addition, Mr. Monteleone's report should be stricken because (a) it is purportedly

rebuttal to a report submitted by Lafarge's expert, Dr. Thomas, but in fact it does not rebut any

of Dr. Thomas's opinions and (b) Mr. Monteleone's opinions are otherwise improper.

The Court's Scheduling Order as to experts provides:

> All expert discovery, including disclosures, reports, production of underlying documents, and depositions shall be completed by **May 22, 2017**....

> 1.  Every party-proponent of a claim (including any counterclaim, cross-claim, or third-party claim) *or affirmative defense* that intends to offer expert testimony in respect of such claim or defense must make the disclosures required by Fed. R. Civ. P. 26(a)(2) by **March 20, 2017**.

> 2.  Every party-opponent of such claim or affirmative defense that intends to offer expert testimony in opposition to such claim or defense must make the disclosures required by Fed. R. Civ. P. 26(a)(2) by **April 17, 2017**.

43

> 3.  Every party-proponent of a claim (including any counterclaim, cross-claim, or third-party claim) or affirmative defense that intends to offer rebuttal expert testimony in respect of such claim or defense must make the disclosures required by Fed. R. Civ. P. 26(a)(2) by **May 8, 2017**.

Dkt. 33, Scheduling Order, 2-3, Nov. 14, 2016 (bold in original) (italics added).[29]

Consistent with this schedule, on March 20, Lafarge submitted Dr. Thomas's report, which sets forth two opinions: ██████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████

On May 3, AIG served reports by Mr. Ahearn and Mr. Monteleone, each of which address solely the professional services exclusion; ████████████████████████████

██████████████████████████████████ Mr. Ahearn is a senior consultant with Engineering Systems, Inc., and performs scientific investigations and root cause analysis of failed components, structures, and systems; his report responds to Dr. Thomas's opinions on the professional services exclusion from an engineering perspective.  Mr. Monteleone is an insurance coverage lawyer, having spent his entire career working for insurance companies or representing them in private practice; his report addresses the professional services exclusion from the standpoint of an insurance lawyer.

---

[29]     After Lafarge served Dr. Thomas's opening report, the parties agreed to extended dates for opposition and rebuttal reports.

44

A.      **The Ahearn And Monteleone Reports Are Untimely.**

The Court's Scheduling Order is clear and mandatory:  "Every party-proponent of . . . an affirmative defense that intends to offer expert testimony in respect of such . . . defense *must* make the disclosures required by Fed. R. Civ. P. 26(a)(2) by **March 20, 2017**."  Scheduling Order at 2 (italics added; bold in original).

Although AIG is the party-proponent of the professional services exclusion, an affirmative defense, it did not make the required disclosures by March 20, as ordered by the Court, and is therefore barred from doing so later on.  *See* Fed. R. Civ. P. 37(c)(1) (any party that fails to make disclosures "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless"); *see, e.g.*, *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 51 (2d Cir. 2004) (affirming exclusion of untimely disclosed experts where party had "ample opportunity to identify experts and submit expert reports in a timely fashion," but "did not avail herself of [those] opportunities"); *Bakalar v. Vavra*, 851 F. Supp. 2d 489, 494 (S.D.N.Y. 2011) ("While defendants had ample opportunity to support their claims with expert testimony, they failed to exercise diligence in obtaining discovery within the parameters established by this Court"); *see also Softel, Inc. v. Dragon Med. & Sci Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) (district court did not abuse discretion by precluding testimony of expert witness for failure to meet discovery deadline).

AIG has offered no justification for its failure to serve its expert reports in accordance with the Court's Order.  AIG raised the professional services exclusion in its Answer filed January 16, 2016, *see* Dkt. 23, AIG Answer at 29, and it examined eight Lafarge witnesses on the topic, *see* Am. Notice Rule 30(b)(6) Dep. to Lafarge N. America, Inc., ¶ 5, Jan. 25, 2017; Dkt. 33, Scheduling Order.  So the exclusion was not a last-minute discovery by AIG.

