UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                                      :

LAFARGE CANADA INC. and LAFARGE    :
NORTH AMERICA INC.                     :
                                        :

                 Plaintiffs,      :

                    v.        :     15-CV-8957 (RA)
                                     :

AMERICAN HOME ASSURANCE COMPANY, :   PLAINTIFFS' STATEMENT OF
AIG INSURANCE COMPANY OF CANADA,   :   UNDISPUTED MATERIAL FACTS
and LEXINGTON INSURANCE COMPANY,   :   PURSUANT TO LOCAL RULE 56.1
                                        :

                 Defendants.   :
-------------------------------------------------------------x

        Plaintiffs Lafarge Canada Inc. ("LCI") and Lafarge North America Inc.,  ("LNA" and, with LCI, "Lafarge") submit the following Statement of Undisputed Material Facts pursuant to Southern District of New York Local Rule 56.1 in support of their motion for summary judgment:

        1.      LCI is a Canadian corporation, and since 2013 its headquarters and principal place of business have been in Mississauga, Ontario, Canada.  Declaration of John Shelonko ("Shelonko Decl.")  ¶¶ 3, 6.

        2.      LNA is a Maryland corporation.  Shelonko Decl. ¶ 7.

        3.      From 2001 to 2012,  LNA's headquarters and principal place of business were in Virginia.  In 2012, LNA's headquarters and principal place of business moved to Chicago, where they have been since.  Shelonko Decl. ¶ 7.

        4.      LCI is a wholly-owned subsidiary of LNA.  Shelonko Decl. ¶ 3.

5.      From at least 2001 through 2012, LCI's headquarters and principal place of business were in Montreal, Quebec, Canada.  Shelonko Decl. ¶ 5.

6.      Defendants American Home Assurance Company, AIG Insurance Company of Canada, and Lexington Insurance Company are subsidiaries of American International Group Inc. (collectively, "AIG").  Dkt. 23, Defendants' Answer ¶ 2.

7.      Beginning in 2008, hundreds of property owners in or near the city of Trois-Rivières, Quebec, Canada reported defects in concrete attributable to excessive concentrations of an iron sulfide mineral known as pyrrhotite in loads of B&B Quarry aggregate. Declaration of Olivier Therrien ("Therrien Decl.") ¶¶ 5-6, 8.

8.      Property owners began filing claims in Quebec seeking compensation for such alleged property damage in 2009 (the "*Trois-Rivières* Litigation").  Therrien Decl. ¶ 6.

9.      Approximately 240 separate lawsuits have been filed in the *Trois-Rivières* Litigation, relating to approximately 1,400 buildings.  Therrien Decl. ¶ 8.

10.      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

11.      Property owners in the Trois-Rivières region continue to file lawsuits for damage allegedly caused by aggregate sourced from B&B Quarry.  Therrien Decl. ¶ 35.

12.      Aggregate consists of crushed rock, gravel, or sand.  Thomas Decl. Ex. 1 at 4.

2

13.    Aggregate is added to a mixture of cement and water to produce concrete.

Thomas Decl. Ex. 1 at 4.

14.    ████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

15.    ████████████████████████████████████
████████████████████████████████████████

16.    ████████████████████████████████████
████████████████

17.    ████████████████████████████████
████████████████████████████

18.    ████████████████████████████████
██████████████

19.    ████████████████████████████████████
████████████████████████

20.    ██████████████████████████████████
████████████████████████████████████████

21.    ██████████████████████████████████
████████████████████████████████

22.    ████████████████████████████████████
██████████████████████████████████████

23.    ████████████████████████████████████
████████████████████████████████████

24. ████████████████████████████████████
████████████████████████████████████████████████
██

25. ██████████████████████████████████████
███████████████████

26. ██████████████████████████████████████
██████████

27. ███████████████████████████████████████
████████████████████████

28. ████████████████████████████████████████
████████████

29. ███████████████████████████████████████
████████████████████████████████████████████████

30.     If concrete containing pyrrhotite is not exposed to water (*e.g.*, an interior wall) or deprived of oxygen (*e.g.*, a concrete slab buried underground), it may never exhibit any damage.  Thomas Decl. Ex. 1 at 16-17.

31. ██████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

32. █████████████████████████████████████
████████████████████████████████████████████████
███

33.   ███████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

34.   For some, but not all of the properties at issue in the TR Claims, LCI sold the cement used in the concrete that also contained B&B Quarry aggregate. Shelonko Decl. ¶ 23.

35.   None of the TR Claims has been filed against LNA; LCI is the only Lafarge entity against which TR Claims have been asserted. Therrien Decl. ¶ 19.

36.   None of the TR Claims alleges that LCI's cement, or any other product manufactured or supplied by Lafarge, was defective or contributed to property damage. Therrien Decl. ¶ 37.

37.   Concrete in the TR Claim properties was supplied by Béton Laurentide ("Laurentide") or Construction Yvan Boisvert ("Boisvert"). Roman Decl. Ex. 2 ¶¶ 6-7.

