UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

LAFARGE CANADA INC. and LAFARGE
NORTH AMERICA INC.

                   Plaintiffs,

                 v.

AMERICAN HOME ASSURANCE COMPANY,
AIG INSURANCE COMPANY OF CANADA,
and LEXINGTON INSURANCE COMPANY,

                 Defendants.

-------------------------------------------------------- x

Civil Action No. 15-CV-8957 (RA)

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS, PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS, AND PLAINTIFFS' COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS**

     Pursuant to Southern District of New York Local Rule 56.1, Plaintiffs Lafarge Canada,

Inc. ("LCI") and Lafarge North America, Inc.'s ("LNA") (collectively, "Lafarge") submit the

following response and counter-statement to the Statement of Undisputed Material Facts of

Defendants American Home Assurance Company ("American Home"), AIG Insurance Company

of Canada ("AIG Canada") and Lexington Insurance Company ("Lexington") (collectively,

"AIG").

<u>**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

**Lafarge Statement Paragraph 1:**

     LCI is a Canadian corporation, and since 2013 its headquarters and principal place of

business have been in Mississauga, Ontario, Canada. Declaration of John Shelonko ("Shelonko

Decl.") ¶¶ 3, 6.

**AIG Response to Paragraph 1:**

Undisputed.

**Lafarge Statement Paragraph 2:**

LNA is a Maryland corporation.  Shelonko Decl. ¶ 7.

**AIG Response to Paragraph 2:**

Undisputed.

**Lafarge Statement Paragraph 3:**

From 2001 to 2012, LNA's headquarters and principal place of business were in Virginia.  In 2012, LNA's headquarters and principal place of business moved to Chicago, where they have been since.  Shelonko Decl. ¶ 7.

**AIG Response to Paragraph 3:**

Undisputed.

**Lafarge Statement Paragraph 4:**

LCI is a wholly-owned subsidiary of LNA.  Shelonko Decl. ¶ 3.

**AIG Response to Paragraph 4:**

Undisputed.

**Lafarge Statement Paragraph 5:**

From at least 2001 through 2012, LCI's headquarters and principal place of business were in Montreal, Quebec, Canada.  Shelonko Decl. ¶ 5.

**AIG Response to Paragraph 5:**

Undisputed.

**Lafarge Statement Paragraph 6:**

Defendants American Home Assurance Company, AIG Insurance Company of Canada, and Lexington Insurance Company are subsidiaries of American International Group Inc. (collectively, "AIG").  Dkt. 23, Defendants' Answer ¶ 2.

**AIG Response to Paragraph 6:**

Undisputed.

**Lafarge Statement Paragraph 7:**

Beginning in 2008, hundreds of property owners in or near the city of Trois-Rivières, Quebec, Canada reported defects in concrete attributable to excessive concentrations of an iron sulfide mineral known as pyrrhotite in loads of B&B Quarry aggregate.  Declaration of Olivier Therrien ("Therrien Decl.") ¶¶ 5-6, 8.

**AIG Response to Paragraph 7:**

Disputed. The property owners' first letters of demand and first claims in the Trois-Rivières Litigation[1] were filed in 2007. Dkt. 4, Plaintiffs' Complaint ¶ 24; Declaration of Mark D. Sheridan, filed in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment, dated July 10, 2017 ("Sheridan Decl."), Ex. 1 at LEX_00039523.)

**Lafarge Statement Paragraph 8:**

Property owners began filing claims in Quebec seeking compensation for such alleged property damage in 2009 (the "*Trois-Rivières* Litigation").  Therrien Decl. ¶ 6.

**AIG Response to Paragraph 8:**

Disputed. The property owners' first claims in the Trois-Rivières Litigation were filed in 2007. Dkt. 4, Plaintiffs' Complaint ¶ 24.

**Lafarge Statement Paragraph 9:**

---

[1] For the sake of clarity and for the purposes of the Member Companies' response to Lafarge's Statement of Undisputed Material Facts only, the Member Companies will refer to Lafarge's defined terms. In the Member Companies SUMF and Memorandum of Law in Support the Member Companies Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment, the Member Companies' will refer to their own defined terms.

Approximately 240 separate lawsuits have been filed in the *Trois-Rivières* Litigation, relating to approximately 1,400 buildings.  Therrien Decl. ¶ 8.

**AIG Response to Paragraph 9:**

Undisputed.

**Lafarge Statement Paragraph 10:**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████

**AIG Response to Paragraph 10:**

Undisputed.

**Lafarge Statement Paragraph 11:**

Property owners in the Trois-Rivières region continue to file lawsuits for damage allegedly caused by aggregate sourced from B&B Quarry.  Therrien Decl. ¶ 35.

**AIG Response to Paragraph 11:**

Undisputed.

**Lafarge Statement Paragraph 12:**

Aggregate consists of crushed rock, gravel, or sand.  Thomas Decl. Ex. 1 at 4.

**AIG Response to Paragraph 12:**

Undisputed.

**Lafarge Statement Paragraph 13:**

Aggregate is added to a mixture of cement and water to produce concrete.  Thomas Decl.

Ex. 1 at 4.

**AIG Response to Paragraph 13:**

Undisputed.

**Lafarge Statement Paragraph 14:**

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

**AIG Response to Paragraph 14:**

Undisputed.

**Lafarge Statement Paragraph 15:**

████████████████████████████████████████████

██████████████████████████████████

**AIG Response to Paragraph 15:**

Undisputed.

**Lafarge Statement Paragraph 16:**

████████████████████████████████████████████

███████████

**AIG Response to Paragraph 16:**

Undisputed.

**Lafarge Statement Paragraph 17:**

████████████████████████████████████████████

███████████████████████

**AIG Response to Paragraph 17:**

Undisputed.

**Lafarge Statement Paragraph 18:**

██████████████████████████████████████████████████

████████████████

**AIG Response to Paragraph 18:**

Undisputed.

**Lafarge Statement Paragraph 19:**

██████████████████████████████████████████████████

██████████████████████████

**AIG Response to Paragraph 19:**

Undisputed.

**Lafarge Statement Paragraph 20:**

██████████████████████████████████████████████████

██████████████████████████████████████

**AIG Response to Paragraph 20:**

Undisputed.

**Lafarge Statement Paragraph 21:**

██████████████████████████████████████████████████

████████████████████████████████

**AIG Response to Paragraph 21:**

Undisputed.

**Lafarge Statement Paragraph 22:**

6

██████████████████████████████████████████████████

█████████████████████████████████████████

**AIG Response to Paragraph 22:**

Undisputed.

**Lafarge Statement Paragraph 23:**

██████████████████████████████████████████████████

██████████████████████████████████████

**AIG Response to Paragraph 23:**

Undisputed.

**Lafarge Statement Paragraph 24:**

██████████████████████████████████████████████████

██████████████████████████████████████

**AIG Response to Paragraph 24:**

Undisputed.

**Lafarge Statement Paragraph 25:**

██████████████████████████████████████████████████

████████████

**AIG Response to Paragraph 25:**

Undisputed.

**Lafarge Statement Paragraph 26:**

██████████████████████████████████████████████████

██

**AIG Response to Paragraph 26:**

7

Undisputed.

**Lafarge Statement Paragraph 27:**

████████████████████████████████████████████

████████████████████

**AIG Response to Paragraph 27:**

Undisputed.

**Lafarge Statement Paragraph 28:**

████████████████████████████████████████████

████████████████████████████████████████████

████████████

**AIG Response to Paragraph 28:**

Undisputed.

**Lafarge Statement Paragraph 29:**

████████████████████████████████████████████

██████████████████████████████████

**AIG Response to Paragraph 29:**

Undisputed.

**Lafarge Statement Paragraph 30:**

If concrete containing pyrrhotite is not exposed to water (*e.g.*, an interior wall) or deprived of oxygen (*e.g.*, a concrete slab buried underground), it may never exhibit any damage. Thomas Decl. Ex. 1 at 16-17.

**AIG Response to Paragraph 30:**

Undisputed.

**Lafarge Statement Paragraph 31:**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

**AIG Response to Paragraph 31:**

Undisputed.

**Lafarge Statement Paragraph 32:**

███████████████████████████████████████████████████

█████████████████████████████████████████

**AIG Response to Paragraph 32:**

Undisputed.

**Lafarge Statement Paragraph 33:**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

**AIG Response to Paragraph 33:**

Undisputed.

**Lafarge Statement Paragraph 34:**

For some, but not all of the properties at issue in the TR Claims, LCI sold the cement

used in the concrete that also contained B&B Quarry aggregate.  Shelonko Decl. ¶ 23.

**AIG Response to Paragraph 34:**

Undisputed.

**Lafarge Statement Paragraph 35:**

None of the TR Claims has been filed against LNA; LCI is the only Lafarge entity against which TR Claims have been asserted. Therrien Decl. ¶ 19.

**AIG Response to Paragraph 35:**

Undisputed.

**Lafarge Statement Paragraph 36:**

None of the TR Claims alleges that LCI's cement, or any other product manufactured or supplied by Lafarge, was defective or contributed to property damage.  Therrien Decl. ¶ 37.

**AIG Response to Paragraph 36:**

Undisputed.

**Lafarge Statement Paragraph 37:**

Concrete in the TR Claim properties was supplied by Béton Laurentide ("Laurentide") or Construction Yvan Boisvert ("Boisvert").  Roman Decl. Ex. 2 ¶¶ 6-7.

**AIG Response to Paragraph 37:**

Undisputed.

**Lafarge Statement Paragraph 38:**

As of 2001, Laurentide and Boisvert were co-owners of the B&B Quarry.  Therrien Decl. ¶ 7.

**AIG Response to Paragraph 38:**

Undisputed.

**Lafarge Statement Paragraph 39:**

Laurentide began incorporating B&B Quarry aggregate into concrete structures in the Trois-Rivières region in 2001.  Therrien Decl. ¶ 7.

**AIG Response to Paragraph 39:**

Undisputed.

**Lafarge Statement Paragraph 40:**

Boisvert began incorporating B&B Quarry aggregate into concrete structures in the Trois-Rivières region before 2001. Therrien Decl. ¶ 7.

**AIG Response to Paragraph 40:**

Undisputed.

**Lafarge Statement Paragraph 41:**

Laurentide and Boisvert represent that they stopped using B&B Quarry aggregate to produce concrete around 2008. Therrien Decl. ¶ 7.

**AIG Response to Paragraph 41:**

Undisputed.

**Lafarge Statement Paragraph 42:**

Plaintiffs in the TR Claims have generally alleged that the damage is sufficiently severe that the foundations of the buildings (or other concrete structures) must be replaced. Therrien Decl. ¶ 11.

**AIG Response to Paragraph 42:**

Undisputed.

**Lafarge Statement Paragraph 43:**

In the case of single-family homes, occupants must vacate the homes while contractors lift the structures, demolish the foundations, pour a new foundation, and reassemble the home and foundation. Therrien Decl. ¶ 12.

**AIG Response to Paragraph 43:**

11

Undisputed.

**Lafarge Statement Paragraph 44:**

For larger dwellings (*e.g.*, multi-family homes) and commercial buildings, other expensive repair and replacement methods are required.  Therrien Decl. ¶ 13.

**AIG Response to Paragraph 44:**

Undisputed.

**Lafarge Statement Paragraph 45:**

███████████████████████████████████████████████

██████████████████████

**AIG Response to Paragraph 45:**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

**Lafarge Statement Paragraph 46:**

███████████████████████████████████████████████

█████████████████████████████████████████

**AIG Response to Paragraph 46:**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

**Lafarge Statement Paragraph 47:**

The TR Claims allege that LCI and Marie de Grosbois, a former LCI employee, informed Laurentide that the B&B Quarry aggregate was suitable to use in concrete.  Therrien Decl. ¶ 38.

**AIG Response to Paragraph 47:**

Disputed. The TR Claims are set forth in written pleadings that speak for themselves. Paragraph 47 contains a characterization of the allegations contained in those pleadings rather than a statement of fact. See, e.g. Therrien Decl. at Ex. 2-3.

**Lafarge Statement Paragraph 48:**

The TR Claims also allege that Lafarge and Ms. de Grosbois failed to warn Laurentide that the B&B Quarry aggregate was not suitable to use in concrete. Therrien Decl. ¶ 38.

**AIG Response to Paragraph 48:**

Disputed. The TR Claims are set forth in written pleadings that speak for themselves. Paragraph 48 contains a characterization of the allegations contained in those pleadings rather than a statement of fact. See, e.g. Therrien Decl. at Ex. 2-3.

**Lafarge Statement Paragraph 49:**

The TR Claims also allege that Lafarge and Ms. de Grosbois failed to prevent Laurentide and others from using aggregate sourced from the B&B Quarry. Therrien Decl. ¶ 38.

**AIG Response to Paragraph 49:**

Disputed. The TR Claims are set forth in written pleadings that speak for themselves. Paragraph 49 contains a characterization of the allegations contained in those pleadings rather than a statement of fact. See, e.g. Therrien Decl. at Ex. 2-3.

**Lafarge Statement Paragraph 50:**

The grounds for LCI's alleged joint-and-several liability in the *Trois-Rivières* claims included

        a.  In February 2002, Laurentide was provided with a one-page chemical analysis spreadsheet by a Lafarge representative and the following day a representative of Laurentide spoke by telephone with Marie de Grosbois of Lafarge. The statements of claims are

alleging that Ms. de Grosbois would have assured Laurentide that the aggregate was suitable for use in concrete.

b.  In May 2002, after having received an independent expert's report characterizing the B&B Quarry aggregate as being similar to aggregate from a nearby quarry as to which issues had been raised, Laurentide faxed the report to LCI with a request for reaction in light of LCI's February 2002 communications about aggregate chemical composition.  LCI never responded to the fax, and thereafter continuously failed to warn about B&B Quarry aggregate notwithstanding having knowledge of the contents of the report.

c.  After agreeing in November 2005 to perform a technical comparison of B&B Quarry aggregate samples with samples from a nearby quarry known to cause concrete defects, LCI negligently delayed (until early 2006) warning Laurentide that continued use of B&B Quarry aggregate was risky.

d.  After determining that continued use of B&B Quarry aggregate was risky, notwithstanding an alleged power to control Laurentide, LCI failed to cause Laurentide to cease use of the aggregate.

e.  After determining that continued use of B&B Quarry aggregate was risky, the statement of claims alleges Laurentide failed to warn all parties that might be involved in use of such aggregate.

Therrien Decl. ¶ 39; Therrien Decl. Ex. 2 at LAF0000739368-LAF0000739370; Therrien Decl. Ex. 3 at LAF0000000479-LAF0000000481.

**AIG Response to Paragraph 50:**

Disputed.  The TR Claims are set forth in written pleadings that speak for themselves. Paragraph 50 contains a characterization of the grounds for LCI's alleged joint-and-several liability rather than a statement of fact. See, e.g. Therrien Decl. at Ex. 2-3.

**Lafarge Statement Paragraph 51:**

LCI disputes these allegations and maintains that it is not liable for any of the TR Claims. Therrien Decl. ¶ 40.

**AIG Response to Paragraph 51:**

Disputed as drafted because "these allegations" could refer to the actual allegations contained in the written pleadings or the characterization of the allegations set forth in Paragraphs 46-49. The Member Companies do not dispute that Lafarge disputes the allegations set forth in the written pleadings and maintains that it is not liable for any of the TR Claims.

**Lafarge Statement Paragraph 52:**

LCI warned Laurentide about the risks of using B&B Quarry aggregate in 2006. Therrien Decl. ¶ 41.

**AIG Response to Paragraph 52:**

Undisputed.

**Lafarge Statement Paragraph 53:**

Laurentide and Boisvert continued using B&B Quarry aggregate for approximately two years after Lafarge's warning. Therrien Decl. ¶ 41.

**AIG Response to Paragraph 53:**

Undisputed.

**Lafarge Statement Paragraph 54:**

The *Trois-Rivières* Litigation is of intense public interest in Quebec not only in the community of Trois-Rivieres, but also parts of the Mauricie regional administrative district, because of the displacement and financial harm caused by the property damage. Therrien Decl. ¶

**AIG Response to Paragraph 54:**

Undisputed.

**Lafarge Statement Paragraph 55:**

Governmental bodies have had to intervene to help property owners while they await final determination by the courts. Therrien Decl. ¶ 14.

**AIG Response to Paragraph 55:**

Undisputed that governmental bodies have helped property owners while they await final determination by the courts. Disputed that such governmental bodies "had to intervene."

**Lafarge Statement Paragraph 56:**

The TR Claims include as defendants general contractors, concrete suppliers including Laurentide and the B&B Quarry, and allege property damage arising from excessive concentrations of pyrrhotite in aggregate. Therrien Decl. ¶¶ 5, 9.

**AIG Response to Paragraph 56:**

Undisputed.

**Lafarge Statement Paragraph 57:**

In addition, the plaintiffs have sued insurers of most of the defendants. Therrien Decl. ¶ 10.

**AIG Response to Paragraph 57:**

Undisputed.

**Lafarge Statement Paragraph 58:**

The Quebec court consolidated lawsuits into a "first wave" of claims in 2012. Therrien Decl. ¶ 16; Roman Decl. Ex. 2 ¶ 13.

**AIG Response to Paragraph 58:**

Undisputed.

**Lafarge Statement Paragraph 59:**

Trial of the first wave cases resulted in a judgment, rendered in June 2014, of approximately C$168 million.  Therrien Decl. ¶ 21.

**AIG Response to Paragraph 59:**

Undisputed.

**Lafarge Statement Paragraph 60:**

LCI was not a party to the first wave trial of the cases.  Roman Decl. Ex. 2 at 1; Therrien Decl. ¶ 16.

**AIG Response to Paragraph 60:**

Undisputed.

**Lafarge Statement Paragraph 61:**

The first wave judgment is on appeal.  Therrien Decl. ¶ 22.

**AIG Response to Paragraph 61:**

Undisputed.

**Lafarge Statement Paragraph 62:**

The court apportioned approximately 70 percent (or about C$114 million) of that first wave judgment to SNC-Lavalin.  Therrien Decl. ¶ 24.

**AIG Response to Paragraph 62:**

Undisputed.

**Lafarge Statement Paragraph 63:**

Lavalin allegedly tested B&B Quarry aggregate between 2003 and 2007 and certified periodically over that period that the aggregate was suitable for use in concrete.  Therrien Decl. ¶ 24.

**AIG Response to Paragraph 63:**

Undisputed.

**Lafarge Statement Paragraph 64:**

Lavalin's share would increase with the expected insolvency or insufficiency of insurance of other defendants. Therrien Decl. ¶ 24.

**AIG Response to Paragraph 64:**

Undisputed.

**Lafarge Statement Paragraph 65:**

Post-judgment interest on the first wave judgment has begun to accrue. Therrien Decl. at ¶ 24.

**AIG Response to Paragraph 65:**

Undisputed.

**Lafarge Statement Paragraph 66:**

Lavalin sued LCI for contribution and alleged that LCI should be held liable for all or part of the award against Lavalin. Therrien Decl. ¶ 25.

**AIG Response to Paragraph 66:**

Undisputed.

**Lafarge Statement Paragraph 67:**

Lavalin's claims against LCI based on the first-wave judgment remain pending. Therrien Decl. ¶ 26.

**AIG Response to Paragraph 67:**

Undisputed.

**Lafarge Statement Paragraph 68:**

Lavalin's claims against LCI constitute a substantial portion of all TR Claims pending against LCI. Therrien Decl. ¶ 26.

**AIG Response to Paragraph 68:**

Disputed. Lavalin's claims against LCI and the remaining TR Claims pending against LCI are set forth in written pleadings that speak for themselves. Paragraph 68 contains a characterization of a "portion" of such claims rather than a statement of fact.

**Lafarge Statement Paragraph 69:**

LCI's potential liability to Lavalin in the first-wave litigation is an undetermined share of Lavalin's total liability. Therrien Decl. ¶ 27.

**AIG Response to Paragraph 69:**

Undisputed.

**Lafarge Statement Paragraph 70:**

LCI has incurred and will continue to incur legal fees and costs for its defense of Lavalin's first-wave contribution claims. Shelonko Decl. ¶ 19; Therrien Decl. ¶ 28.

**AIG Response to Paragraph 70:**

Undisputed.

**Lafarge Statement Paragraph 71:**

LCI has not been subject to any judgment nor entered into a settlement with Lavalin. Therrien Decl. ¶ 29.

**AIG Response to Paragraph 71:**

Undisputed.

**Lafarge Statement Paragraph 72:**

The Quebec court is consolidating all other claims, including subsequent claims, into a "second wave."  Therrien Decl. ¶ 17.

**AIG Response to Paragraph 72:**

Undisputed.

**Lafarge Statement Paragraph 73:**

In the second wave, LCI has been named as direct defendant by approximately 33 underlying property owners or their assignees for damage to and loss of use of their properties and as a third-party defendant in contribution claims brought by Lavalin and other defendants. Therrien Decl. ¶ 30.

**AIG Response to Paragraph 73:**

Undisputed.

**Lafarge Statement Paragraph 74:**

Second wave lawsuits, including contribution claims by Lavalin and other co-defendants, continue to be filed against LCI and other defendants.  Therrien Decl. ¶ 35.

**AIG Response to Paragraph 74:**

Undisputed.

**Lafarge Statement Paragraph 75:**

LCI has incurred and will continue to incur legal fees and costs for its defense of the second-wave TR Claims.  Therrien Decl. ¶ 33.

**AIG Response to Paragraph 75:**

Undisputed.

**Lafarge Statement Paragraph 76:**

LCI has not been subject to any judgment or entered any settlement and maintains that it is not liable.  Therrien Decl. ¶ 32.

**AIG Response to Paragraph 76:**

Undisputed.

**Lafarge Statement Paragraph 77:**

Second wave lawsuits are in the preliminary stages and continue to be filed.  Therrien Decl. ¶ 35.

**AIG Response to Paragraph 77:**

Undisputed.

**Lafarge Statement Paragraph 78:**

No trial date for the second wave lawsuits has been set.  Therrien Decl. ¶ 36.

**AIG Response to Paragraph 78:**

Undisputed.

**Lafarge Statement Paragraph 79:**

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

**AIG Response to Paragraph 79:**

███████████████████████████████████████

██████████████████████████

**Lafarge Statement Paragraph 80:**

For the period spanning 2004-12, insurance coverage was provided to LCI by Defendant Lexington Insurance Company ("Lexington"), which issued nine umbrella general liability ("GL") policies to LNA, and Defendant AIG Insurance Company of Canada ("AIG Canada"), which issued two umbrella GL policies to LCI.

**AIG Response to Paragraph 80:**

Undisputed.

**Lafarge Statement Paragraph 81:**

The nine umbrella GL policies issued by Lexington to LNA are:

    a.    Policy No. 509/DL416804, effective from April 1, 2004 to April 1, 2005 (the "2004 Lexington Policy");

    a.    Policy No. 5577221, effective from April 1, 2005 to April 1, 2006 (the "2005 Lexington Policy")

    b.    Policy No. 5577402, effective from April 1, 2006 to April 1, 2007 (the "2006 Lexington Policy");

    c.    Policy No. 5577605, originally effective from April 1, 2007 to April 1, 2008 and canceled as of July 1, 2007 (the "2007 Lexington Stub Policy");

    d.    Policy No. 5577605 effective from July 1, 2007 to July 1, 2008 (the "2007 Lexington Policy");

    e.    Policy No. 2213650, effective from July 1, 2008 to July 1, 2009 (the "2008 Lexington Policy");

    f.    Policy No. 2213938, effective from July 1, 2009 to July 1, 2010 (the "2009 Lexington Policy");

> g.    Policy No. 62785160, effective from July 1, 2010 to July 1, 2011 (the "2010 Lexington Policy"); and
>
> h.    Policy No. 62785160, effective from July 1, 2011 to July 1, 2012 (the "2011 Lexington Policy").

*See* Roman Decl. Ex. 14 ("Exhibit 14" in 30(b)(6) Dep. of AIG witness Erik San Julian. (30(b)(6) San Julian Dep."); Roman Decl. Ex 15 ("Exhibit 15" in 30(b)(6) San Julian Dep. ); Roman Decl. Ex 16 ("Exhibit 16" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 17 ("Exhibit 17" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 18 ("Exhibit 18" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 19 ("Exhibit 19" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 20 ("Exhibit 20" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 21 ("Exhibit 21" in 30(b)(6) San Julian Dep.).

**AIG Response to Paragraph 81:**

Disputed because the 2004 Lexington Policy number is 5577047 rather than 509/DL416804. Roman Decl. Ex 14 ("Exhibit 14" in 30(b)(6) San Julian Dep.) at LEX_00000740.

2.    The two umbrella GL policies issued by AIG Canada to LCI are:

> a.    Policy No. 5462471, effective from April 1, 2004 to April 1, 2005. (the "2004 AIG Canada Policy"); and
>
> b.    Policy No. 20418478, effective from July 1, 2011 to July 1, 2012 (the "2011 AIG Canada Policy").