Moreover, AIG's failure to serve its reports when due has prejudiced Lafarge.  Not only did Lafarge have only eight business days to provide a second report by Dr. Thomas to rebut opinions set forth by Mr. Ahearn – rather than the four-week period specified in the Scheduling Order – but Lafarge did not have time to retain an insurance expert to rebut the opinions of Mr. Monteleone.  *See* discussion *infra* Part B.

It is of no moment that Lafarge's expert Dr. Thomas opined on professional services on March 20.  The exclusion is *AIG's* coverage defense, and AIG had an obligation to disclose opinions on its affirmative defenses by March 20.

Nor is a finding of bad faith required for the reports to be precluded.  *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) ("Since Rule 37(c)(1) by its terms does not require a showing of bad faith, we now hold that such a requirement should not be read into the Rule."); *see also Softel,* 118 F.3d at 961 (district court did not abuse discretion by precluding testimony of expert witness for failure to meet deadline, finding insufficient time and administrative issues an "inadequate" explanation).

## B.    The Monteleone Report Is Not A Rebuttal Report.

Mr. Monteleone's report should be stricken for the separate and independent reason that it does not rebut Dr. Thomas's report.  Although it is difficult to imagine any circumstance in which an insurance lawyer could rebut the expert testimony of an engineer, Mr. Monteleone concedes the obvious:  "*I didn't write [my report] as rebuttal to anything in [Dr. Thomas's] report.*"  Roman Decl. Ex. 39 at 61:24-25 (emphasis added); *see also* Roman Decl. Ex. 39  at 62:11-13 ("there's probably no rebuttal to anything in [Dr. Thomas's]] report because I'm focusing on insurance aspects of professional services"); Roman Decl. Ex. 39  at 84:24-25 ("I did not do this as a rebuttal report").  If it was not a rebuttal report, it was due March 20.  That should end the matter.

Even a casual review of Mr. Monteleone's report reveals why he concedes that his report does not rebut Dr. Thomas's.  At the outset, Mr. Monteleone states that "I expect to testify regarding my experience in the insurance industry," Roman Decl. Ex. 37 at 1, and he concludes by asserting that his opinions are based on his "experience in the areas of insurance claims handling and insurance company underwriting practices," *id.* at 8.  In between, Mr. Monteleone offers three opinions: (i) that "[p]rofessional liability and casualty policies are customarily underwritten in separate underwriting departments"; (ii) "liability arising out of services of the type performed by Lafarge . . . is customarily excluded from coverage under general liability casualty policies by the inclusion of a 'professional services' exclusion"; and (iii) the "allegations and claims in the underlying [*Trois-Rivières*] litigation . . . involve the alleged liability for the types of activities that are customarily excluded from coverage by the 'professional services' exclusions contained in the . . . policies at issue."  *Id.* at 3, 5, 7.

None of these issues is addressed in Dr. Thomas's report.  Dr. Thomas does not opine about insurance or its underwriting; rather, he addresses the manner in which professional services are provided in the relevant industries and the level of skill or expertise needed to provide such services. ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████ Thomas Decl. Ex. 1 at 24-25.  Mr. Monteleone's report is not responsive to these opinions.

### C.     Mr. Monteleone's Opinions Are Improper.

Mr. Monteleone's opinions should be stricken for two additional reasons: (i) the substance of Mr. Monteleone's report and testimony concerns the customs and practices of the insurance industry, which is irrelevant when, as here, there is no claim that the policy is

ambiguous and (ii) Mr. Monteleone's report offers legal opinions that seek to invade the province of the Court.