38.   As of 2001, Laurentide and Boisvert were co-owners of the B&B Quarry. Therrien Decl. ¶ 7.

39.   Laurentide began incorporating B&B Quarry aggregate into concrete structures in the Trois-Rivières region in 2001. Therrien Decl. ¶ 7.

40.   Boisvert began incorporating B&B Quarry aggregate into concrete structures in the Trois-Rivières region before 2001. Therrien Decl. ¶ 7.

41.   Laurentide and Boisvert represent that they stopped using B&B Quarry aggregate to produce concrete around 2008. Therrien Decl. ¶ 7.

42.    Plaintiffs in the TR Claims have generally alleged that the damage is sufficiently severe that the foundations of the buildings (or other concrete structures) must be replaced.  Therrien Decl. ¶ 11.

43.    In the case of single-family homes, occupants must vacate the homes while contractors lift the structures, demolish the foundations, pour a new foundation, and reassemble the home and foundation.  Therrien Decl. ¶ 12.

44.    For larger dwellings (*e.g.*, multi-family homes) and commercial buildings, other expensive repair and replacement methods are required.  Therrien Decl. ¶ 13.

45.    ███████████████████████████████████████████
████████████████████████

46.    ███████████████████████████████████████████
██████████████████████████████████

47.    The TR Claims allege that LCI and Marie de Grosbois, a former LCI employee, informed Laurentide that the B&B Quarry aggregate was suitable to use in concrete. Therrien Decl. ¶ 38.

48.    The TR Claims also allege that Lafarge and Ms. de Grosbois failed to warn Laurentide that the B&B Quarry aggregate was not suitable to use in concrete.  Therrien Decl. ¶ 38.

49.    The TR Claims also allege that Lafarge and Ms. de Grosbois failed to prevent Laurentide and others from using aggregate sourced from the B&B Quarry.  Therrien Decl. ¶ 38.

50.    The grounds for LCI's alleged joint-and-several liability in the *Trois-Rivières* claims included

6

a.  In February 2002, Laurentide was provided with a one-page chemical analysis spreadsheet by a Lafarge representative and the following day a representative of Laurentide spoke by telephone with Marie de Grosbois of Lafarge.  The statements of claims are alleging that Ms. de Grosbois would have assured Laurentide that the aggregate was suitable for use in concrete.

b.  In May 2002, after having received an independent expert's report characterizing the B&B Quarry aggregate as being similar to aggregate from a nearby quarry as to which issues had been raised, Laurentide faxed the report to LCI with a request for reaction in light of LCI's February 2002 communications about aggregate chemical composition.  LCI never responded to the fax, and thereafter continuously failed to warn about B&B Quarry aggregate notwithstanding having knowledge of the contents of the report.

c.  After agreeing in November 2005 to perform a technical comparison of B&B Quarry aggregate samples with samples from a nearby quarry known to cause concrete defects, LCI negligently delayed (until early 2006) warning Laurentide that continued use of B&B Quarry aggregate was risky.

d.  After determining that continued use of B&B Quarry aggregate was risky, notwithstanding an alleged power to control Laurentide, LCI failed to cause Laurentide to cease use of the aggregate.

e.  After determining that continued use of B&B Quarry aggregate was risky, the statement of claims alleges Laurentide failed to warn all parties that might be involved in use of such aggregate.

Therrien Decl. ¶ 39; Therrien Decl. Ex. 2 at LAF0000739368 - LAF0000739370; Therrien Decl. Ex. 3 at LAF0000000479 - LAF0000000481.

51.     LCI disputes these allegations and maintains that it is not liable for any of the TR Claims.  Therrien Decl. ¶ 40.

52.     LCI warned Laurentide about the risks of using B&B Quarry aggregate in 2006.  Therrien Decl. ¶ 41.

53.     Laurentide and Boisvert continued using B&B Quarry aggregate for approximately two years after Lafarge's warning.  Therrien Decl. ¶ 41.

54.     The *Trois-Rivières* Litigation is of intense public interest in Quebec not only in the community of Trois-Rivieres, but also parts of the Mauricie regional administrative district, because of the displacement and financial harm caused by the property damage. Therrien Decl. ¶ 14.

55.     Governmental bodies have had to intervene to help property owners while they await final determination by the courts. Therrien Decl. ¶ 14.

56.     The TR Claims include as defendants general contractors, concrete suppliers including Laurentide and the B&B Quarry, and allege property damage arising from excessive concentrations of pyrrhotite in aggregate.  Therrien Decl. ¶¶ 5, 9.

57.     In addition, the plaintiffs have sued insurers of most of the defendants. Therrien Decl. ¶ 10.

58.     The Quebec court consolidated lawsuits into a "first wave" of claims in 2012.  Therrien Decl. ¶ 16; Roman Decl. Ex. 2 ¶ 13.