*See* Roman Decl. Ex. 13 ("Exhibit 13" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 22 ("Exhibit 22" in 30(b)(6) San Julian Dep.).

**AIG Response to Paragraph 82:**

Undisputed.

**Lafarge Statement Paragraph 83:**

As a wholly-owned subsidiary of LNA, LCI is a "Named Insured" in each of the Umbrella Policies[2] set forth above.    Shelonko Decl. ¶¶ 12-13;    Roman Decl. Ex. 13 at LEX_00113024, LEX_00113047; Roman Decl. Ex. 14 at LEX_00000792; Roman Decl. Ex. 15 at LEX_00000842; Roman Decl. Ex. 16 at LEX_00000919; Roman Decl. Ex. 17 at LEX_00001058; Roman Decl. Ex. 18 at LEX_00000593.; Roman Decl. Ex. 19 at LEX_00000685; Roman Decl. Ex. 20 at LEX_00001093; Roman Decl. Ex. 21 at LEX00001179; Roman Decl. Ex. 22 at LEX0000529.

**AIG Response to Paragraph 83:**

Undisputed.

**Lafarge Statement Paragraph 84:**

Under the Umbrella Policies, a "Named Insured" is "any person or organization designated in … the Declarations" or "any organization in which you maintain an interest of more than fifty percent (50%)." Roman Decl. Ex. 13 at LEX_00113047; Roman Decl. Ex. 14 at LEX_00000792; Roman Decl. Ex. 15 at LEX_00000842; Roman Decl. Ex. 16 at LEX_00000919; Roman Decl. Ex. 17 at LEX_00001058; Roman Decl. Ex. 18 at LEX_00000593.; Roman Decl. Ex. 19 at LEX_00000685; Roman Decl. Ex. 20 at LEX_00001093; Roman Decl. Ex. 21 at LEX00001179; Roman Decl. Ex. 22 at LEX0000529.

**AIG Response to Paragraph 84:**

---

[2] Lafarge fails to expressly define the term "Umbrella Policies" in its Statement of Undisputed Material Facts. The Member Companies understand the term "Umbrella Policies" to mean the 11 umbrella policies enumerated in Paragraphs 81 and 82.

Undisputed.

**Lafarge Statement Paragraph 85:**

LCI is insured under all the above-listed Umbrella Policies.  Roman Decl. Ex. 4 at 68:17-69:5 (30(b)(6) San Julian Dep.).

**AIG Response to Paragraph 85:**

Undisputed.

**Lafarge Statement Paragraph 86:**

During the time that the Umbrella Policies were issued to LCI, the domicile of LCI was Quebec, Canada.  Shelonko Decl. ¶ 10.

**AIG Response to Paragraph 86:**

Disputed. The 2004 through 2011 Umbrella Policies issued by Lexington were not issued to LCI. The 2004 through 2011 Umbrella Policies issued by Lexington were issued to LNA in Virginia. It is undisputed that the 2004 and 2011 AIG Canada Policies were issued to LCI, and at that time LCI's domicile was Quebec, Canada. It is also undisputed that the domicile of LCI was Quebec, Canada during the time the 2004 through 2011 Umbrella Policies issued by Lexington were issued to LNA.  Roman Decl. Ex. 14 ("Exhibit 14" in 30(b)(6) Dep. of AIG witness Erik San Julian. (30(b)(6) San Julian Dep."); Roman Decl. Ex 15 ("Exhibit 15" in 30(b)(6) San Julian Dep. ); Roman Decl. Ex 16 ("Exhibit 16" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 17 ("Exhibit 17" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 18 ("Exhibit 18" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 19 ("Exhibit 19" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 20 ("Exhibit 20" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 21 ("Exhibit 21" in 30(b)(6) San Julian Dep.).

**Lafarge Statement Paragraph 87:**

25

Each Umbrella Policy provides coverage for losses arising from "property damage" that occurs during the policy period that (i) exceeds a self-insured retention of C$2,000,000 and (ii) is a kind of loss for which the Umbrella Policies provide coverage. Roman Decl. Ex. 13 at LEX_00113025, LEX_00113072; Roman Decl. Ex. 14 at LEX_00000745, LEX_00000787; Roman Decl. Ex. 15 at LEX_00000866, LEX_00000844; Roman Decl. Ex. 16 at LEX_00000943, LEX_00000971; Roman Decl. Ex. 17 at LEX_00000992, LEX_00001007; Roman Decl. Ex. 18 at LEX_000000631, LEX_00000595; Roman Decl. Ex. 19 at LEX_00000674, LEX_00000687; Roman Decl. Ex. 20 at LEX_00001125, LEX_00001095; Roman Decl. Ex. 21 at LEX00001213, LEX_00001181; Roman Decl. Ex. 22 at LEX0000480, LEX_00000531.

**AIG Response to Paragraph 87:**

Disputed because the word "coverage" as used in Paragraph 87 is ambiguous. The Umbrella Policies are written documents that are governed by their terms and the assertion contained in this Paragraph does not address all terms that may be applicable.

**Lafarge Statement Paragraph 88:**

Each Umbrella Policy issued by Lexington has a limit of US$50 million. Roman Decl. Ex. 14 at LEX_00000744; Roman Decl. Ex. 15 at LEX_00000812; Roman Decl. Ex. 16 at LEX_00000893; Roman Decl. Ex. 17 at LEX_00000976; Roman Decl. Ex. 18 at LEX_00000566; Roman Decl. Ex. 19 at LEX_00000658; Roman Decl. Ex. 20 at LEX_00001066; Roman Decl. Ex. 21 at LEX_00001152.

**AIG Response to Paragraph 88:**

Undisputed.

**Lafarge Statement Paragraph 89:**

The 2004 AIG Canada Policy has a per-occurrence limit of C$3 million. Roman Decl. Ex. 13 at LEX_00113024.

**AIG Response to Paragraph 89:**

Undisputed.

**Lafarge Statement Paragraph 90:**

The 2011 AIG Canada Policy has a per-occurrence limit of US$50 million. Roman Decl. Ex. 22 at LEX_00000476.

**AIG Response to Paragraph 90:**

Undisputed.

**Lafarge Statement Paragraph 91:**

All the Umbrella Policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property," or "loss of use of tangible property that is not physically injured." Roman Decl. Ex. 13 at LEX_00113049; Roman Decl. Ex. 14 at LEX_00000766; Roman Decl. Ex. 15 at LEX_00000888; Roman Decl. Ex. 16 at LEX_00000965; Roman Decl. Ex. 17 at LEX_00001052; Roman Decl. Ex. 18 at LEX_00000653; Roman Decl. Ex. 19 at LEX_00000737; Roman Decl. Ex. 20 at LEX_00001147; Roman Decl. Ex. 21 at LEX_00001235; Roman Decl. Ex. 22 at LEX_00000503.

**AIG Response to Paragraph 91:**

Undisputed.

**Lafarge Statement Paragraph 92:**

The Umbrella Policies provide rules for counting "occurrences." An "occurrence" is defined in each of the Umbrella Policies as follows:

1. As respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**.

2. As respects **Personal Injury** and **Advertising Injury,**, an offense arising out of your business that causes **Personal Injury** and **Advertising Injury**. All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

Roman Decl. Ex. 13 at LEX_00113048; Roman Decl. Ex. 14 at LEX_00000765; Roman Decl. Ex. 15 at LEX_00000887; Roman Decl. Ex. 16 at LEX_00000964; Roman Decl. Ex. 17 at LEX_00001051; Roman Decl. 18 at LEX_00000652; Roman Decl. Ex. 19 at LEX_00000736; Roman Decl. Ex. 20 at LEX_00001146; Roman Decl. Ex. 21 at LEX_00001234; Roman Decl. Ex. 21 at LEX_00000502.

**AIG Response to Paragraph 92:**

Disputed. Paragraph 92 mischaracterizes the Umbrella Policies because the Umbrella Policies do not "provide rules for counting 'occurrences.'"

**Lafarge Statement Paragraph 93:**

The property damage covered by the Umbrella Policies includes risks in multiple jurisdictions. Each Umbrella Policy states:

> We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of ... Property Damage ... to which this insurance applies.

> This policy applies, only if: the ... Property Damage is caused
> by an Occurrence that takes place anywhere, and the ...
> Property Damage occurs during the Policy Period.

Roman Decl. Ex. 13 at LEX_00113025; Roman Decl. Ex. 14 at LEX_00000745; Roman Decl. Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

**AIG Response to Paragraph 93:**

Disputed. The statement that "[t]he property damage covered by the Umbrella Policies includes risks in multiple jurisdictions" is disputed as unintelligible.

**Lafarge Statement Paragraph 94:**

The Umbrella Policies provide that the Insurers will pay for "all damages under this policy regardless of the number of Insureds," "claims made or Suits brought," "persons or organizations making claims or bringing Suits," or "coverages provided under this policy." Roman Decl. Ex. 13 at LEX_00113028; Roman Decl. Ex. 14 at LEX_00000747; Roman Decl. Ex. 15 at LEX_00000868; Roman Decl. Ex. 16 at LEX_00000945; Roman Decl. Ex. 17 at LEX_000001032; Roman Decl. Ex. 18 at LEX_00000633; Roman Decl. Ex. 19 at LEX_00000717; Roman Decl. Ex. 20 at LEX_00001127; Roman Decl. Ex. 21 at LEX_00001215; Roman Decl. Ex. 22 at LEX_00000482.

**AIG Response to Paragraph 94:**

Undisputed.

**Lafarge Statement Paragraph 95:**

The Umbrella Policies include a term limiting coverage that provides that insurance does not apply to any liability arising out of "any professional services performed by or on behalf of the Insured, including but not limited to the preparation or approval of maps, shop drawings, plans, opinions, reports, surveys, field orders, change orders, designs or specifications, and any supervisory, inspection or engineering services" or "any liability arising out of the rendering of, or the failure to render, professional services or any error, omission or mistake of a professional nature performed by or on behalf of the insured, including but not limited to: (a) the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications; and (b) supervisory, inspection, architectural, engineering or surveying services." Roman Decl. Ex. 13 at LEX_00113058; Roman Decl. Ex. 14 at LEX_00000775; Roman Decl. Ex. 15 at LEX_00000819; Roman Decl. Ex. 16 at LEX_00000901; Roman Decl. Ex. 17 at LEX_00000984; Roman Decl. Ex. 18 at LEX_00000574; Roman Decl. Ex. 19 at LEX_00000666; Roman Decl. Ex. 20 at LEX_00001074; Roman Decl. Ex. 21 at LEX_00001160; Roman Decl. Ex. 22 at LEX_00000510.

**AIG Response to Paragraph 95:**

Disputed. The statement that the Umbrella Policies "include a term limiting coverage" is disputed as drafted. The Member Companies also clarify that the 2004 AIG Canada Policy and the 2004 Lexington Policy do not apply to any liability arising out of "any professional services performed by or on behalf of the Insured, including but not limited to the preparation or approval of maps, shop drawings, plans, opinions, reports, surveys, field orders, change orders, designs or specifications, and any supervisory, inspection or engineering services." Roman Decl. Ex. 13 at LEX_00113058; Roman Decl. Ex. 14 at LEX_00000775. The remaining Umbrella Policies do not apply to "any liability arising out of the rendering of, or the failure to render, professional

services or any error, omission or mistake of a professional nature performed by or on behalf of the insured, including but not limited to: (a) the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications; and (b) supervisory, inspection, architectural, engineering or surveying services." Roman Decl. Ex. 15 at LEX_00000819; Roman Decl. Ex. 16 at LEX_00000901; Roman Decl. Ex. 17 at LEX_00000984; Roman Decl. Ex. 18 at LEX_00000574; Roman Decl. Ex. 19 at LEX_00000666; Roman Decl. Ex. 20 at LEX_00001074; Roman Decl. Ex. 21 at LEX_00001160; Roman Decl. Ex. 22 at LEX_00000510.

**Lafarge Statement Paragraph 96:**

The Umbrella Policies protect against liability risks in excess of a stated "retained limit." The retained limit is C$2 million for LCI and US$2 million for LNA. Ex. 13 at LEX_00113072; Ex. 14 at LEX_00000787; Ex. 15 at LEX_00000844; Ex. 16 at LEX_00000921; Ex. 17 at LEX_00001007; Ex. 18 at LEX_00000595; Ex. 19 at LEX_00000687; Ex. 20 at LEX_00001095; Ex. 21 at LEX_00001181; Ex. 22 at LEX_00000531.

**AIG Response to Paragraph 96:**

Disputed. The Member Companies dispute that the Umbrella Policies "protect" against "liability risks" in excess of a stated "retained limit." The Umbrella Policies are written documents that are governed by their terms and the assertion contained in this Paragraph does not address all terms that may be applicable. The Member Companies also dispute that "[t]he retained limit is C$2 million for LCI and US$2 million for LNA." The retained limit is C$2 million per occurrence for Canadian General Liability. Roman Decl. Ex. 13 at LEX_00113072; Roman Decl. Ex. 14 at LEX_00000787; Roman Decl. Ex. 15 at LEX_00000844; Roman Decl. Ex. 16 at LEX_00000921; Roman Decl. Ex. 17 at LEX_00001007; Roman Decl. Ex. 18 at

LEX_00000595; Roman Decl. Ex. 19 at LEX_00000687; Roman Decl. Ex. 20 at LEX_00001095; Roman Decl. Ex. 21 at LEX_00001181; Roman Decl. Ex. 22 at LEX_00000531.

**Lafarge Statement Paragraph 97:**

The definition of "Loss" under the Umbrella Policies includes the phrase "those sums actually paid as judgments or settlements." Roman Decl. Ex. 13 at LEX_00113046; Roman Decl. Ex. 14 at LEX_00000763; Roman Decl. Ex. 15 at LEX_00000842; Roman Decl. Ex. 16 at LEX_00000919; Roman Decl. Ex. 17 at LEX_00001058; Roman Decl. Ex. 18 at LEX_00000593; Roman Decl. Ex. 19 at LEX_00000685; Roman Decl. Ex. 20 at LEX_00001093; Roman Decl. Ex. 21 at LEX_00001179; Roman Decl. Ex. 22 at LEX_00000501.

**AIG Response to Paragraph 97:**

Undisputed.

**Lafarge Statement Paragraph 98:**

Each Umbrella Policy states that coverage applies to "Property Damage" that "occurs during the Policy Period" and also that:

> If such an **Insured,** or authorized employee knew, prior to the **Policy Period,** that the **Bodily Injury** or **Property Damage** had occurred, then any continuation, change or resumption of such **Bodily Injury** or **Property Damage** during or after the **Policy Period** will be deemed to have been known prior to the **Policy Period**

Roman Decl. Ex. 13 at LEX_00113025; Roman Decl. Ex. 14 at LEX_00000788; Roman Decl. Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at

LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

**AIG Response to Paragraph 98:**

Disputed because the word "coverage" as used in Paragraph 98 is ambiguous. The Umbrella Policies are written documents that are governed by their terms and the assertion contained in this Paragraph does not address all terms that may be applicable.

**Lafarge Statement Paragraph 99:**

The "insuring agreement" of each Umbrella Policy states that the policy applies only if "no employee authorized by you to give or receive notice of an **Occurrence**, claim or Suit, knew that the **Bodily Injury** or **Property Damage** had occurred, in whole or in part." Roman Decl. Ex. 13 at LEX_0011073; Roman Decl. Ex. 14 at LEX_00000788; Roman Decl. Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

**AIG Response to Paragraph 99:**

Undisputed.

**Lafarge Statement Paragraph 100:**

Between 2001 and 2012, LNA and LCI obtained umbrella and excess coverage (the "Excess Policies") above the Primary Policies from 2001-04 and above the Umbrella Policies from 2004-12. Shelonko Decl. ¶ 15.

**AIG Response to Paragraph 100:**

Disputed. The Member Companies lack knowledge or information sufficient to form a belief as to the statements contained in Paragraph 100.

**Lafarge Statement Paragraph 101:**

LCI is a Named Insured under the Excess Policies. Shelonko Decl. ¶ 15.

**AIG Response to Paragraph 101:**

Disputed. The Member Companies lack knowledge or information sufficient to form a belief as to the statements contained in Paragraph 101.

**Lafarge Statement Paragraph 102:**

LCI is insured by seven primary GL policies issued by Defendant American Home Assurance Company ("American Home") and four primary GL policies issued by AIG Canada. (Collectively, these policies are referred to by AIG as the "Primary Policies.") AIG Answer ¶ 54.

**AIG Response to Paragraph 102:**

Disputed to the extent that the statement that "LCI is insured by seven primary GL policies issued by American Home" is contradicted by the statement in Paragraph 103 that American Home issued "eight primary GL policies" to LCI.

**Lafarge Statement Paragraph 103:**

The eight primary GL policies issued by American Home to LCI are:

a. Policy No. RMGLA 2505270, effective from April 1, 1996 to April 1, 1997 (the "1996 American Home Policy");

b. Policy No. RMGLA 2505270, effective from April 1, 2001 to April 1, 2002 (the "2001 American Home Policy");

    c.    Policy No. RMGLA 2505270, effective from April 1, 2002 to April 1, 2003 (the "2003 American Home Policy");

    d.    Policy No. RMGLA 2505270, effective from April 1, 2003 to April 1, 2004 (the "2003 American Home Policy");

    e.    Policy No. RMGLA 2505270, effective from April 1, 2004 to April 1, 2005 (the "2004 American Home Policy");

    f.    Policy No. RMGLA 2505270, effective from April 1, 2005 to April 1, 2006 (the "2005 American Home Policy");

    g.    Policy No. RMGL 2505270, effective from April 1, 2006 to April 1, 2007 (the "2006 American Home Policy"); and

    h.    Policy No RMGL 2505270, effective from April 1, 2007 to April 1, 2008 (the "2007 American Home Policy").

*See* Roman Decl. Ex. 5 ("Exhibit 5" in AIG's 30(b)(6) San Julian Dep.); Roman Decl. Ex. 6 ("Exhibit 6" in AIG's 30(b)(6) San Julian Dep.); Roman Decl. Ex. 7 ("Exhibit 7" in AIG's 30(b)(6) San Julian Dep.); Roman Decl. Ex. 8 ("Exhibit 8" in AIG's 30(b)(6) San Julian Dep.).

**AIG Response to Paragraph 103:**

Undisputed.

**Lafarge Statement Paragraph 104:**

The four primary GL policies issued by AIG Canada to LCI are as follows:

    i.    Policy No. RMGL 2505270, effective from July 1, 2008 to July 1, 2009  (the "2008 AIG Canada Primary Policy");

    j.    Policy No. RMGL 2505270, effective from July 1, 2009 to July 1, 2010 (the "2009 AIG Canada Primary Policy");

   k.  Policy No. RMGL 2505270, effective from July 1, 2010 to July 1,

      2011 (the "2010 AIG Canada Primary Policy"); and

   l.  Policy No. RMGL 2505270, effective from July 1, 2011 to July 1,

      2012 (the "2011 AIG Canada Primary Policy").

*See* Roman Decl. Ex. 9 ("Exhibit 9" in AIG's 30(b)(6) San Julian Dep.); Roman Decl. Ex. 10 ("Exhibit 10" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 11 ("Exhibit 11" in 30(b)(6) San Julian Dep.); Roman Decl. Ex. 12 ("Exhibit 12" in 30(b)(6) San Julian Dep.).    Effective November 1, 2008, all of the American Home Primary Policies were novated to AIG Canada. Roman Decl. Ex. 39 at 4.

**AIG Response to Paragraph 104:**

Undisputed.

**Lafarge Statement Paragraph 105:**

LCI is a "Named Insured" in the declarations of each of the Primary Policies set forth above.    Roman Decl. Ex. 5 at LEX_0001239; Roman Declaration Ex. 6 at  LEX_00001297; Roman Decl. Ex. 7 at  LEX_00001346; Roman Decl. Ex. 8 at LEX_00001391; Roman Decl. Ex. 9 at LEX_00001430; Roman Decl. Ex. 10 at LEX_00001484; Roman Decl. Ex. 11 at LEX_00001538; Roman Decl. Ex. 12 at LEX_00001597.    LCI is insured under all of these policies.  Roman Decl. Ex. 4 at 68:17-69:5 (30(b)(6) San Julian Dep.).

**AIG Response to Paragraph 105:**

Undisputed.

**Lafarge Statement Paragraph 106:**

During the time that the Primary Policies were issued to LCI, the domicile of LCI was Quebec, Canada.  Shelonko Decl. ¶ 10.

**AIG Response to Paragraph 106:**

Undisputed.

**Lafarge Statement Paragraph 107:**

All claims for defense or indemnity costs paid by American Home and AIG Canada under the Primary Policies are ultimately reimbursed by Lafarge. Roman Decl. Ex. 23 at 49:5-51:15 (Lafarge 30(b)(6) Shelonko Dep.); Shelonko Decl. ¶ 14.

**AIG Response to Paragraph 107:**

Undisputed.

**Lafarge Statement Paragraph 108:**

The limits of the Primary Policies range from C$1 million to C$5 million. Roman Decl. Ex. 5 at LEX_00001239; Roman Decl. Ex. 6 at LEX_00001297; Roman Decl. Ex. 7 at LEX_00001346; Roman Decl. Ex. 8 at LEX_00001391; Roman Decl. Ex. 9 at LEX_00001430; Roman Decl. Ex. 10 at LEX_00001484; Roman Decl. Ex. 11 at LEX_00001538; Roman Decl. Ex. 12 at LEX_00001597.

**AIG Response to Paragraph 108:**

Undisputed.

**Lafarge Statement Paragraph 109:**

The Primary Policies each provide coverage for property damage liability. Specifically, each policy provides that the Insurers will pay

> all sums which the Insured shall become obligated to pay by reason of the liability imposed upon the Insured by law or assumed under contract or agreement because of:
>
> (a) Injury to, destruction or loss of property or any loss of use of property caused by an accident; or

> (b) Injury to, destruction or loss of tangible property or any
> loss of use of property caused by an occurrence . . . .

Roman Decl. Ex. 5 at LEX_0001241; Roman Declaration Ex. 6 at LEX_00001299; Roman Decl. Ex. 7 at LEX_00001348; Roman Decl. Ex. 8 at LEX_00001393; Roman Decl. Ex. 9 at LEX_00001432; Roman Decl. Ex. 10 at LEX_00001486; Roman Decl. Ex. 11 at LEX_00001540; Roman Decl. Ex. 12 at LEX_00001599.

**AIG Response to Paragraph 109:**

Disputed because the word "coverage" as used in Paragraph 109 is ambiguous. The Primary Policies are written documents that are governed by their terms and the assertion contained in this Paragraph does not address all terms that may be applicable.

**Lafarge Statement Paragraph 110:**

The Primary Policies provide rules for counting "occurrences." An "occurrence" is defined in each of the Primary Policies as follows:

> With respect to Bodily Injury and Property Damage, "Occurrence
> means an accident, including continuous or repeated exposure to
> substantially the same general harmful conditions which result in
> Bodily Injury or Property Damage during the Policy Period,
> neither intended nor expected from the standpoint of the Insured.

> With respect to Personal Injury, "Occurrence" means an act or
> series of acts of the same or similar nature committed during the
> Policy Period which results in a Personal Injury.

Roman Decl. Ex. 5 at LEX_00001243; Roman Decl. Ex. 6 at LEX_0001301; Roman Decl. Ex. 7 at LEX_00001350; Roman Decl. Ex. 8 at LEX_00001395; Roman Decl. Ex. 9 at LEX_00001434; Roman Decl. Ex. 10 at LEX_00001488; Roman Decl. Ex. 11 at LEX_00001542; Roman Decl. Ex. 12 at LEX_00001601.

**AIG Response to Paragraph 110:**

Disputed. Paragraph 110 mischaracterizes the Primary Policies because the Primary Policies do not "provide rules for counting 'occurrences.'"

**Lafarge Statement Paragraph 111:**

The property damage covered by the Primary Policies covers risks in multiple jurisdictions. With the exception of the 2010 and 2011 AIG Canada Primary Policies, each of the Primary Policies "applies to accidents or occurrences which take place ... anywhere in the world." Roman Decl. Ex. 5 at LEX_00001252; Roman Decl. Ex. 6 at LEX_00001309; Roman Decl. Ex. 7 at LEX_00001358; Roman Decl. Ex. 8 at LEX_00001402; Roman Decl. Ex. 9 at LEX_00001442; Roman Decl. Ex. 10 at LEX_00001496.

**AIG Response to Paragraph 111:**

Disputed. The statement that "[t]he property damage covered by the Primary Policies includes risks in multiple jurisdictions" is disputed as unintelligible.

**Lafarge Statement Paragraph 112:**

The 2010 and 2011 AIG Canada Primary Policies provide coverage for occurrences which take place during the policy period in any "coverage territory." According to the policies, "coverage territory" means

      a. Canada and the United States of America (including its territories and possessions);

      b. [I]nternational waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

    c. All parts of the world if:

      1) The injury or damage arises out of:

        a. Goods or products made or sold by you in the territory described in a. above; or

        b. The activities of a person whose home is in the territory described in

> a. above, but is away for a short time
> on your business; and
>
> 2) [T]he insured's responsibility to pay
> damages is determined in a "suit" on the
> merits, in the territory described in a. above
> or in a settlement we agree to in writing.