### 1.    Opinions about Custom and Practice Are Irrelevant.

Extrinsic evidence, such as testimony about industry custom and practice, is admissible only when the policy provision at issue is ambiguous. *See, e.g., Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, 166 (Can.) ("it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face"); *B... C... v. Canada Vie Compagnie d'Assurance*, 2008 QCCS 5506, at ¶ 35 (Can. Que. Super. Ct.) ("[T]he Court believes that the terms of the insurance contract are indeed clear, and in the absence of ambiguity, the intent of the parties is deduced from the text of the policy. In fact, it is only in case of doubt that we must seek extrinsic proof.").[30]

Each of Mr. Monteleone's three expert opinions concerns customary practices in the insurance industry, specifically, that "professional liability and casualty policies are *customarily* underwritten in separate underwriting departments," "liability arising out of services of the type performed by Lafarge . . . is *customarily* excluded from coverage under general liability casualty policies by the inclusion of a '[p]rofessional services' exclusion," and the "allegations and claims in the underlying [*Trois-Rivières*] litigation . . . involve the alleged liability for the types of activities that are *customarily* excluded from coverage by the 'professional services' exclusions

---

[30] In the event that Virginia law were applied, the rule is the same. *See, e.g., Title Ins. Co. of Richmond v. Howell*, 164 S.E. 387, 389 (Va. 1932) ("extraneous evidence of a custom which alters or varies the terms of . . . a contract is upon familiar principles inadmissible"); *S. Ins. Co. of Virginia v. Williams*, 561 S.E.2d 730, 733 (Va. 2002) ("It is well established that insurance contracts, like other contracts, generally are to be construed according to their terms and without reference to parol evidence.  However, resort to parol evidence is proper where a latent ambiguity exists in a particular insurance contract.").

contained in the . . . policies at issue." Roman Decl. Ex. 37 at 3-7 (emphases added). Indeed, Mr. Monteleone admits in the opening of his report that insurance industry custom and practice is the primary basis of his opinions. *Id.* at 1.

In the absence of a contention by AIG that its professional services exclusion is ambiguous – a contention that AIG has not made – and a finding by this Court that extrinsic evidence is appropriate to assist the Court or trier of fact in resolving the ambiguity – a finding that this Court has not made – Mr. Monteleone's opinions as to industry custom and practice are irrelevant and should be excluded.

### 2.      Legal Opinions Are Inadmissible.

In the course of offering extrinsic evidence, Mr. Monteleone's report offers legal opinions and conclusions that are irrelevant and should be stricken in the event that the Court finds that the professional services exclusion is ambiguous and allows extrinsic evidence to resolve the ambiguity. *See e.g.*, *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("as a general rule[,] an expert's testimony on issues of law is inadmissible"); *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Expert testimony may not usurp the province of the judge to instruct on the law"). Courts in this Circuit have been particularly hostile to expert testimony that seeks to interpret contract terms for the judge. *See e.g. Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (affirming district court forbidding expert testimony offering interpretation of contract term because it "would give the appearance that the court was shifting to witnesses the responsibility to decide the case"); *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988), *reheard on other grounds*, 856 F.2d 5 (2d Cir. 1988) ("Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions.").

Here, Mr. Monteleone's report attempts to invade this Court's province by opining as to how the professional service exclusion should be interpreted.  For example, Mr. Monteleone asserts that testimony that the underlying litigation did not involve Lafarge's own product and that the testing undertaken by Lafarge did not require specialized knowledge "should be irrelevant to the potential applicability of the exclusion."  Roman Decl. Ex. 37 at 5-6.  Similarly, Mr. Monteleone states that "the professional services exclusion does not require that the professional services are [sic] rendered pursuant to any contract, oral or written."  *Id.* at 6.  Likewise, Mr. Monteleone claims that "the professional services exclusion contains no requirement that such services be rendered for a fee in order for the exclusion to apply."  *Id.* at 7.

Because Mr. Monteleone cannot pass off such legal opinions as testimony about the customary practice of insurance underwriters, *see Bilzerian*, 926 F.2d at 1295 ("testimony encompassing ultimate legal conclusion based upon facts of case is not admissible and may not be made so simply because it is presented in terms of industry practice"), those opinions should be stricken from his report and he should otherwise be prohibited from presenting them.