59.     Trial of the first wave cases resulted in a judgment, rendered in June 2014, of approximately C$168 million.  Therrien Decl. ¶ 21.

60.     LCI was not a party to the first wave trial of the cases.  Roman Decl. Ex. 2 at 1; Therrien Decl. ¶ 16.

61.     The first wave judgment is on appeal.  Therrien Decl. ¶ 22.

62.     The court apportioned approximately 70 percent (or about C$114 million) of that first wave judgment to SNC-Lavalin.  Therrien Decl. ¶ 24.

63.    Lavalin allegedly tested B&B Quarry aggregate between 2003 and 2007 and certified periodically over that period that the aggregate was suitable for use in concrete. Therrien Decl. ¶ 24.

64.    Lavalin's share would increase with the expected insolvency or insufficiency of insurance of other defendants.  Therrien Decl. ¶ 24.

65.    Post-judgment interest on the first wave judgment has begun to accrue. Therrien Decl. at ¶ 24.

66.    Lavalin sued LCI for contribution and alleged that LCI should be held liable for all or part of the award against Lavalin.  Therrien Decl. ¶ 25.

67.    Lavalin's claims against LCI based on the first-wave judgment remain pending.  Therrien Decl. ¶ 26.

68.    Lavalin's claims against LCI constitute a substantial portion of all TR Claims pending against LCI.  Therrien Decl. ¶ 26.

69.    LCI's potential liability to Lavalin in the first-wave litigation is an undetermined share of Lavalin's total liability.  Therrien Decl. ¶ 27.

70.    LCI has incurred and will continue to incur legal fees and costs for its defense of Lavalin's first-wave contribution claims.  Shelonko Decl. ¶ 19; Therrien Decl. ¶ 28.

71.    LCI has not been subject to any judgment nor entered into a settlement with Lavalin.  Therrien Decl. ¶ 29.

72.    The Quebec court is consolidating all other claims, including subsequent claims, into a "second wave."  Therrien Decl. ¶ 17.

73.    In the second wave, LCI has been named as direct defendant by approximately 33 underlying property owners or their assignees for damage to and loss of use of

their properties and as a third-party defendant in contribution claims brought by Lavalin and other defendants.  Therrien Decl. ¶ 30.

74.     Second wave lawsuits, including contribution claims by Lavalin and other co-defendants, continue to be filed against LCI and other defendants.  Therrien Decl. ¶ 35.

75.     LCI has incurred and will continue to incur legal fees and costs for its defense of the second-wave TR Claims.  Therrien Decl. ¶ 33.

76.     LCI has not been subject to any judgment or entered any settlement and maintains that it is not liable.  Therrien Decl. ¶ 32.

77.     Second wave lawsuits are in the preliminary stages and continue to be filed.  Therrien Decl. ¶ 35.

78.     No trial date for the second wave lawsuits has been set.  Therrien Decl. ¶ 36.

79.     ███████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

80.     For the period spanning 2004-12,  insurance coverage was provided to LCI by Defendant Lexington Insurance Company ("Lexington"), which issued nine umbrella general liability ("GL") policies to LNA, and Defendant AIG Insurance Company of Canada ("AIG Canada"), which issued two umbrella GL policies to LCI.

81.     The nine umbrella GL policies issued by Lexington to LNA are:

a.  Policy No. 509/DL416804, effective from April 1, 2004 to April 1, 2005 (the "2004 Lexington Policy");

a.  Policy No. 5577221, effective from April 1, 2005 to April 1, 2006 (the "2005 Lexington Policy")

b.  Policy No. 5577402, effective from April 1, 2006 to April 1, 2007 (the "2006 Lexington Policy");

c.  Policy No. 5577605, originally effective from April 1, 2007 to April 1, 2008 and canceled as of July 1, 2007 (the "2007 Lexington Stub Policy");

d.  Policy No. 5577605 effective from July 1, 2007 to July 1, 2008 (the "2007 Lexington Policy");

e.  Policy No. 2213650, effective from July 1, 2008 to July 1, 2009 (the "2008 Lexington Policy");

f.  Policy No. 2213938, effective from July 1, 2009 to July 1, 2010 (the "2009 Lexington Policy");

g.  Policy No. 62785160, effective from July 1, 2010 to July 1, 2011 (the "2010 Lexington Policy"); and

h.  Policy No. 62785160, effective from July 1, 2011 to July 1, 2012 (the "2011 Lexington Policy").

See Roman Decl. Ex. 14 ("Exhibit 14" in 30(b)(6) Dep. of AIG witness Erik San Julian. (30(b)(6) San Julian Dep."); Roman Decl. Ex 15 ("Exhibit 15" in 30(b)(6) San Julian Dep. ); Roman Decl. Ex 16 ("Exhibit 16" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 17 ("Exhibit 17" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 18 ("Exhibit 18" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 19 ("Exhibit 19" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 20

("Exhibit 20" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 21 ("Exhibit 21" in 30(b)(6) San Julian Dep.).