Roman Decl. Ex. 11 at LEX_00001550; Roman Decl. Ex. 12 at LEX_000001609.

**AIG Response to Paragraph 112:**

Disputed because the word "coverage" as used in Paragraph 112 is ambiguous. The 2010 and 2011 AIG Canada Primary Policies are written documents that are governed by their terms and the assertion contained in this Paragraph does not address all terms that may be applicable.

**Lafarge Statement Paragraph 113:**

Each Primary Policy also contains an endorsement entitled "Non-Accumulation of Limits of Insurance." The following provision is included in each Primary Policy:

> It is agreed that in the event coverage for an
> occurrence is deemed to involve coverage under this policy
> or any other commercial general liability policy … the
> company's total limit of insurance for all damages because
> of bodily injury and property damage and all personal
> injury and advertising injury shall not exceed [amount] for
> any occurrence . . . .

The only variation between policies is the limits, which range from C$1 million to C$5 million. Roman Decl. Ex. 5 at LEX_00001255; Roman Decl. Ex. 6 at LEX_00001311; Roman Decl. Ex. 7 at LEX_00001360; Roman Decl. Ex. 8 at LEX_00001405; Roman Decl. Ex. 9 at LEX_00001444; Roman Decl. Ex. 10 at LEX_00001498; Roman Ex. 11 at LEX_00001562; Roman Ex. 12 at LEX_00001621.

**AIG Response to Paragraph 113:**

Disputed to the extent that the limits are not the "only variations" between the Primary Policies. Paragraph 116 is direct evidence of one such variation.

40

**Lafarge Statement Paragraph 114:**

Each Primary Policy provides: "The Insurer also agrees to: (a) Defend any suit against the Insured alleging such … destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent." Roman Decl. Ex. 5 at LEX_00001242; Roman Decl. Ex. 6 at LEX_00001300; Roman Decl. Ex. 7 at LEX_00001349; Roman Decl. Ex. 8 at LEX_00001394; Roman Decl. Ex. 9 at LEX_00001433; Roman Decl. Ex. 10 at LEX_00001487; Roman Decl. Ex. 11 at LEX_00001541; Roman Decl. Ex. 12 at LEX_00001600.

**AIG Response to Paragraph 114:**

Undisputed.

**Lafarge Statement Paragraph 115:**

There is no exclusion in any of the Primary Policies limiting LCI coverage for the TR Claims. Roman Decl. Ex. 5; Roman Decl. Ex. 6; Roman Decl. Ex. 7; Roman Decl. Ex. 8; Roman Decl. Ex. 9; Roman Decl. Ex. 10; Roman Decl. Ex. 11; Roman Decl. Ex. 12.

**AIG Response to Paragraph 115:**

Undisputed.

**Lafarge Statement Paragraph 116:**

The Primary Policy beginning in July 2010 provides:

> If this Coverage Form and any other Coverage Form or policy issued to you by us or any of our affiliated companies apply to the same "occurrence" or offense, the maximum limit of insurance under all the Coverage Forms or policies will not exceed the highest applicable limit of insurance available under any one Coverage Form or policy. This condition does not apply to any other Coverage Form or policy issued by us or any of our affiliated companies specifically to apply as excess insurance over this Coverage Form.

Roman Decl. Ex. 11 at LEX_00001562.

**AIG Response to Paragraph 116:**

Undisputed.

**Lafarge Statement Paragraph 117:**

All the policies in this case provide that their limits are not eroded by defense expenses. Roman Decl. Ex. 5 at LEX_00001242; Roman Decl. Ex. 6 at LEX_00001300; Roman Decl. Ex. 7 at LEX_00001349; Roman Decl. Ex. 8 at LEX_00001394; Roman Decl. Ex. 9 at LEX_00001433; Roman Decl. Ex. 10 at LEX_00001487; Roman Decl. Ex. 11 at LEX_00001541; Roman Decl. Ex. 12 at LEX_00001600; Roman Decl. Ex. 13 at LEX_00113029; Roman Decl. Ex. 14 at LEX_00000748; Roman Decl. Ex. 15 at LEX_00000840; Roman Decl. Ex. 16 at LEX_00000917; Roman Decl. Ex. 17 at LEX_00001056; Roman Decl. Ex. 18 at LEX_00000591; Roman Decl. Ex. 19 at LEX_00000683; Roman Decl. Ex. 20 at LEX_00001091; Roman Decl. Ex. 21 at LEX_00001177; Roman Decl. Ex. 22 at LEX_00000527.

**AIG Response to Paragraph 117:**

Undisputed.

**Lafarge Statement Paragraph 118:**

On November 15, 2011, Lafarge provided notice of potential claims against LCI to its insurers, including AIG.  Shelonko Decl. ¶ 25; Shelonko Decl. Ex. 1 at 1.

**AIG Response to Paragraph 118:**

Undisputed.

**Lafarge Statement Paragraph 119:**

AIG has refused to provide a defense for or agreed to indemnify LCI.  Dkt. 23, Defendants' Answer.

**AIG Response to Paragraph 119:**

Disputed.  The Member Companies are providing a defense to LCI under the Primary Policies pursuant to a reservation of rights. Sheridan Decl. ¶ 40.  There is no present duty to defend or indemnify under the Umbrella Policies.

**Lafarge Statement Paragraph 120:**

Pursuant to the fronting arrangement applicable under the Primary Policies, LCI's legal fees and costs for the *Trois-Rivières* Litigation are paid by a third party administrator ("TPA"). The TPA is reimbursed by AIG for those costs, and AIG is reimbursed by a Lafarge affiliate. Shelonko Decl. ¶ 20.

**AIG Response to Paragraph 120:**

Undisputed.

**Lafarge Statement Paragraph 121:**

Before filing the present action, Lafarge requested AIG's confirmation that LCI's potential liability in the *Trois-Rivières* Litigation are covered by the Umbrella Policies. Shelonko Decl. Ex. 2 at 1.

**AIG Response to Paragraph 121:**

Undisputed.

**Lafarge Statement Paragraph 122:**

AIG declined to provide such confirmation.  Shelonko Decl. Ex. 3.

**AIG Response to Paragraph 122:**

Undisputed.

**Lafarge Statement Paragraph 123:**

AIG contends that the so-called "professional services" and "expected or intended" exclusions in the Umbrella policies apply to LCI's claims and therefore bar coverage. Dkt. 53, Defendants' Notice of Motion for Summary Judgment; Roman Decl. Ex. 4 at 135:8-135:13.

**AIG Response to Paragraph 123:**

Disputed to the extent that the Member Companies clarify that the "professional services" and "expected or intended" exclusions in the Umbrella Policies apply to claims by LNA and LCI and therefore bar coverage. Dkt. 53, Defendants' Notice of Motion for Summary Judgment

**Lafarge Statement Paragraph 124:**

LCI had no knowledge of potential property damage arising from use of aggregate from the B&B Quarry in concrete for which LCI or LNA would be subject to a claim until November 2011, when two LCI employees and one former employee were subpoenaed and deposed in the *Trois-Rivières* Litigation. Shelonko Decl. ¶ 17.

**AIG Response to Paragraph 124:**

Disputed. By LCI's January 31, 2006 completion of the DeGrosbois Report, LCI was aware of the risk of property damage caused by the use of B&B Quarry aggregate in concrete. Sheridan Decl. Ex. 15, at LAF0000004320[Trans.]; Ex 17, Ex. 35 at 94:1-11. Laurentide began receiving claims related to property damage caused by B&B Quarry aggregate in 2007 and Lafarge representatives sat on Laurentide's board during that time. Sheridan Decl. Ex. 2, at LEX_00039523. Finally, LCI and LNA became aware of property damage arising from use of aggregate from the B&B Quarry in concrete no later than May 18, 2011 when it learned that two employees and one former employee had been subpoenaed by the Trois-Rivières Litigation Court as witnesses. Sheridan Decl. Ex. 2; Ex. 4, at 184:17-185:6. On November 15, 2011, John

Shelonko wrote a letter to all interested insurers "to place all insurers on notice of claim that may be raised" against LCI in the Trois-Rivières Litigation. Sheridan Decl. Ex. 3.

**PLAINTIFFS' RESPONSES TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**AIG Statement Paragraph 125:**

American Home and AIG Canada issued eleven primary "fronting" CGL[3] policies to LCI between April 1, 2001 and July 1, 2012.  LSMUF ¶¶ 103-04; L. Br. at 6-7.

**Lafarge Response to Paragraph 125:**

Undisputed.

**AIG Statement Paragraph 126:**

LCI purchased the Primary Policies to satisfy Canadian statutory requirements. L. Br. at 2.

**Lafarge Response to Paragraph 126:**

Undisputed that one of the reasons LCI purchased the Primary Policies was to satisfy Canadian statutory requirements.

**AIG Statement Paragraph 127:**

American Home and AIG Canada underwrote and issued the Primary Policies from Toronto, Ontario to LCI in Montreal, Quebec. Roman Decl. Ex. 5 at LEX_0001239-40; Roman Declaration Ex. 6 at LEX_00001297-98; Roman Decl. Ex. 7 at LEX_00001346-47; Roman Decl. Ex. 8 at LEX_00001391-92; Roman Decl. Ex. 9 at LEX_00001430-31; Roman Decl. Ex. 10 at LEX_00001484-85; Roman Decl. Ex. 11 at LEX_00001538-39; Roman Decl. Ex. 12 at LEX_00001597-98.

---

[3] The defined terms herein (unless otherwise specified) follow those contained in the Member Companies' Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment.

**Lafarge Response to Paragraph 127:**

Undisputed.

**AIG Statement Paragraph 128:**

Under the Primary Policies and other agreements entered with American Home and AIG Canada, losses paid under the Primary Policies are ultimately due to be paid either by Mountain Prairie Insurance Company (an LCI-related entity) or by LCI itself.  L. Br. at 2; Dkt. 4, Complaint at ¶ 64.

**Lafarge Response to Paragraph 128:**

Undisputed.

**AIG Statement Paragraph 129:**

As John Shelonko, LCI and LNA's Rule 30(b)(6) deponent and LNA's former vice president of risk management, testified, Mountain Prairie and/or LCI "reimburse" American Home or AIG Canada for all defense and indemnity costs on covered claims. Sheridan Decl. Ex. 4, at 30:12-18; 62:7-18.

**Lafarge Response to Paragraph 129:**

Undisputed.

**AIG Statement Paragraph 130:**

For the period from 2004-12, Lexington issued nine umbrella CGL policies to LCI's parent corporation, first-named insured LNA, for consecutive policy periods from April 1, 2004 to July 1, 2012. Roman Decl. Ex. 14 at LEX_00000744; Roman Decl. Ex. 15 at LEX_00000812; Roman Decl. Ex. 16 at LEX_00000893; Roman Decl. Ex. 17 at LEX_00000976; Roman Decl. Ex. 18 at LEX_00000566; Roman Decl. Ex. 19 at LEX_00000658; Roman Decl. Ex. 20 at LEX_00001066; Roman Decl. Ex. 21 at LEX_00001152.

**Lafarge Response to Paragraph 130:**

Undisputed.

**AIG Statement Paragraph 31:**

Each Lexington Policy was issued for a one-year period, except for the 2007-08 policy, which was issued for the 15-month period April 1, 2007 to July 1, 2008. Roman Decl. Ex. 14 at LEX_00000744; Roman Decl. Ex. 15 at LEX_00000812; Roman Decl. Ex. 16 at LEX_00000893; Roman Decl. Ex. 17 at LEX_00000976; LEX_00001029; Roman Decl. Ex. 18 at LEX_00000566; Roman Decl. Ex. 19 at LEX_00000658; Roman Decl. Ex. 20 at LEX_00001066; Roman Decl. Ex. 21 at LEX_00001152.

**Lafarge Response to Paragraph 131:**

Disputed that the policy was first issued for 15 months. Rather, the policy was originally issued for the 12-month period of April 1, 2007 to April 1, 2008, and then modified to provide a new set of limits from July 1, 2007 to July 1, 2008 in addition to the existing limits from April 1, 2007 to July 1, 2007.

**AIG Statement Paragraph 132:**

Commerce & Industry Insurance Company of Canada n/k/a AIG Insurance Company of Canada issued an umbrella CGL policy to LCI for the period April 1, 2004 to April 1, 2005, which shared applicable limits with the Umbrella Policy for the same period issued by Lexington. Roman Decl. Ex. 13.

**Lafarge Response to Paragraph 132:**

Undisputed that the 2004-05 Lexington policy states that "[i]f damages covered by this policy are also covered in whole or part by [the 2004-05 AIG Canada umbrella policy], our total

Limits of Insurance under both policies combined shall be" US$50 million per occurrence and total aggregate.  Roman Decl. Ex. 14 at LEX_00000808.

**AIG Statement Paragraph 133:**

The C&I Policy was issued to accommodate Lafarge's emergency request to maintain specific projects in Canada that required evidence of certain insurance from an insurer licensed in Canada. Sheridan Decl. Ex. 5 at LEX_00058850-51.

**Lafarge Response to Paragraph 133:**

Disputed.  The phrase "emergency request" is not substantiated by the cited evidence.

**AIG Statement Paragraph 134:**

AIG Canada issued an umbrella CGL policy to LCI for the period July 1, 2011 to July 1, 2012. LSMUF ¶ 82.

**Lafarge Response to Paragraph 134:**

Undisputed.

**AIG Statement Paragraph 135:**

Lexington underwrote and issued the Umbrella Policies from London, United Kingdom to LNA in Virginia.   Roman Decl. Ex. 14 at LEX_00000744; Roman Decl. Ex. 15 at LEX_00000812; Roman Decl. Ex. 16 at LEX_00000893; Roman Decl. Ex. 17 at LEX_00000976; Roman Decl. Ex. 18 at LEX_00000566; Roman Decl. Ex. 19 at LEX_00000658; Roman Decl. Ex. 20 at LEX_00001066; Roman Decl. Ex. 21 at LEX_00001152.

**Lafarge Response to Paragraph 135:**

Undisputed.

**AIG Statement Paragraph 136:**

Shelonko testified that the Umbrella Policies do not "follow form" to the Primary Policies and operate independently with their own terms. Sheridan Decl. Ex. 4 at 86:21-87:25.

**Lafarge Response to Paragraph 136:**

Undisputed that Mr. Shelonko testified that the Lafarge Umbrella Policies do not "follow form" to the Primary Policies and that they have their "own terms," but the citation does not reflect that Mr. Shelonko testified that the Lafarge Umbrella Policies operate independently from the Primary Policies.

**AIG Statement Paragraph 137:**

The insuring agreements of the Umbrella Policies, the C&I Policy and the AIG Canada Umbrella Policy provide that the insurer "will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of . . . Property Damage . . . to which this insurance applies." Roman Decl. Ex. 13 at LEX_00113025; Roman Decl. Ex. 14 at LEX_00000745; Roman Decl. Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

**Lafarge Response to Paragraph 137:**

Undisputed that each Lafarge Umbrella Policy pays covered Loss after satisfaction, according to the Policy, of a C$2 million per occurrence Retained Limit.

**AIG Statement Paragraph 138:**

The applicable Retained Limit in each Umbrella Policy Period, the C&I Policy Period and the AIG Canada Umbrella Policy Period is C$2 million per occurrence. Roman Decl. Ex. 13

at LEX_00113072; Roman Decl. Ex. 14 at LEX_00000787; Roman Decl. Ex. 15 at LEX_00000844; Roman Decl. Ex. 16 at LEX_00000921; Roman Decl. Ex. 17 at LEX_00001007; Roman Decl. Ex. 18 at LEX_00000595; Roman Decl. Ex. 19 at LEX_00000687; Roman Decl. Ex. 20 at LEX_00001095; Roman Decl. Ex. 21 at LEX_00001181; Roman Decl. Ex. 22 at LEX_00000531.

**Lafarge Response to Paragraph 138:**

Undisputed that each Lafarge Umbrella Policy applies after satisfaction of a C$2 million per occurrence Retained Limit.

**AIG Statement Paragraph 139:**

LNA or LCI only satisfy an applicable Retained Limit in an Umbrella Policy Period, the C&I Policy Period and the AIG Canada Umbrella Policy Period through indemnity payments. Sheridan Decl. Ex. 4 at 98:15-19.

**Lafarge Response to Paragraph 139:**

Disputed. The statement is not a proper statement of fact, and no response is required. To the extent that a response is required, the Retained Limit of each Lafarge Umbrella Policy is "exhausted by the payment of Loss to which [that] policy applies," and Loss is defined as "those sums actually paid as judgments or settlements . . . ." Roman Decl. Ex. 13 at LEX00113074, LEX_00113077; Roman Decl. Ex. 14 at LEX_00000789, LEX_00000792; Roman Decl. Ex. 15 at LEX_00000840, LEX_00000842; Roman Decl. Ex. 16 at LEX_00000917, LEX_00000919; Roman Decl. Ex. 17 at LEX_00001002, LEX_00001004; Roman Decl. Ex. 18 at LEX_00000591, LEX_00000593; Roman Decl. Ex. 19 at LEX_00000683, LEX_00000685; Roman Decl. Ex. 20 at LEX_00001091, LEX_00001093; Roman Decl. Ex. 21 at LEX_00001177, LEX_00001179; Roman Decl. Ex. 22 at LEX_00000527, LEX_00000529. In

addition, under governing Quebec law, AIG Canada and Lexington are bound to pay LCI's defense costs in proportion to the extent that the damages claimed against LCI exceed the Retained Limit of the Lafarge Umbrella Policies. Roman Decl. Ex. 25.

**AIG Statement Paragraph 140:**

After satisfaction of an applicable Retained Limit(s) in connection with an otherwise covered claim, the insurer will "have the right and duty to defend any Suit against the Insured that seeks damages for . . . Property Damage . . . covered by this policy." Roman Decl. Ex. 13 at LEX_00113070; Roman Decl. Ex. 14 at LEX_00000785; Roman Decl. Ex. 15 at LEX_00000841; Roman Decl. Ex. 16 at LEX_00000918; Roman Decl. Ex. 17 at LEX_00001003; Roman Decl. Ex. 18 at LEX_00000592; Roman Decl. Ex. 19 at LEX_00000684; Roman Decl. Ex. 20 at LEX_00001092; Roman Decl. Ex. 21 at LEX_00001178; Roman Decl. Ex. 22 at LEX_00000528.

**Lafarge Response to Paragraph 140:**

Disputed. The statement is not a proper statement of fact, and no response is required. To the extent that a response is required, the quoted language appears in the Lafarge Umbrella Policies. In addition, under governing Quebec law, excess insurers are bound to pay defense costs if the damages claimed against the insured implicate the excess insurers' policies. Roman Decl. Ex. 25.

**AIG Statement Paragraph 141:**

As Shelonko testified, however, until LNA or LCI satisfy the Retained Limit(s), Lexington has no obligation to make a defense or indemnity payment on their behalf. Sheridan Decl. Ex. 4 at 92:14-93:2, 94:14-99:13.

**Lafarge Response to Paragraph 141:**

52

Disputed.  The statement is not a proper statement of fact, and no response is required. To the extent that a response is required, Mr. Shelonko testified that Lexington has no present obligation to make defense or indemnity payments based on satisfaction of a Retained Limit under the Lafarge Umbrella Policies.  In addition, under governing Quebec law, excess insurers are bound to pay defense costs if the damages claimed against the insured implicate the excess insurers' policies. Roman Decl. Ex. 25.

**AIG Statement Paragraph 142:**

The Umbrella Policies, the C&I Policy and the AIG Canada Umbrella Policy also "appl[y], only if: the [] Property Damage is caused by an Occurrence that takes place anywhere, and the [] Property Damage occurs during the Policy Period."  Roman Decl. Ex. 13 at LEX_00113025; Roman Decl. Ex. 14 at LEX_00000745; Roman Decl. Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

**Lafarge Response to Paragraph 142:**

Undisputed.

**AIG Statement Paragraph 143:**

████████████████████████████████████ the Umbrella Policies, the C&I Policy and the AIG Canada Umbrella Policy provide, in relevant part:

C. 1. This Policy applies to . . . Property Damage, only if prior to the Policy Period, [none of certain specified parties] knew that the . . . Property Damage had occurred in whole or in part. If [any of the certain specified parties] knew prior to the Policy Period that the . . . Property Damage had occurred, then any continuation change or resumption of . . . Property Damage during or after the Policy Period will be deemed to have been known prior to the Policy Period.

  2. Bodily Injury or Property Damage which occurs during the Policy Period and was not, prior to the Policy Period, known to have occurred by [certain specified parties] . . . includes any continuation, change or resumption of that Bodily Injury or Property Damage after the end of the Policy Period.

  Roman Decl. Ex. 13 at LEX_00113073; Roman Decl. Ex. 14 at LEX_00000788; Roman Decl. Ex. 15 at LEX_00000866; Roman Decl. Ex. 16 at LEX_00000943; Roman Decl. Ex. 17 at LEX_00001030; Roman Decl. Ex. 18 at LEX_00000631; Roman Decl. Ex. 19 at LEX_00000715; Roman Decl. Ex. 20 at LEX_00001125; Roman Decl. Ex. 21 at LEX_00001213; Roman Decl. Ex. 22 at LEX_00000480.

**Lafarge Response to Paragraph 143:**

Undisputed.

**AIG Statement Paragraph 144:**

  The Umbrella Policies, the C&I Policy and the AIG Canada Umbrella Policy define Property Damage, in relevant part, as "physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it." Roman Decl. Ex. 13 at LEX_00113049; Roman Decl. Ex. 14 at LEX_00000766; Roman Decl. Ex. 15 at LEX_00000888; Roman Decl. Ex. 16 at LEX_00000965; Roman Decl. Ex. 17 at LEX_00001052; Roman Decl. Ex. 18 at LEX_00000653; Roman Decl. Ex. 19 at LEX_00000737; Roman Decl. Ex. 20 at LEX_00001147; Roman Decl. Ex. 21 at LEX_00001235; Roman Decl. Ex. 22 at LEX_00000503.

**Lafarge Response to Paragraph 144:**

Undisputed.

**AIG Statement Paragraph 145:**

The Umbrella Policies (with the exception of the 2004 Lexington Umbrella Policy) and the AIG Canada Umbrella Policy do not apply to "any liability arising out of the rendering of, or the failure to render, professional services or any error, omission or mistake of a professional nature performed by or on behalf of the Insured."  Professional services includes but is not limited to: "a. the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications; and b. supervisory, inspection, architectural, engineering or surveying services." Roman Decl. Ex. 15 at LEX_00000819; Roman Decl. Ex. 16 at LEX_00000901; Roman Decl. Ex. 17 at LEX_00000984; Roman Decl. Ex. 18 at LEX_00000574; Roman Decl. Ex. 19 at LEX_00000666; Roman Decl. Ex. 20 at LEX_00001074; Roman Decl. Ex. 21 at LEX_00001160; Roman Decl. Ex. 22 at LEX_00000510.

**Lafarge Response to Paragraph 145:**

Disputed.  The statement is not a proper statement of fact, and no response is required. To the extent that a response is required, the cited exclusion appears exclusively in "Contractors Limitation Endorsements" or "Contractors Excluded Hazards Endorsements" (collectively, "Contractors Endorsements") in each policy and therefore applies only in the context of work by Lafarge as a contractor.

**AIG Statement Paragraph 146:**

The 2004 Umbrella Policy and the C&I Policy language, which is substantially similar to that of the Umbrella Policies and the AIG Canada Umbrella Policy, provides that the policy does not apply to "any professional services performed by or on behalf of the Insured, including but not limited to the preparation or approval of maps, shop drawings, plans, opinions, reports, surveys, field orders, change orders, designs or specifications, and any supervisory, inspection or

engineering services." Roman Decl. Ex. 13 at LEX_00113058; Roman Decl. Ex. 14 at LEX_00000775.

**Lafarge Response to Paragraph 146:**

Disputed. This provision appears only in "Contractors Endorsements" in each policy and therefore applies only in the context of work by Lafarge as a contractor.

**AIG Statement Paragraph 147:**

The Umbrella Policies, the C&I Policy and the AIG Canada Umbrella Policy do not apply to "Property Damage expected or intended from the standpoint of the Insured." Roman Decl. Ex. 13 at LEX_00113032; Roman Decl. Ex. 14 at LEX_00000751; Roman Decl. Ex. 15 at LEX_00000873; Roman Decl. Ex. 16 at LEX_00000950; Roman Decl. Ex. 17 at LEX_00001037; Roman Decl. Ex. 18 at LEX_00000638; Roman Decl. Ex. 19 at LEX_00000722; Roman Decl. Ex. 20 at LEX_00001132; Roman Decl. Ex. 21 at LEX_00001220; Roman Decl. Ex. 22 at LEX_00000487.

**Lafarge Response to Paragraph 147:**

Undisputed.