## CONCLUSION

For the reasons stated in the foregoing, Lafarge respectfully requests that the Court (a) hold that Quebec substantive law applies to all Policies, (b) enter a declaratory judgment in the form set forth in the accompanying proposed order, and (c) strike the reports of AIG's proffered experts Mr. Ahearn and Mr. Monteleone (and exclude them from testifying at trial).

New York, New York
June 12, 2017

Respectfully submitted,

COVINGTON & BURLING LLP


By:   s/ Bert Wells
          Bert Wells

Neil K. Roman
Jonathan D. Cohen
Russell M. Squire
Abdi Aidid
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
bwells@cov.com
nroman@cov.com
jcohen@cov.com
rsquire@cov.com
aaidid@cov.com


*Counsel for Plaintiffs Lafarge Canada
Inc. and Lafarge North America Inc.*

51

## ATTACHMENT A

| Primary Policy Period(s) | Primary Limit* |
|---|---|
| April 1, 2001 to April 1, 2002<br>April 1, 2002 to April 1, 2003<br>April 1, 2003 to April 1, 2004 | C$1 million |
| April 1, 2004 to April 1, 2005 | C$2 million |
| April 1, 2005 to April 1, 2006<br>April 1, 2006 to April 1, 2007<br>April 1, 2007 to July 1, 2007<br>July 1, 2007 to July 1, 2008<br>July 1, 2008 to July 1, 2009<br>July 1, 2009 to July 1, 2010<br>July 1, 2010 to July 1, 2011 | C$5 million |
| July 1, 2011 to July 1, 2012 | C$2 million |

\*       Each stated limit is further restricted by the effect of the provision in each Primary Policy stating that any payment of coverage that erodes the limits of one Primary Policy also erodes the limits of all other Primary Policies in equal amount.

**A**TTACHMENT **B**

| Umbrella Policy Period(s) | AIG Canada Umbrella Limit | Lexington Umbrella Limit |
|---|---|---|
| April 1, 2004 to April 1, 2005 | US$3 million | US$50 million |
| April 1, 2005 to April 1, 2006<br>April 1, 2006 to April 1, 2007<br>April 1, 2007 to July 1, 2007<br>July 1, 2007 to July 1, 2008<br>July 1, 2008 to July 1, 2009<br>July 1, 2009 to July 1, 2010<br>July 1, 2010 to July 1, 2011 | N/A | US$50 million |
| July 1, 2011 to July 1, 2012 | US$50 million | US$50 million |

53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————x
                         :

LAFARGE CANADA INC. and LAFARGE    :
NORTH AMERICA INC.,                   :
                          :

                Plaintiffs,      :
                          :

                  v.         :    15-CV-8957 (RA)
                          :

AMERICAN HOME ASSURANCE COMPANY, :    **[PROPOSED] ORDER GRANTING**
AIG INSURANCE COMPANY OF CANADA,   :    **PLAINTIFFS' MOTION FOR**
and LEXINGTON INSURANCE COMPANY,   :    **SUMMARY JUDGMENT AND**
                          :    **PLAINTIFFS' MOTION TO**
          Defendants.      :    **STRIKE**
                          :

————————————————————x

      Upon consideration of Plaintiffs' motion for summary judgment and motion to strike, the opposition thereto, and the entire record herein, it is hereby

      ORDERED that Plaintiff's motion to strike is granted and the reports of David Ahearn and Joseph Monteleone are hereby stricken; and it is further

      ORDERED that Plaintiffs' motion for summary judgment is granted; and it is further

      ORDERED that Plaintiffs are entitled to and are hereby awarded a declaratory judgment as follows as to the policies of insurance listed in Attachment A to this Order (the "Policies"):

      1.      Defendants American Home Assurance Company ("American Home"), AIG Insurance Company of Canada ("AIG Canada"), and Lexington Insurance Company ("Lexington") are obligated under the Policies to provide liability insurance coverage to plaintiff Lafarge Canada Inc. ("LCI") by paying indemnity costs, if any, and defense costs arising from claims asserted against LCI alleging damage to the concrete foundations of buildings and other concrete structures (each, a "TR Property") located in the province of Quebec, Canada allegedly arising from incorporation in such concrete of aggregate sourced from the B&B Quarry

containing the mineral pyrrhotite (the "TR Claims").  For purposes of this Order, each TR

Property shall be treated as if it were a separate TR Claim.