82.    The two umbrella GL policies issued by AIG Canada to LCI are:

    a.  Policy No. 5462471, effective from April 1, 2004 to April 1, 2005. (the "2004 AIG Canada Policy"); and

    b.  Policy No. 20418478, effective from July 1, 2011 to July 1, 2012 (the "2011 AIG Canada Policy").

*See* Roman Decl. Ex. 13 ("Exhibit 13" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 22 ("Exhibit 22" in 30(b)(6) San Julian Dep.).

83.    As a wholly-owned subsidiary of LNA, LCI is a "Named Insured" in each of the Umbrella Policies set forth above.  Shelonko Decl. ¶¶ 12-13;  Roman Decl. Ex. 13 at LEX_00113024, LEX_00113047; Roman Decl. Ex. 14 at LEX_00000792; Roman Decl. Ex. 15 at LEX_00000842; Roman Decl. Ex. 16 at LEX_00000919; Roman Decl. Ex. 17 at LEX_00001058; Roman Decl. Ex. 18 at LEX_00000593.; Roman Decl. Ex. 19 at LEX_00000685; Roman Decl. Ex. 20 at LEX_00001093; Roman Decl. Ex. 21 at LEX00001179; Roman Decl. Ex. 22 at LEX0000529.

84.    Under the Umbrella Policies, a "Named Insured" is "any person or organization designated in … the Declarations" or "any organization in which you maintain an interest of more than fifty percent (50%)."  Roman Decl. Ex. 13 at LEX_00113047; Roman Decl. Ex. 14 at LEX_00000792; Roman Decl. Ex. 15 at LEX_00000842; Roman Decl. Ex. 16 at LEX_00000919; Roman Decl. Ex. 17 at LEX_00001058; Roman Decl. Ex. 18 at LEX_00000593.; Roman Decl. Ex. 19 at LEX_00000685; Roman Decl. Ex. 20 at LEX_00001093; Roman Decl. Ex. 21 at LEX00001179; Roman Decl. Ex. 22 at LEX0000529.

85.     LCI is insured under all the above-listed Umbrella Policies.  Roman Decl.
Ex. 4 at 68:17-69:5 (30(b)(6) San Julian Dep.).

86.     During the time that the Umbrella Policies were issued to LCI, the
domicile of LCI was Quebec, Canada.  Shelonko Decl. ¶ 10.

87.     Each Umbrella Policy provides coverage for losses arising from "property
damage" that occurs during the policy period that (i) exceeds a self-insured retention of
C$2,000,000 and (ii) is a kind of loss for which the Umbrella Policies provide coverage.  Roman
Decl. Ex. 13 at LEX_00113025, LEX_00113072; Roman Decl. Ex. 14 at LEX_00000745,
LEX_00000787; Roman Decl. Ex. 15 at LEX_00000866, LEX_00000844; Roman Decl. Ex. 16
at LEX_00000943, LEX_00000971; Roman Decl. Ex. 17 at LEX_00000992, LEX_00001007;
Roman Decl. Ex. 18 at LEX_000000631, LEX_00000595; Roman Decl. Ex. 19 at
LEX_00000674, LEX_00000687; Roman Decl. Ex. 20 at LEX_00001125, LEX_00001095;
Roman Decl. Ex. 21 at LEX00001213, LEX_00001181; Roman Decl. Ex. 22 at LEX0000480,
LEX_00000531.

88.     Each Umbrella Policy issued by Lexington has a limit of US$50 million.
Roman Decl. Ex. 14 at LEX_00000744; Roman Decl. Ex. 15 at LEX_00000812; Roman Decl.
Ex. 16 at LEX_00000893; Roman Decl. Ex. 17 at LEX_00000976; Roman Decl. Ex. 18 at
LEX_00000566; Roman Decl. Ex. 19 at LEX_00000658; Roman Decl. Ex. 20 at
LEX_00001066; Roman Decl. Ex. 21 at LEX_00001152.

89.     The 2004 AIG Canada Policy has a per-occurrence limit of C$3 million.
Roman Decl. Ex. 13 at LEX_00113024.

90.     The 2011 AIG Canada Policy has a per-occurrence limit of C$50 million.
Roman Decl. Ex. 22 at LEX_00000476.

91.    All the Umbrella Policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property," or "loss of use of tangible property that is not physically injured."  Roman Decl. Ex. 13 at LEX_00113049; Roman Decl. Ex. 14 at LEX_00000766; Roman Decl. Ex. 15 at LEX_00000888; Roman Decl. Ex. 16 at LEX_00000965; Roman Decl. Ex. 17 at LEX_00001052; Roman Decl. Ex. 18 at LEX_00000653; Roman Decl. Ex. 19 at LEX_00000737; Roman Decl. Ex. 20 at LEX_00001147; Roman Decl. Ex. 21 at LEX_00001235; Roman Decl. Ex. 22 at LEX_00000503.