**AIG Statement Paragraph 148:**

Lafarge does not dispute that the Professional Services Exclusion and the Expected or Intended Exclusion are unambiguous or that those exclusions are included in the Umbrella Policies. L. Br. 47-49.

**Lafarge Response to Paragraph 148:**

Undisputed that both exclusions are included in the Umbrella Policies, although the so-called "professional services exclusion" appears exclusively in "Contractors Endorsements" in

each policy and therefore applies only in the context of work by Lafarge as a contractor; Lafarge submits that the question of ambiguity is for the Court to determine.

**AIG Statement Paragraph 149:**

On several occasions between 2004 through 2011, LNA's broker requested that Lexington remove the Professional Services Exclusion.  Sheridan Decl. Ex. 6 at 107:2-109:12.

**Lafarge Response to Paragraph 149:**

Disputed.  LNA's broker only requested that the Contractors Endorsement be revised or removed in 2011 as a result of LNA's plan to begin offering new services.  Roman Decl. Ex. 23 at 88:23-89:25.

**AIG Statement Paragraph 150:**

Each time LNA's broker requested that Lexington remove the Professional Services Exclusion, Lexington denied the request.  Sheridan Decl. Ex. 6 at 107:2-109:12.

**Lafarge Response to Paragraph 150:**

Undisputed that Lexington did not remove the Contractors Endorsement from the 2011-2012 Lexington policy when requested by LNA's broker to revise or remove that exclusion in 2011.

**AIG Statement Paragraph 151:**

███████████████████████████████████████████

████████████████████████████████

**Lafarge Response to Paragraph 151:**

Undisputed.

**AIG Statement Paragraph 152:**

The underwriters indicated that excess liability division "d[id] not underwrite professional liability coverage," which is instead available in a "separate market" and recommended Lafarge seek such coverage in the "professional market." Sheridan Decl. Ex. 6 at 99:19–101:11.

**Lafarge Response to Paragraph 152:**

Disputed. The statement is vague and ambiguous, including with respect to dates of the purported statements; in any event, LNA only requested that the Contractors Endorsement be revised or removed in 2011 as a result of LNA's plan to begin offering new services. Roman Decl. Ex. 23 at 88:23-89:25.

**AIG Statement Paragraph 153:**

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**Lafarge Response to Paragraph 153:**

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**AIG Statement Paragraph 154:**

LCI seeks a present declaration of insurance coverage under the Primary and Umbrella Polices for its potential liability in connection with several ongoing underlying lawsuits pending before the Superior Court of Quebec in the judicial district of Trois-Rivières.  L. Br. 33-38.

**Lafarge Response to Paragraph 154:**

Undisputed, except that Lafarge states that other lawsuits are pending in other courts in Trois-Rivières.

**AIG Statement Paragraph 155:**

The Trois-Rivières Litigation arises out of two groups of related underlying civil lawsuits.  L. Br. at 5-6.

**Lafarge Response to Paragraph 155.**

Undisputed.

**AIG Statement Paragraph 156:**

The first group of lawsuits in the Trois-Rivières Litigation consists of multi-plaintiff, multi-wave civil litigations brought by plaintiff-owners of approximately 1,800 residential and commercial buildings and concrete structures, who allege that, between about 1994 and 2010, their buildings were constructed with concrete that incorporated unsuitable aggregate sourced from a quarry in the region of Trois-Rivières, Quebec operated by B&B Quarry. Dkt. 4, Complaint at ¶ 17.

**Lafarge Response to Paragraph 156:**

Undisputed, except there are 1,400 total structures involved in the Trois-Rivières Litigation.  Therrien Decl. ¶ 8.

**AIG Statement Paragraph 157:**

The claimants in the Trois-Rivières Litigation assert that the B&B Quarry aggregate contained sulfur-containing minerals that triggered a chemical reaction that has resulted in deterioration of concrete. Dkt. 4, Complaint at ¶ 19.

**Lafarge Response to Paragraph 157:**

Undisputed, except that the allegations relate to a specific sulfur-containing mineral, pyrrhotite. Therrien Decl. ¶ 5.

**AIG Statement Paragraph 158:**

SNC seeks to hold LCI equally liable for SNC's liability in connection with the First-Wave Claims of the Trois-Rivières Litigation and any liability SNC has for the Second-Wave Claims. Dkt. 4, Complaint at ¶ 31.

**Lafarge Response to Paragraph 158:**

Disputed.  The Complaint does not allege that SNC seeks to hold LCI equally liable. Dkt. 4, Complaint at ¶ 31; *see* response to Paragraph 66.

**AIG Statement Paragraph 159:**

In 2001, Michel Bergeron an executive with Laurentide, owner of a fifty-percent interest in B&B Quarry, became aware of swelling and cracking problems in concrete foundations in the region of Trois-Rivières, Quebec, including concerns that the sulfur content of the aggregate from Maskimo Quarry, which was located approximately 500 meters from B&B Quarry, was the cause of some of the deterioration problems. Therrien Decl., Ex. 1 at ¶¶ 176-77, 179, 199.

**Lafarge Response to Paragraph 159:**

Disputed.  The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 160:**

LCI held a 30% ownership stake in Laurentide.  Dkt. 4, Complaint at ¶ 25.

**Lafarge Response to Paragraph 160:**

Undisputed that LCI once held a 30% ownership interest in Laurentide.

**AIG Statement Paragraph 161:**

In 2002, Laurentide received a recommendation from LCI to retain geologist Marc-André Bérubé to analyze issues related to aggregate.  Therrien Decl., Ex. 1 at ¶ 178.

**Lafarge Response to Paragraph 161:**

Disputed.  The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 162:**

Lafarge maintains the "Centre Technique et Scientifique" or technical services center ("CTS"), which performs technical services and testing.  Sheridan Decl. Ex. 7 at 25:6-19; Ahearn Decl. at Ex. 1 at 7.

**Lafarge Response to Paragraph 162:**

Disputed because the term "technical services" as used in Paragraph 162 is ambiguous, but undisputed that the proper acronym for CTS is "Centre Technique et Scientifique."

**AIG Statement Paragraph 163:**

"CTS plays a key role in cement product development and plant performance management, provides technical expertise to the overall organization, promotes knowledge sharing and synergies among functional areas and regions, facilitates employee development through rigorous training, and contributes to the company's high level of manufacturing asset performance."  Ahearn Decl. at Ex. 1 at 7.

**Lafarge Response to Paragraph 163:**

61

Undisputed that this statement accurately quotes from a Lafarge website description of CTS's internal work for Lafarge.

**AIG Statement Paragraph 164:**

LCI employed a variety of individuals that worked for or with CTS—many of whom possessed knowledge and training as engineers, chemists, and geologists. Sheridan Decl. Ex. 7 at 9:12-10:2; 28:1-4; Ex. 8; Ex. 31; Ahearn Decl. at Ex. 1 at 7.

**Lafarge Response to Paragraph 164:**

Disputed because the terms "variety of individuals" and "many of whom" as used in Paragraph 164 are ambiguous and because Mr. Ahearn, an expert witness who has never worked at CTS, does not have firsthand knowledge of the qualifications of those employed at CTS.

**AIG Statement Paragraph 165:**

LCI employed trained geologist, Marie De Grosbois, a graduate of the University of Quebec in Montreal who majored in earth sciences. Sheridan Decl. Ex. 9 at 21:14-23:14.

**Lafarge Response to Paragraph 165:**

Undisputed that LCI once employed Ms. de Grosbois and that Ms. de Grosbois is a graduate of the University of Quebec in Montreal who majored in earth sciences as an undergraduate. Sheridan Decl. Ex. 9 at 21:14-23:14

**AIG Statement Paragraph 166:**

De Grosbois completed some graduate studies in applied engineering at McGill University and was at one time a registered member of the Professional Association of Geologists. Sheridan Decl. Ex. 9 at 23:18-24:8; 73:16-74:4.

**Lafarge Response to Paragraph 166:**

Undisputed.

**AIG Statement Paragraph 167:**

De Grosbois received technical professional training during her employment at LCI. Sheridan Decl. Ex. 9 at 24:15-28:16.

**Lafarge Response to Paragraph 167:**

Disputed because the term "technical professional training" as used in Paragraph 167 is ambiguous.

**AIG Statement Paragraph 168:**

LCI hired De Grosbois in 1990 as a senior geologist in the geological department of CTS. Sheridan Decl. Ex. 9 at 36:1-23.

**Lafarge Response to Paragraph 168:**

Undisputed.

**AIG Statement Paragraph 169:**

LCI employed Pascale Poulin, a certified chemist with a bachelor's degree in applied science, as a laboratory coordinator in CTS. Ahearn Decl. at Ex. 1 at 7; Sheridan Decl. Ex. 31.

**Lafarge Response to Paragraph 169:**

Disputed. The cited evidence does not support the statement that Ms. Poulin is a certified chemist who has a bachelor's degree in applied science.

**AIG Statement Paragraph 170:**



**Lafarge Response to Paragraph 170:**

████████████████████████████████████

████████████████████████████████████

████████████████████████████

**AIG Statement Paragraph 171:**

Anik Delagrave, who served as De Grosbois' supervisor after 2003, obtained a Ph.D. in civil engineering at Laval University and is a licensed civil engineer in Quebec, who attends continuing education courses with The American Concrete Institute.   Sheridan Decl. Ex. 7 at 9:12-10:2; 12:5-21; 28:1-4.

**Lafarge Response to Paragraph 171:**

Undisputed.

**AIG Statement Paragraph 172:**

████████████████████████████████████

████████████████████████████████████

████████████    ████████████████████████

████████████████████

**Lafarge Response to Paragraph 172:**

Undisputed.

**AIG Statement Paragraph 173:**

In 2002, Bérubé suggested that Laurentide measure the total sulfur content of the B&B Quarry stone and Laurentide sought Lafarge's assistance.   Based on Laurentide's request for additional assistance, Perreault asked De Grosbois to request a total sulfur analysis of B&B Quarry aggregate.   Sheridan Decl. Ex. 9 at 93:17-22; 97:20-23; 98:17-25; 99:9-12; Therrien Decl. Ex. 1 at ¶¶ 294-95.

**Lafarge Response to Paragraph 173.**

███████████████████████████████████████████████

████████████████████████████████████

**AIG Statement Paragraph 174:**

De Grosbois gave instructions to Pascale Poulin to perform the total sulfur test, which is an analysis of chemical compounds examined through XRF and a specific sulfur analysis through LECO. Sheridan Decl. Ex. 9 at 103:2-21; 104:1-8.

**Lafarge Response to Paragraph 174:**

███████████████████████████████████████████████

███████████████████

**AIG Statement Paragraph 175:**

Poulin conducted the analysis and because of her training knew how to prepare the sample and execute the testing to achieve certifiable results. Sheridan Decl. Ex. 9 at 103:19-25.

**Lafarge Response to Paragraph 175:**

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

**AIG Statement Paragraph 176:**

Because the generated results of the XRF and LECO testing do not always provide a calculation for the percent equivalent pyrite based on the Province of Quebec Bureau of Normes Quebec ("BNQ") standard, De Grosbois instructed the CTS employees to provide those calculations. Sheridan Decl. Ex. 9 at 109:21-112:1.

**Lafarge Response to Paragraph 176:**

Disputed. The results were automatically calculated according to a pre-programmed standard. Sheridan Decl. Ex. 9 at 109:22-23.

**AIG Statement Paragraph 177:**

████████████████████████████████████████████

█████████████████████████████

**Lafarge Response to Paragraph 177:**

████████████████████████████████████████████

█████████████████████████████

**AIG Statement Paragraph 178:**

After testing and before release of the results of the chemical analysis by Perreault, De Grosbois reviewed the results. Sheridan Decl. Ex. 9 at 122:21-122:20.

**Lafarge Response to Paragraph 178:**

Disputed. Ms. de Grosbois did not review the results; she only "looked at it, that's it" to ensure that numbers were there. Sheridan Decl. Ex. 9 at 121:2-20.

**AIG Statement Paragraph 179:**

De Grosbois spoke with Bergeron on the telephone after Perreault delivered the chemical analysis to him. Sheridan Decl. Ex. 9 at 123:13-16.

**Lafarge Response to Paragraph 179:**

████████████████████████████████████████████

████████████████████████████

**AIG Statement Paragraph 180:**

███████████████████████████████████████████

████████████████████████████████████████████

█

**Lafarge Response to Paragraph 180:**

███████████████████████████████████████

██████████████████████████████████████

███████████

**AIG Statement Paragraph 181:**

████████████████████████████████████

████████████████████████████████████████████

████████████████

**Lafarge Response to Paragraph 181:**

████████████████████████████████████

████████████████████████████████████████████

█████████

**AIG Statement Paragraph 182:**

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

**Lafarge Response to Paragraph 182:**

████████████████████████████████████

████████████

67

**AIG Statement Paragraph 183:**

The conversation that De Grosbois had with Bergeron was based on her knowledge and training as a geologist, especially as to her recommendation to conduct the additional IPPG test. Sheridan Decl. Ex. 9 at 165:3-166:22.

**Lafarge Response to Paragraph 183:**

Disputed.  Any person involved in "construction material test and control" would know this information.  Sheridan Decl. Ex. 9 at 166:6-166:7.

**AIG Statement Paragraph 184:**

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

**Lafarge Response to Paragraph 184:**

████████████████████████████████████████████

████████████████████████████████████████

████████████████████

**AIG Statement Paragraph 185:**

Laurentide continued to use B&B Quarry aggregate after receipt of the May 2002, Bérubé Report.  Therrien Decl., Ex. 1 at ¶ 1318.

**Lafarge Response to Paragraph 185:**

Disputed.  The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 186:**

68

On October 14, 2003, the news publication Le Nouveliste published an article regarding the alleged issues involving the Maskimo Quarry. Therrien Decl. Ex. 1 at ¶¶ 193; 1189-93.

**Lafarge Response to Paragraph 186:**

Disputed. The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 187:**

In 2003 B&B Quarry, and its owners, including Laurentide, hired geologist Alain Blanchette to further analyze the B&B Quarry aggregate. Therrien Decl., Ex. 1 at ¶ 135.

**Lafarge Response to Paragraph 187:**

Disputed. The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 188:**

Beginning in 2003 and continuing on a yearly basis, SNC and Blanchette performed testing on the B&B Quarry aggregates to determine their suitability for use in concrete. Therrien Decl., Ex. 1 ¶¶ 135; 1821.

**Lafarge Response to Paragraph 188:**

Disputed. The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 189:**

Between 2003 and 2007, Blanchette authored five reports, each of which certified B&B Quarry's aggregate as suitable for use in concrete. Therrien Decl., Ex. 1 at ¶¶ 135-38.

**Lafarge Response to Paragraph 189:**

Disputed.  The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 190:**

In September 2005, De Grosbois attended a meeting at Laurentide about concrete damages allegedly stemming from the aggregate used.  Sheridan Decl. Ex. 9 at 200:9-15.

**Lafarge Response to Paragraph 190:**

███████████████████████████████████████████

████████████████████████████

**AIG Statement Paragraph 191:**

Because of her background in geology, De Grosbois was at the September 2005 meeting to understand the potential for aggregate to cause damage in the concrete. Sheridan Decl. Ex. 9 at 215:1-19.

**Lafarge Response to Paragraph 191:**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

**AIG Statement Paragraph 192:**

In September 2005 De Grosbois went to the Maskimo and B&B Quarries to conduct a comparison of the sulfide present at the quarries and take representative samples for further testing. Sheridan Decl. Ex. 9 at 224:15-225:15.

**Lafarge Response to Paragraph 192:**

████████████████████████████████████████

████████████████████████████████████████

**AIG Statement Paragraph 193:**

De Grosbois, through a petrography, sought to quantify and ascertain the quality of the sulfide. Sheridan Decl. Ex. 9 at 229:3-9.

**Lafarge Response to Paragraph 193:**

Disputed. The cited testimony refers to efforts by Ms. de Grosbois to quantify and determine the type and distribution of sulfide as part of her analysis comparing aggregate from the B&B, Continental, and Maskimo quarries; it does not support the statement that she was seeking to determine the "quality" of the sulfide in the sense of its suitability for use in concrete. Sheridan Decl. Ex. 9 at 229:3-9.

**AIG Statement Paragraph 194:**

During the visual inspection of B&B Quarry, De Grosbois concluded that the sulfide was unevenly distributed through the quarry, that there were no zones without any sulfide, and that there were no different rock types. Sheridan Decl. Ex. 9 at 231:8-18.

**Lafarge Response to Paragraph 194:**

Undisputed.

**AIG Statement Paragraph 195:**

De Grosbois identified the sulfide by the metallic lustre of the minerals, which she learned to identify through her training as a geologist. Sheridan Decl. Ex. 9 at 231:19-232:14.

**Lafarge Response to Paragraph 195:**

Undisputed that Ms. de Grosbois identified the presence of sulfide by the metallic lustre of the minerals, which she learned to identify through her training as a geologist. Sheridan Decl. Ex. 9 at 231:19-232:14.

**AIG Statement Paragraph 196:**

Only the geologists who attended the visits to B&B Quarry and Maskimo Quarry were able to visually identify the sulfides. Sheridan Decl. Ex. 9 at 231:11-232:14; Ex. 35 80:1-18.

**Lafarge Response to Paragraph 196:**

Disputed. The cited testimony does not support this statement.

**AIG Statement Paragraph 197:**

Based on the visual inspection, sulfide from the B&B Quarry and the Maskimo Quarry appeared similar, however, De Grosbois was not able to identify if it was pyrite or pyrrhotite as the sulfide was fine-grained. Sheridan Decl. Ex. 9 at 235:11-19.

**Lafarge Response to Paragraph 197:**

██████████████████████████████████████

████████████████████████████████████████

████████

**AIG Statement Paragraph 198:**

Based on her visits to B&B Quarry and the Maskimo Quarry, De Grosbois was able to reach some preliminary conclusions about use of B&B Quarry aggregate, including that the distribution of sulfur was fairly uneven and thus selective mining would not be an option without an extensive drilling program. Sheridan Decl. Ex. 9 at 237:14-239:3.

**Lafarge Response to Paragraph 198:**

Undisputed that Ms. de Grosbois reached some preliminary conclusions, but never reached preliminary (or final) conclusions about the suitability of aggregate for use in concrete. Sheridan Decl. Ex. 15 at 9.

**AIG Statement Paragraph 199:**

De Grosbois collected and brought back rock samples from the B&B Quarry and the Maskimo Quarry to examine at the CTS. Sheridan Decl. Ex. 9 at 236:15-23.

**Lafarge Response to Paragraph 199:**

███████████████████████████████████████████

███████████████████████████

**AIG Statement Paragraph 200:**

De Grosbois was supplied with a sample from Continental Quarry for reference purposes. Sheridan Decl. Ex. 9 at 225:2-23.

**Lafarge Response to Paragraph 200:**

Undisputed that Mr. de Grosbois was supplied with a sample from Continental Quarry in Fall 2005.

**AIG Statement Paragraph 201:**

After returning to CTS, De Grosbois determined what tests to perform on the B&B Quarry samples. Sheridan Decl. Ex. 9 at 256:19-22

**Lafarge Response to Paragraph 201:**

████████████████████████████████████████

**AIG Statement Paragraph 202:**

De Grosbois' supervisor at the time, Anik Delagrave, relied on De Grosbois to choose the tests based on De Grosbois' background as a geologist.   Sheridan Decl. Ex. 7 at 96:6-97:10; 98:6-15.

**Lafarge Response to Paragraph 202:**

██████████████████████████████████████████████

█████████████████████████████████

**AIG Statement Paragraph 203:**

De Grosbois performed a chemical analysis to estimate the total amount of sulfide in the samples from B&B Quarry, Maskimo Quarry and Continental Quarry.   Sheridan Decl. Ex. 9 at 261:22-262:19.

**Lafarge Response to Paragraph 203:**

Undisputed that Ms. de Grosbois in Fall 2005 performed tests, among other things, to estimate the total amount of sulfide in samples from the three quarries.

**AIG Statement Paragraph 204:**

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

**Lafarge Response to Paragraph 204:**

██████████████████████████

**AIG Statement Paragraph 205:**

Based on her analysis, De Grosbois prepared a written petrographic report, which she finalized on January 31, 2006. Sheridan Decl. Ex. 9 at 259:2-6; Ex 15 at LAF0000004312[Trans.].

**Lafarge Response to Paragraph 205:**

Undisputed.

**AIG Statement Paragraph 206:**

No one assisted De Grosbois in creating the De Grosbois Report. Sheridan Decl. Ex. 9 at 259:7-9.

**Lafarge Response to Paragraph 206:**

Undisputed that Ms. de Grosbois wrote the report, but disputed that she performed all the tests without assistance Supplemental Declaration of Neil K. Roman ("Supp. Roman Decl.") Ex. 1 at 256:23-257:7.

**AIG Statement Paragraph 207:**

De Grosbois stated that without her geology training, she would not have been able to know of the existence of the appropriate tests or how the petrographic analysis could be used with the chemical analysis to reach a conclusion. Sheridan Decl. Ex. 9 at 263:8-264:6.

**Lafarge Response to Paragraph 207:**

Disputed. Ms. de Grosbois testified that her training in geology allowed her to identify the combination of tests to be conducted. Sheridan Decl. Ex. 9 at 263:8-264:6.

**AIG Statement Paragraph 208:**

LCI employees relied on De Grosbois because they could not conduct a petrographic analysis or interpret the results of such an analysis, including, for instance, De Grosbois' supervisor, Delagrave. Sheridan Decl. Ex. 7 at 98:4-99:2.

**Lafarge Response to Paragraph 208:**

███████████████████████████████████████████████████

████████████████████████████████████████████

**AIG Statement Paragraph 209:**

The De Grosbois Report concluded that the B&B Quarry aggregate contained levels of pyrrhotite exceeding the levels at the Maskimo Quarry, which were known at the time to have caused damage.  Sheridan Decl. Ex. 9 at 264:13-265:23, Ex. 15 at LAF0000004312[Trans.].

**Lafarge Response to Paragraph 209:**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

**AIG Statement Paragraph 210:**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

**Lafarge Response to Paragraph 210:**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

**AIG Statement Paragraph 211:**

In March 2006, Alain Canuel, who was a sales director at LCI and a board member of Laurentide, warned Laurentide's board of the dangers of using B&B's aggregate and recommended its use be discontinued.  Sheridan Decl. Ex. 16 at 83:18-84:17.

**Lafarge Response to Paragraph 211:**

Disputed that Mr. Canuel told Laurentide that use of B&B aggregate was dangerous; to the contrary, he recommended discontinuing use of B&B aggregate "to be cautious." Sheridan Decl. Ex. 16 at 83:18-84:17.

**AIG Statement Paragraph 212:**

In April 2006, Alain Canuel sent the De Grosbois Report to Laurentide along with a letter informing Laurentide to immediately stop using aggregates from B&B Quarry in concrete. Sheridan Decl. Ex. 17 at LAF0000004733-34[Trans.].

**Lafarge Response to Paragraph 212:**

Disputed. The letter from Mr. Canuel to Laurentide did not inform Laurentide to stop using aggregates from B&B Quarry in concrete, but states that "it is in the interest of the company and its shareholders to immediately stop using aggregates from B&B Quarry in its concrete mixes." *See* Declaration of Alain Canuel & Ex. 1 thereto.

**AIG Statement Paragraph 213:**

The April 2006 letter from Alain Canuel to Laurentide stated:

> [a]lthough this report does not contain any conclusion, namely whether [Laurentide] must or not continue to use the aggregates from B&B Quarry to make concrete, the few alleged cases of defective concrete manufactured with aggregates from the Maskimo Quarry incite us to believe, as we mentioned in the meeting of the board of directors of [Laurentide] held last March, that it is in the interest of the Company and its shareholders to immediately stop using the aggregates from B&B Quarry in its concrete mixes.

Sheridan Decl. Ex. 17 at LAF0000004734[Trans.].

**Lafarge Response to Paragraph 213:**

Undisputed.

**AIG Statement Paragraph 214:**

On November 28, 2007 Blanchette recommended discontinuing use of the B&B aggregate. Therrien Decl. Ex. 1 at ¶ 1318.

**Lafarge Response to Paragraph 214:**

Disputed. The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 215:**

Laurentide continued to use B&B aggregate and may have used it until 2007. Therrien Decl. Ex. 1 at ¶ 181.

**Lafarge Response to Paragraph 215:**

Disputed. The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 216:**

In 2007, Laurentide started receiving claims for damages allegedly caused by its aggregate. Dkt. 4, Complaint ¶ 24; Sheridan Decl. Ex. 1 at LEX_00039523.

**Lafarge Response to Paragraph 216:**

██████████

**AIG Statement Paragraph 217:**

The Trois-Rivières Litigation commenced in 2007. Dkt. 4, Complaint ¶ 24.

**Lafarge Response to Paragraph 217:**

██████████

**AIG Statement Paragraph 218:**

In the initial claims in the Trois-Rivières Litigation, plaintiffs brought suit against B&B Quarry, Laurentide, and SNC as well as contractors and entities that participated in the construction of the damaged structures.  Therrien Decl. at ¶¶ 9, 16.