2.      For each TR Claim, the Policies from which LCI may elect to recover indemnity

and defense costs are those with policy periods that overlap with the period commencing on the

date that concrete was first poured at the TR Property (the "pour date") and ending on the date

that the damage at that TR Property manifested.  Such period shall be termed the "trigger

period," and such TR Claim shall be said to "trigger" such Policies for purposes of this Order.

3.      Indemnity costs shall consist of payments in satisfaction of (a) judgments of TR

Claims and (b) settlements of TR Claims to which Defendants have consented, which consent

shall be neither unreasonably denied nor delayed.  Indemnity costs shall also include pre- and

post-judgment interest, costs of bonds on appeal, and any other amounts other than defense costs

for which the Policies provide coverage.

4.      Defense costs shall consist of reasonable fees and expenses of counsel for the

defense of the TR Claims, including disbursements to third parties (experts and others)

reasonably incurred in the defense of the TR Claims.

5.      Any purported absence of visible damage from pyrrhotite oxidation at a TR

Property shall not be considered in evaluating whether the TR Property has suffered such

damage, or whether a proposed settlement of the TR Claim is reasonable, if other evidence

reasonably supports the existence of damage from pyrrhotite oxidation at the TR Property.

6.      The TR Claims collectively constitute a single occurrence under all Policies.

7.      A TR Claim satisfies all conditions for coverage under every Primary Policy that

it triggers, with the exception of Primary Policies, if any, for which the per-occurrence limit for

TR Claims, as set forth in Attachment A, has been exhausted.  Where this Order provides that

LCI is entitled to payment of indemnity or defense costs from a Primary Policy, LCI may demand such payment from either American Home or AIG Canada, in the case of Primary Policies in the period April 1, 2001 to July 1, 2008, or AIG Canada only, in the case of subsequent Primary Policies.

8. A TR Claim satisfies all conditions for coverage under every Umbrella Policy that it triggers for which the retained limit for TR Claims has been satisfied, with the exception of Umbrella Policies, if any, for which the per-occurrence limit for TR Claims or the aggregate limit has been exhausted, as set forth in Attachment A. Where this Order provides that LCI is entitled to payment of indemnity or defense costs from an Umbrella Policy, LCI may demand such payment from either Lexington or AIG Canada, depending which is the issuer.

9. The retained limit for TR Claims for an Umbrella Policy will be satisfied if the total telescoped portion of indemnity costs for all TR Claims that trigger the Umbrella Policy is C$2 million or more. For purposes of this determination, the "telescoped portion" of indemnity costs for any one TR Claim that triggers an Umbrella Policy shall be (a) if the pour date is within the period of the Umbrella Policy, 100% of such indemnity costs, and (b) if the pour date precedes the period of the Umbrella Policy, a percentage of such indemnity costs equal to the ratio of (i) the time from the start of the policy period to the end of the trigger period to (ii) the trigger period. This determination shall be made separately for each Umbrella Policy without reference to whether such telescoped portion of indemnity costs includes amounts that also constitutes the telescoped portion of indemnity costs for some other Umbrella Policy.

10. LCI is entitled to payment of indemnity costs from each Primary Policy for which a TR Claim satisfies all conditions for coverage under paragraph 7, and the amount payable under such Primary Policy shall be a percentage of the indemnity costs equal to the ratio of (i)

the time that the trigger period and the policy period overlap to (ii) the trigger period.

      11.     LCI is entitled to payment of indemnity costs from each Umbrella Policy for which a TR Claim satisfies all conditions for coverage under paragraph 8, and the amount payable under such Umbrella Policy shall be the telescoped portion of the indemnity costs paid after the retained limit was satisfied.

      12.     LCI is not entitled to duplicative recoveries under paragraphs 10 and 11 and may not recover more than 100% of its indemnity costs.