92.    The Umbrella Policies provide rules for counting "occurrences."  An "occurrence" is defined in each of the Umbrella Policies as follows:

> 1.    As respects **Bodily Injury** or **Property Damage,** an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**.
>
> 2.    As respects **Personal Injury** and **Advertising Injury**,, an offense arising out of your business that causes **Personal Injury** and **Advertising Injury.** All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

Roman Decl. Ex. 13 at LEX_00113048; Roman Decl. Ex. 14 at LEX_00000765; Roman Decl. Ex. 15 at LEX_00000887; Roman Decl. Ex. 16 at LEX_00000964; Roman Decl. Ex. 17 at LEX_00001051; Roman Decl. 18 at LEX_00000652; Roman Decl. Ex. 19 at LEX_00000736; Roman Decl. Ex. 20 at LEX_00001146; Roman Decl. Ex. 21 at LEX_00001234; Roman Decl. Ex. 21 at LEX_00000502.

93.     The property damage covered by the Umbrella Policies includes risks in multiple jurisdictions.  Each Umbrella Policy states:

> We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of ... Property Damage ... to which this insurance applies.
>
> This policy applies, only if: the ... Property Damage is caused by an Occurrence that takes place anywhere, and the ... Property Damage occurs during the Policy Period.

Roman Decl. Ex. 13 at LEX_00113025; Roman Decl. Ex. 14 at LEX_00000745; Roman Decl. Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

94.     The Umbrella Policies provide that the Insurers will pay for "all damages under this policy regardless of the number of Insureds," "claims made or Suits brought," "persons or organizations making claims or bringing Suits," or "coverages provided under this policy."  Roman Decl. Ex. 13 at LEX_00113028; Roman Decl. Ex. 14 at LEX_00000747; Roman Decl. Ex. 15 at LEX_00000868; Roman Decl. Ex. 16 at LEX_00000945; Roman Decl. Ex. 17 at LEX_000001032; Roman Decl. Ex. 18 at LEX_00000633; Roman Decl. Ex. 19 at LEX_00000717; Roman Decl. Ex. 20 at LEX_00001127; Roman Decl. Ex. 21 at LEX_00001215; Roman Decl. Ex. 22 at LEX_00000482.

95.     The Umbrella Policies include a term limiting coverage that provides that insurance does not apply to any liability arising out of "any professional services performed by or on behalf of the Insured, including but not limited to the preparation or approval of maps,

15

shop drawings, plans, opinions, reports, surveys, field orders, change orders, designs or

specifications, and any supervisory, inspection or engineering services" or "any liability arising

out of the rendering of, or the failure to render, professional services or any error, omission or

mistake of a professional nature performed by or on behalf of the insured, including but not

limited to: (a) the preparation or approval of maps, plans, opinions, reports, surveys, designs or

specifications; and (b) supervisory, inspection, architectural, engineering or surveying services."

Roman Decl. Ex. 13 at LEX_00113058; Roman Decl. Ex. 14 at LEX_00000775; Roman Decl.

Ex. 15 at LEX_00000819; Roman Decl. Ex. 16 at LEX_00000901; Roman Decl. Ex. 17 at

LEX_00000984; Roman Decl. Ex. 18 at LEX_00000574; Roman Decl. Ex. 19 at

LEX_00000666; Roman Decl. Ex. 20 at LEX_00001074; Roman Decl. Ex. 21 at

LEX_00001160; Roman Decl. Ex. 22 at LEX_00000510.

   96. The Umbrella Policies protect against liability risks in excess of a stated

"retained limit." The retained limit is C$2 million for LCI and US$2 million for LNA. Ex. 13 at

LEX_00113072; Ex. 14 at LEX_00000787; Ex. 15 at LEX_00000844; Ex. 16 at

LEX_00000921; Ex. 17 at LEX_00001007; Ex. 18 at LEX_00000595; Ex. 19 at

LEX_00000687; Ex. 20 at LEX_00001095; Ex. 21 at LEX_00001181; Ex. 22 at

LEX_00000531.

   97. The definition of "Loss" under the Umbrella Policies includes the phrase

"those sums actually paid as judgments or settlements." Roman Decl. Ex. 13 at LEX_00113046;

Roman Decl. Ex. 14 at LEX_00000763; Roman Decl. Ex. 15 at LEX_00000842; Roman Decl.

Ex. 16 at LEX_00000919; Roman Decl. Ex. 17 at LEX_00001058; Roman Decl. Ex. 18 at

LEX_00000593; Roman Decl. Ex. 19 at LEX_00000685; Roman Decl. Ex. 20 at

LEX_00001093; Roman Decl. Ex. 21 at LEX_00001179; Roman Decl. Ex. 22 at

LEX_00000501.