**Lafarge Response to Paragraph 218:**

Undisputed.

**AIG Statement Paragraph 219:**

Neither LCI nor LNA were named as defendants in the initial claims in the Trois-Rivières Litigation.  Therrien Decl. at ¶ 16; Dkt. 4, Complaint at ¶ 25.

**Lafarge Response to Paragraph 219:**

Undisputed.

**AIG Statement Paragraph 220:**

In the Trois-Rivières Litigation, Insurers Intact Assurance Desjardins Assurances Generales, Inc., Aviva Assurance/Union Canadienne and La Capitale Assurances Generales Inc. retained as an expert witness geologist Marc-Andre Bérubé, who had earlier provided an analysis of B&B Quarry aggregate.  Sheridan Decl. Ex. 18 at LAF0000370093[Trans.].

**Lafarge Response to Paragraph 220:**

Disputed.  The statement relies on inadmissible hearsay evidence.

**AIG Statement Paragraph 221:**

Bérubé, in his capacity as an expert in the Trois-Rivières Litigation issued a report, dated November 11, 2011 (the "Bérubé Expert Report").  Sheridan Decl. Ex. 18 at LAF0000370087[Trans.].

**Lafarge Response to Paragraph 221:**

Disputed because the term "issued" is ambiguous, but undisputed that Mr. Bérubé, in his capacity as an expert in the Trois-Rivières Litigation, wrote a report, dated November 11, 2011 (the "Bérubé Expert Report").

**AIG Statement Paragraph 222:**

The Bérubé Expert Report concluded that based on De Grosbois' education, experience, knowledge, and training, De Grosbois failed to comply with her professional obligations by not recommending Laurentide discontinue using B&B Quarry aggregates in early 2002.  Sheridan Decl. Ex. 18 at LAF0000370147-50[Trans.].

**Lafarge Response to Paragraph 222:**

Undisputed that Mr. Bérubé wrote (but did not submit to the court in the Trois-Rivières Litigation) a report in 2011 containing this conclusion.

**AIG Statement Paragraph 223:**

The Bérubé Expert Report further criticized De Grosbois for failing to instruct Laurentide to stop using B&B Quarry aggregate.  Sheridan Decl. Ex. 18 at LAF0000370150[Trans.].

**Lafarge Response to Paragraph 223:**

Undisputed that Mr. Bérubé wrote a report in 2011 containing this conclusion.

**AIG Statement Paragraph 224:**

De Grosbois and LCI allegedly had access to a number of studies submitted by Terratech to B&B Quarry since December 2003 as well as to French Standards that limited the sulfur content in aggregates for concrete.  Sheridan Decl. Ex. 18 at LAF0000370147-150[Trans.].

**Lafarge Response to Paragraph 224:**

Disputed.  The statement is an allegation and not a statement of fact and relies on inadmissible hearsay evidence.

**AIG Statement Paragraph 225:**

In 2012, the Trois-Rivières Litigation court consolidated proceedings for approximately seventy of the most developed initially-filed lawsuits, which involved nearly 900 concrete structures poured between 2003 and 2008. Dkt. 4, Complaint at ¶ 24.

**Lafarge Response to Paragraph 225:**

Undisputed.

**AIG Statement Paragraph 226:**

In the First-Wave Judgment, the court rendered a judgment of approximately C$168 million (about US$130 million) in June and November 2014. Dkt. 4, Complaint at ¶ 27-28.

**Lafarge Response to Paragraph 226:**

Undisputed.

**AIG Statement Paragraph 227:**

In the First-Wave Judgment, the court concluded that SNC and its geologist Blanchette were jointly and severally liable for the damages caused to claimants for the period between May 2003 and November 28, 2007, and that the defects in the concrete started from the time the foundations were poured. Therrien Decl. Ex. 1 at ¶ 2270.

**Lafarge Response to Paragraph 227:**

Undisputed that the court reached those conclusions.

**AIG Statement Paragraph 228:**

SNC received the largest share of liability (approximately 70%) in the First-Wave Judgment. LSUMF ¶ 62; Therrien Decl. Ex. 1 at ¶ 2270.

**Lafarge Response to Paragraph 228:**

Undisputed.

**AIG Statement Paragraph 229:**

In the First-Wave Judgment, each one of the concrete company defendants and B&B Quarry were held responsible for 25% of the damages, or 12.5% each, while the contractors/workers were liable for 5% of the damages caused. Therrien Decl. Ex. 1 at ¶ 2270.

**Lafarge Response to Paragraph 229:**

Undisputed.

**AIG Statement Paragraph 230:**

The First-Wave Judgment ordered the defendants jointly and severally liable, thus SNC's share has increased as other First-Wave Judgment debtors became insolvent or are not insured sufficiently. Therrien Decl. ¶ 24; Ex. 1 at ¶ 2270.

**Lafarge Response to Paragraph 230:**

Undisputed.

**AIG Statement Paragraph 231:**

In the First-Wave Judgment, the court found that Blanchette's reports certifying B&B Quarry aggregate were prepared despite his awareness of similar problems involving the Maskimo Quarry aggregates and also despite the existence of other experts' opinions linking the sulfur content of B&B Quarry aggregates to deterioration problems. Therrien Decl. Ex. 1 at ¶¶ 1299-1306.

**Lafarge Response to Paragraph 231:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 232:**

82

In the First-Wave Judgment, the court found that Blanchette "ignored the professional obligations imposed on him by his code of ethics . . . [and] rendered opinions without any nuances and without any warnings, which should have been a basic precaution given the divergence of the opinions of the other experts involved in the Maskimo [Quarry] case." Therrien Decl. Ex. 1 at ¶¶ 1298-99.

**Lafarge Response to Paragraph 232:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 233:**

In the First-Wave Judgment, the court thus held that the liability of SNC and Blanchette applied from the date of Blanchette's May 2003 report certifying the use of B&B aggregate for manufacturing concrete. Therrien Decl. Ex. 1 at ¶ 1317.

**Lafarge Response to Paragraph 233:**

Undisputed that the court's opinion contains such a ruling.

**AIG Statement Paragraph 234:**

SNC and Blanchette's responsibility for the damages caused by the use of B&B Quarry aggregate only ended as of November 28, 2007, when Blanchette recommended that B&B Quarry aggregate should not be used. Therrien Decl. Ex. 1 at ¶ 1318.

**Lafarge Response to Paragraph 234:**

Disputed. Defendants' statement is a conclusion of law, not a statement of fact, and relies on inadmissible hearsay evidence.

**AIG Statement Paragraph 235:**

No judgment was entered against them in connection with the First-Wave Claims. Therrien Decl. ¶¶ 16, 29.

**Lafarge Response to Paragraph 235:**

Disputed. It is unclear to whom "them" refers.

**AIG Statement Paragraph 236:**

Though SNC attempted to insert LCI into the First-Wave Claims, the court granted LCI's request to be removed. Sheridan Decl. Ex. 19 at 66:4-68:4.

**Lafarge Response to Paragraph 236:**

Disputed. The cited evidence demonstrates that a general contractor, not SNC, unsuccessfully attempted to insert LCI into the First-Wave Claims.

**AIG Statement Paragraph 237:**

LCI's employees including De Grosbois and Perreault were deposed and testified at the First-Wave Trial. Therrien Decl. Ex. 1 at ¶¶ 167-68.

**Lafarge Response to Paragraph 237:**

Undisputed.

**AIG Statement Paragraph 238:**

In the First-Wave Judgment, the court stated that Laurentide asked LCI to act in a consulting capacity with respect to the quality problem regarding B&B Quarry aggregate. Therrien Decl. Ex. 1 at ¶ 166.

**Lafarge Response to Paragraph 238:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 239:**

Based on the testimony of LCI employees Perreault and De Grosbois, the court wrote in the First-Wave Judgment that LCI's role "was to reassure [] Laurentide about the use of B&B [Quarry] stone" and to determine whether the B&B Quarry aggregate "could pose the same problems as Maskimo [Quarry]" aggregate. Therrien Decl. Ex. 1 at ¶¶ 167-68.

**Lafarge Response to Paragraph 239:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 240:**

The court stated that Laurentide asked LCI in February 2002 to check B&B Quarry aggregate and that De Grosbois initiated a chemical analysis of such aggregate that indicated equivalent pyrite content was 0.92%. Therrien Decl. Ex. 1 at ¶¶ 295-98.

**Lafarge Response to Paragraph 240:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 241:**

The court stated that LCI "conclude[ed] in 2002 that B&B [Quarry] aggregate was good." Therrien Decl. Ex. 1 at ¶ 347.

**Lafarge Response to Paragraph 241:**

85

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 242:**

According to the First-Wave Judgment, after receipt of Bérubé's 2002 Report, Bergeron "eagerly conveyed" it to De Grosbois "with the following [fax] note: 'I am including a copy of Mr. Marc-Andre Bérubé's report on the expert valuation of our stone. This report leaves us somewhat perplexed, especially since, according to your analysis, the use of this stone in making concrete poses no problem. In your opinion, is it possible that this stone reacts more with one kind of cement as opposed to another? I await your comments.'" Therrien Decl. Ex. 1 at ¶ 348.

**Lafarge Response to Paragraph 242:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 243:**

According to the First-Wave Judgment, in 2005 at Laurentide's request, De Grosbois went to the Maskimo and B&B quarries, collected samples, and again conducted a chemical analysis. Therrien Decl. Ex. 1 at ¶¶ 363-64.

**Lafarge Response to Paragraph 243:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 244:**

According to the First-Wave Judgment, based on the De Grosbois Report, Canuel went to Laurentide in March 2006, "to verbally expose the content of" the De Grosbois Report and to recommend Laurentide "stop using the [B&B Quarry aggregate] in the concrete unless it could be proven that th[e] stone did not represent any danger." Therrien Decl. Ex. 1 at ¶¶ 989-90.

**Lafarge Response to Paragraph 244:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 245:**

The First-Wave Judgment remains on appeal. Therrien Decl., ¶ 22.

**Lafarge Response to Paragraph 245:**

Undisputed.

**AIG Statement Paragraph 246:**

On December 18, 2014, SNC and Blanchette initiated a "Motion to Institute a Claim for Contribution" to hold LCI liable in whole or in part for SNC's liability in the First-Wave Claims. Therrien Decl., Ex. 2.

**Lafarge Response to Paragraph 246:**

Undisputed.

**AIG Statement Paragraph 247:**

The Motion to Institute a Claim for Contribution joined earlier-filed contribution actions against LCI. Therrien Decl., Ex. 2.

**Lafarge Response to Paragraph 247:**

Undisputed.

**AIG Statement Paragraph 248:**

**Lafarge Response to Paragraph 248:**

**AIG Statement Paragraph 249:**

**Lafarge Response to Paragraph 249:**

**AIG Statement Paragraph 250:**

**Lafarge Response to Paragraph 250:**

**AIG Statement Paragraph 251:**

On May 23, 2002, Bergeron faxed the 2002 Bérubé Report to Lafarge employee Martin Perreault. Sheridan Decl. Ex. 21 at LAF0000004709[Trans.].

**Lafarge Response to Paragraph 251:**

███████████████████████████████████████████

**AIG Statement Paragraph 252:**

The following claims have been alleged against LCI by SNC in its contribution claim. The allegations concerning LCI's allegedly unlawful conduct are representative of the allegations against LCI in all other lawsuits in which LCI has been named as a third party defendant by SNC.

<u>**FACTS**</u>
. . .
20.    In the early 2000s, there were discussions of certain premature deterioration issues in several concrete jobs with aggregates originating from the Maskimo Quarry, located near B&B Quarry, in the Trois-Rivières region, and one of the hypotheses considered to explain the cause of the deterioration was the presence of iron sulphide (pyrite and/or pyrrhotite) in the concrete aggregates;

21.    Worried about the quality of B&B aggregates, Bèton Laurentide's officers informed Lafarge's representatives of the situation and asked them to provide technical support in evaluating the reactivity potential of B&B aggregates in regard to its use in concrete mixes;

22.    Moreover, on January 23, 2002, after a discussion regarding issues associated with Maskimo Quarry's aggregate, B&B Group's officers met to discuss the possibility of taking measures to ensure the production of quality aggregate;

23.    On January 24, 2002, Mr. Martin Perreault, Lafarge's technical service representative, went to Bèton Laurentide's offices to get a sample of B&B aggregates in order to have it examined by Ms. Marie De Grosbois, as reflected in the handwritten notes of

Mr. Michel Bergeron, Bèton Laurentide's president, filed in support of this motion as Exhibit **PG-3**;

24.     The same day, Mr. Martin Perreault also accompanied Mr. Michel Bergeron in order to examine different constructions that contained aggregates from Maskimo Quarry;

25.     In early February 2002, at the request of Bèton Laurentide's representative, Mr. Martin Perreault and Ms. Marie De Grosbois instructed Lafarge's technical laboratory to perform a chemical analysis of B&B aggregates in order to determine its total sulphide content, as reflected in "Lab request, #52-20002-0036" filed in support of this motion as Exhibit **PG-4**;

26.     On February 21, 2002, Mr. Martin Perreault faxed Mr. Michel Bergeron the results of this chemical analysis, as reflected in the facsimile transmission receipt dated February 21, 2002 and the chemical analysis # SBO-01-P1 filed as a set in support of this motion as Exhibit **PG-5**;

27.     The next day, February 22, 2002, Mr. Michel Bergeron immediately communicated with Ms. Marie De Grosbois in order to get advice and more details in regard to the analysis, which confirmed the present of pyrite in the aggregates;

28.     Ms. Marie De Grosbois then reassured Mr. Michel Bergeron that the B&B aggregates analyzed was a good quality aggregates for concrete;

29.     The possible issues relating to the use of aggregates containing iron sulphide continued to be discussed during Bèton Laurentide's board of directors' meetings, as reflected in the agenda of the meeting of April 30, 2002, filed in support of this motion as Exhibit **PG-6**;

30.     Subsequently, Bèton Laurentide's representatives continued, for the benefit of B&B Group, to consult Lafarge's professionals to obtain advice as to the risks related to the use of B&B aggregates;

31.     Moreover, during the same period, Bèton Laurentide's representatives consulted another expert geologist, Mr. Marc-Andrè Bèrubè;

32.     On May 17, 2002, Mr. Marc-Andrè Bèrubè sent to Bèton Laurentide's representatives his report, in which he concluded that

there were serious risks that B&B aggregates may lead to the same type of deterioration issues as the Maskimo aggregates, as reflected in Marc-André Bérubé's report dated May 4, 2002 prepared for Béton Laurentide, filed in support of this motion as Exhibit **PG-7**;

33.    On the same day, Mr. Michel Bergeron sent by fax a copy of this report to Ms. Marie De Grosbois, as reflected in the facsimile transmission receipt dated May 17, 2002 sent to Ms. Marie De Grosbois filed in support of this motion as Exhibit **PG-8**;

34.    The facsimile transmission receipt dated May 17, 2002 (Exhibit    **PG-8**)    not    only    references    the    advice    and recommendations relating to the use of B&B aggregates previously given by Lafarge, but it also reveals concerns and questions that Mr. Michel Bergeron, again, wanted to submit to Ms. Marie De Grosbois in light of her opinion of February 2002:

*"I am including a copy of Marc-André Bérubé's report on the analysis of our stone.   This report leaves us a little puzzled, especially considering that according to your analysis, there was not any issue in using this aggregate for the making of concrete. In your opinion, is it possible that this aggregate might react more with one type of cement as opposed to another?   Waiting for your comments!  Yours truly."*

35.    On May 23, 2002, Mr. Michel Bergeron also sent Mr. Martin Perreault a copy of Mr. Marc-André Bérubé's report, as reflected in the facsimile transmission receipt dated May 23, 2002 sent to Mr. Perreault and the proof of receipt of Mr. Marc-André Bérubé's report by Mr. Martin Perreault, filed as a set in support of this motion as Exhibit **PG-9**.

36.    On May 24, 2002, Mr. Michel Bergeron also sent a copy of this report to Mr. Serge Plante, another Lafarge employee and a director of Béton Laurentide, as reflected in the facsimile transmission receipt dated May 24, 2004 sent to Mr. Serge Plante filed in support of this motion as Exhibit **PG-10**.

37.    Despite the fact that Lafarge's services had been retained as technical advisor and that Lafarge's representatives had knowledge of the conclusions contained in Mr. Bérubé's report since May 2002, it appears that Lafarge never reacted nor undertook to conduct additional analysis of the B&B aggregates until September 2005;

38.     Moreover, following the transmission of said report to Lafarge's representatives, several meetings of Bèton Laurentide's board of directors were held, in 2002 and 2003, at which Lafarge's representatives participated in discussions about the presence of iron sulfides in concrete aggregates, as reflected in the agendas of Bèton Laurentide's board of directors meetings of July 12, 2002, October 30, 2002, April 24, 2003, June 27, 2003, and September 5, 2003, filed as a set in support of this motion as Exhibit **PG-11**;

39.     Besides, notes taken on the agenda for October 30, 2002 even mention that Mr. Serge Plante had to "follow-up" with Ms. Marie De Grosbois regarding the Maskimo case (Exhibit PG-11);

40.     Furthermore, during a telephone discussion with Mr. Marc-Andrè Bèrubè, that, according to his testimony, was held between June 2002 and September 2003, Ms. Marie De Grosbois asked Mr. Bèrubè whether he "believed in the Trois-Rivières pyrrhotite issues":

41.     Mr. Bèrubè then told Ms. Marie De Grosbois that, based on the expert reports he did on a building in the Trois-Rivières region (the IGA), he believed the issues were caused by the presence of pyrite and/or pyrrhotite in the aggregates;

42.     Aware of the concerns raised about the use of B&B aggregates containing iron sulfides, and after having consulted Mr. Bèrubè's professional opinion, Ms. De Grosbois nevertheless maintained the opinion expressed to Mr. Bergeron with respect to the good quality of the B&B aggregates for concrete production;

43.     On September 2, 2005, Bèton Laurentide's board of directors held a meeting, which Mr. Martin Perreault attended;

44.     During this meeting, Mr. Michel Bergeron summarized various problematic cases involving Bèton Laurentide related to the use of Maskimo aggregates;

45.     Furthermore, there were discussions about the conclusions reached in Mr. Marc-Andrè Bèrubè's May 4, 2002 report analyzing the B&B aggregates (Exhibit PG-7) and about Mr. Alain Blanchette's report prepared in January 2004 (Exhibit PG-2);

46.     It was decided that Mr. Martin Perreault would confirm whether Mr. Marc Deschènes, another geologist at Lafarge, could do an analysis of these reports, as reflected in the summary of the

meeting of Béton Laurentide's board of directors held September 2, 2005, filed in support of this motion as Exhibit **PG-12**.

47.    A little over three (3) weeks after this meeting, a second meeting was held at the offices of Béton Laurentide which certain of Lafarge's representatives attended, namely Martin Perreault, Isabelle Lord, Marie De Grosbois, and Éric Fontaine, as reflected in the summary of the meeting held on September 26, 2005, filed in support of this motion as Exhibit **PG-13**;

48.    The summary of the meeting of September 26, 2005 reflects that the following interventions were made:

> *"Michel BERGERON briefly explains the objective of the meeting, namely:*
>
> > The interpretation of various reports relating to the pyrithe (sic) that we have.
> >
> > Find one or several means to ensure that our aggregate (B&B) is not dangerously reactive to sulfides.
>
> *After two (2) hours of discussions on the topics, Ms. Marie DEGROSBOIS, along with France and Éric, went to B&B and Maskimo quarries to perform a visual inspection and collect a few samples of aggregates.*
>
> *At the same time, Richard was able to give Madame DEGROSBOIS a sample of aggregate from Carrière Continental.*
>
> *Based on these samples, Madame DEGROSBOIS should be able to perform tests comparable to the tests performed by Mr. Marc-André Bérubé whose results were sent to us on his report dated May 4, 2002."*

as reflected in the summary of the meeting held on September 26, 2005 (Exhibit PG-13);

49.    Immediately after this meeting, Ms. Marie De Grosbois, Mr. Éric Fontaine, Mr. Martin Perreault and Ms. France Cote went to B&B Quarry and to Maskimo Quarry in order to perform a visual inspection of the quarries for the purpose of performing tests similar to those Mr. Marc-André Bérubé performed for his report

dated May 4, 2002 (Exhibit PG-7), and subsequently to prepare a report;

50.    Mr. Martin Perreault described the meeting held with the people from Lafarge's research center and members of B&B Group, where there was discussion about the potential reaction of Pyrrhotite in regard to B&B aggregates, as well as the necessity of taking action on that matter, as reflected in the monthly reports prepared by Martin Perreault for the months of September and October 2005 and the transmission emails, filed as a set in support of this motion as Exhibit **PG-14**;

51.    On January 31, 2006, Ms. Marie De Grosbois finally issued her report on B&B aggregates, as reflected in said report dated January 31, 2006, filed in support of this motion as Exhibit **PG-15**;

52.    In this report, Ms. Marie De Grosbois describes the case as follows:

*"The company Bèton Laurentide located in St-Boniface operates an aggregates quarry, the B&B Quarry. Among other things, it mines aggregates to be used in the making of concrete. An issue relating to the presence of sulfides in the aggregate was revealed in a quarry located nearby, Maskimo Quarry. A third quarry, Carrière Continental, also located nearby, supplies concrete aggregates.*

*Bèton Laurentide solicited our expertise in order to determine if the B&B Quarry faces a sulphide issue similar to the one present at the Maskimo Quarry."*

53.    The, she concludes as follows:

*"The two samples taken from the Maskimo and B&B quarries contain comparable total amounts of sulfides, in the range of 3.8% in the Maskimo Quarry sample and 4.8% in the B&B Quarry sample. The large majority of these sulfides are pyrrhotite (>90%) with minor quantities or small inclusions of pyrrhotite of pyrite, pentiandite and chalcopyrite. The sample taken from Continental Quarry contains a very small amount of sulfur, 0.03%, and no sulphide was observed under the microscope. All the observations made and the measures taken are limited to the samples available taken from the quarries examined, and may not be representative of past or future production of aggregates or of the whole bedrock.*

*We cannot say if the quantities of sulfides in the form of pyrrhotite measured are deleterious in an aggregate used in the making of concrete, because no aggregate acceptance criterion related to the quantities of sulfides exists in the current standard norms of the BNQ or CSA."*

as set forth in the January 31, 2008 report (PG-15);

54.    After the issuance of this report at the end of January 2006, Ms. Marie De Grosbois met her superior, Ms. Anik Delagrave, in order to discuss the matter;

55.    Moreover, it is only on April 26, 2006 that Mr. Alain Canuel, Lafarge's Eastern Canada director of sales, also a director of Bèton Laurentide at that time, wrote a letter to Mr. Tom Bellemare, director of Bèton Laurentide and B&B Quarry, in which he recommends to stop using the B&B aggregates in its concrete mix immediately:

*"Although this report does not contain any conclusion as to whether Bèton Laurentide Inc. should or not continue to use B&B Quarry aggregates to manufacture concrete, the few alleged cases of detective concrete produced with aggregates originating from Maskimo Quarry brings us to believe, as we mentioned during the Bèton Laurentide Inc.'s board of directors' meeting held last March, that it is in the interest of the Corporation and its shareholders to immediately stop the use of B&B Quarry aggregates in its concrete mixes."*

as set forth in the letter dated April 26, 2006, filed in support of this motion as Exhibit **PG-16**;

56.    Mr. Martin Perreault also discussed with Mr. François Bellemare, officer of Bèton Laurentide and B&B Quarry, and Mr. Yvan Boisvert, director of Bèton Boisvert and B&B Quarry, Lafarge's recommendation to cease the operations of the B&B Quarry for concrete aggregate, as reflected in the monthly report f April 2006 prepared by Mr. Martin Perreault and sent to Mr. Alain Canuel and Ms. Sylvie Allard on May 1, 2006, filed in support of this motion as Exhibit **PG-17**;

57.    Thus, in this report (PG-17), Mr. Martin Perreault identifies as a "major event" the following:

*"Bèton Laurentide/Bellemare:    After discussion with François Bellemare and Yvan Boisvert co-owner of BB Quarry it*

*seems that they will continue to sell and use concrete stone even after Lafarge warning. They will increase their quality control. Before blast during drilling they will grab stone dust samples for analyses. Each blast will be controlled chemically."*

[Original text in English]

58.     Despite the warnings and recommendations of Lafarge's experts in the spring of 2006, the directors of B&B Quarry and Beton Laurentide, as well as Lafarge's representatives, tolerated and accepted the continued use of the B&B aggregates and thousands of metric tonnes of concrete containing said aggregates continued to be produces and sold;

## LAFARGE AND MS. DE GROSBOIS' JOINT AND SEVERAL LIABILITY

59.     Given that they sat on Bèton Laurentide's board of directors and because of their active participation during discussions about the choice to use B&B aggregates and marketing concrete containing this aggregate, Lafarge's representatives and employees had standing knowledge of the issue;

60.     Lafarge's representatives were aware of the alleged issues in the Maskimo case and were informed about B&B Group's concerns as to the use of B&B aggregates;