      13.     Per-occurrence limits, and aggregate limits for Umbrella Policies, are eroded by payment of judgments and settlements only, not other types of indemnity costs or defense costs.

      14.     LCI is entitled to recover defense costs from each Policy in proportion to how the amount demanded by underlying claimants in TR Claims would be allocated to that Policy, regardless of whether that Policy is a Primary or Umbrella Policy.  To the extent that LCI has disproportionately recovered defense costs incurred to date from any Primary Policies, LCI shall be entitled to re-allocate such defense costs among the Policies in accordance with this paragraph, and Defendants shall pay such re-allocated amounts consistent with the foregoing.


**SO ORDERED.**


Dated:_____


                                      _____
                                        Hon. Ronnie Abrams
                                        United States District Judge

**Attachment A**

| Period | Issuer | Policy No. | Primary Policy or Umbrella Policy | Per-Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 4/1/2001-4/1/2002 | American Home | RMGLA 2505270 | Primary Policy | C$1 million | N/A |
| 4/1/2002-4/1/2003 | American Home | RMGLA 2505270 | Primary Policy | C$1 million | N/A |
| 4/1/2003-4/1/2004 | American Home | RMGLA 2505270 | Primary Policy | C$1 million | N/A |
| 4/1/2004-4/1/2005 | American Home | RMGLA 2505270 | Primary Policy | C$2 million | N/A |
| 4/1/2004-4/1/2005 | AIG Canada | 5462471 | Umbrella Policy | US$ 3 million | US$ 3 million |
| 4/1/2004-4/1/2005 | Lexington | 509/DL416804 | Umbrella Policy | US$ 50 million | US$ 50 million |
| 4/1/2005-4/1/2006 | American Home | RMGL 2505270 | Primary Policy | C$5 million | N/A |
| 4/1/2005-4/1/2006 | Lexington | 5577221 | Umbrella Policy | US$ 50 million | US$ 50 million |
| 4/1/2006-4/1/2007 | American Home | RMGL 2505270 | Primary Policy | C$5 million | N/A |
| 4/1/2006-4/1/2007 | Lexington | 5577402 | Umbrella Policy | US$ 50 million | US$ 50 million |
| 4/1/2007-7/1/2007 | American Home | RMGL 2505270 | Primary Policy | C$5 million | N/A |
| 4/1/2007-7/1/2007 | Lexington | 5577605 | Umbrella Policy | US$ 50 million | US$ 50 million |
| 7/1/2007-7/1/2008 | American Home | RMGL 2505270 | Primary Policy | C$5 million | N/A |
| 7/1/2007-7/1/2008 | Lexington | 5577605 | Umbrella Policy | US$ 50 million | US$ 50 million |

| Period | Issuer | Policy No. | Primary Policy or Umbrella Policy | Per-Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 7/1/2008-7/1/2009 | AIG Canada | RMGL 2505270 | Primary Policy | C$5 million | N/A |
| 7/1/2008-7/1/2009 | Lexington | 2213650 | Umbrella Policy | US$ 50 million | US$ 50 million |
| 7/1/2009-7/1/2010 | AIG Canada | RMGL 2505270 | Primary Policy | C$5 million | N/A |
| 7/1/2009-7/1/2010 | Lexington | 2213938 | Umbrella Policy | US$ 50 million | US$ 50 million |
| 7/1/2010-7/1/2011 | AIG Canada | RMGL 2505270 | Primary Policy | C$5 million | N/A |
| 7/1/2010-7/1/2011 | Lexington | 62785160 | Umbrella Policy | US$ 50 million | US$ 50 million |
| 7/1/2011-7/1/2012 | AIG Canada | RMGL 2505270 | Primary Policy | C$2 million | N/A |
| 7/1/2011-7/1/2012 | Lexington | 62785160 | Umbrella Policy | US$ 50 million | US$ 50 million |
| 7/1/2011-7/1/2012 | AIG Canada | 20418478 | Umbrella Policy | US$ 50 million | US$ 50 million |