98.     Each Umbrella Policy states that coverage applies to "Property Damage"

that "occurs during the Policy Period" and also that:

> If such an **Insured,** or authorized employee knew, prior to the
> **Policy Period,** that the **Bodily Injury** or **Property Damage**
> had occurred, then any continuation, change or resumption of
> such **Bodily Injury** or **Property Damage** during or after the
> **Policy Period** will be deemed to have been known prior to the
> **Policy Period**

Roman Decl. Ex. 13 at LEX_00113025; Roman Decl. Ex. 14 at LEX_00000788; Roman Decl.

Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at

LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at

LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at

LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

99.     The "insuring agreement" of each Umbrella Policy states that the policy

applies only if "no employee authorized by you to give or receive notice of an **Occurrence,**

claim or Suit, knew that the **Bodily Injury** or **Property Damage** had occurred, in whole or in

part."   Roman Decl. Ex. 13 at LEX_0011073; Roman Decl. Ex. 14 at LEX_00000788; Roman

Decl. Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at

LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at

LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at

LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

100.     Between 2001 and 2012, LNA and LCI obtained umbrella and excess

coverage (the "Excess Policies") above the Primary Policies from 2001-04 and above the

Umbrella Policies from 2004-12.  Shelonko Decl. ¶ 15.

101.    LCI is a Named Insured under the Excess Policies.  Shelonko Decl. ¶ 15.

102.    LCI is  insured by seven primary GL policies issued by Defendant American Home Assurance Company ("American Home") and four primary GL policies issued by AIG Canada. (Collectively, these policies are referred to by AIG as the "Primary Policies.") AIG Answer ¶ 54.

103.    The eight primary GL policies issued by American Home to LCI are:

    a.  Policy No. RMGLA 2505270, effective from April 1, 1996 to April 1, 1997 (the "1996 American Home Policy");

    b.  Policy No. RMGLA 2505270, effective from April 1, 2001 to April 1, 2002 (the "2001 American Home Policy");

    c.  Policy No. RMGLA 2505270, effective from April 1, 2002 to April 1, 2003 (the "2003 American Home Policy");

    d.  Policy No. RMGLA 2505270, effective from April 1, 2003 to April 1, 2004 (the "2003 American Home Policy");

    e.  Policy No. RMGLA 2505270, effective from April 1, 2004 to April 1, 2005 (the "2004 American Home Policy");

    f.  Policy No. RMGLA 2505270, effective from April 1, 2005 to April 1, 2006 (the "2005 American Home Policy");

    g.  Policy No. RMGL 2505270, effective from April 1, 2006 to April 1, 2007 (the "2006 American Home Policy"); and

    h.  Policy No RMGL 2505270, effective from April 1, 2007 to April 1, 2008 (the "2007 American Home Policy").

18

*See* Roman Decl. Ex. 5 ("Exhibit 5" in AIG's 30(b)(6) San Julian Dep.); Roman Decl. Ex. 6 ("Exhibit 6" in AIG's 30(b)(6) San Julian Dep.); Roman Decl. Ex. 7 ("Exhibit 7" in AIG's 30(b)(6) San Julian Dep.); Roman Decl. Ex. 8 ("Exhibit 8" in AIG's 30(b)(6) San Julian Dep.).

104. The four primary GL policies issued by AIG Canada to LCI are as follows:

     i.  Policy No. RMGL 2505270, effective from July 1, 2008 to July 1, 2009 (the "2008 AIG Canada Primary Policy");

     j.  Policy No. RMGL 2505270, effective from July 1, 2009 to July 1, 2010 (the "2009 AIG Canada Primary Policy");

     k.  Policy No. RMGL 2505270, effective from July 1, 2010 to July 1, 2011 (the "2010 AIG Canada Primary Policy"); and

     l.  Policy No. RMGL 2505270, effective from July 1, 2011 to July 1, 2012 (the "2011 AIG Canada Primary Policy").

*See* Roman Decl. Ex. 9 ("Exhibit 9" in AIG's 30(b)(6) San Julian Dep.); Roman Decl. Ex. 10 ("Exhibit 10" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 11 ("Exhibit 11" in30(b)(6) San Julian Dep.); Roman Decl. Ex. 12 ("Exhibit 12" in 30(b)(6) San Julian Dep.). Effective November 1, 2008, all of the American Home Primary Policies were novated to AIG Canada. Roman Decl. Ex. 39 at 4.

105. LCI is a "Named Insured" in the declarations of each of the Primary Policies set forth above. Roman Decl. Ex. 5 at LEX_0001239; Roman Declaration Ex. 6 at LEX_00001297; Roman Decl. Ex. 7 at LEX_00001346; Roman Decl. Ex. 8 at LEX_00001391; Roman Decl. Ex. 9 at LEX_00001430; Roman Decl. Ex. 10 at LEX_00001484; Roman Decl.

Ex. 11 at LEX_00001538; Roman Decl. Ex. 12 at LEX_00001597.  LCI is insured under all of these policies.  Roman Decl. Ex. 4 at 68:17-69:5 (30(b)(6) San Julian Dep.).