61.     Given that Lafarge was acting as a technical advisor to B&B Group, B&B Group relied on the expertise of Lafarge's representatives in making technical decisions;

62.     Lafarge's services were therefore retained in order to analyze the aggregate that was used in their concrete mixes and that originated from B&B Quarry;

63.     Starting in 2002, following an analysis of B&B aggregates' Lafarge geologist, Ms. De Grosbois, concluded that it was an acceptable concrete aggregate and a decision was made to continue using B&B aggregates in concrete mixes;

64.     If SNC Lavalin and Mr. Blanchette were to be held extra-contractually liable for the analysis made on B&B aggregates, then Third-Party Defendants Lafarge and Ms. De Grosbois must also be held liable for the analysis and advice provided to the officers of B&B Group, their error having caused the same harm;

65.    Mr. Marc-André Bérubé retained as an expert in the present dispute, writes in his report dated November 11, 2011 that he is of the opinion that "Ms. De Grosbois from Lafarge, in the same manner as Mr. Blanchette from Terratech, failed in their professional duties by not recommending Béton Laurentide to stop using aggregates from B&B Quarry in the concrete, as early as May 2002," as set forth in Marc-André Bérubé's expert report dated November 11, 2011, filed in support of this motion as Exhibit **PG-18**;

66.    Moreover, as early as May 2002, Lafarge's representatives were in possession of Marc-André Bérubé's report concluding that B&B aggregates might be problematic; they should have made the appropriate verifications, as requested by Béton Laurentide representatives, and appropriately advised B&B Group as to the scope of this report and the consequences on Concrete suppliers and B&B Quarry's activities;

67.    Considering all these facts brought to the attention of Lafarge's representatives in 2002, 2003, 2004, and 2005, their decision to take steps and do additional tests on B&B aggregates in September 2005 appears, at the very least, tardy; nothing explains the lack of follow-up and the delay in adequately responding to B&B Group's questions;

68.    Moreover, after Ms. Marie De Grosbois issued the report dated January 31, 2006 (PG- 15), Lafarge's representatives waited nearly three (3) months before advising Mr. Tom Bellemare to stop using B&B aggregates in his concrete mixes:

69.    Furthermore, Lafarge's representatives, never provided Mr. Alain Blanchette with the relevant information and reports they had relating to this matter, despite their knowledge of his involvement and the mandate given to Terratech;

70.    Moreover, given the position adopted by Lafarge's representatives and given that they had been informed of B&B Group's refusal to cease using the B&B aggregates despite their warning (PG-16), they should have taken appropriate measures to prevent future owners from sustaining damages and should have made sure to follow up with Béton Laurentide and B&B Quarry regarding this matter; however, Lafarge simply continued its commercial relationship with Béton Laurentide without any further intervention;

71.     Thus, if the Court were to hold SNC-Lavalin and Mr. Blanchette liable by judgment that becomes the final in this matter, *a fortiori* the court must conclude that Lafarge's representatives were negligent to intervene in a timely manner in order to prevent the B&B Group from using a potentially deleterious aggregate, and ensuring that Concrete suppliers take the necessary measures to guarantee the quality of the concrete to be sold;

72.     Had it not been for Lafarge's inaction and negligence, the damage suffered by the Plaintiff would never have occurred;

73.     Therefore, Third-Party Defendants should be held liable for the injury suffered by the Plaintiff;

74.     If the Plaintiff has suffered damages caused by Third-Party Plaintiffs, which is not admitted and to the contrary expressly denied, Third-Party Defendants should be held jointly and severally liable to pay their respective share for the injury suffered by Plaintiff;

75.     The present motion to institute a claim for contribution is well founded in fact and in law.

**FOR All THESE REASONS, THIRD-PARTY PLAINTIFFS RESPECTFULLY PRAY THE COURT TO:**

**GRANT** the present motion to institute a claim for contribution;

**HOLD LIABLE** the Third-Party Defendants Lafarge Canada Inc. and Marie De Grosbois, jointly and severally, to indemnify Third-Party Plaintiffs for their share of any judgment rendered against term, in capital, interest and costs, in the context of the main action:

**THE WHOLE** with costs, including expert fees relating to the preparation and court attendance.

Therrien Decl., ¶ 25; Ex 2.

**Lafarge Response to Paragraph 252:**

Undisputed that these allegations have been made, but many of these allegations are disputed.

**AIG Statement Paragraph 253:**

The following claims have been alleged against LCI as a direct defendant in the Second-Wave Claims. The allegations concerning LCI's allegedly unlawful conduct are representative of the allegations against LCI in all other lawsuits in which LCI has been named as a direct defendant.

## LIABILITY OF LAFARGE CANADA INC.

2.16    The Defendant *LAFARGE CANADA* (hereinafter *"LAFARGE"*) is a division of Lafarge, also specialized in the production and sale of cement, concrete and aggregate, as reflected in the *CIDREQ* report and an excerpt of its website filed as a set in support of the present motion as exhibit **P-3**;

2.17    In 2001, *LAFARGE* held a third of the shares of *BETON LAURENTIDE INC.*, having acquired them from Jacques Bertrand, as will be further demonstrated at the hearing;

2.18    *LAFARGE* remained a shareholder until 2009, in addition to acting as a technical advisor and exclusive supplier of cement used by *BETON LAURENTIDE INC.* in the course of its operations of concrete making;

2.19    In addition to the geologist Alain Blanchette from the firm SNC LAVALIN INC., involved in the analysis of the quality of the aggregate used by Construction Yvan Boisvert and Beton Laurentide Inc., as early as 2002 Lafarge's geologists, acting as consultants, were also called to make a judgment on this issue;

2.20    The main geologist from *LAFARGE's* laboratory involved in the analysis of the aggregate of Carriere B&B Inc. in the present file is Ms. Marie De Grosbois;

2.21    In 2001, *BETON MASKIMO INC.* was already facing numerous claims based on the premature deterioration of the foundation built with aggregates containing pyrrhotite originating from *CARRIERE MASKIMO INC.* In this context, studies of the aggregate of *CARRIERE B&B INC.* were required by *BETON LAURENTIDE INC.* for its benefit and that of *CONSTRUCTIONS YVAN BOISVERT INC.* and *CARRIERE B&B INC.* to determine whether *CARRIERE B&B INC.*'s aggregate could have the same deleterious effects as those caused by the Maskimo aggregate;

2.22    *LAFARGE* through its aggregate division, had an internal team and a laboratory that were in charge of controlling the quality of the aggregates used by its clients, including *BETON LAURENTIDE INC.*;

2.23    It is in such context that *LAFARGE* conducted a chemical analysis in February 2002 in order to determine the total sulphide content and the quality of the aggregate of *CARRIERE B&B INC.*;

2.24    The opinion required from Ms. Marie De Grosbois, Lafarge's geologist, was to determine whether the aggregate of *CARRIERE B&B INC.* could have the same deleterious reactive effects as those of *CARRIERE MASKIMO INC.*;

2.25    *LAFARGE's* analysis show that the *CARRIERE B&B INC.* aggregate had an "equivalent" of pyrite of 0.92%, as reflected in exhibit **P-4** filed in support herewith;

2.26    Notwithstanding this fact, during a conversation with Mr. Michel Bergeron in February 2002, after the communication to the latter of the report, exhibit **P-4**, the geologist Marie de Grosbois confirmed unreservedly that the *CARRIERE B&B INC.* aggregates were good aggregates for concrete production and that they could continue to be used in the concrete mixtures of the ready-mix concrete companies *BETON LAURENTIDE,* and *CONSTRUCTION YVAN BOISVERT INC.*;

2.27    Marie De Grosbois and *LAFARGE* did not further their investigation to the point of being able to differentiate between the different types and levels of sulphides (pyrite and pyrrhotite) in the aggregates examined, as will be further demonstrated at the hearing;

2.28    Of particular note, Marie de Grosbois and *LAFARGE* did not change their position in May 2002, when Mr. Michel Bergeron sent them the expert report prepared by Marc-Andre Berube, which contained reservations that raised questions regarding the B&B aggregate, which he considered to be similar to the problematic Maskimo aggregate, as reflected in the facsimile messages filed as a set as exhibit **P-5**;

2.29    This opinion rendered by Marie De Grosbois and *LAFARGE* in February 2002 was done without reservation and without any cautionary statements;

2.30    Marie De Grosbois and *LAFARGE* are thus liable due to their ignoring and contravening the public standards regarding the use of aggregate in the manufacturing of concrete, including the CSA standard, which deals with aggregates in concrete, as well as the European standard which, as early as 1983, adopted a standard setting the allowable threshold of total sulphides in the aggregate, expressed in SO3, at 0.4%;

2.31    Moreover, in August 2002, the European standard EN 12620 was adopted, and in the article 6.3.2 entitled "total sulphides", it provides the following:

*"Where applicable, the total quantity of sulphides (S) in the aggregates and the fillers determined in accordance with article 11 of EN 1744-1: 1998, cannot exceed:*

*- 2 % S In mass for air-cooled blast-furnace slags;*
*- 1 % S in mass for aggregates other than air-cooled blast furnace slags;*

*Special precautions must be taken where pyrrhotite, an unstable form or iron sulphides (FeS) is present in the aggregate. If the presence of this mineral is observed, the total quantity of sulphides (S) should be reduced to 0.1% at the most."* [Emphasis added]

2.32    Additionally, Marie de Grosbois and *LAFARGE*, like the other Defendants, could not ignore the scientific literature of that time, which prohibited the use of aggregate containing pyrrhotite;

2.33    Moreover, Marie de Grosbois and *LAFARGE* contravened their obligations pursuant to the *Geologist Code of Ethics* applicable in February 2002: a copy of the *Geologists Code of Ethics* is being filed in support of the present motion as exhibit **P-6**;

2.34    Marie de Grosbois and *LAFARGE* wrongly held and also defaulted in amending the opinion rendered in February 2002 when they knew or should have known, as early as then, that the B&B aggregate should not be used in the making of concrete;

2.35    The extracontractual liability of *LAFARGE* and Marie De Grosbois is thus based on their defaults and the negligence committed in the course of their analysis and recommendations;

2.36    The contractual fault of Marie De Grosbois and *LAFARGE* towards its contracting parties *BETON LAURENTIDE INC.*

*CONSTRUCTION YVAN BOISVERT INC.* and *CARRIERE B&B INC.* also calls into play their extracontractual liability towards the Plaintiffs;

2.37    Also, the "joint venture" that brings together these various stakeholders results in them being all severally and jointly liable in *solidum* for the damages suffered by the Plaintiffs;

2.38    The Plaintiffs also seek the joint and several liability of the following Defendants in their capacity of liability insurers pursuant to the policies in effect for the benefit of the Defendants, DESJARDINS COMPAGNIE D'ASSURANCE, BETON LAURENTIDE INC., BETON MASKIMO INC., CARRIERE B&B INC., SNC LAVALIN INC., ALAIN BLANCHETTE;

2.39    NORTHBRIDGE (LOMBARD) the General Insurance Company of Canada acted as insurer and covers the civil liability of CARRIERE B&B INC. for the period going from 2003 to 2010;

2.40    CHARTIS Insurance Company of Canada, acts as the primary insurer of SNC LAVALIN INC. pursuant to the policy bearing number 1729110, to the extent of the limit of its insurance coverage, while the Defendants SOUSCRIPTEURS DE LLOYD'S, ZURICH, ACE and CHARTIS act as the excess insurers of SNC LAVALIN INC. pursuant to the terms and conditions of the policies bearing numbers QC 090004, 8434261, E0X003732-004 and 1729111;

2.41    The Defendant INTACT (AXA ASSURANCE INC.) acts as insurer and covers the civil liability of the Defendant BETON LAURENTIDE INC. for the period between September 15, 1998 and September15, 2004, the Defendant NORTHBRIDGE for the period between September 15, 2004 and December 1, 2009, and the Defendant Zurich for the period between December 1, 2009 and December 1, 2011;

2.42    Furthermore, CHARTIS INSURANCE COMPANY OF CANADA also acts as excess insurer for the Defendant BETON LAURENTIDE;

2.43    ( ... )

2.44    Consequently, considering the extent of the current and upcoming claims involving their insured in the context of the present file and those currently under the special case management, the Plaintiffs are well-founded in seeking the joint and several

102

condemnations of the insurers described above for the benefit of their insured, Defendants to this motion, pursuant to sections 2501 and following CCQ;

2.45    The present motion is well-founded in fact and in law.

**FOR THESE REASONS, MAY IT PLEASE THE COURT TO:**

**GRANT** the Plaintiffs' motion;

**MS SYLVIE GAGNON AND MR. DANIEL SYLVESTRE**, 3885 de Saurel, Trois-Rivières, **SEQUENCE 1359** (32249-B)

ORDER the Defendants DesJardins Compangnie D'Assurance, Beton Laurentide Inc., Beton Maskimo Inc., Carriere B & B Inc., SNC Lavalin Inc., Alain Blanchette, Lafarge, Northbridge, Intact (AXA), Chartis, Les Souscripteurs DeLloyd's, Zurich Et Ace, to pay jointly and severally and *in solidum*, to the Plaintiffs **SYLVIE GAGNON ET DANIEL SYLVESTRE** the total sum of **$170,719.83**, taxes included, with interest from the service of the demand letter, dated June 6, 2015, including the additional indemnity provided by section 1619 of the Civil Code of Quebec;

ORDER the Defendants DesJardins Compangnie D'Assurance, Beton Laurentide Inc., Beton Maskimo Inc., Carriere B & B Inc., SNC Lavalin Inc., Alain Blanchette, Lafarge, Northbridge, Intact (AXA), Chartis, Les Souscripteurs DeLloyd's, Zurich Et Ace, to pay jointly and severally and *in solidum*, to the Plaintiffs **SYLVIE GAGNON ET DANIEL SYLVESTRE** all other disbursements incurred by them in addition to the damages, troubles and inconveniences, which are evaluated at $14,000.00;

Therrien Decl., ¶ 31; Ex 3.

**Lafarge Response to Paragraph 253:**

Undisputed that these allegations have been made, but many of these allegations are disputed.

**AIG Statement Paragraph 254:**

The Contribution Action is ongoing and remains pending before the Superior Court of Quebec in the judicial district of Trois-Rivières.  Therrien Decl. ¶ 26.

**Lafarge Response to Paragraph 254:**

Undisputed.

**AIG Statement Paragraph 255:**

Also ongoing before the Superior Court of Quebec in the judicial district of Trois-Rivières are the "Second-Wave Claims," which include those underlying plaintiff-owner claims not resolved in the First-Wave Judgment.  Therrien Decl. ¶¶ 30, 35.

**Lafarge Response to Paragraph 255:**

Undisputed.

**AIG Statement Paragraph 256:**

LCI is named as a direct defendant in certain Second-Wave Claims and also faces potential liability as a third-party defendant from SNC and other Second-Wave defendants.  Therrien Decl. ¶¶ 26, 30, 35.

**Lafarge Response to Paragraph 256:**

Undisputed.

**AIG Statement Paragraph 257:**

███████████████████████████████████████████████
███████████████████████████████████

**Lafarge Response to Paragraph 257:**

Undisputed.

**AIG Statement Paragraph 258:**

To date, no settlement has been reached in the Trois-Rivières Litigation.  Therrien Decl. ¶¶ 29, 32.

**Lafarge Response to Paragraph 258:**

Undisputed.

**AIG Statement Paragraph 259:**

Through discovery, Lafarge provided testimony and/or disclosed documents regarding the allegations in the Trois-Rivières Litigation as well as the application of the Umbrella Policies to such allegations. Sheridan Decl. ¶ 37.

**Lafarge Response to Paragraph 259:**

The statement is not a proper statement of fact, and no response is required.   To the extent that a response is required, Lafarge states that in this coverage action Lafarge provided testimony and/or disclosed documents regarding allegations in the Trois-Rivières Litigation, but is uncertain as to what is meant by application of policies to allegations.

**AIG Statement Paragraph 260:**

███████████████████████████████████████████████

████████████████████████████████

**Lafarge Response to Paragraph 260:**

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

**AIG Statement Paragraph 261:**

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

**Lafarge Response to Paragraph 261:**



**AIG Statement Paragraph 263:**

With respect to the Umbrella Policies, Shelonko acknowledged that the Professional Services Exclusion would apply where "there was specialized knowledge imparted, and if there were opinions or reports that were provided, involving specialized knowledge." Sheridan Decl. Ex. 4 at 126:16-20.

**Lafarge Response to Paragraph 263:**

Undisputed that Mr. Shelonko so testified, but the statement is a legal conclusion and is not a statement of fact to which a response is required.

**AIG Statement Paragraph 264:**

**Lafarge Response to Paragraph 264:**

**AIG Statement Paragraph 265:**

**Lafarge Response to Paragraph 265:**

**AIG Statement Paragraph 266:**

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

**Lafarge Response to Paragraph 266:**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**AIG Statement Paragraph 267:**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████        ████████████████████

████████████████████████████

**Lafarge Response to Paragraph 267:**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

**AIG Statement Paragraph 268:**

On March 20, 2017, Lafarge disclosed their expert Dr. Michael Thomas, but did not provide all the materials on which he relied until March 31, 2017.  Declaration of Michael Thomas, dated July 12, 2017, ("Thomas Decl.") at Ex. 1.

**Lafarge Response to Paragraph 268:**

The statement is not a proper statement of fact, and no response is required.  To the extent that a response is required, Lafarge states that to the extent that it inadvertently did not timely provide all of Dr. Thomas's materials, Lafarge gave AIG and its experts additional time to respond to Dr. Thomas's report and that AIG suffered no prejudice as a result.

**AIG Statement Paragraph 269:**

Thomas, a professor in the Department of Civil Engineering at the University of New Brunswick with no experience in the insurance industry, proffered two opinions.  Thomas Decl. Ex. 1 at 1; Sheridan Decl. Ex. 27 at 4:16-22; 10:10-16; 62:15-18.

**Lafarge Response to Paragraph 269:**

The statement is not a proper statement of fact, and no response is required.  To the extent that a response is required, undisputed that Dr. Thomas is chair of the Department of Civil Engineering at the University of New Brunswick, that he has proffered two core opinions in this case, and that he is not an expert in the insurance industry (nor are his reports offered as expert insurance opinions).

**AIG Statement Paragraph 270:**

███████████████████████████████████████████████

███████████████████████████████████

**Lafarge Response to Paragraph 270:**

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

**AIG Statement Paragraph 271:**

[REDACTED]

**Lafarge Response to Paragraph 271:**

[REDACTED]

**AIG Statement Paragraph 272:**

[REDACTED]

**Lafarge Response to Paragraph 272:**

[REDACTED]

**AIG Statement Paragraph 273:**

**Lafarge Response to Paragraph 273:**

**AIG Statement Paragraph 274:**

On May 3, 2017, the Member Companies disclosed their experts David L. Ahearn, P.E. and Joseph Monteleone. Declaration of David L. Ahearn, dated July 6, 2017 ("Ahearn Decl.") at Ex. 1 at 3, 15-17; Declaration of Joseph Monteleone, dated July 5, 2017 ("Monteleone Decl.") at Ex. 1 at 2.

**Lafarge Response to Paragraph 274:**

The statement is not a proper statement of fact, and no response is required. To the extent that a response is required, undisputed.

**AIG Statement Paragraph 275:**

Ahearn, a professional civil engineer and materials scientist, offered several opinions, including that a professional service in the form of a chemical analysis, which used both intellectual knowledge and specialized equipment, was performed to identify the presence of sulfur within samples of rock aggregate from a production quarry in 2002; that LCI performed a professional service by providing explanation of that data; and LCI performed professional services from 2005 to 2006 in the form of testing and consulting. Ahearn Decl. at Ex. 1 at 3, 15-17.

**Lafarge Response to Paragraph 275:**

The statement is not a proper statement of fact, and no response is required. To the extent that a response is required, Lafarge refers to Mr. Ahearn's report and testimony for a full statement of his opinions.

**AIG Statement Paragraph 276:**

Monteleone, an experienced insurance professional, opined that professional liability and casualty policies are customarily underwritten in separate underwriting departments and by separate individual underwriters; ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████ and the

allegations and claims in the Trois-Rivières Litigation involve alleged liability for the types of

activities that are customarily excluded from coverage by the professional services exclusions

contained in the various Umbrella Policies at issue. Monteleone Decl. at Ex. 1 at 2.

**Lafarge Response to Paragraph 276:**

The statement is not a proper statement of fact, and no response is required. To the

extent that a response is required, Lafarge refers to Mr. Monteleone's report and testimony for a

full statement of his opinions.

**AIG Statement Paragraph 277:**

To perform chemical analysis on aggregate samples, the rocks must be crushed into a fine

powder that is mixed to provide a homogenous representation of the aggregate. Ahearn Decl. at

Ex. 1 at 6; Sheridan Decl. Exs. 28-30.

**Lafarge Response to Paragraph 277:**

Disputed. The paragraph describes just one method of aggregate sample preparation --

preparation of a fused bead. There are other ways of preparing samples that do not require

heating, including loose-packing powders into a cup and covering with a thin film or producing

pressed-powdered briquettes (with or without a binder). XRF analysis can even be performed on

a liquid. *See* Supplemental Thomas Decl. ¶ 4.

**AIG Statement Paragraph 278:**

The rock is crushed into a fine powder that will pass through a 100-mesh screen (100

openings per square inch). Ahearn Decl. at Ex. 1 at 6; Sheridan Decl. Exs. 29-30.

**Lafarge Response to Paragraph 278:**

Disputed.  The paragraph describes just one method of aggregate sample preparation -- preparation of a fused bead.  There are other ways of preparing samples that do not require heating, including loose-packing powders into a cup and covering with a thin film or producing pressed-powdered briquettes (with or without a binder).  XRF analysis can even be performed on a liquid.  *See* Supplemental Thomas Decl. ¶ 4.

**AIG Statement Paragraph 279:**

For testing in XRF, a small sample of the fine powdered aggregate is selected and pressed into a puck.  Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 279:**

Disputed.  The paragraph describes just one method of aggregate sample preparation -- preparation of a fused bead.  There are other ways of preparing samples that do not require heating, including loose-packing powders into a cup and covering with a thin film or producing pressed-powdered briquettes (with or without a binder).  XRF analysis can even be performed on a liquid.  *See* Supplemental Thomas Decl. ¶ 4.

**AIG Statement Paragraph 280:**

A specific plastic film then covers the powder, or the powder is heat pressed within a glassy matrix.  Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 280.**

Disputed.  The paragraph describes just one method of aggregate sample preparation -- preparation of a fused bead.  There are other ways of preparing samples that do not require heating, including loose-packing powders into a cup and covering with a thin film or producing pressed-powdered briquettes (with or without a binder).  XRF analysis can even be performed on a liquid.  *See* Supplemental Thomas Decl. ¶ 4.

**AIG Statement Paragraph 281:**

The glass and plastic specifically allow passage of x-rays. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 281:**

Disputed. The paragraph describes just one method of aggregate sample preparation -- preparation of a fused bead. There are other ways of preparing samples that do not require heating, including loose-packing powders into a cup and covering with a thin film or producing pressed-powdered briquettes (with or without a binder). XRF analysis can even be performed on a liquid. *See* Supplemental Thomas Decl. ¶ 4.

**AIG Statement Paragraph 282:**

The sample is then bombarded with an x-ray beam, which causes electrons to eject from within the atoms present in the powder. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 282:**

Undisputed.

**AIG Statement Paragraph 283:**

To stabilize, electrons of higher energy fill in the vacancy from an ejected lower energy electron. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 283:**

Undisputed.

**AIG Statement Paragraph 284:**

During this exchange, a photon of energy equal to the difference in the two electron states is ejected (fluorescence). Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 284:**

Undisputed.

**AIG Statement Paragraph 285:**

This difference in energy is specific to the element, thus allowing identification of the elements present in the powdered sample. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 285:**

Disputed. Identification of elements in an aggregate sample can also be made by wavelength-dispersive XRF as an alternative to energy-dispersive XRF. *See* Supplemental Thomas Decl. ¶ 5.

**AIG Statement Paragraph 286:**

████████████████████████████████████████████████

**Lafarge Response to Paragraph 286:**

Undisputed.

**AIG Statement Paragraph 287:**

To detect chemical oxide during the XRF scan, the material is heated to 1000°C. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 287:**

Disputed. The material being tested to identify elements is heated to 1000°C (or 950°C) during preparation of the fused bead; the material is not heated to 1000°C as part of the XRF determination, although heat is developed as the result of bombarding the material with X-rays. *See* Supplemental Thomas Decl. ¶ 6.

**AIG Statement Paragraph 288:**

During this heating the sulfur is evaporated, so the XRF test does not report the sulfur content. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 288:**

Disputed. Not all sulfur is "evaporated" during the heating described in statement no. 287. The amount of sulfur lost can be minimized by controlling fusing time and temperature. *See* Supplemental Thomas Declaration ¶ 7.

**AIG Statement Paragraph 289:**

Loss on ignition (LOI) is reported. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 289:**

Disputed. LOI is reported, but it is determined by a separate technique – not by XRF. *See* Supplemental Thomas Decl. ¶ 8.