106.    During the time that the Primary Policies were issued to LCI, the domicile of LCI was Quebec, Canada.  Shelonko Decl. ¶ 10.

107.    All claims for defense or indemnity costs paid by American Home and AIG Canada under the Primary Policies are ultimately reimbursed by Lafarge.  Roman Decl. Ex. 23 at 49:5-51:15 (Lafarge 30(b)(6) Shelonko Dep.); Shelonko Decl. ¶ 14.

108.    The limits of the Primary Policies range from C$1 million to C$5 million. Roman Decl. Ex. 5 at LEX_00001239; Roman Decl. Ex. 6 at LEX_0001297; Roman Decl. Ex. 7 at LEX_00001346; Roman Decl. Ex. 8 at LEX_00001391; Roman Decl. Ex. 9 at LEX_00001430; Roman Decl. Ex. 10 at LEX_00001484; Roman Decl. Ex. 11 at LEX_00001538; Roman Decl. Ex. 12 at LEX_00001597.

109.    The Primary Policies each provide coverage for property damage liability. Specifically, each policy provides that the Insurers will pay

> all sums which the Insured shall become obligated to pay by reason of the liability imposed upon the Insured by law or assumed under contract or agreement because of:
>
> (a) Injury to, destruction or loss of property or any loss of use of property caused by an accident; or
>
> (b) Injury to, destruction or loss of tangible property or any loss of use of property caused by an occurrence . . . .

Roman Decl. Ex. 5 at LEX_0001241; Roman Declaration Ex. 6 at  LEX_00001299; Roman Decl. Ex. 7 at  LEX_00001348; Roman Decl. Ex. 8 at LEX_00001393; Roman Decl. Ex. 9 at LEX_00001432; Roman Decl. Ex. 10 at LEX_00001486; Roman Decl. Ex. 11 at LEX_00001540; Roman Decl. Ex. 12 at LEX_00001599.

110.    The Primary Policies provide rules for counting "occurrences."  An "occurrence" is defined in each of the Primary Policies as follows:

> With respect to Bodily Injury and Property Damage, "Occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions which result in Bodily Injury or Property Damage during the Policy Period, neither intended nor expected from the standpoint of the Insured.
>
> With respect to Personal Injury, "Occurrence" means an act or series of acts of the same or similar nature committed during the Policy Period which results in a Personal Injury.

Roman Decl. Ex. 5 at LEX_00001243; Roman Decl. Ex. 6 at LEX_0001301; Roman Decl. Ex. 7 at LEX_00001350; Roman Decl. Ex. 8 at LEX_00001395; Roman Decl. Ex. 9 at LEX_00001434; Roman Decl. Ex. 10 at LEX_00001488; Roman Decl. Ex. 11 at LEX_00001542; Roman Decl. Ex. 12 at LEX_00001601.

111.    The property damage covered by the Primary Policies covers risks in multiple jurisdictions.  With the exception of the 2010 and 2011 AIG Canada Primary Policies, each of the Primary Policies "applies to accidents or occurrences which take place ... anywhere in the world."  Roman Decl. Ex. 5 at LEX_00001252; Roman Decl. Ex. 6 at LEX_0001309; Roman Decl. Ex. 7 at LEX_00001358; Roman Decl. Ex. 8 at LEX_00001402; Roman Decl. Ex. 9 at LEX_00001442; Roman Decl. Ex. 10 at LEX_00001496.

112.    The 2010 and 2011 AIG Canada Primary Policies provide coverage for occurrences which take place during the policy period in any "coverage territory." According to the policies, "coverage territory" means

> a.  Canada and the United States of America (including its territories and possessions);
> b.  [I]nternational waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

21

    c.  All parts of the world if:
        1)  The injury or damage arises out of:
               a. Goods or products made or sold by you in the territory described in a. above; or
               b. The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and
        2)  [T]he insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to in writing.

Roman Decl. Ex. 11 at LEX_00001550; Roman Decl. Ex. 12 at LEX_000001609.

        113.    Each Primary Policy also contains an endorsement entitled "Non-Accumulation of Limits of Insurance." The following provision is included in each Primary Policy:

> It is agreed that in the event coverage for an occurrence is deemed to involve coverage under this policy or any other commercial general liability policy ... the company's total limit of insurance for all damages because of bodily injury and property damage and all personal injury and advertising injury shall not exceed [amount] for any occurrence . . . .

The only variation between policies is the limits, which range from C$1 million to C$5 million. Roman Decl. Ex. 5 at LEX_00001255; Roman Decl. Ex. 6 at LEX_00001311; Roman Decl. Ex. 7 at LEX_00001360; Roman Decl. Ex. 8 at LEX_00001405; Roman Decl. Ex. 9 at LEX_00001444; Roman Decl. Ex. 10 at LEX_00001498; Roman Ex. 11 at LEX_00001562; Roman Ex. 12 at LEX_00001621.