**AIG Statement Paragraph 290:**

Because XRF cannot calculate sulfur content, the entity or individual performing the test needed to perform an additional test in order to determine total sulfur content. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 290:**

Disputed. XRF can be used to determine sulfur content, and it is used for this purpose on a routine basis in cement plants. Corrections can be made for sulfur evaporated during fusion of the bead sample if this method of sample preparation is used. *See* Supplemental Thomas Decl. ¶ 9.

**AIG Statement Paragraph 291:**

XRF testing requires specialized equipment, costing over $100,000, and the employment of personnel who have been trained to operate this equipment. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 291:**

Disputed. Not all XRF equipment costs more than $100,000; some units cost less than $25,000. *See* Supplemental Thomas Decl. ¶ 10. In addition, the terms "specialized," "employment," "trained," and "operate" as used in Paragraph 291 are ambiguous.

**AIG Statement Paragraph 292:**

Performing chemical analysis via XRF is providing a professional service in the materials science industry. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 292:**

Disputed. The statement sets forth Mr. Ahearn's opinion ███████████████ ███████████████████ and is not a statement of fact.

**AIG Statement Paragraph 293:**

Since the sulfur content could not be measured by XRF, the sulfur content was determined using a LECO Sulfur Analyzer. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 293:**

Disputed. The statement cites Mr. Ahearn's report, not record evidence and is in any event vague and ambiguous in that it fails to identify who was measuring what and when.

**AIG Statement Paragraph 294:**

The powdered aggregate sample is heated until combustion while surrounded by oxygen gas, causing an oxidation reaction. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 294:**

Undisputed.

**AIG Statement Paragraph 295:**

The gas is passed through an infrared spectroscopy (IR) detector for identification and, in this case, reported as sulfur trioxide (S03). Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 295:**

Disputed. The paragraph cites Mr. Ahearn's report, not record evidence, and is in any event vague and ambiguous in that it fails to identify who was measuring what and when.

**AIG Statement Paragraph 296:**

This process also requires specialized equipment and employees who have been trained to conduct these operations. Ahearn Decl. at Ex. 1 at 6.

**Lafarge Response to Paragraph 296:**

Disputed. The paragraph cites Mr. Ahearn's opinion ███████████████████ ███████████████████████ and is not a statement of fact.

**AIG Statement Paragraph 297:**

Estimating the percent pyrite ($FeS_2$) present in aggregate requires both XRF chemistry data and amount of sulfur reported by the LECO. Ahearn Decl. at Ex. 1 at 7.

**Lafarge Response to Paragraph 297:**

Disputed. The procedure described for calculating equivalent pyrite ($FeS_2$) is not correct. The iron ($Fe_2O_3$) and loss-on-ignition (LOI) figures from XRF data are not required. Pyrite is calculated directly from the LECO sulfur determination. *See* Supplemental Thomas Decl. ¶ 11.

**AIG Statement Paragraph 298:**

By analyzing the LECO data, a portion of the LOI from the XRF data is contributed to sulfur evaporation and calculated as percentage of SO3. Ahearn Decl. at Ex. 1 at 7.

**Lafarge Response to Paragraph 298:**

Disputed. The procedure described for calculating equivalent pyrite ($FeS_2$) is not correct. The iron ($Fe_2O_3$) and loss-on-ignition (LOI) figures from XRF data are not required. Pyrite is calculated directly from the LECO sulfur determination. *See* Supplemental Thomas Decl. ¶ 11.

**AIG Statement Paragraph 299:**

By comparing stoichiometry, the iron present in Fe2O3, and the sulfur in SO3, a calculation can provide an estimated Percent Equivalent Pyrite (FeS). Sheridan Decl. Ex. 9 at 104:1-110:25; Ahearn Decl. at Ex. 1 at 7.

**Lafarge Response to Paragraph 299:**

Disputed. The procedure described for calculating equivalent pyrite ($FeS_2$) is not correct. The iron ($Fe_2O_3$) and loss-on-ignition (LOI) figures from XRF data are not required. Equivalent pyrite is calculated directly from the LECO sulfur determination. *See* Supplemental Thomas Decl. ¶ 11.

**AIG Statement Paragraph 300:**

Pascale Poulin conducted the analysis and was trained and experienced on which two tests were required for total sulfur content of aggregates, and how to perform the sample preparation and testing techniques to achieve accurate certifiable results. Ahearn Decl. at Ex. 1 at 7; Sheridan Decl. Ex. 9 at 103:2-25.

**Lafarge Response to Paragraph 300:**

Disputed. The statement relies on inadmissible hearsay evidence.

**AIG Statement Paragraph 301:**

Pascale Poulin was a laboratory coordinator for Lafarge in 2002. Ahearn Decl. at Ex. 1 at 7; Sheridan Decl. Ex. 31.

**Lafarge Response to Paragraph 301:**

Disputed. The statement relies on inadmissible hearsay evidence

**AIG Statement Paragraph 302:**

Poulin was a certified chemist with a bachelor's degree in applied science.  Ahearn Decl. at Ex. 1 at 7; Sheridan Decl. Ex. 31.

**Lafarge Response to Paragraph 302:**

Disputed.  The statement relies on inadmissible hearsay evidence.

**AIG Statement Paragraph 303:**

Lafarge Corporate Technical Services (CTS) performs laboratory tests for Lafarge factories and for customers.  Ahearn Decl. at Ex. 1 at 7; Sheridan Decl. Ex. 29.

**Lafarge Response to Paragraph 303:**

████████████████████████████████████████████████

████████████████████████████████████████

**AIG Statement Paragraph 304:**

████████████████████████████████████████████████

███████████████████████████████████████████

**Lafarge Response to Paragraph 304:**

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████

**AIG Statement Paragraph 305:**

Testing at CTS occurs according to industry standards and against certified standard reference materials to assure accuracy.  Ahearn Decl. at Ex. 1 at 7

**Lafarge Response to Paragraph 305:**

Disputed.  The statement cites the report of Mr. Ahearn, who does not have firsthand knowledge of testing at CTS.

**AIG Statement Paragraph 306:**

Due to the rigorous procedures required to obtain accurate and repeatable results, it is often degreed chemists, scientists, and/or engineers that are employed at testing labs, including at Lafarge. Ahearn Decl. at Ex. 1 at 7.

**Lafarge Response to Paragraph 306:**

Disputed. The statement cites the report of Mr. Ahearn (with which Dr. Thomas disagrees, *see* Supplemental Thomas Decl. ¶ 12), who does not have firsthand knowledge of testing at CTS. In addition, the terms "often" and "testing labs" as used in Paragraph 306 are ambiguous.

**AIG Statement Paragraph 307:**

Concrete labs often use both civil engineers and chemists to perform concrete testing, and even simple field tests for slump and sample collection of concrete are usually performed by a professional engineer (PE) or engineer in training (EIT), and under the direction or due charge of an experienced professional engineer. Ahearn Decl. at Ex. 1 at 7.

**Lafarge Response to Paragraph 307:**

Disputed. The statement cites Mr. Ahearn's opinion, with which Dr. Thomas disagrees, *see* Supplemental Thomas Decl. ¶ 12. In addition, the terms "often" and "usually" as used in Paragraph 307 are ambiguous.

**AIG Statement Paragraph 308:**

SNC is a professional services firm. Therrien Decl. Ex. 1 ¶ 183.

**Lafarge Response to Paragraph 308:**

Disputed. The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 309:**

Because De Grosbois wanted to determine the presence of sulfide, the nature of the sulfide, and the proportion of pyrrhotite versus pyrite, she performed tests beyond those performed in 2002.  Sheridan Decl. Ex. 9 at 257:1-257:15

**Lafarge Response to Paragraph 309:**

Undisputed.

**AIG Statement Paragraph 310:**

SNC carried and maintained professional liability insurance.  Therrien Decl. Ex. 1 ¶¶ 1973, 1976.

**Lafarge Response to Paragraph 310:**

Disputed.  The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 311:**

SNC's professional liability insurer is involved in the Trois-Rivières Litigation. Therrien Decl. Ex. 1 ¶ 1987.

**Lafarge Response to Paragraph 311:**

Disputed.  The statement relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 312:**

The court based SNC and Blanchette's liability squarely on the fact that Blanchette provided poor professional advice, i.e. he "rendered opinions without any nuances and without any warnings," even though all of his reports were written while he was well aware of the problem situation at the Maskimo Quarry and of the various opinions of other experts, some of

123

whom opined that the aggregate was the cause of the swelling problems.  Therrien Decl. Ex. 1 ¶¶ 1298-1303.

**Lafarge Response to Paragraph 312:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the Court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 313:**

The court also found that "[Blanchette] did not pursue his investigation to the point of differentiating the different sul[f]ide contents in the analyzed aggregate, which was [an obligation] imposed by his [geologist] code of ethics or required by [industry standards]." Therrien Decl. Ex. 1 ¶¶ 1298-1303.

**Lafarge Response to Paragraph 313**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the Court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 314:**

After questioning Lafarge's employees Perreault and De Grosbois, the court found that Lafarge's role, much like SNC and Blanchette's role, "was to reassure [] Laurentide about the use of B&B [Quarry] stone" and to determine whether the B&B Quarry aggregate "could pose the same problems as Maskimo [Quarry]" aggregate.  Therrien Decl. Ex. 1 ¶¶ 167-68.

**Lafarge Response to Paragraph 314:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the court; the statement

relies on factual findings made by a court in a proceeding to which Lafarge was not a party. *See* Response to Paragraph 238.

**AIG Statement Paragraph 315:**

On December 18, 2014, after the entry of the First-Wave Judgment, SNC and Blanchette initiated a "Motion to Institute a Claim for Contribution" to hold Lafarge liable in whole or in part for SNC's liability in the First-Wave Claims.  Therrien Decl. ¶ 25.

**Lafarge Response to Paragraph 315:**

Undisputed.

**AIG Statement Paragraph 316:**

The Motion to Institute a Claim for Contribution joined earlier-filed contribution actions against LCI.  Therrien Decl. ¶ 25.

**Lafarge Response to Paragraph 316:**

Undisputed.

**AIG Statement Paragraph 317:**

Apart from there being small differences in the earlier-filed actions, including varying monetary amounts at issue, the allegations of each pleading are nearly identical substantively. Therrien Decl. ¶ 25.

**Lafarge Response to Paragraph 317:**

Undisputed.

**AIG Statement Paragraph 318:**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

**Lafarge Response to Paragraph 318:**

Undisputed.

**AIG Statement Paragraph 319:**

The court in the Trois-Rivières Litigation concluded that De Grosbois gave Bergeron the assurance that the concrete was suitable or "good." Therrien Decl. Ex. 1 ¶¶ 297, 437, 1766.

**Lafarge Response to Paragraph 319:**

Disputed. *See* Response to Paragraph 241.

**AIG Statement Paragraph 320:**

Lafarge employees testified that they could not understand the De Grobois Report because they were not trained geologists. Sheridan Decl. Ex. 7 at 98:4-99:2, Ex. 16 at 73:1-73:11.

**Lafarge Response to Paragraph 320:**

Undisputed that some Lafarge employees so testified.

**AIG Statement Paragraph 321:**

The De Grosbois Report concluded that the B&B Quarry aggregates contained 4.8% total sulfide quantities, 1% more than was found in aggregate which was causing property damage throughout the region. Sheridan Decl. Ex. 15 at LAF000004320[Trans.].

**Lafarge Response to Paragraph 321:**

Undisputed.

**AIG Statement Paragraph 322:**

The De Grosbois also noted that the "vast majority of these sulfides are pyrrhotite (>90%)." Sheridan Decl. Ex. 15 at LAF000004320[Trans.].

**Lafarge Response to Paragraph 322:**

Undisputed.

126

**AIG Statement Paragraph 323:**

De Grosbois later admitted that she had never seen aggregates with iron sulfide content as high as what she examined from B&B Quarry. Sheridan Decl. Ex. 18 at LAF0000370149[Trans.].

**Lafarge Response to Paragraph 323:**

Disputed. The statement relies on inadmissible hearsay evidence.

**AIG Statement Paragraph 324:**

In April of 2016, Defendants served Interrogatory No. 20 asking Lafarge to set forth the law it contended "governed the interpretation of the Umbrella Policies." Sheridan Decl. Ex. 33 at 21.

**Lafarge Response to Paragraph 324:**

Disputed. The statement is not a proper statement of fact, and no response is required. To the extent that a response is required, undisputed that AIG served such an interrogatory.

**AIG Statement Paragraph 325:**

Lafarge refused, claiming Interrogatory No. 20 was a premature contention interrogatory. Sheridan Decl. Ex. 33 at 21.

**Lafarge Response to Paragraph 325:**

The statement is not a proper statement of fact, and no response is required. To the extent that a response is required, undisputed that Lafarge properly objected to the interrogatory.

**AIG Statement Paragraph 326:**

The C&I Policy does not and was never intended to supplant the regular Umbrella program. Sheridan Decl. Ex. 6 at 235:11-235:20, Ex. 5.

**Lafarge Response to Paragraph 326:**

127

Disputed.  The statement is not supported by the citations and is in any event vague and ambiguous as to what is meant by "supplant."

**AIG Statement Paragraph 327:**

Lafarge became aware of the damages in the Trois-Rivières Litigation on or before May 18, 2011, when it learned that two employees and one former employee had been subpoenaed by the court.  Sheridan Decl. Ex. 2, Ex. 4 at 184:25-185:6.

**Lafarge Response to Paragraph 327:**

Undisputed that Lafarge became aware of the damages and claims against the Wave 1 Defendants (but not Lafarge) in the Trois-Rivières Litigation on or before May 18, 2011, when it learned that two employees and one former employee had been subpoenaed by the court.

**AIG Statement Paragraph 328:**

An expert opinion on custom and practice should be excluded as irrelevant where the opinion is offered to inform a court's interpretation of a contract provision that is unambiguous. Sheridan Decl. Ex. 34 at 3:17-3:19.

**Lafarge Response to Paragraph 328:**

Disputed.  The statement is not a proper statement of fact, and no response is required.

**AIG Statement Paragraph 329:**

De Grosbois also received technical professional training during her employment at LCI, including, for example, multi-day training regarding cement hydration, quarry crushing and screening methods, and how to assess the performance of different types of concrete.  Sheridan Decl. Ex. 9 at 25:15-28:16.

**Lafarge Response to Paragraph 329:**

128

**AIG Statement Paragraph 330:**

The results of the XRF and LECO testing do not automatically provide a calculation for the percent equivalent pyrite, which provides a theoretical maximum amount of potentially deleterious sulfur-containing minerals contained in the aggregate. Sheridan Decl. Ex. 9 at 109:6-109:20.

**Lafarge Response to Paragraph 330:**

Disputed. Equivalent pyrite is calculated from results generated by an XRF machine according to a standard formula. Supp. Roman Decl. Ex. 1 at 109:12-20.

**AIG Statement Paragraph 331:**

This is at or near the threshold some literature identified as unacceptable for use in concrete. Sheridan Decl. Ex. 18 at LAF0000370149-50[Trans.].

**Lafarge Response to Paragraph 331:**

Disputed because it is unclear to what "this" refers and because the statement relies on inadmissible hearsay evidence.

**AIG Statement Paragraph 332:**

Because Perreault did not have the necessary knowledge or experience as a geologist to evaluate the conflicting Bérubé and Blanchette reports regarding B&B Quarry aggregate, Perreault and the board agreed that Lafarge's geologist would attend a subsequent meeting. Sheridan Decl. Ex. 35 at 54:24-58:1.

**Lafarge Response to Paragraph 332:**

███████████████████████████

███████████████████████████

███████████████████████████

█████████

**AIG Statement Paragraph 333:**

The court in the Trois-Rivières Litigation found that "industry experts knew that pyrrhotite is 100 times more reactive than pyrite" and quoted one expert as stating that "the damage it will take pyrite to create in 500 years, pyrrhotite will do in five." Therrien Decl. Ex. 1 at ¶¶ 270-71.

**Lafarge Response to Paragraph 333:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the Court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 334:**

The court stated that it "consistently felt, during the testimonies of Lafarge's people, that one after another they were hesitant, reluctant to acknowledge precise facts, and most importantly, took narrow minded positions . . . despite the fact that the March 2006 episode that culminated in Lafarge's position was the result of a process in which all the actors in the corporation played active roles." Therrien Decl. Ex. 1 at ¶ 1860.

**Lafarge Response to Paragraph 334:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the Court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 335:**

The Trois-Rivières court found coverage void for certain underlying parties under policies issued after the insured's receipt of an opinion recommending that they stop using B&B Quarry aggregate to their insurers because those parties failed to provide that information to their insurers. Therrien Decl. Ex. 1 at ¶¶ 1870-71.

**Lafarge Response to Paragraph 335:**

Undisputed that the court's opinion contains such a statement, but disputed that it constitutes admissible evidence as to the truth of the matter asserted by the Court; the statement relies on factual findings made by a court in a proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 336:**

The court in the Trois-Rivières Litigation concluded that De Grosbois did, in fact, receive the fax from Bergeron in approximately May 2002 transmitting the 2002 Bérubé Report. Therrien Decl. Ex. 1 at ¶¶ 344, 348, 968.

**Lafarge Response to Paragraph 336:**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

**AIG Statement Paragraph 337:**

SNC and Blanchette's liability was for professional fault because they failed to prohibit the use of an aggregate they analyzed that contained pyrite and pyrrhotite levels, which in plaintiffs' view was the cause of damages. Therrien Decl. Ex. 1 at ¶ 28.

**Lafarge Response to Paragraph 337:**

Undisputed that the court in the Underlying Litigation made such a finding, but

Paragraph 337 relies on inadmissible hearsay evidence, *i.e.,* factual findings made by a court in a

proceeding to which Lafarge was not a party.

**AIG Statement Paragraph 338:**

The Umbrella Policies, the C&I Policy and the AIG Canada Umbrella Policy define

Occurrence, in relevant part, as "an accident, including continuous or repeated exposure to

substantially the same general harmful conditions." Roman Decl. Ex. 13 at LEX_00113048;

Roman Decl. Ex. 14 at LEX_00000765; Roman Decl. Ex. 15 at LEX_00000887; Roman Decl.

Ex. 16 at LEX_00000964; Roman Decl. Ex. 17 at LEX_00001051; Roman Decl. Ex. 18 at

LEX_00000652; Roman Decl. Ex. 19 at LEX_00000736; Roman Decl. Ex. 20 at

LEX_00001146; Roman Decl. Ex. 21 at LEX_00001234; Roman Decl. Ex. 22 at

LEX_00000502.

**Lafarge Response to Paragraph 338:**

Undisputed.

**AIG Statement Paragraph 339:**

The Umbrella Policies (with the exception of the 2004 Lexington Policy) and the AIG

Canada Umbrella Policy provide that no payments are due "unless and until the total applicable

Retained Limit(s) . . . have been exhausted by the payment of Loss to which [such policy]

applies." Although the language of the 2004 Lexington Policy and the C&I Policy differs

slightly from the quoted language, the effect is the same. Roman Decl. Ex. 13 at

LEX_00113029; Roman Decl. Ex. 14 at LEX_00000748; Roman Decl. Ex. 15 at

LEX_00000840; Roman Decl. Ex. 16 at LEX_00000917; Roman Decl. Ex. 17 at

LEX_00001056; Roman Decl. Ex. 18 at LEX_00000591; Roman Decl. Ex. 19 at

LEX_00000683; Roman Decl. Ex. 20 at LEX_00001091; Roman Decl. Ex. 21 at LEX_00001177; Roman Decl. Ex. 22 at LEX_00000527; L. Br. at 30 n.18.

**Lafarge Response to Paragraph 339:**

Undisputed that the Umbrella Policies (with the exception of the 2004 Lexington Policy) and the AIG Canada Umbrella Policy provide that no payments are due "unless and until the total applicable Retained Limit(s) . . . have been exhausted by the payment of Loss to which [such policy] applies," but disputed that the effect of the 2004 Lexington Policy and the C&I Policy is the same; the 2004 Lexington Policy and the C&I Policy are set forth in written policies that speak for themselves.   Roman Decl. Ex. 15 at LEX_00000840; Roman Decl. 16 at LEX_00000917; Roman Decl. 17 at LEX_00001002; Roman Decl. 18 at LEX_00000591; Roman Decl. 19 at LEX_00000683; Roman Decl. 20 at LEX_00001091; Roman Decl. 21 at LEX_00001177.

## LAFARGE COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

**Lafarge Statement Paragraph 340:**

The so-called "professional services exclusion" in the Umbrella Policies appears only in the "Contractors Limitation Endorsement" or "Contractors Excluded Hazards Endorsement" to each of those policies. *See, e.g.,* Roman Decl. Ex. 13 at LEX_00113029; Roman Decl. Ex. 14 at LEX_00000748; Roman Decl. Ex. 15 at LEX_00000840; Roman Decl. Ex. 16 at LEX_00000917; Roman Decl. Ex. 17 at LEX_00001056; Roman Decl. Ex. 18 at LEX_00000591; Roman Decl. Ex. 19 at LEX_00000683; Roman Decl. Ex. 20 at LEX_00001091; Roman Decl. Ex. 21 at LEX_00001177; Roman Decl. Ex. 22 at LEX_00000527; L. Br. at 30 n.18.

**Lafarge Statement Paragraph 341:**

Lafarge was not acting as Laurentide's contractor in February 2002 when it conducted a test on aggregate from the B&B Quarry and when Ms. de Grosbois discussed the results of that test with Mr. Bergeron of Beton Laurentide. At no time did Lafarge act as Laurentide's contractor with respect to consideration of suitability of aggregate for use in concrete.

**Lafarge Statement Paragraph 342:**

There are no allegations in the *Trois-Rivières* Litigation that LCI acted as a contractor. Therrien Decl. ¶ 39.

**Lafarge Statement Paragraph 343:**

Ms. De Grosbois was a Lafarge senior geologist at the time of Lafarge's testing of aggregate from the B&B Quarry in 2002 (the "2002 testing"). "Supp. Roman Decl. Ex. 1 at 93:5-11.

**Lafarge Statement Paragraph 344:**

Ms. de Grosbois was a Lafarge senior product specialist at the time of Lafarge's analysis of aggregate from the B&B Quarry, the Maskimo Quarry, and the Continental Quarry in 2005-06 (the "2005-06 analysis"). Supp. Roman Decl. Ex. 1 at 44:23-25.

**Lafarge Statement Paragraph 345:**

Martin Perreault was a Lafarge technical representative at the time of the 2002 testing. Supp. Roman Decl. Ex. 2 at 100:20-23.

**Lafarge Statement Paragraph 346:**

Mr. Perreault was a Lafarge technical sales representative at the time of the 2005-06 analysis. Supp. Roman Decl. Ex. 2 at 27:11-12; 100:20-23.

**Lafarge Statement Paragraph 347:**

Mr. Perreault is not a geologist. Supp. Roman Decl. Ex. 2 at 100:20-100:23.

**Lafarge Statement Paragraph 348:**

Throughout the period 2002-06, Lafarge operated a laboratory known as the Center for Technical Services ("CTS") in Montreal, Canada. Supp. Roman Decl. Ex. 1 at 36:20-37:7; Supp. Roman Decl. Ex. 3 at 41:13-23; Supp. Roman Decl. Ex. 2 at 9:6-21.

**Lafarge Statement Paragraph 349:**

CTS provided technical assistance to Lafarge's cement manufacturing operations in North America. Supp. Roman Decl. Ex. 4 at 31:25-32:4.

**Lafarge Statement Paragraph 350:**

CTS supported Lafarge cement plants and Lafarge employees. Supp. Roman Decl. Ex. 1 at 95:8-16.

**Lafarge Statement Paragraph 351:**

In 2002, CTS was organized in four departments: the process department; the department of quality and products; the engineering department; and the raw materials department. Supp. Roman Decl. Ex. 1 at 42:5-19.

**Lafarge Statement Paragraph 352:**

Ms. de Grosbois worked in the raw materials department at the time of the 2002 testing. Supp. Roman Decl. Ex. 1 at 42:1-19.

**Lafarge Statement Paragraph 353:**

Ms. de Grosbois worked in the department of quality and products at the time of the 2005-06 analysis. Supp. Roman Decl. Ex. 1 at 44:12-17.

**Lafarge Statement Paragraph 354:**

At the time of the 2005-06 analysis, Anik Delagrave was manager of the department of quality and products  at CTS.  Supp. Roman Decl. Ex. 4 at 26:17-27:21.

**Lafarge Statement Paragraph 355:**

Ms. Delagrave's job involved supervising product specialists and the laboratory more generally.  Supp. Roman Decl. Ex. 4 at 26:21-27:4.

**Lafarge Statement Paragraph 356:**

From 2003-08, Ms. Delagrave supervised Ms. de Grosbois.  Supp. Roman Decl. Ex. 4. at 27:22-25.

**Lafarge Statement Paragraph 357:**

Ms. Delagrave is not a geologist.  Supp. Roman Decl. Ex. 4. at 41:19-41:20.