        114.    Each Primary Policy provides : "The Insurer also agrees to: (a) Defend any suit against the Insured alleging such ... destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent." Roman Decl. Ex. 5 at LEX_00001242; Roman Decl. Ex. 6 at LEX_00001300; Roman Decl. Ex. 7 at LEX_00001349;

Roman Decl. Ex. 8 at LEX_00001394; Roman Decl. Ex. 9 at LEX_00001433; Roman Decl. Ex. 10 at LEX_00001487; Roman Decl. Ex. 11 at LEX_00001541; Roman Decl. Ex. 12 at LEX_00001600.

115.    There is no exclusion in any of the Primary Policies limiting LCI coverage for the TR Claims.  Roman Decl. Ex. 5; Roman Decl. Ex. 6; Roman Decl. Ex. 7; Roman Decl. Ex. 8; Roman Decl. Ex. 9; Roman Decl. Ex. 10; Roman Decl. Ex. 11; Roman Decl. Ex. 12.

116.    The Primary Policy beginning in July 2010 provides:

> If this Coverage Form and any other Coverage Form or policy issued to you by us or any of our affiliated companies apply to the same "occurrence" or offense, the maximum limit of insurance under all the Coverage Forms or policies will not exceed the highest applicable limit of insurance available under any one Coverage Form or policy. This condition does not apply to any other Coverage Form or policy issued by us or any of our affiliated companies specifically to apply as excess insurance over this Coverage Form.

Roman Decl. Ex. 11 at LEX_00001562.

117.    All the policies in this case provide that their limits are not eroded by defense expenses.  Roman Decl. Ex. 5 at LEX_00001242; Roman Decl. Ex. 6 at LEX_00001300; Roman Decl. Ex. 7 at LEX_00001349; Roman Decl. Ex. 8 at LEX_00001394; Roman Decl. Ex. 9 at LEX_00001433; Roman Decl. Ex. 10 at LEX_00001487; Roman Decl. Ex. 11 at LEX_00001541; Roman Decl. Ex. 12 at LEX_00001600; Roman Decl. Ex. 13 at LEX_00113029; Roman Decl. Ex. 14 at LEX_00000748; Roman Decl. Ex. 15 at LEX_00000840; Roman Decl. Ex. 16 at LEX_00000917; Roman Decl. Ex. 17 at LEX_00001056; Roman Decl. Ex. 18 at LEX_00000591; Roman Decl. Ex. 19 at LEX_00000683; Roman Decl. Ex. 20 at LEX_00001091; Roman Decl. Ex. 21 at LEX_00001177; Roman Decl. Ex. 22 at LEX_00000527.

118.    On November 15, 2011, Lafarge provided notice of potential claims against LCI to its insurers, including AIG.  Shelonko Decl. ¶ 25; Shelonko Decl. Ex. 1 at 1.

119.    AIG has refused to provide a defense for or agreed to indemnify LCI. Dkt. 23, Defendants' Answer.

120.    Pursuant to the fronting arrangement applicable under the Primary Policies, LCI's legal fees and costs for the *Trois-Rivières* Litigation are paid by a third party administrator ("TPA").  The TPA is reimbursed by AIG for those costs, and AIG is reimbursed by a Lafarge affiliate.  Shelonko Decl. ¶ 20.

121.    Before filing the present action, Lafarge requested AIG's confirmation that LCI's potential liability in the *Trois-Rivières* Litigation are covered by the Umbrella Policies.  Shelonko Decl. Ex. 2 at 1.

122.    AIG declined to provide such confirmation.  Shelonko Decl. Ex. 3.

123.    AIG contends that the so-called "professional services" and "expected or intended" exclusions in the Umbrella policies apply to LCI's claims and therefore bar coverage. Dkt. 53, Defendants' Notice of Motion for Summary Judgment; Roman Decl. Ex. 4 at 135:8-135:13.

124.    LCI had no knowledge of potential property damage arising from use of aggregate from the B&B Quarry in concrete for which LCI or LNA would be subject to a claim until November 2011, when two LCI employees and one former employee were subpoenaed and deposed in the *Trois-Rivières* Litigation.  Shelonko Decl. ¶ 17.

New York, New York                          Respectfully submitted,
        June 12, 2017
                                            COVINGTON & BURLING LLP

                                            By:  __s/ Bert Wells_____
                                                    Bert Wells

                                            Neil K. Roman
                                            Jonathan D. Cohen
                                            Russell M. Squire
                                            Abdi Aidid
                                            The New York Times Building
                                            620 Eighth Avenue
                                            New York, New York 10018-1405
                                            (212) 841-1000
                                            bwells@cov.com
                                            nroman@cov.com
                                            jcohen@cov.com
                                            rsquire@cov.com
                                            aaidid@cov.com


                                            *Counsel for Plaintiffs Lafarge Canada
                                            Inc. and Lafarge North America Inc.*

25