**Lafarge Statement Paragraph 358:**

Beton Laurentide ("Laurentide") was a concrete supplier in the Trois-Rivieres region of Quebec, Canada.  Therrien Decl. ¶ 6-7.

136

**Lafarge Statement Paragraph 359:**

As of 2001, Laurentide and Construction Yvan Boisvert were co-owners of the B&B Quarry.  Therrien Decl. ¶ 7.

**Lafarge Statement Paragraph 360:**

Laurentide began purchasing B&B Quarry aggregate for incorporation into concrete structures in the Trois-Rivières region of Quebec, Canada in 2001. Therrien Decl. ¶ 7.

**Lafarge Statement Paragraph 361:**

████████████████████████████████████████

████████████████████████

**Lafarge Statement Paragraph 362:**

████████████████████████████████████

████████████████████

**Lafarge Statement Paragraph 363:**

Mr. Perreault served as a member of Laurentide's board of directors in 2004.  Supp. Roman Decl. Ex. 2 at 56:13-15.

**Lafarge Statement Paragraph 364:**

██████████████████████████████

████████████████████████████████████████

██████████████████

**Lafarge Statement Paragraph 365:**

████████████████████████████████████████

████████████████

**Lafarge Statement Paragraph 366:**

**Lafarge Statement Paragraph 367:**

**Lafarge Statement Paragraph 368:**

**Lafarge Statement Paragraph 369:**

Mr. Perreault passed on to Ms. de Grosbois Mr. Bergeron's request for a test of the sample retrieved from Laurentide in January 2002.  Supp. Roman Decl. Ex. 1 at 93:17-22.

**Lafarge Statement Paragraph 370:**

Mr. Perreault asked Ms. de Grosbois to authorize the test requested by Mr. Bergeron because he could not do so himself.  Supp. Roman Decl. Ex. 1 at 94:8-11.

**Lafarge Statement Paragraph 371:**

Any engineer at CTS could have authorized the test requested by Mr. Bergeron, but as a technical sales representative, Mr. Perreault did not have authorization.  Supp. Roman Decl. Ex. 1 at 94:22-23, 96:10-13.

**Lafarge Statement Paragraph 372:**

Mr. Perreault did not inform Ms. de Grosbois that the sample to be tested at Mr. Bergeron's request was from B&B Quarry.  Supp. Roman Decl. Ex. 1 at 98:21-99:8.

138

**Lafarge Statement Paragraph 373:**

Mr. Perreault told Ms. de Grosbois that the sample to be tested at the request of Mr. Bergeron was from Laurentide.  Supp. Roman Decl. Ex. 1 at 98:23-25, 99:21-99:24.

**Lafarge Statement Paragraph 374:**

Ms. de Grosbois did not know that the sample to be tested at the request of Mr. Bergeron was of aggregate that would be used in the manufacture of concrete.  Supp. Roman Decl. Ex. 1 at 100:4-100:8.

**Lafarge Statement Paragraph 375:**

Ms. de Grosbois never had physical possession of the sample to be tested at the request of Mr. Bergeron.  Supp. Roman Decl. Ex. 1 at 102:6-102:8.

**Lafarge Statement Paragraph 376:**

Ms. de Grosbois instructed Lafarge laboratory technician Pascale Poulin to conduct a total sulfur test of the sample to be tested at the request of Mr. Bergeron.  Supp. Roman Decl. Ex. 1 at 103:8-9.

**Lafarge Statement Paragraph 377:**

Ms. de Grosbois did not give Ms. Poulin any further instructions as to how to test the sample to be tested at the request of Mr. Bergeron.  Supp. Roman Decl. Ex. 1 at 103:19-25.

**Lafarge Statement Paragraph 378:**

The 2002 test was performed by Ms. Poulin and Claude Verville.  Supp. Roman Decl. Ex. 1 at 102:14-21; Supp. Roman Decl. Ex. 5 at LAF0000028405; Supp. Roman Decl. Ex. 1 at 97:24-98:12.

**Lafarge Statement Paragraph 379:**

Ms. Poulin operated the machines used to conduct the 2002 test. Supp. Roman Decl. Ex. 1 at 102:25-103:1.

**Lafarge Statement Paragraph 380:**

Ms. Poulin used two machines to conduct the 2002 test: LECO and x-ray fluorescence (XRF) machines. Supp. Roman Decl. Ex. 1 at 104:5-104:8; Supp. Roman Decl. Ex. 5 at LAF0000028405; Supp. Roman Decl. Ex. 1 at 97:24-98:12.

**Lafarge Statement Paragraph 381:**

A LECO machine is a carbon sulfur analyzer that uses a combustion furnace and infrared detector. Supp. Roman Decl. Ex 1. at 133:4-9.

**Lafarge Statement Paragraph 382:**

LECO machines are used to detect sulfur in a sample of aggregate. Thomas Decl. Ex. 1 at 21.

**Lafarge Statement Paragraph 383:**

LECO machines analyze only for sulfur, carbon, and nitrogen, not pyrrhotite. Supp. Roman Decl. Ex 10 at 218:14-218:16.

**Lafarge Statement Paragraph 384:**

XRF machines determine the chemical composition of a sample with respect to its major constituents. Thomas Decl. Ex. 1 at 21.

**Lafarge Statement Paragraph 385:**

To operate an XRF machine, the operator inserts a sample and then receives a list of chemicals within the sample. Supp. Roman Decl. Ex. 1 at 107:14-107:16.

**Lafarge Statement Paragraph 386:**

Equivalent pyrite is calculated from results generated by an XRF machine according to a standard formula. Supp. Roman Decl. Ex. 1 at 109:12-109:20.

**Lafarge Statement Paragraph 387:**

This standard formula for calculation of pyrite is pre-programmed into XRF machines and does not involve decisions or judgments by the machine operator. Supp. Roman Decl. Ex. 1 at 109:23-109:24.

**Lafarge Statement Paragraph 388:**

With respect to the stone from B&B Quarry tested in 2002, the XRF and LECO machines provided results, which were then memorialized in a one-page spreadsheet. Supp. Roman Decl. Ex. 5 at LAF0000028405; Supp. Roman Decl. Ex. 1 at 97:24-108:24.

**Lafarge Statement Paragraph 389:**

Mr. Perreault transmitted this one-page spreadsheet to Mr. Bergeron by fax on February 21, 2002. Declaration of Martin Perreault ("Perreault Decl."), Ex. 1 at LAF0000028404.

**Lafarge Statement Paragraph 390:**

The one-page spreadsheet included the number 0.92, which represented the equivalent pyrite. Perreault Decl. Ex. 1 at LAF0000028404; Supp. Roman Decl. Ex. 1 at 97:24-98:12.

**Lafarge Statement Paragraph 391:**

The fax transmitted by Mr. Perreault to Mr. Bergeron on February 21, 2002 did not include commentary or text explaining the results or setting forth any conclusions by any of the CTS lab technicians or anyone else. Perreault Decl. Ex. 1 at LAF0000028405.

**Lafarge Statement Paragraph 392:**

The 2002 test did not identify any minerals present in the aggregate. Supp. Roman Decl. Ex. 1 at 148:23-149:5.

**Lafarge Statement Paragraph 393:**

███████████████████████████████████████████████

**Lafarge Statement Paragraph 394:**

█████████████████████████████████████

████████████████████████████████

**Lafarge Statement Paragraph 395:**

███████████████████████████████████████████

████████████████

**Lafarge Statement Paragraph 396:**

███████████████████████████████████████████████

██████████████████████████████

**Lafarge Statement Paragraph 397:**

Special experience is not required to operate LECO and XRF machines.  Thomas Decl.
Ex. 1 at 25; Supplemental Thomas Decl. ¶ 12.

**Lafarge Statement Paragraph 398:**

████████████████████████████████████████████████

███████████████

**Lafarge Statement Paragraph 399:**

It is customary in the concrete industry for there to be a written agreement before an
aggregate suitability analysis is conducted.  Thomas Decl. Ex. 1 at 8, 25.

**Lafarge Statement Paragraph 400:**

████████████████████████████████████████

**Lafarge Statement Paragraph 401:**

It is customary in the concrete industry for there to be payment in connection with provision of professional services.  Thomas Decl. Ex. 1 at 25.

**Lafarge Statement Paragraph 402:**

███████████████████████████████████████████████████

████████████████████

**Lafarge Statement Paragraph 403:**

After the test, Mr. Bergeron called Ms. de Grosbois to discuss the results of the 2002 test (the "February 22 telephone conversation").  Roman Ex. 1 at 123:13-21.

**Lafarge Statement Paragraph 404:**

████████████████████████████████████████

█████████████████████████████████████████████

██████████

**Lafarge Statement Paragraph 405:**

█████████████████████████████████

█████████████████████████████████████████████

█████████████████████████

**Lafarge Statement Paragraph 406:**

███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

**Lafarge Statement Paragraph 407:**

143



**Lafarge Statement Paragraph 408:**

**Lafarge Statement Paragraph 409:**

**Lafarge Statement Paragraph 410:**

In or around August 2005, Mr. Bergeron informed Mr. Perreault that he had received demand letters from property owners in the Trois-Rivières region, alleging deterioration of concrete in structures similar to that at the IGA Supermarket, Supp. Roman Decl. Ex. 2 at 55:1-55:19; Mr. Bergeron informed Mr. Perreault of these letters at a meeting of Laurentide's board of directors, at which Mr. Perreault was a guest, Supp. Roman Decl. Ex. 2 at 55:1-55:19.

**Lafarge Statement Paragraph 411:**

At this board meeting in August 2005, Mr. Bergeron asked Mr. Perreault to interpret reports analyzing aggregate from the B&B Quarry prepared by Dr. Bérubé and Alain Blanchette, a geologist.  Supp. Roman Decl. Ex. 2 at 58:6-58:14.

**Lafarge Statement Paragraph 412:**

Mr. Perreault informed Mr. Bergeron and others at Laurentide that he is not a geologist and therefore is not qualified to answer questions about how to interpret geological reports. Supp. Roman Decl. Ex. 2 at 57:24-58:1.

**Lafarge Statement Paragraph 413:**

The Bérubé and Blanchette reports come to different conclusions as to what accounted for concrete deterioration in the Trois-Rivières region and whether it was safe to use aggregate sourced from the B&B Quarry in concrete.  Supp. Roman Decl. Ex. 2 at 59:4-20.

**Lafarge Statement Paragraph 414:**

Mr. Blanchette concluded that the B&B Quarry stone was suitable for use in concrete. Supp. Roman Decl. Ex. 2 at 59:14-16.

**Lafarge Statement Paragraph 415:**

Mr. Bérubé concluded that it might be risky to continue using the B&B Quarry stone in concrete.  Supp. Roman Decl. Ex. 2 at 59:12-14.

**Lafarge Statement Paragraph 416:**

███████████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████

**Lafarge Statement Paragraph 417:**

At the September 26 meeting, Laurentide provided Ms. de Grosbois with reports prepared by Mr. Blanchette and Mr. Bérubé.  Supp. Roman Decl. Ex. 1 at 230:3-14.

**Lafarge Statement Paragraph 418:**

At the conclusion of the September 26 meeting, attendees agreed that Ms. de Grosbois would

visit the B&B Quarry and conduct for Laurentide a petrographic examination of aggregate from that quarry as well as aggregate from the Maskimo Quarry and Continental Quarry, Supp. Roman Decl. Ex. 1 at 227:1-7; specifically, attendees agreed that Lafarge would "do the petrography of the quarry, to have a visual examination of the quarry, and to go and try to quantify and qualify the sulfide, and to take representative samples for testing. And basically to compare the three quarries, in terms of sulfide," Supp. Roman Decl. Ex. 1 at 229:3-9.

### Lafarge Statement Paragraph 419:

Immediately after the September 26 meeting, the Lafarge employees in attendance visited the B&B Quarry. Supp. Roman Decl. Ex. 1 at 230:15-17

### Lafarge Statement Paragraph 420:

At the B&B Quarry, Ms. de Grosbois and Mr. Fontaine "walked along the quarry walls, identified different zones" and "picked up some samples on the quarry wall"; they also "went to the production pile" where "there was two aggregate size, three different production piles" and took samples from there as well. Supp. Roman Decl. Ex. 1 at 230:23-231:7.

### Lafarge Statement Paragraph 421:

Ms. de Grosbois observed that sulfide was present and unevenly distributed throughout the B&B Quarry. Supp. Roman Decl. Ex. 1 at 231:11-18.

### Lafarge Statement Paragraph 422:

Immediately after the visit to the B&B Quarry, Ms. de Grosbois, Mr. Perreault, Mr. Fontaine, and Ms. Lord visited the Maskimo Quarry. Supp. Roman Decl. Ex. 1 at 234:4-6.

### Lafarge Statement Paragraph 423:

Because the Maskimo Quarry was closed, the Lafarge representatives surveyed only the exterior. Supp. Roman Decl. Ex. 1 at 234:7-24.

146

**Lafarge Statement Paragraph 424:**

Ms. de Grosbois visually inspected piles of rock at the Maskimo Quarry and concluded that they contain sulfides.  Supp. Roman Decl. Ex. 1 at 235:3-16.

**Lafarge Statement Paragraph 425:**

Ms. de Grosbois concluded from her visual inspection of the B&B Quarry and Maskimo Quarry that stone in those quarries was similar.  Supp. Roman Decl. Ex. 1 at 236:6-12.

**Lafarge Statement Paragraph 426:**

Ms. de Grosbois was not able to tell from her visual inspection of the B&B and Maskimo quarries whether or not pyrite or pyrrhotite was present.  Supp. Roman Decl. Ex. 1 at 235:11-16.

**Lafarge Statement Paragraph 427:**

Ms. de Grosbois collected hand-sized specimens from both the B&B and Maskimo quarries to be examined at the CTS laboratory.  Supp. Roman Decl. Ex. 1. at 236:17-237:4.

**Lafarge Statement Paragraph 428:**

Ms. de Grosbois took custody of the samples from the B&B and Maskimo quarries and brought them to CTS.  Supp. Roman Decl. Ex. 1. at 236:17-237:13.

**Lafarge Statement Paragraph 429:**

After the meeting at Laurentide and the quarry visits on September 26, 2005, Ms. de Grosbois conducted the 2005-06 comparative analysis of the aggregate from both the B&B and Maskimo quarries as well as the Continental Quarry.  Supp. Roman Decl. Ex. 9; Supp. Roman Decl. Ex. 1 at 224:17-225:15; 258:19-259:1.

**Lafarge Statement Paragraph 430:**

In conducting the 2005-06 analysis, Ms. de Grosbois decided which tests were necessary to determine whether stone from the B&B Quarry has similar qualities to stone from the Maskimo Quarry and Continental Quarry.  Roman Supp. Decl. Ex. 1 at 258:13-18.

**Lafarge Statement Paragraph 431:**

The tests (and equipment) chosen by Ms. de Grosbois in conducting the 2005-06 analysis included a petrographic analysis, a chemical test, and a scanning electron microscope examination.  Supp. Roman Decl. Ex. 1 at 260:1-262:24; 258:19-259:1; Supp. Roman Decl. Ex. 9.

**Lafarge Statement Paragraph 432:**

Ms. de Grosbois used the scanning electron microscope at the University of Quebec at Montreal because Lafarge did not have that piece of equipment.  The scanning electron microscope was necessary because Lafarge was otherwise incapable of detailed imaging.  Supp. Roman Decl. Ex. 1 at 257:1-4.

**Lafarge Statement Paragraph 433:**

Ms. de Grosbois finalized her report on January 31, 2006.  Supp. Roman Decl. Ex. 5; Supp. Roman Decl. Ex. 1 at 259:2-6.

**Lafarge Statement Paragraph 434:**

The B&B Quarry had been in operation since the mid-1990s, without claims of property damage associated with use of aggregates from the quarry before the claims filed in the Underlying Litigation against Laurentide and others beginning in 2007.  Perreault Decl. ¶ 6.

**Lafarge Statement Paragraph 435:**

Ms. de Grosbois sent her report to Mr. Perreault, copying Ms. Delagrave, dated January 31, 2006, concluding that aggregate from the Maskimo and B&B quarries contained similar

levels of sulfides. Supp. Roman Decl. Ex. 9 at LAF000004320; Supp. Roman Decl. Ex. 1 at 258:19-20.

**Lafarge Statement Paragraph 436:**

The January 31, 2006 report does not set forth a conclusion concerning suitability of B&B Quarry aggregate for use in concrete.  The report states that "It cannot be said whether the sulphide quantities measured in the form of pyrrhotite are deleterious in an aggregate used for the manufacture of concrete since no criterion of acceptance of an aggregate related to sulfide quantities exists in the current standards of the Quebec Standards Office or Canadian Standards Association."  Supp. Roman Decl. Ex. 9 a LAF0000004320; Supp. Roman Decl. Ex. 1 at 258:19-259:1.

**Lafarge Statement Paragraph 437:**

No industry or Canadian government standard concerning acceptable levels of iron sulfide or pyrrhotite content in aggregates existed before and including January 31, 2006.  Supp. Roman Decl. Ex. 1 at 273:19-274:24; 2006 Report at LAF0000004320.

**Lafarge Statement Paragraph 438:**

At a meeting of the Laurentide board on March 29, 2006, Mr. Canuel advised the board that "to be cautious, it might be a good thing to stop using" B&B Quarry aggregate to make concrete.  Supp. Roman Decl. Ex. 3 at 84:11-17.

**Lafarge Statement Paragraph 439:**

███████████████████████████████████████████

███████████████████████████████████████

**Lafarge Statement Paragraph 440:**

Lafarge believed after the March 29, 2006 meeting that Laurentide would stop using aggregate from the B&B Quarry.  Supp. Roman Decl. Ex. 2 at 84:11-85:22.

**Lafarge Statement Paragraph 441:**

On April 26, 2006, Mr. Canuel sent a letter to Laurentide President Tom Bellemare, enclosing Ms. de Grosbois's January 31, 2006 report.  Canuel Decl. Ex. 1 at LAF0000004733; Supp. Roman Decl. Ex. 3 at 96:7-20; Canuel Decl. ¶ 3; Canuel Decl. Ex. 1.  Referring to Ms. de Grosbois's report, the letter states:

> Although this report does not contain any conclusion, namely whether Béton Laurentide Inc. must or not continue to use the aggregates from B&B Quarry to make concrete, the few alleged cases of defective concrete manufactured with aggregates from the Maskimo Quarry incite us to believe, as we mentioned in the meeting of the board of directors of Béton Laurentide Inc. held last March, that it is in the interest of the Company and its shareholders to immediately stop using the aggregates from B&B Quarry in its concrete mixes.

> Obviously, we could change our position if further studies allowed concluding that these aggregates are not at the origin of the alleged problems.

> We are counting on your cooperation to confirm that Béton Laurentide Inc. will stop using aggregates from B&B Quarry in its concrete mixes.

*Id.* at LAF0000004734 [Trans].

**Lafarge Statement Paragraph 442:**

████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████

150

**Lafarge Statement Paragraph 443:**

████████████████████████████████████████

████████████████████████████████████████

████████████████████

**Lafarge Statement Paragraph 444:**

There were no claims of property damage associated with use of aggregates from the B&B Quarry before the claims filed in the *Trois-Rivières* Litigation against Béton Laurentide and others in 2009 and no suits directed against LCI for property damage associated with use of B&B Quarry aggregates by other parties before October 2012. Declaration of Pierre Legault ("Legault Decl.") ¶ 3-4.

**Lafarge Statement Paragraph 445:**

████████████████████████████████████████

████████████████████████████████████████

████████████████████

**Lafarge Statement Paragraph 446:**

In June 2016, the Superior Court of Quebec appointed a mediation judge for the purpose of facilitating a global settlement among the parties. Legault Decl. ¶ 6.

**Lafarge Statement Paragraph 447:**

Only a few formal mediation sessions have taken place as a result of the lack of comprehensive information regarding the scope of potential damages in the Wave 2 cases. Legault Decl. ¶ 6.

**Lafarge Statement Paragraph 448:**

The information-gathering process of the mediation is in its final stages.  Legault Decl. ¶ 6.

**Lafarge Statement Paragraph 449:**

███████████████████████████████████████

█████████████████████████

**Lafarge Statement Paragraph 450:**

LCI's insurance policies are at issue in the *Trois-Rivières* Litigation because plaintiffs contended that LCI became subject to an order requiring all defendants involved in the Wave 2 cases to produce insurance policies that could be called to respond to claims brought against them by the plaintiffs, and the parties needed to agree on or have the court determine which policies would be subject to mandatory disclosure. Legault Decl. ¶ 12.

**Lafarge Statement Paragraph 451:**

Issuers of policies that are subject to QCC §3119 are also subject to personal jurisdiction, direct actions by underlying plaintiffs, and Quebec substantive law in Quebec courts.  Legault Decl. ¶ 13-14.

**Lafarge Statement Paragraph 452:**

███████████████████████████████████████

█████████████████████████

**Lafarge Statement Paragraph 453:**

Policies issued to LCI in Quebec were the subject of their own underwriting and premium payments, which were independent of the underwriting and premiums for policies issued to LNA.  Supplemental Declaration of John Shelonko (Supp. Shelonko Decl.) ¶ 3.

**Lafarge Statement Paragraph 454:**

The LCI Primary Policies were underwritten separately from the Umbrella Policies and from the LNA primary policies.  Supp. Shelonko Decl. ¶ 6.

**Lafarge Statement Paragraph 455:**

As part of the underwriting of the LCI Primary Policies, American Home and AIG Canada assessed LCI's exposures in an annual LCI-specific risk review conducted independent of the LNA underwriting process.  Supp. Shelonko Decl. ¶ 6.

**Lafarge Statement Paragraph 456:**

During the period 2005-11, AIG declined to provide umbrella policies that LCI requested be issued to it in Quebec.  Supp. Shelonko Decl. ¶ 6.

**Lafarge Statement Paragraph 457:**

LCI paid premiums specifically to obtain two umbrella policies issued to it by AIG Canada for the policy periods 2004-05 and 2011-12.  Those premiums were separate from the premiums paid by LNA for the umbrella policies issued by Lexington that also provided general liability coverage to LCI.  The premiums were US$250,000 for the 2004-05 AIG Canada umbrella policy and US$350,000 for the 2011-12 AIG Canada umbrella policy.  Supp. Shelonko Decl. ¶ 7.

**Lafarge Statement Paragraph 458:**

The 2004-05 Lexington policy specified that "an additional premium of US$50,000" was being charged for issuance of the 2004-05 AIG Canada umbrella policy (referred to as "the fronted policy in Canada" because it shared limits with the 2004-05 Lexington policy).  Supp. Shelonko Decl. ¶ 8.

**Lafarge Statement Paragraph 459:**

LCI paid premiums to procure the Primary Policies issued to it in Quebec by Quebec-qualified insurers during the period 2001-12; those premiums were in addition to premiums paid by LNA for its own primary policies that also provided primary coverage to LCI during this same period and totaled approximately C$23 million over the 2001-12 period.  Supp. Shelonko Decl. ¶ 4.

**Lafarge Statement Paragraph 460:**

AIG does not contend that each affected structure in the Trois-Rivières Litigation is a separate occurrence.  Supp. Roman Decl. Ex. 11 at 142:21-143:4.

**Lafarge Statement Paragraph 461:**

Lafarge disclosed its choice of law in  a response dated May 22, 2017 to Interrogatory No. 20 posed by AIG asking for Lafarge's contention as to choice of law.  Lafarge stated that "Plaintiffs contend that the substantive law of the province of Québec, Canada governs interpretation of the UMBRELLA POLICIES in this action."  Supp. Roman Decl. Ex. 12 at 8.

**Lafarge Statement Paragraph 462:**

AIG construes a professional service as something beyond what a lay person could do for purposes of the professional services exclusion in its policies.  Supp. Roman Decl. Ex. 11 at 211:11-211:12.

**Lafarge Statement Paragraph 463:**

AIG does not construe a lawyer telling one not to drink a cup of coffee as a professional service within the meaning of the professional services exclusions in its policies.  Supp. Roman Decl. Ex. 10 at 157:23-158:2.

**Lafarge Statement Paragraph 464:**

AIG does not construe a doctor washing his hands as a professional service within the meaning of the professional services exclusions in its policies.  Supp. Roman Decl. Ex. 6 at 109:23-110:7.

**Lafarge Statement Paragraph 465:**

AIG's own underwriting representative testified, subsequent knowledge regarding damage resulting from past negligence is relevant with respect to timely notice of the claim (which is not at issue in this case), not for purposes of the expected/intended exclusion.   Supp. Roman Decl. Ex. 10 at 212:11-213:2.

New York, New York
August 7, 2017

Respectfully submitted,

COVINGTON & BURLING LLP


By:    s/ Bert Wells
          Bert Wells

Neil K. Roman
Russell M. Squire
Abdi Aidid
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
bwells@cov.com
nroman@cov.com
rsquire@cov.com
aaidid@cov.com

*Counsel for Plaintiffs Lafarge Canada
Inc. and Lafarge North America Inc.*