**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAFARGE CANADA INC., and LAFARGE NORTH AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN HOME ASSURANCE COMPANY, AIG INSURANCE COMPANY OF CANADA, and LEXINGTON INSURANCE COMPANY, <br><br> Defendants. | Case No. 1:15-cv-08957-RA |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS AMERICAN HOME ASSURANCE COMPANY, AIG INSURANCE COMPANY OF CANADA, AND LEXINGTON INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

## <u>TABLE OF CONTENTS</u>

**PAGE**

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT .......................................................................................................................... 3

I.    THE PROFESSIONAL SERVICES EXCLUSION BARS COVERAGE
UNDER THE UMBRELLA POLICIES ................................................................. 3

    A.    The Heading On The Umbrella Policies' Professional Services
Exclusion Cannot, As A Matter Of Law, Change the Plain Meaning
Of That Exclusion ...................................................................................... 4

    B.    Indemnity Coverage Is Barred Based On The Allegations In The
Trois-Rivières Litigation............................................................................. 5

    C.    No Trois-Rivières Litigation Claim Escapes The Professional
Services Exclusion ...................................................................................... 8

        i.    Courts Broadly Construe The Professional Services
Exclusion To Bar Coverage For All Liability Arising Out
Of Professional Services ................................................................. 8

        ii.    All Allegations Are For Professional Failures And Fall
Within The Professional Services Exclusion.............................. 14

            1.    Lafarge's Pre-2005 Conduct Constitutes
Professional Services That Fall Within The
Professional Services Exclusion ..................................... 15

            2.    Lafarge's 2005 and 2006 Professional Services
Form A Basis For Lafarge's Potential Liability And
Fall Within The Professional Services Exclusion............ 18

II.    THE UMBRELLA POLICIES ARE GOVERNED BY VIRGINIA LAW ........ 20

III.    THE EXPECTED OR INTENDED EXCLUSION APPLIES
REGARDLESS OF WHETHER LAFARGE WAS "CERTAIN" THAT
PROPERTY DAMAGE WOULD OCCUR...................................................... 23

IV.    ONLY ONE UMBRELLA POLICY CAN APPLY TO EACH
UNDERLYING CLAIM ...................................................................................... 27

    A.    Under Provisions C(1) And C(2), Only One Umbrella Policy Can
Apply To Each Underlying Claim ............................................................ 27

    B.    The Provisions Of C(2) Preclude Lafarge's Relief On Allocation .......... 30

        i.    Lafarge Must Satisfy A Separate Retained Limit In Each
Triggered Policy Period ................................................................. 30

        ii.    Lafarge Cannot Establish Satisfaction Of The Retained
Limits Because The Number Of Occurrences At Issue
Cannot Yet Be Determined........................................................... 31

i

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

V.      C(1)'S UNAMBIGUOUS LANGUAGE PROHIBITS COVERAGE UNDER THE 2011 UMBRELLA POLICIES ...................................................... 33

VI.     NEITHER THE UMBRELLA POLICIES, NOR THE CANADIAN UMBRELLA POLICIES, COVER DEFENSE COSTS INCURRED BEFORE TRIGGER........................................................................................ 35

VII.    REDACTED ....... 37

VIII.   DAVID AHEARN'S AND JOSEPH MONTELEONE'S EXPERT OPINIONS ARE ADMISSIBLE ...................................................................... 39

CONCLUSION ................................................................................................... 39

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>AES Corp. v. Steadfast Ins. Co.</u>,
   283 Va. 609 (Va. 2012)..................................................................................6, 23

<u>Appalachian Ins. Co. v. General Elec. Co.</u>,
   No. 122807-1996, 2008 N.Y. Misc. LEXIS 4460 (N.Y. Sup. Ct. 2008)..................................22

<u>Associated Indem. Corp. v. Dow Chem. Co.</u>,
   814 F. Supp. 613 (E.D. Mich. 1993).......................................................................32

<u>Bayudan v. Tradewind Ins. Co.</u>,
   87 Haw. 379 (Haw. Ct. App. 1998) ........................................................................7

<u>Beazley Ins. Co. v. Am. Econ. Ins. Co.</u>,
   No. 12-CV-01720, 2013 U.S. Dist. LEXIS 71699 (D. Nev. May 20, 2013)..........................10

<u>Bohreer v. Erie Ins. Group</u>,
   475 F. Supp. 2d 578 (E.D. Va. 2007) ..........................................................9, 10, 20

<u>Can. Gas Assoc. v. Guardian Ins. Co. of Can.</u>,
   [1998] O.J. No. 5260 (Ont. Ct. of Just. (Gen. Div.)) ........................................12, 14

<u>Can.Nat'l Ry. Co. v. Chartis Ins. Co. of Can.</u>,
   2013 QCCA 1271, (Can. Que. C.A.) .......................................................................36

<u>Carova Corp. v. U.S. Fid. & Guar. Co.</u>,
   12 Fed. Appx. 99 (4th Cir. 2001)...........................................................................24

<u>Centennial Ins. Co. v. Neyer</u>,
   No. 11-cv-210, 2012 U.S. Dist. LEXIS 122816 (S.D. Miss. Aug. 29, 2012)........................10

<u>Certain Underwriters at Lloyd's v. Foster Wheeler Corp.</u>,
   822 N.Y.S.2d 30 (N.Y. App. Div. 2006) ............................................................20, 21

<u>Chemetics Int'l Ltd. v. Commercial Union Assurance Co. of Can.</u>,
   1984 CarswellBC 201 (Can. B.C.C.A. 1984).........................................................12

<u>Chemstar, Inc. v. Liberty Mut. Ins. Co.</u>,
   41 F.3d 429 (9th Cir. 1994) ...............................................................................32

<u>Dar El-Bina Eng'g & Contr. Co. v. Rep. of Iraq</u>,
   79 F. Supp. 2d 374 (S.D.N.Y. 2000)......................................................................14

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

Deguise v. Montiminy,
    2014 QCCS 2672 (Can. Que.) ....................................................................................................28

Dragas Mgmt. Corp v. Hanover Ins. Co.,
    798 F. Supp. 2d 758 (E.D. Va. 2011) .......................................................................................33

Early v. State Farm Auto Ins. Co.,
    73 Va. Cir. 400 (Va. Cir. Ct. 2007).........................................................................................32

Employers Mut. Cas. Co. v. Salyer,
    207 Mich. App. 235 (Mich. Ct. App. 1994) ...........................................................................10

Energy Ins. Mut. v. Ace Am. Ins. Co.,
    No. A140656, 2017 Cal. App. LEXIS 696 (Cal. App. 1st Dist. July 11, 2017)......................11

Evanston Ins. Co. v. Harbor Walk Dev., LLC,
    814 F. Supp. 2d 635 (E.D. Va. 2011) .......................................................................................6

F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh,
    205 F.3d 66 (2d Cir. 2000).......................................................................................................26

Factory Mut. Ins. Co. v. Richelieu Metal Quebec,
    2012 QCCS 4334 (Can. Que. Super. Ct.) ...............................................................................13

In re Fosamax Prods. Liab. Litig.,
    707 F.3d 189 (2d Cir. 2013).....................................................................................................17

Garage G.T.D. Inc. v. Jean-Noel Savard,
    200-05-002151-830 (Can. Que. Super. Ct.).............................................................................12

Goodeve Manhire and Partners Inc. v. Encon Group Inc. and Temple Ins. Co.,
    2016 ONSC 7005 (CanLII)......................................................................................................12

Hartford Mut. Ins. Co. v. Grimm,
    17 Va. Cir. 543 (Va. Cir. Ct 1980)..........................................................................................24

Hotel Roanoke Conf. Ctr. Comm'n v. Cincinnati Ins. Co.,
    119 Fed. App'x. 451 (4th Cir. 2005) .................................................................................23, 24

La prevoyance, compagnie d'assurance v. La Commission scolaire catholique de
    Montreal, 1190 N AZ-9000011211 (Can. Que. C.A.)............................................................35

Lazard Freres & Co. v. Protective Life Ins. Co.,
    108 F.3d 1531 (2d Cir. 1997)...................................................................................................20

Lennar Corp. v. Great Am. Ins. Co.,
    200 S.W. 3d 651 (Tex. App. 2006)..........................................................................................33

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Lerner v. Gen. Ins. Co. of Am.,
    245 S.E.2d 249 (Va. 1978).........................................................................................7

Lyons v. Lancer Ins. Co.,
    681 F.3d 50 (2d Cir. 2012)......................................................................................26

Marks v. Scottsdale Ins. Co.,
    791 F.3d 448 (4th Cir. 2015) .....................................................................................6

Marx & Co. v. Diners' Club, Inc.,
    550 F.2d 505 (2d Cir. 1977).....................................................................................38

Maryland Cas. Co. v. Cont'l Cas. Co.,
    332 F. 3d 145 (2d Cir. 2003).....................................................................................21

Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP,
    472 Fed. App'x. 219 (4th Cir. 2012) .........................................................................7

Minn. Lawyers Mut. Ins. Co. v. Protostorm, LLC,
    197 F. Supp. 3d 876 (E.D. Va. 2016) ........................................................................9

Nakano v. Jamie Sadock, Inc.,
    No. 98-cv-0515, 2000 U.S. Dist. LEXIS 7144 (S.D.N.Y. May 25, 2000) ..............................22

Penn. Nat'l Mut. Cas. Ins. Co. v. St. John,
    106 A.3d 1 (Pa. 2014) ........................................................................................29, 30

Premier Pet Prods., LLC v. Travelers Prop. Cas. Co. of Am.,
    678 F. Supp. 2d 409 (E.D. Va. 2010) ......................................................................20

Res. Bank v. Progressive Cas. Ins. Co.,
    503 F. Supp. 2d 789 (E.D. Va. 2007) ....................................................................4, 5

Schneider v. Cont'l Cas. Co.,
    989 F.2d 728 (4th Cir. 1993) ..............................................................................37, 38

Scott v. Chipotle Mexican Grill, Inc.,
    315 F.R.D. 33 (S.D.N.Y. 2016) ...............................................................................38

Selective Way Ins. Co. v. Crawl Space Door Sys.,
    162 F. Supp. 3d 547 (E.D. Va. 2016) ........................................................................6

Souveraine Compagnie d'Assurance Generale v. Etudes Pyro-Techniques M.J.R.
    Itée, 1998 CanLII 11410 (Can. Que. Super. Ct.) .....................................................12

Sparta, Inc. v. DTC Communs., Inc.,
    No. 1:16-cv-01079, 2017 U.S. Dist. LEXIS 99354 (E.D. Va. June 26, 2017).........................38

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

St. Paul Fire & Marine Ins. Co. v. Jacobson,
    826 F. Supp. 155 (E.D. Va. 1993), aff'd 48 F.3d 778 (4th Cir. 1995)..............................8, 9, 10

Station Square Dev. Inc. v. Amako Const. Ltd.,
    1989 CanLII 2797 (BC SC) ...................................................................................................12

Tagged, Inc. v. Scottsdale Ins. Co.,
    No. 11-127, 2011 U.S. Dist. LEXIS 75262 (S.D.N.Y. May 27, 2011) ................................4, 5

Travelers Cas. & Sur. Co. v. Honeywell Int'l, Inc.,
    2007 N.Y. Misc. LEXIS 7758 (N.Y. Sup. Ct. Oct. 2, 2007) ...................................................21

United States Fid. & Guar. Co. v. Rowe,
    249 F. Supp. 993 (E.D. Va. 1966) ...........................................................................................7

Va. Beach v. Aetna Cas. & Sur. Co.,
    426 F. Supp. 821 (E.D. Va. 1976) .........................................................................................10

**Statutes**

R.S.Q., c. G-1.01, s. 1 ..................................................................................................................13

R.S.Q., c. G-1.01, s. 2 ..................................................................................................................13

R.S.Q., c. G-1.01, s. 5 ..................................................................................................................13

R.S.Q., c. G-1.01, s. 6 ..................................................................................................................13

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

## PRELIMINARY STATEMENT

As the Member Companies set forth in their moving papers, this case should be dismissed based on the straightforward application of the Professional Services Exclusion. The only conceivable basis upon which Lafarge's liability can be established in the Trois-Rivières Litigation – its trained geologist's testing of, and opinions about, the concrete aggregate sourced from B&B Quarry – is conduct that is indisputably of a professional nature. Upon analyzing these irrefutable facts under either Virginia or Quebec law, this Court need not go any further, and should grant the Member Companies' summary judgment motion.

Faced with this reality, Lafarge offers a number of arguments as to why the Professional Services Exclusion does not apply, none of which saves its claims for coverage. First, pointing to the use of the term "contractor" in a subject heading above the exclusion, Lafarge submits that because it is not a contractor, the exclusion does not apply. But this argument ignores (i) the broad language in the actual exclusion which bars coverage for "*any liability arising out of the rendering of, or failure to render, professional services or any error, omission or mistake of a professional nature*"; (ii) the additional provision in the Umbrella Policies stating that headings "are solely for convenience and form no part of the terms and conditions of coverage"; and (iii) the ample authority establishing that words cherry-picked from headings neither change the meaning of an exclusion nor limit its applicability.

Second, Lafarge criticizes the Member Companies for their reliance on "duty to defend" cases in which the applicability of the relevant professional services exclusion was assessed against the backdrop of the allegations in the underlying complaint for purposes of determining the insurer's defense obligations, as opposed to its ultimate duty to indemnify the insured for any judgment or settlement. This, according to Lafarge, impermissibly hinges indemnity coverage on the "caprice" of the drafters of the complaint (who could strip insureds of coverage simply by

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

including certain allegations regardless of merit), versus the facts ultimately established at the underlying trial.   This argument, however, completely overlooks that in this case, *all* the allegations against Lafarge concern professional services it performed, such that the only conceivable scenarios under which it can ever be held liable would necessarily result in liability falling squarely within the Professional Services Exclusion. Under these circumstances, the Member Companies respectfully submit that thorough analysis of the allegations in the Trois-Rivières Litigation is not only permissible but compelled.

Finally, Lafarge strains to argue that the relevant activities in which it engaged were not "professional" in nature by attempting to draw artificial distinctions between these activities over time – beginning with early conduct that Lafarge characterizes as merely "mechanical" and ending with later conduct that Lafarge alleges was disconnected from activities that even it concedes were professional in nature.   In making these arguments, however, Lafarge misrepresents the factual record before the Court largely by ignoring (and/or simply by disputing) the allegations made against it in the Trois-Rivières Litigation.   In reality, those allegations make clear that to the extent Lafarge is held liable, it will necessarily be on the basis of activities that are unquestionably "professional" in nature.  Thus, the Member Companies are entitled to summary judgment on their defense that the Professional Services Exclusion bars coverage.

Even if the Court's analysis was to move beyond the dispositive Professional Services Exclusion, partial summary judgment in the Member Companies' favor is appropriate.  Lafarge argues that the occurrence requirement and/or the Expected or Intended Exclusion does not bar coverage because it was not "certain" that damages might result from the continuing use of B&B Quarry aggregates.  Courts do not require such a high bar.  Even if Lafarge is correct, however, it cannot be disputed that, after years of overwhelming scientific evidence produced by Lafarge's

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

and other companies' professionals, Lafarge expected property damage to occur in March of 2006 when it advised Laurentide to "immediately stop" using B&B Quarry aggregates. Coverage thus is barred under all Umbrella Policies issued after March of 2006.

Likewise, the Member Companies are entitled to a declaration that the Umbrella Policy in effect when alleged property damage begins deems any continuation of damage after the policy as damages occurring "during the policy period." Thus, the Court should find that coverage for any individual property is limited to a single policy. The plain language of the Umbrella Policies, as well as case law, dictate this result. And, the Member Companies are entitled to a declaration that they have no obligation for defense expenses incurred prior to Lafarge satisfying the C$2m retained limit(s) of the Umbrella Policies. Lafarge concedes this point under Virginia law and fails to distinguish controlling Quebec law reaching the same conclusion.

For these reasons, the Member Companies respectfully request that the Court enter judgment that the Professional Services Exclusion bars coverage for the Trois-Rivières Litigation. This dispositive issue resolves the entire case. To the extent the Court finds it necessary to consider the Member Companies' other arguments, they request declarations that (1) there is no insurance coverage available after March 2006; (2) continuing damages to a single property cannot trigger coverage under more than one Umbrella Policy; and (3) there is no obligation to pay defense expenses incurred prior to triggering the Umbrella Policies. The Court should also strike Lafarge's expert opinion on the Professional Services Exclusion.

## ARGUMENT

## I.   THE PROFESSIONAL SERVICES EXCLUSION BARS COVERAGE UNDER THE UMBRELLA POLICIES.

As demonstrated in the Member Companies' moving papers, the Professional Services Exclusion bars coverage because all of Lafarge's potential liability in the Trois-Rivières Litigation

3

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

arises out of or is intertwined with the professional services it rendered in connection with the B&B Quarry aggregate. (Br. at 17-26).[1]  In response, Lafarge contends that (i) reference to "contractors" in the exclusion section's heading renders the broad exclusion inapplicable to Lafarge; (ii) the Court cannot rely on the allegations in the Trois-Rivières Litigation to determine whether the Professional Services Exclusion bars coverage for an indemnity claim, and (iii) the relevant activities performed by Lafarge were, in any event, not "professional" in nature.  For the reasons below, each of these arguments is without merit.

**A.     The Heading On The Umbrella Policies' Professional Services Exclusion Cannot, As A Matter Of Law, Change the Plain Meaning Of That Exclusion.**

Without citation, Lafarge asserts that the Professional Services Exclusion applies only to conduct performed by contractors, and thus, cannot apply to the Trois-Rivières Litigation.  Lafarge bases its argument solely on the "Contractors Limitation Endorsement" heading of the endorsement that contains the Professional Services Exclusion.  This argument is baseless and contradicted by the terms of the Umbrella Policies.  (SUMF ¶467) (providing that "[h]eadings . . . are solely for convenience and form no part of the terms and conditions of coverage").

Moreover, courts in Virginia and elsewhere hold that headings cannot change the meaning of the terms of such policies.  Res. Bank v. Progressive Cas. Ins. Co., 503 F. Supp. 2d 789, 794-95 (E.D. Va. 2007) (holding heading of exclusion could neither change the meaning of the terms of the exclusion nor render such exclusion ambiguous); Tagged, Inc. v. Scottsdale Ins. Co., No. 11-127, 2011 U.S. Dist. LEXIS 75262, at *13-14 n.3 (S.D.N.Y. May 27, 2011) (holding heading could not limit broad applicability of the terms of the exclusion).

---

[1] As set forth on pp. 20, infra, the Umbrella Policies are governed by Virginia law.  That said, even if the Court were to apply Quebec law to the Umbrella Policies, the Professional Services Exclusion similarly bars coverage for all of Lafarge's potential liability.  See pp. 11-14, infra.

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Here, the Umbrella Policies provide that "[t]his insurance does not apply to any liability arising out of the rendering of, or the failure to render, professional services or any error, omission or mistake of a professional nature performed by or on behalf of the Insured." (SUMF ¶145.) Far from limiting its applicability to particular individuals, roles, or "contractors," the language speaks in terms of "any liability." Lafarge's attempt to use the heading "Contractors Limitation Endorsement" would change the plain meaning of the policies, which bar coverage for "any liability" arising out of professional services. Neither the Umbrella Policies themselves (SUMF ¶145-46, 467), nor the law, <u>Res. Bank</u>, 503 F. Supp. 2d at 795; <u>Tagged</u>, 2011 U.S. Dist. LEXIS 75262, at *13-14, permit this outcome.

### B. Indemnity Coverage Is Barred Based On The Allegations In The Trois-Rivières Litigation.

Lafarge criticizes the Member Companies' reliance on case law addressing whether professional services exclusions relieve insurers of their duty to defend, versus indemnify, their insureds. According to Lafarge, while it may be appropriate in duty to defend cases to review the allegations in the underlying complaint, it is inappropriate to do so here because Lafarge seeks to enforce the Member Companies' duty to indemnify. The duty to indemnify, Lafarge contends, turns not on allegations but on actual facts, and cannot be nullified merely because a plaintiff chooses to include allegations in its complaint that fall within a coverage exclusion.

Lafarge's argument overlooks that this is not a case in which plaintiffs have merely *included* allegations that would fall within application of the Professional Services Exclusion, along with other allegations unrelated to Lafarge's professional conduct that could give rise to liability for which Lafarge could seek indemnification. Rather, it is a case in which *all* of plaintiffs' allegations relate to conduct by Lafarge that was professional in nature. Thus, there is no need for the Court to await further factual development. Either plaintiffs succeed in proving their

5

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

allegations against Lafarge, in which case they also will have necessarily established the applicability of the Professional Services Exclusion, or plaintiffs will not prove their allegations, in which case Lafarge will have no liability and no claim against the Umbrella Policies.

Courts have developed a framework, often applied during an examination of the duty to defend but by no means limited to that context, which analyzes the allegations against an insured to determine whether the potential for liability for covered damages exists. AES Corp. v. Steadfast Ins. Co., 283 Va. 609, 617-618 (Va. 2012). In that situation, where it is clear that potential liability for a covered claim is absent, a court can relieve an insurer of any obligation to provide coverage. See, e.g., Evanston Ins. Co. v. Harbor Walk Dev., LLC, 814 F. Supp. 2d 635, 643 (E.D. Va. 2011) ("Although an insurer's duty to indemnify will depend on resolution of facts alleged in the complaint, no such fact finding is necessary if there is no duty to defend because the allegations . . . would fall outside the policy's coverage."); Marks v. Scottsdale Ins. Co., 791 F.3d 448, 454 (4th Cir. 2015) (holding that where insurer had no duty to defend based on complaint's allegations, it followed that insurer "also has no duty to indemnify"); Selective Way Ins. Co. v. Crawl Space Door Sys., 162 F. Supp. 3d 547, 552 (E.D. Va. 2016) ("If there is no duty to defend . . . there can be no duty to indemnify."). This Court should also follow these principles, and based on the allegations in the Trois-Rivières Litigation that Lafarge "act[ed] as a technical advisor" regarding B&B Quarry aggregate and used its "expertise" and "judgment" to aid Laurentide and B&B Quarry "in making technical decisions" (SUMF ¶252-53), decline to find coverage for the Trois-Rivières Litigation based on the Professional Services Exclusion.

Nor is the Court's analysis of the Member Companies' coverage obligations limited to only those allegations that Lafarge *accepts*. Denying allegations of uncovered conduct – such as denying De Grosbois "reassured" Bergeron that the B&B Quarry aggregate constituted "a good

6

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

concrete aggregate" (SUMF ¶252) – does not obligate an insurer to cover claims that would not be covered if they were proven. Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP, 472 Fed. App'x. 219, 224 (4th Cir. 2012) ("Appellants cannot obtain a defense by having a court assume plaintiffs will fail to prove the heart of their allegations."). This is because denials do not alter the nature of the claims asserted – an underlying allegation does not cease to be an allegation simply because it is disputed. Id.

Allegations constituting an uncovered claim, even if baseless, do not result in coverage. See, e.g., Lerner v. Gen. Ins. Co. of Am., 245 S.E.2d 249, 251 (Va. 1978) (noting that requirement to defend groundless, false or fraudulent claims places no obligation on insurer "when, under the allegations of the complaint, it would not be liable under its contract for any recovery therein had"); United States Fid. & Guar. Co. v. Rowe, 249 F. Supp. 993, 1006-07 (E.D. Va. 1966) ("A groundless or frivolous suit is to be distinguished from one for which no policy coverage is afforded. In the former category, coverage is available if the claim against the insured can be established. . . However, in the latter category no coverage is available even if the claim can be proven"); Bayudan v. Tradewind Ins. Co., 87 Haw. 379, 389 (Haw. Ct. App. 1998) ("Since the assault claim is not within the occurrence language, as we have explained, it is not covered even assuming the claim was groundless.").

Simply put, coverage obligations arise from the possibility of coverage *if an underlying plaintiff is successful* in proving her claims. If the Trois-Rivières Litigation's allegations fail, then no coverage exists because Lafarge will not be obligated to pay anything. For this reason, the Court may analyze the allegations in the Trois-Rivières Litigation to apply the Professional Services Exclusion, and Lafarge denying these allegations cannot create a question of fact preventing the Court from granting relief.

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

C.     **No Trois-Rivières Litigation Claim Escapes The Professional Services Exclusion.**

In its final attempt to manufacture coverage, Lafarge argues that none of its potential liability arises out of or is intertwined with the activities that were "professional" in nature by drawing artificial distinctions between its activities. With respect to what it characterizes as its earlier 2002 conduct, Lafarge contends that such conduct was not professional in nature because it was mechanical performance of a routine test, and involved a telephone conversation that did not occur as alleged. (L. Reply 26-28.) For its later conduct, including the De Grosbois Report and warning regarding B&B Quarry aggregate, Lafarge concedes that the conduct constitutes professional services, but baldly asserts its liability will not arise out of such conduct. Lafarge goes a step further and predicts that its liability, if any, will only result from allegations such as its purported failure to use its thirty-percent corporate interest in Laurentide to prevent the continued use of B&B Quarry aggregate, which Lafarge characterizes as unrelated to the professional services it now admits it provided. But Lafarge's effort to recast its alleged conduct is futile. In addition to being based on a mischaracterization of the facts, both Virginia and Canadian courts broadly construe the Professional Services Exclusion to bar coverage for all liability arising out of the provision of professional services. All alleged conduct and liability falls easily within this standard, and therefore, must be excluded.

    i.     **Courts Broadly Construe The Professional Services Exclusion To Bar Coverage For All Liability Arising Out Of Professional Services.**

Lafarge does not dispute that Virginia courts interpret the term "professional services" or "of a professional nature" as conduct that "exacts the use or application of special learning or attainments of some kind." St. Paul Fire & Marine Ins. Co. v. Jacobson, 826 F. Supp. 155, 160-62 (E.D. Va. 1993), aff'd 48 F.3d 778 (4th Cir. 1995). Nor does Lafarge dispute that, even though exclusions generally are interpreted narrowly, Virginia courts broadly apply professional services

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

exclusions to include all conduct that "arises out of the rendering or failure to render" or is "inextricably intertwined" with a professional service. Bohreer v. Erie Ins. Group, 475 F. Supp. 2d 578, 581-85 (E.D. Va. 2007); Minn. Lawyers Mut. Ins. Co. v. Protostorm, LLC, 197 F. Supp. 3d 876, 883-884 (E.D. Va. 2016) ("'[A]rising out of' has a broad meaning, even broader than the phrase 'resulting from.'").

Rather, Lafarge attempts to distinguish some of the Member Companies' cases by arguing that Bohreer and Jacobson are inapposite because certain of the "routine" activities in question were excluded since they were "inextricably intertwined" with a professional service, rather than themselves constituting professional services. (L. Reply at 24 n.21.) Needless to say, it would be a bizarre result if conduct "inextricably intertwined" with professional services could be excluded under a professional services exclusion, but conduct actually constituting a professional service warranted coverage. Likewise, Lafarge's attempt to distinguish these cases by asserting that they involved service providers, and "not a product vendor like LCI," is also frivolous. Lafarge agrees with the Member Companies' assertion that the inquiry turns on "the nature of the [] act or the service provided which g[ives] rise to the damages complained of, not merely to the insured's professional status (D. Br. at 18-19; L. Reply at 23), and agrees, as it must, that none of its product was at issue in the Trois-Rivières Litigation. (L. Reply at 24.) As Lafarge itself states, "[n]one of the [c]laims alleges that LCI's cement, or any other product manufactured or supplied by Lafarge, was defective or contributed to property damage." (LSUMF ¶36.) The cases—fairly read—do not hold that purported "routine" activities can never constitute professional services themselves, but rather that the gravamen of the allegations against the insured is what determines the applicability of the exclusion. See Bohreer, 475 F. Supp. 2d at 586; Jacobson, 48 F.3d at 782.

9

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

For instance, in <u>Bohreer</u>, the court noted that it would not focus on a single allegation or aspect of the insured's purported conduct, because the allegations against the insured—which included "mishandl[ing] the []remains," "not safeguard[ing] or controll[ing] the body," and "improperly cremat[ing] the body and remains"—all "ar[o]se out of[] <u>or</u> were inextricably intertwined with the professional service of cremation." <u>Bohreer</u>, 475 F. Supp. 2d 578, 581 (emphasis added). The court stated that the insured, "[a]ttempting to avoid this clear result," improperly focused on a single paragraph of the complaint that it characterized as alleging a "clerical" error of mislabeling remains. <u>Id.</u> The court rejected the insured's characterizations because "[t]he allegations contained in the [u]nderlying [a]ction go to the very essence of the professional service provided by a crematory, namely the proper performance of a cremation and the proper delivery of the unadulterated cremated remains." <u>Id.</u>; <u>see also Jacobson</u>, 48 F.3d at 782 (rejecting insured's limited focus on selective parts of underlying allegations).[2]

---

[2]In footnote 22, Lafarge also misleadingly contends that other cases on which the Member Companies relied are distinguishable on their facts. Nearly all of the cases referenced by Lafarge were cited by the Member Companies for the uncontroversial proposition that federal courts regularly apply professional services exclusions to bar insurance coverage in the procedural context of summary judgment. (D. Br. at 18.) Regardless, Lafarge's attempted distinctions are without a difference. Lafarge states that <u>Beazley Ins. Co. v. Am. Econ. Ins. Co.</u> is unimportant because the insured was an architect apparently asking this Court to believe that the Umbrella Policies' Professional Services Exclusion may apply to an architect, but not to Lafarge's own geologist. No. 12-CV-01720, 2013 U.S. Dist. LEXIS 71699, at *22-23 (D. Nev. May 20, 2013). Lafarge alleges that <u>Va. Beach v. Aetna Cas. & Sur. Co.</u> is inapplicable because there was no dispute that the conduct was professional, but disregards that the court held that all preparation, specifications, and supervision rendered by the Army Corps of Engineers were excluded professional services. 426 F. Supp. 821, 826 (E.D. Va. 1976). Likewise, Lafarge contends that <u>Employers Mut. Cas. Co. v. Salyer</u> and <u>Centennial Ins. Co. v. Neyer</u> are immaterial because they involved "mistaken" and "wrong" recommendations related to soil REDACTED

10

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

A very recent decision in California, which followed the same broad application of professional services exclusions as Virginia, illustrates this point. Energy Ins. Mut. v. Ace Am. Ins. Co., No. A140656, 2017 Cal. App. LEXIS 696, *29 (Cal. App. 1st Dist. July 11, 2017). There, the court considered whether claims against an insured, whose failure to properly mark the location of a petroleum line resulted in explosion, arose out of services of a professional nature. Id. at *8. The court rejected the insured's argument that the professional services exclusion applies narrowly, stating "[c]ourts have applied the professional services exclusion broadly to bar coverage for damages resulting from a wide range of [] services that extend beyond those traditionally considered 'professions.'" Id. at *15. The court stated that "marking underground [pipeline] installations [is] clearly analogous to other skilled services that have been held to be professional services. . . . because inspectors had "specialized knowledge in various facets of pipeline construction." Id. at *15-16. The court also rejected the insured's argument that the professional services exclusion did not apply because the underlying lawsuits alleged "ordinary, common law negligence," as well as "other actionable conduct," such as trespass and nuisance. Id. at *25. For the court, even if the underlying actions "theoretically raise[d] some claims that do not arise out of provision of or failure to provide professional services," "the gravamen of the actions [wa]s that the [] insured failed to mark the pipeline." Id. at *28.

Lafarge's cited cases, which are almost exclusively from Canada, do not change this conclusion. Canadian law, which Quebec courts and Lafarge acknowledge is persuasive authority of Quebec insurance law (L. Reply at 30-31), demonstrates that even under Quebec law the Professional Services Exclusion bars all potential liability in the Trois-Rivières Litigation. See Compagnie canadienne d'assurances générales Lombard v. Union canadienne (L'), compagnie d'assurances, 2012 QCCA 1408 (CanLII) ("This decision by the Supreme Court comes to us from

11

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

[c]ommon [l]aw but, in insurance matters . . . it is possible to take foreign decisions into account for those cases that align with the general economy of our civil law."). Numerous Canadian courts apply the "arising out of" language of the Professional Services Exclusion to encompass all potential liability connected to conduct of a professional nature. Can. Gas Assoc. v. Guardian Ins. Co. of Can., [1998] O.J. No. 5260 (Ont. Ct. of Just. (Gen. Div.)); Goodeve Manhire and Partners Inc. v. Encon Group Inc. and Temple Ins. Co., 2016 ONSC 7005 (CanLII); Station Square Dev. Inc. v. Amako Const. Ltd., 1989 CanLII 2797 (BC SC).[3]

The cases relied upon by Lafarge merely support the innocuous proposition that acts lacking specialized knowledge and training may not be professional services, such as engineers spilling heating oil in Souveraine or a petroleum distributor removing truck parts on a Mack truck in Garage. See, e.g., Souveraine Compagnie d'Assurance Generale v. Etudes Pyro-Techniques M.J.R. ltée, 1998 CanLII 11410 (Can. Que. Super. Ct.); Garage G.T.D. Inc. v. Jean-Noel Savard, 200-05-002151-830 (Can. Que. Super. Ct.). Indeed, in Chemetics, the court held that an engineer's failure to warn of the risk of damage to a water tower by overfilling it with water was not necessarily a professional service because vendors other than engineers with specialized knowledge could provide such a common-sense warning. Chemetics Int'l Ltd. v. Commercial Union Assurance Co. of Can., 1984 CarswellBC 201 (Can. B.C.C.A. 1984). Likewise, in

---

[3]For instance, in Gas Assoc., the court rejected the insured's argument that claims for breach of fiduciary duty and failure to warn fell outside of the scope of the professional services exclusion, holding "the allegations . . . ar[o]se from the alleged failure to establish the appropriate standards or tests for products to be used in the natural gas industry and as such do fall within the exclusion for professional services." [1998] O.J. No. 5260, at 3-5. Similarly, in Amako, the court rejected the insured's argument that allegations fell outside of the scope of professional services, stating that "the essential allegations [] are of errors or omissions in the provision of services ordinarily provided by architects and engineers such as design and inspection." 1989 CanLII 2797, at ¶9, 10; see also Goodeve, 2016 ONSC 7005, at 12 (CanLII) (barring coverage for all claims, including claim for nuisance, because all arose out of the rendering or failure to render professional services).

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Richelieu, the court held that a metal worker's liability was different from an engineer's liability because the worker's liability was for the failure to deliver "the column provided for in the [design] plan . . . [and for] selecting the angles welded on three sides," which "ha[d] nothing to do with [] 'professional' services" or "with the 'professional' liability of the engineer, the architect or others." Factory Mut. Ins. Co. v. Richelieu Metal Quebec, Inc., 2012 QCCS 4334 (Can. Que. Super. Ct.).

As set forth below, Lafarge's potential liability in the Trois-Rivières Litigation all arises out of professional services and has no comparison to the accidental spilling of heating oil or the straightforward warning that someone without specialized knowledge could have provided. Nor do the cases question the binding Quebec law, relied upon in the First-Wave Judgment, which categorizes the identification and interpretation of geological phenomena as a professional activity that requires complete information and appropriate disclaimers.[4] Lafarge itself has characterized all damages at issue as arising from "an unusual geologic phenomenon at the B&B Quarry." (L. Reply at 10.) It defies logic to assume that someone without specialized knowledge could identify and understand such an "unusual geologic phenomenon." Further, Lafarge's cases do not reference any Virginia or Canadian holding that narrowly interprets the "arising out of" language

---

[4]To find liability on the part of SNC and Blanchette, the First-Wave Judgment relied on the Quebec Professional Code. (Declaration of Olivier Therrien, dated June 8, 2017, ("Th. Decl."), Ex 1 at ¶¶ 1259-60, 1298-99.) Quebec law provides that the "practice of the profession of geologist includes such scientific activities as identifying, observing, characterizing, interpreting or modeling geological phenomena." R.S.Q., c. G-1.01, s. 1, 2, 5, 6. It continues that "[o]nly a geologist may . . . give professional advice or an opinion or make a report in relation to mining, petroleum or gas resource exploration, development, operation or project assessment activities." R.S.Q., c. G-1.01, s. 6. Under the Geologist Code of Ethics, geologists "may provide an opinion, make a recommendation or return a document only on the following conditions: (1) they have collected adequate and sufficient information given the purpose of the work; (2) they specify the quality of data and information on which their opinions, recommendations or documents are based; and (3) they emphasize and explain the limits of information available and, as the case may be, the need to obtain additional information." See http://legisquebec.gouv.qc.ca/en/ShowDoc/cr/G-1.01,%20r.%202.2.

13

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

of the Professional Services Exclusion.  See Gas Assoc., [1998] O.J. No. 5260, at 5 (holding that

breach of fiduciary duty and failure to warn claims arose out of provision of professional services).

Lafarge simply has not offered any insight on the law that can save its claims.[5]

> **ii.      All Allegations Are For Professional Failures And Fall Within The Professional Services Exclusion.**

There can be no debate that Lafarge's alleged failures are of a professional nature.  SNC

and Blanchette were found liable based on their unnuanced professional opinions and lackluster

investigations in connection with their opinions regarding the suitability of B&B Quarry aggregate.

They seek to hold Lafarge liable because its "analysis and advice provided to the officers of B&B

[Quarry] . . . caused the same harm." (SUMF ¶252).  Similarly, the Second-Wave Claims seek to

hold Lafarge liable for the rendering of opinions "done without reservation and without any

cautionary statements," "for contraven[ing] their obligations pursuant to the Geologist Code of

Ethics," and conduct "committed in the course of their analysis and recommendations." (SUMF

¶253; at 2.29, 2.30, 2.35.) (De Grosbois and Lafarge "are thus liable . . . based on their defaults

and the negligence committed in the course of their analysis and recommendations").   Even

Lafarge's risk manager, John Shelonko, conceded that "SNC alleges 'perfect solidarity' between

itself and Lafarge, meaning that the alleged joint and several liability purportedly rest on the same

legal basis for the same kinds of acts or omissions."  (Th. Decl. Ex 2 at LAF0000739349.)

This is not surprising since it is alleged – with respect to the entire applicable period of

Lafarge's conduct – that Lafarge "act[ed] as a technical advisor" and used its "expertise" and

"judgment" to aid Laurentide and B&B Quarry "in making technical decisions."  (SUMF ¶¶252-

---

[5]Lafarge has the burden to support its assertion of Quebec law.  See Dar El-Bina Eng'g & Contr. Co. v. Rep. of Iraq, 79 F. Supp. 2d 374, 383 (S.D.N.Y. 2000) ("[F]ailure to plead and prove applicable foreign law permits the court to proceed on the assumption that the law of the foreign jurisdiction accords with that of New York.").

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

53.)  Indeed, the Second-Wave complaints include allegations related to 2002, 2003, 2004, 2005, and 2006.  (SUMF ¶252, at 63, 66, 67.)  Moreover, without reference to a particular event, the Second-Wave complaints allege that an expert witness in the Trois-Rivières Litigation opined that De Grosbois "in the same manner as [] Blanchette from [SNC], failed in her professional duties by not recommending [] Laurentide to stop using aggregates from B&B Quarry in the concrete, as early as May 2002."  (SUMF ¶253, at 65.)

Nor can there be any dispute that Lafarge always understood that the Professional Services Exclusion applied to its conduct in Trois-Rivières Litigation.  This is evidenced in a report dated February 12, 2012, where under a paragraph entitled "Professional Liability," Lafarge wrote "the desire to provide [] services is pushing the need to have [Professional Liability] coverage.  [One of our plants] is working on [] testing and other lab services for third parties without the sale of product."  (SUMF ¶468.)  **REDACTED**

Thus, Lafarge's efforts to avoid the Professional Services Exclusion by dividing the conduct into discrete components has no basis in the Trois-Rivières Litigation allegations.

       **1.**      **Lafarge's Pre-2005 Conduct Constitutes Professional Services That Fall Within The Professional Services Exclusion.**

Lafarge argues that its professionals' conduct prior to 2005 and 2006 was not in the nature of a professional service.  (L. Reply at 25-26.)  It does so by focusing almost exclusively on a trained lab technician's chemical analysis and mischaracterizing the record, misleadingly stating that De Grosbois "did not test and never even saw or touched B&B aggregate and was involved only in passing [the] request from [] Bergeron of Laurentide to test a sample."  (Id.)

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

REDACTED

Thus, despite its attempts to downplay its actions and oversimplify its conduct as primarily "physical or manual," Lafarge cannot escape the fact that allegations speak in much broader terms than the "mechanical" execution of a test and reference its analysis and recommendations—conduct requiring judgment, mental effort, and interpretation beyond that of any lay person.

The allegations belie the notion that a person without specialized knowledge could conduct the chemical analysis, explain the results, and recommend additional testing. Notably, it is alleged that Bergeron requested a chemical analysis of B&B Quarry aggregates from Lafarge *based on its expertise*. (SUMF ¶252, at 61) ("Given that Lafarge was acting as a technical advisor to B&B Group, B&B Group relied on the expertise of Lafarge's representatives in making technical decisions."). Further, it is alleged that Perreault passed Laurentide's request to De Grosbois based on her experience as a geologist. (SUMF ¶252, at 23) ("Perreault . . . went to [] Laurentide's offices to get a sample of B&B aggregates in order to have it examined by [] De Grosbois"). Had the chemical analysis been a routine event that anyone could have conducted, Perreault would have just conducted the analysis himself.[6]

The Trois-Rivières Litigation further alleges that after receiving the results of the chemical analysis, Bergeron "immediately communicated with [De Grosbois] in order to get advice and

---

[6]Lafarge confirms that this purportedly routine analysis could be authorized only by engineer-level employees working at CTS. (Supp. Roman Decl. Ex. 1 at 94:22-23, 96:10-13.)

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

clarification about the result of this analysis." (SUMF ¶252.) De Grosbois allegedly "then reassured [] Bergeron and indicated that the analyzed B&B [Quarry] [a]ggregate constituted a good concrete aggregate." (<u>Id.</u>)  If Bergeron was capable of analyzing the results or their impact, he would not have had to reach out to De Grosbois.  (<u>Id.</u>, at 21.)  Nor would he have prompted De Grosbois to provide her alleged assessment that "B&B [Quarry] [a]ggregate constituted a good concrete aggregate"— REDACTED

REDACTED  Regardless, even if all Bergeron was doing was seeking confirmation or a second opinion, that he reached out to De Grosbois for advice does not alter the fact that such advice was a quintessential professional service.  Lafarge has no substantive response to these allegations, instead only passively denying that the alleged statements were made.  (L. Reply at 29.)  As explained in Section I.B., these denials, which the First-Wave Judgment already questioned (SUMF ¶334), are no obstacle to application of the Professional Services Exclusion.

To understand the context of these alleged failures, the First-Wave Judgment, which characterized all failures by SNC and its geologist Blanchette as failures to fulfill professional obligations, is instructive.  (Th. Decl. Ex 1 at ¶¶ 1259-60.)  Specifically, the court examined the legal requirement in Quebec, codified in the Geologist Code of Ethics, of a geologist to "clearly explain the facts and interpretations, as well as the uncertainties and differences in the interpretations." (Th. Decl. Ex 1 at ¶¶ 1259-60, 1298-99.)  Based on these obligations, the court concluded that "Blanchette did not comply with his code of ethics in that he did not inform his clients of the degree of uncertainty inherent in his interpretations and recommendations in light of

REDACTED

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

the complexity of geological phenomena." (Th. Decl. Ex 1 at ¶1259.) As a result, the court concluded that "Blanchette ignored the professional obligations imposed on him by his code of ethics," rendering "opinions without any nuances and without any warnings, which would have been a basic precaution." (Th. Decl. Ex 1 at ¶¶1298-99.)

Lafarge itself recognized that the claims against it "*rest on the same legal basis for the same kinds of acts or omissions*" that resulted in SNC's liability in the First-Wave Judgement. (Th. Decl. Ex 2 at LAF0000739349) (emphasis added.)   REDACTED

There is no question that Lafarge's 2002 and 2003 conduct constituted professional services.

> **2. Lafarge's 2005 and 2006 Professional Services Form A Basis For Lafarge's Potential Liability And Fall Within The Professional Services Exclusion.**

Lafarge attempts to distinguish its 2002 and 2003 conduct from its 2005 and 2006 conduct, now conceding that its 2005 and 2006 conduct constitutes professional services. (L. Reply at 29-30.) Notwithstanding that concession, Lafarge contends that those professional services somehow do not form any basis of its potential liability. But, as discussed above (section I.C.i,) Lafarge's attempt to distinguish its earlier conduct from its later conduct is a distinction without a difference, because all of its conduct constitutes services of a professional nature, and those professional services are the only basis upon which Lafarge could have any liability.

The Trois-Rivières Litigation alleges that in September 2005, after Laurentide expressed additional concerns regarding the use of B&B Quarry aggregate, De Grosbois visited B&B Quarry, conducted additional analysis of B&B Quarry aggregate, and issued the De Grosbois Report. (SUMF ¶252-53.) Based on what it learned in preparing the De Grosbois Report, Lafarge warned

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Laurentide of the dangers of using B&B Quarry's aggregate and recommended Laurentide discontinue its use immediately. (Id.) This admittedly professional conduct constitutes the basis for Lafarge's liability, and Lafarge's assertions to the contrary are unfounded. (SUMF ¶253 (alleging liability for opinions "done without reservation and without any cautionary statements," "for contraven[ing] [] obligations pursuant to the Geologist Code of Ethics," and for conduct "committed in the course of their analysis and recommendations."))

Lafarge ignores all of these allegations and states, without citation or explanation, that the plaintiffs in the Trois-Rivières Litigation do not allege liability against Lafarge based on its analysis in 2005-06.  Yet, the underlying complaints include no fewer than *ten* allegations referencing Lafarge's 2005-06 conduct, including, as Lafarge itself acknowledges, multiple allegations regarding the manner in which De Grosbois provided her admittedly professional conduct in 2005-06. (SUMF ¶252-53.)  Lafarge's assertion also disregards that SNC was liable for rendering "opinions without any nuances and without any warnings" and that the claims against Lafarge "rest on the same legal basis." (Th. Decl. Ex. 1 at ¶1298-99; Ex. 2 at LAF0000739349.)

Lafarge also attempts to mischaracterize several other allegations regarding its 2005-06 conduct as seeking liability for mere negligence. (L. Reply 29-31.)  Those allegations include that (i) Lafarge and De Grosbois did not issue the De Grosbois Report quickly enough, (ii) did not warn Laurentide to stop using B&B Quarry aggregate quickly enough after the De Grosbois Report, and (iii) did not force Laurentide to follow the warning Lafarge provided based on the De Grosbois Report.  Lafarge's self-serving characterizations are meaningless and not supported by the record.  As the underlying complaints make clear, any liability for how the professional services were provided or whether Lafarge acted forcefully enough to implement its professional recommendations unquestionably arises out of the knowledge Lafarge gained from its work in

19

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

connection with the De Grosbois Report, an admittedly professional activity.[8] (SUMF ¶252-253.)
In any event, courts examine a complaint's allegations, not labels on causes of action, to assess
coverage. Premier Pet Prods., LLC v. Travelers Prop. Cas. Co. of Am., 678 F. Supp. 2d 409, 416
(E.D. Va. 2010) ("The nature of the policyholder's conduct trumps the form of the action
pleaded."). Thus, all alleged 2005-06 liability arises out of or is intertwined with the use of
Lafarge's and De Grosbois's special knowledge, training, and experience, and therefore remains
squarely within the Professional Services Exclusion. Bohreer, 475 F. Supp. 2d at 581-85; (SUMF
¶¶ 180, 181, 183, 191, 252-53, 272.)[9]

## II.    THE UMBRELLA POLICIES ARE GOVERNED BY VIRGINIA LAW.

With respect to insurance contracts, New York courts apply the law of the state understood
to be the location of the insured risk, holding that the law of the state of the insured's domicile
must be applied if the insured risk is located in multiple states. Lazard Freres & Co. v. Protective
Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997); Certain Underwriters at Lloyd's v. Foster
Wheeler Corp., 822 N.Y.S.2d 30, 37 (N.Y. App. Div. 2006). There is no dispute that LNA was
domiciled in Virginia. (SUMF ¶130.) Accordingly, Virginia law governs.

---

[8]In any event, Lafarge's focus on the allegation that it should have used its corporate interest to
force Laurentide to stop using B&B Quarry aggregate sooner is puzzling because it concedes that
the allegation is legally and factually baseless because "as a minority (30%) shareholder with only
one seat on Laurentide's board, LCI had no control to exercise." (L. Reply at 31.)

[9]Lafarge now concedes that the work for the De Grosbois Report and recommendation to stop using
B&B Quarry aggregate constitutes professional services. (L. Reply at 29-30.) Lafarge's
liability, if any, arising from concrete containing B&B Quarry aggregate poured after January 2006
arises out of or is inextricably intertwined with those services. The claims regarding the De
Grosbois Report's completeness, thoroughness, and timing, as well as any potential responsibility
to force Laurentide to cease using B&B Quarry aggregate, are all based upon the De Grosbois
Report. Thus, at the very least, the Member Companies are entitled to a declaration that coverage
for concrete poured after January 2006 is barred by the Professional Services Exclusion.

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

In the face of this reality, Lafarge argues that Quebec law should apply.  In so doing, Lafarge insists that because the "fronting" Primary Policies, the C&I Policy and the AIG Canada Umbrella Policy were issued to LCI in Quebec, the Court must apply Quebec law to this entire dispute.  They argue this even though those policies are not relevant to the outcome of this dispute under the Umbrella Policies.  Lafarge, however, provides no support for its request that only one law apply to multiple insurance policies.

Instead, Lafarge attempts to support this position based on inapposite authority providing that a single insurance policy should not be subject to the laws of multiple jurisdictions.  See, e.g., Maryland Cas. Co. v. Cont'l Cas. Co., 332 F. 3d 145, 152 (2d Cir. 2003) ("[T]he drafters of the Restatement did not intend for the courts to apply the laws of more than one state to a *single insurance policy*.") (emphasis added); Certain Underwriters at Lloyd's v. Foster Wheeler Corp., 822 N.Y.S.2d 30, 37 (N.Y. App. Div. 2006), aff'd, 9 N.Y.3d 928 (2007) (same).

Contrary to Lafarge's position, however, New York law does not require the Court to select one jurisdiction's law to govern all policies in this dispute.  Travelers Cas. & Sur. Co. v. Honeywell Int'l, Inc., 2007 N.Y. Misc. LEXIS 7758, *26-27 (N.Y. Sup. Ct. Oct. 2, 2007) (applying New Jersey law to policies issued to an insured with its principal place of business in New Jersey and New York law to an insured with its principal place of business in New York).

Lafarge's other argument – that Quebec law must apply because "the alleged tortious conduct was, and underlying litigation is, in Quebec" – is equally unsupported. (L. Reply at 6.) In all but one of the cases cited by Lafarge, the courts applied the law of the principal place of business of the named insured to whom the policy was issued.  (D. Br. at 40.)  Further, New York courts have repeatedly rejected the argument that the situs of the damage is relevant to the application of choice of law principles in multi-state coverage cases.  Maryland Cas. Co., 332 F.3d

21

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

at 155 ("[T]he interest of a state in which [the damage took place] diminishes when the question is not whether someone will or can pay for the [damage] but rather who will pay."); see also Appalachian Ins. Co. v. General Elec. Co., No. 122807-1996, 2008 N.Y. Misc. LEXIS 4460, at *19 (N.Y. Sup. Ct. 2008) (rejecting insured's "law of the site theory").

Finally, Lafarge's argument that the mere existence of the "fronting" Primary Policies, the C&I Policy, and AIG Canada Umbrella Policy impacts the choice of law applicable to the Umbrella Policies is incorrect. The Primary Policies "do not provide real risk transfer" and operate independently from the Umbrella Policies. (L. Reply at 6-7; SUMF ¶126-29, 136.) The C&I Policy's sole purpose was to accommodate Lafarge's emergency request to maintain specific projects in British Columbia that required evidence of insurance from an insurer licensed in Canada. (SUMF ¶133, 466) (admitting policy was "just a front to issue certificates in Canada"). The AIG Canada Umbrella Policy is inapplicable due to Lafarge's knowledge about the property damage at issue in the Trois-Rivières Litigation prior to inception of that policy. See, infra, pp. 33-35. Thus, these policies are irrelevant to the choice of law applicable to the Umbrella Policies.

Even if these policies were relevant, their existence does not require the Court to apply Quebec law to the Umbrella Policies that were indisputably issued and delivered to LNA in Virginia. At most, Quebec law, if properly and timely asserted,[10] would apply only to those

---

[10]Lafarge strains to explain why its assertion of Quebec law should be permitted. REDACTED

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

policies issued in Canada. Thus, Virginia law applies to the Umbrella Policies.[11]

### III. THE EXPECTED OR INTENDED EXCLUSION APPLIES REGARDLESS OF WHETHER LAFARGE WAS "CERTAIN" THAT PROPERTY DAMAGE WOULD OCCUR.

Contrary to Lafarge's assertions, courts exclude coverage under the "occurrence" requirement or expected or intended exclusion even where an insured lacks complete certainty regarding the consequences of its actions. See Hotel Roanoke Conf. Ctr. Comm'n v. Cincinnati Ins. Co., 119 Fed. App'x. 451, 454 (4th Cir. 2005) (holding where insured engaged in "deliberat[ive]" and "studied" conduct, any resulting liability was excluded as the damages were expected). Indeed, courts require only than that an insured reasonably anticipate the probable consequences of its actions to exclude coverage. AES Corp. v. Steadfast Ins. Co., 283 Va. 609, 617-618 (Va. 2012) ("An 'accident' is [] understood to mean an event which creates an effect which is not the natural or probable consequence of the means employed and is not intended, designed, or reasonably anticipated."). That is because an "occurrence" is a fortuitous accident; an expected injury is one in which the actor knew or should have reasonably anticipated particular consequences would result. (SUMF ¶¶142-47 (defining occurrence as "an accident" and excluding coverage for "Property Damage . . . expected or intended from the standpoint of the Insured."))

Where, as here, an insured engages in deliberative conduct it understands will lead to probable consequences – even if those consequences have not yet occurred – courts have found an absence of an occurrence and/or barred coverage. For instance, in Hotel Roanoke, the court examined whether a hotel's claim for lost revenue and other expenses incurred during the months the attached conference center was closed for repairs was covered under the center's policies. 119

---

[11]Regardless, as discussed above, pp. 11-14, supra, even under Quebec law, all of the claims in the Trois-Rivières Litigation are barred under the Umbrella Policies' Professional Services Exclusion. This case should be dismissed on that basis.

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Fed. App'x. at 454.  The Fourth Circuit concluded that the insured's conduct that gave rise to liability to the hotel was the "result of a careful, studied decision to close the [] [c]enter and proceed with repairs in a deliberately chosen manner, which "necessarily would diminish the [hotel's] revenues."  Id.  The court reached its determination even though no diminished revenue had yet actually resulted at the time the decision was made to close the center.  Id.  The panel thus held that the center's claim for reimbursement for the hotel's lost revenue and expenses was not covered because it neither was an occurrence nor an unexpected event from the center's standpoint.  Id.

In Hartford Mut. Ins. Co. v. Grimm, the court examined whether a claim against the insured for malicious prosecution was a covered occurrence when it was alleged that the insured improperly "swore out a warrant" that lead to a kidnapping charge against another individual.  17 Va. Cir. 543, 546 (Va. Cir. Ct 1980).  Even though the claim did not assert that the insured supported the warrant with actual malice, the court found that "[t]here c[ould] be no serious contention that [the insured] did not expect or intend the consequences when she swore out the warrant" because it was alleged that the embarrassment caused by the charge was "foreseeable," demonstrating that the conduct was "therefore both expected and intended from the standpoint of [the insured]."  Id. at 547; see also Carova Corp. v. U.S. Fid. & Guar. Co., 12 Fed. Appx. 99, 101 (4th Cir. 2001) (excluding coverage for lawsuit by property owner against insured, who operated a dump on adjacent property, for damage caused by failure to prevent trash from blowing onto property because insured could expect such consequences).

**REDACTED**

24

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Beginning in March 2006, Lafarge advised Laurentide to stop using aggregates from B&B Quarry in concrete, stating that "alleged cases of defective concrete manufactured with aggregates from the Maskimo Quarry incite us to believe . . . that it is in the interest of the Company and its shareholders to immediately stop using the aggregates from B&B Quarry in its concrete mixes." (SUMF ¶213.) This warning arose out of the De Grosbois Report, which concluded that the B&B Quarry aggregates contained 4.8% total sulfide quantities, *1% more than was found in Maskimo Quarry aggregate.* (SUMF ¶321.) REDACTED

De Grosbois also testified that she reviewed Bérubé's report that concluded the pyrrhotite in aggregate was a possible cause of concrete deterioration. (SUMF ¶469.) Further, Lafarge, by attending the September 2005 Laurentide board meeting, knew that claims related to damage from pyrrhotite in Maskimo Quarry aggregate were settled by Laurentide. (SUMF ¶474.)

REDACTED

Perreault also testified that after the De Grosbois Report there were "watercooler discussions" among Lafarge employees that "the two types of aggregate [(B&B Quarry and

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Maskimo Quarry)] were similar" and that Lafarge may "make a recommendation to stop using the stone." (SUMF ¶471.) REDACTED

Lafarge cannot credibly assert that it did not have knowledge that pyrrhotite in aggregate would lead to concrete deterioration and thus property damage or that it did not reasonably anticipate that concrete deterioration would occur from use of B&B Quarry aggregate. (SUMF ¶¶211-13.) Instead, it attempts to distort the proper analysis as requiring certainty of the consequences of its actions and to diminish its conduct to the point of a mere fortuitous accident through blanket denials that it lacked knowledge or expectation. This attempt cannot create a genuine dispute of fact. Lyons v. Lancer Ins. Co., 681 F.3d 50, 56-57 (2d Cir. 2012) (summary judgment appropriate where "party's proffered evidence is merely colorable or is not significantly probative"); F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses do not create genuine issues of material fact."). Accordingly, the Member Companies are entitled to a declaration that there is no coverage for the Trois-Rivières Litigation under any Umbrella Policy[12] issued after March 2006.[13]

---

[12] Based on the "occurrence" requirement in the Primary Policies, these arguments apply with equal force to all Primary Policies issued after March 2006.

[13] This conclusion would be the same under Quebec law. No Canadian case referenced by Lafarge alters the First-Wave Judgment's holding that coverage was void under policies issued after their insureds received a recommendation that they stop using B&B Quarry aggregate because those insureds failed to provide that information to their insurers. (SUMF ¶335.)

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

## IV.    ONLY ONE UMBRELLA POLICY CAN APPLY TO EACH UNDERLYING CLAIM.

**REDACTED**

[14] Even though Lafarge and the Member Companies disagree on what this Court should declare, both agree that the issue of which Umbrella Policies *are potentially triggered* is currently ripe for declaratory relief. **REDACTED**

. This potential *trigger* declaration, however, is distinct from Lafarge's requested declaratory relief with respect to *allocation*.  Allocation requires a determination regarding the number of occurrences in order to ascertain whether the Retained Limit(s) – which apply on a "per occurrence" basis – have been satisfied such that coverage is *attached* for the purposes of allocation.  For the reasons discussed below, while the *trigger* declaration is ripe, Lafarge is not presently entitled to its requested relief regarding *allocation*.

### A.    Under Provisions C(1) And C(2), Only One Umbrella Policy Can Apply To Each Underlying Claim.

There is no "gap in [the Member Companies'] reasoning" regarding the deemer provisions of C(1) and C(2).  (L. Reply at 14).  While C(1) would preclude coverage entirely under *any* Umbrella Policies for the continuing damages at issue if Lafarge had knowledge that such injury had occurred in whole or part prior to the inception of the Umbrella Policies, the plain terms of

---

[14] While the Member Companies dispute Lafarge's claims for coverage under the C&I Policy and the AIG Canada Umbrella Policy for the reasons discussed in Section II, Lafarge has admitted that the policy language is, in all relevant respects, identical between the Umbrella Policies and those policies.  Therefore, the Member Companies are entitled to the requested relief under those policies if they are determined to be relevant.

27

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

C(2) apply regardless of whether Lafarge becomes aware of the injury *during or after* the policy

period.  Section C(2) provides:

> Property Damage which occurs during the Policy Period and was not, prior to the
> Policy Period, known to have occurred by [certain specified parties], includes any
> continuation, change or resumption of that . . . Property Damage after the end of
> the Policy Period.  (SUMF ¶143.)

Contrary to Lafarge's assertion, nothing about C(2) limits its application to those instances where

the insured learns of such damages *during* the policy period.   Pursuant to this unambiguous

language, continuing damage that takes place after the policy period is deemed to occur "during

the policy period" of the policy in which it is first covered.  This is necessary to provide coverage

for such damages because by their express terms each Umbrella Policy applies "only if: the []

Property Damage occurs *during the Policy Period*."   (SUMF ¶142) (emphasis added.)   Read

together, these clauses establish that coverage for both unknown property damage that takes place

during one of the effective periods of the Umbrella Policies *and* any continuation of that property

damage, is limited to the first Umbrella Policy in which such property damage takes place.

To escape the result dictated by the plain language of these Insuring Agreement provisions,

Lafarge would have to establish that the exact same damages "deemed" to occur during one

Umbrella Policy can also constitute damages that "occur during the policy period" of subsequent

Umbrella Policies.  It is patently clear that the *exact same* damages cannot occur during more than

one policy period of the successive policies at issue.

Tellingly, in opposition, Lafarge offers neither analysis of these Insuring Agreement terms

nor anything other than self-serving statements.  For example, Lafarge asserts that its contrary

position "is based on widely recognized principles of insurance law." (L. Reply at 9.)  Yet, review

of the referenced page shows that the only offered authority for Lafarge's purported "widely

recognized principles" is the First-Wave Judgment, <u>Deguise v. Montiminy</u>, 2014 QCCS 2672, at

28

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

¶¶ 1917-1934).” (L. Br. at 15.)  Lafarge's claim of wide recognition is hard to square, however, with its reluctant admission only a page later that “Quebec courts *have not addressed the allocation of multi-year loses under multiple policies containing the language of Paragraph C.2* of the Lafarge Umbrella Policies.” (L. Reply at 16) (emphasis added.)

Lafarge also incorrectly claims that “there is no support for AIG's 'one triggered policy rule' either in the [p]olicy language or case law.” (L. Reply at 13.)  As set forth above, the Member Companies' position is established by the Insuring Agreement's plain terms, and it is Lafarge's reasoning that suffers from an illogical gap by requiring the same exact damage to occur at two different times.

The Member Companies position is also supported by relevant case law that Lafarge fails to distinguish.  In <u>Penn. Nat'l Mut. Cas. Ins. Co. v. St. John</u>, 106 A.3d 1, 21 (Pa. 2014), the Pennsylvania Supreme Court addressed the exact question before this Court:

> Does the “multiple trigger” theory of liability insurance coverage . . . apply to cases presenting continuous, progressive “property damage,” *so that all policies on the risk from exposure to the harmful condition through “manifestation” of the injury are triggered?*

<u>Id.</u> at 10.  The court recognized that “[i]f, as Appellants argue, a single 'occurrence' could trigger coverage under multiple policy periods based on continuous, progressive bodily injury or property damage, then [the language in C(2)] would be rendered largely irrelevant.” <u>Id.</u> at 21. ▮REDACTED

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

**REDACTED**.  The only cited case to address *that issue* is <u>St. John</u>, and it found – as the Court should here – in favor of the relief sought by the Member Companies.

**B.    The Provisions of C(2) Preclude Lafarge's Relief On Allocation.**

**REDACTED**

**REDACTED**.  This is so because the Retained Limit(s), which Lafarge recognizes must be satisfied before coverage under any Umbrella Policy attaches, apply on a per occurrence basis and the number of occurrences at issue cannot currently be determined.

**i.    Lafarge Must Satisfy A Separate Retained Limit In Each Triggered Policy Period.**

Each Umbrella Policy specifies that the insurer "will not make any payment under this policy unless and until the total applicable **Retained Limit(s)** . . . have been exhausted by the payment of Loss to which this policy applies."  (L. Br. at 30.)  There is no dispute that such Retained Limit(s) apply on a "per occurrence" basis.  (SUMF ¶138.)  This language establishes that, regardless of the number of occurrences at issue, Lafarge must satisfy *separate* Retained Limit(s) before coverage attaches *under each* individual Umbrella Policy.  Lafarge, however, asserts that this is not the case because "the telescoping loss provision of C.2 of the insuring agreements is to the contrary."  (L. Reply at 17.)  Although it is less than clear, Lafarge appears to base its position on the same misapplication of the language of C(2) that purportedly allows it to trigger multiple Umbrella Policy years for the same underlying claim.  Just as it believes it can use the *exact same damages* (<u>i.e.</u> continuation of damages after the policy period under which they are first covered) to trigger coverage under multiple Umbrella Policies, Lafarge asserts that it gets to use the *exact same dollars* to satisfy the Retained Limit(s) under multiple Umbrella Policies.

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Unsurprisingly, the culmination of Lafarge's positions allow it to have the best of all worlds – being permitted to stack the limits of liability under multiple years of Umbrella Policies without having to separately satisfy multiple C$2 million Retained Limit(s).   As established above, however, Lafarge's interpretation of C(2) finds no support under the policy language or in case law.   For the same reasons discussed in Section IV.A., Lafarge's attempt to use that language to justify its extraordinary assertion that it can use dollars required to satisfy Retained Limit(s) in one policy period to satisfy the applicable Retained Limit(s) in another policy period fails.[15]

> ### ii.     Lafarge Cannot Establish Satisfaction Of The Retained Limits Because The Number Of Occurrences At Issue Cannot Yet Be Determined.

While Lafarge accuses the Member Companies of "neither providing [their] analysis of the number of occurrences, nor attempt[ing] to prove that the underlying claims constitute more than one occurrence" (L. Reply at 9), its accusation is incorrect.   The Member Companies' position on the number of occurrences could not be clearer.   As previously stated, a determination of the number of covered occurrences must await resolution of the Trois-Rivières Litigation.   For this reason, the Member Companies can have no obligation to "prove" that the underlying claims constitute more than one occurrence.

The Member Companies' recognition that Travelers du Canada found a single occurrence where multiple cars were damaged on a single day does not support Lafarge's extraordinary claim here.   Far from addressing the number of occurrences in the context of damages taking place over a single day, the instant matter involves damages caused by specifically identified instances of Lafarge's alleged professional conduct (many of which Lafarge denies) over a period of years.   It is these multiple events that form the basis of Lafarge's alleged liability in connection with

---

[15]Lafarge's position, if credited, would result in allowing it to access insurance coverage of up to $450 million by expending little more than CD$2 million.   This interpretation must be rejected because its results are plainly unreasonable.

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

hundreds of claims involving structures that were built over more than a decade. Try as it might to blur this reality, none of the cases relied upon by Lafarge supports its claim that the number of occurrences determination is presently ripe for adjudication.

The single occurrence finding in <u>Chemstar, Inc. v. Liberty Mut. Ins. Co.</u>, 41 F.3d 429 (9th Cir. 1994) was based on the court's finding that "no intervening business decisions occurred between Chemstar's failure to warn and the pitting." <u>Id.</u> at 433. Likewise, in <u>Associated Indem. Corp. v. Dow Chem. Co.</u>, 814 F. Supp. 613 (E.D. Mich. 1993) it was based on the fact that claims "were asserted against the [insured] because the basis for its liability was that it made, sold and delivered" the defective resin. <u>Id.</u> at 623; <u>see also</u> <u>Early v. State Farm Auto Ins. Co.</u>, 73 Va. Cir. 400, 405 (Va. Cir. Ct. 2007) (basing holding on the stipulated short period between the two car accidents at issue, the fact that the accidents occurred in the same location, and that the hazard "existed in an unbroken, uninterrupted continuum until the second collision occurred").

The facts at issue in these cases could not be more dissimilar from those presented here. Lafarge provided no warning about the use of B&B aggregate following the technical services it provided in 2002, but did provide a warning to stop using the stone in 2006. REDACTED

████████████████████████████████████████████

████████████████████████████████████████ Unlike the insured in <u>Dow</u>, Lafarge did not make, sell, or deliver the B&B Quarry aggregate. Finally, unlike <u>Early</u>, the time between the hundreds of incidents of property damage at issue spans multiple years; the properties at issue are geographically dispersed; and Lafarge's conduct (to the extent it is anything more than excluded professional services) cannot be said to amount to an "unbroken, uninterrupted continuum" because Lafarge itself attempts to distinguish between its purportedly non-professional conduct in 2002 and its now admitted professional services in 2005.

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

Finally, in a desperate attempt to resurrect its entirely misplaced reliance on <u>Dragas Mgmt.</u> <u>Corp. v. Hanover Ins. Co.</u>, 798 F. Supp. 2d 758 (E.D. Va. 2011), Lafarge resorts to misrepresenting quoted sections of the court's recitation of an entirely different case as the court's *holding*.  (L. Reply at 10.)  Far from *holding* that "'distribution of defective goods . . . was only one occurrence' because the distributor took 'no distinct action giving rise to liability for each sale,'" the quoted language appears in the section of the court's opinion summarizing the arguments offered by certain of the litigants.  <u>Id.</u> at 763.  The court went on to *reject* applicability of the case quoted because "there the insured in question only distributed the defective product; it did not install or otherwise involve itself with the product post-distribution."  <u>Id.</u>  The same cannot be said of Lafarge's conduct.  Although Lafarge attempts to characterize its alleged conduct as "LCI's continuous failure to stop the use of B&B aggregate in concrete," Lafarge itself identified *five independent bases* on which it is alleged to be liable.  (L. Br. at 20 n. 20.)  While <u>Dragas</u> rejected reliance on the case Lafarge quoted, it approvingly quoted the following statement from <u>Lennar</u> <u>Corp. v. Great Am. Ins. Co.</u>, 200 S.W. 3d 651 (Tex. App. 2006) as the correct application of the cause test: "Under the 'cause' analysis, the proper focus in interpreting 'occurrence' under a liability policy is on the number of events that cause the injuries and give rise to the insured's liability."  <u>Id.</u> at 682.  Because the ultimate source of Lafarge's liability, if any, has not yet been determined and because Lafarge has pointed to *no authority* finding a single occurrence under similar facts, the number of occurrences at issue cannot yet be determined.

## V.   C(1)'S UNAMBIGUOUS LANGUAGE PROHIBITS COVERAGE UNDER THE 2011 UMBRELLA POLICIES.

**REDACTED**

(SUMF ¶143).  Lafarge attempts to evade this inquiry without confronting

33

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

application of the actual terms contained in C(1) to the uncontroverted facts. In fact, Lafarge's opposition amounts to nothing more than its attempt to read into C(1) a requirement that it become aware of *claims asserted against it*. C(1)'s plain terms, however, establish that the only knowledge necessary is Lafarge's knowledge that the property damage at issue in the Trois-Rivières Litigation "*had occurred in whole or in part*." (SUMF ¶143.)

Lafarge unquestionably had knowledge that property damage arising out of concrete deterioration caused by B&B Quarry aggregate "had occurred in whole or in part" by May 18, 2011. By this date Lafarge's risk manager – John Shelonko – was aware that various Lafarge employees had received subpoenas in connection with the Trois-Rivières Litigation. (SUMF ¶327). His knowledge of the litigation unquestionably establishes Lafarge's knowledge that property damage arising out of concrete deterioration caused by B&B Quarry aggregate "had occurred in whole or in part." (SUMF ¶143.)

This knowledge establishes the Member Companies' requested relief based on the application of C(1). Contrary to Lafarge's assertion, it can point to no language in C(1) requiring that Lafarge must know that someone seeks to hold it liable for the property damage at issue. Finally, Lafarge's argument that it needed to be aware of damage "to specific properties" is unsupported. Lafarge again attempts to read terms into the Umbrella Policies that are not there. Property damage is defined, in relevant part as "physical injury to tangible property," not physical injury to specific pieces of tangible property. (SUMF ¶144). Again, Lafarge cannot deny that as of May 18, 2011 it was aware of the claimed damages at issue in the Trois-Rivières Litigation.

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

Therefore, the Member Companies are entitled to a declaration that coverage under the 2011

Umbrella Policies is not available.[16]

## VI.    NEITHER THE UMBRELLA POLICIES, NOR THE CANADIAN UMBRELLA POLICIES, COVER DEFENSE COSTS INCURRED BEFORE TRIGGER.

Lafarge concedes that its claim regarding pre-trigger defense costs finds no support under

Virginia law.  (L. Reply at 19) ("Although Virginia law may not recognize the equity of allocating

defense costs as between primary and umbrella insurers . . ., Quebec law, which governs this case,

does.").  Also, because Lafarge made absolutely no attempt to respond to the argument that no

claim regarding defense expenses is properly part of this coverage action, it concedes that the

Member Companies are entitled to summary judgment on this point.

Were this Court to set these dispositive points aside, Lafarge's entitlement to allocate pre-

trigger defense expenses fairs no better under Quebec law.  Lafarge argues that the inability to

seek reimbursement for defense costs incurred prior to trigger is inequitable because "LCI's

defense has benefited all of the insurers" and if that defense is successful, liability would have

vanished "without a dime having been paid under those policies."  (L. Reply at 18.)  There is no

inequity in this result because that is exactly how the policies operate.  (L. Br. at 30, 34).

Lafarge's reliance on La prevoyance, compagnie d'assurance v. La Commission scolaire

catholique de Montreal, 1190 N AZ-9000011211, at 4 (Can. Que. C.A.) is misplaced.  This Court

---

[16] Questions regarding exactly when Lafarge first became aware of concrete deterioration caused by B&B Quarry aggregate also prevents Lafarge from securing the relief it seeks.  Lafarge's long running knowledge of the property damage at issue is at the heart of the allegations against it in the Trois-Rivières Litigation.  For example, the underlying claims allege that "between 2001 and 2009 several representatives from Lafarge . . . participated in all of the discussions regarding the use of the aggregates from B&B Quarry" and that "Lafarge representatives and employees had substantial knowledge of the issue." (Th. Decl. Ex 2 at 18; SUMF ¶252, at 59.)  Lafarge itself has also made representations regarding when the property damage at issue began, placing that date in 2008 or 2009.  (L. Br. at 3.)  Because the underlying claimants have asserted, and may develop, facts establishing Lafarge's knowledge of the damages at issue well before May 18, 2011, declaratory relief in Lafarge's favor on any Umbrella Policies after 2009 is inappropriate.

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

need look no further than the language Lafarge excerpted to determine that the case is inapposite. The portion quoted by Lafarge states that "an insurer may not 'exempt itself from paying costs, or from recovering them, *where the claim is included within its coverage*." (L. Reply at 19) (emphasis added.) There is no dispute that neither the Umbrella Policies, nor the Canadian Umbrella Policies, provide coverage *until* Lafarge's payment of C$2 million in loss per occurrence. Because no claims "fall within" the coverage provided by those policies until the self-insured retention is satisfied, La prevoyance is inapplicable.

Finally, Lafarge cannot distinguish Can. Nat'l Ry. Co. v. Chartis Ins. Co. of Can., 2013 QCCA 1271, (Can. Que. C.A.), because it addresses the precise issue presented here – i.e. whether, under Quebec law, an insurer whose policies are subject to satisfaction of a retained limit could have any obligation to reimburse defense costs that were incurred prior to the satisfaction of that amount. The court found an insurer that provides coverage only after satisfaction of an SIR could not owe reimbursement for such costs, stating:

> It must therefore be remembered that the insurance policy with [AIG] becomes applicable only when CN or a primary insurance carrier[] has paid the sum of $5,000,000 [] to third parties. *Prior to that there is neither protection nor obligation to defend* in accordance with art. 2503 C.c.Q.

(emphasis added). Like the policy in CN, and as Lafarge has recognized, neither the Umbrella Policies, nor the Canadian Umbrella Policies, are triggered until Lafarge has paid at least C$2M in "loss" to which such policies apply. While Lafarge attempts to distinguish CN based on its assertion that CN involved "only a self-insured retention and a single (excess) layer of coverage" (L. Reply at 19), the CN court expressly recognized that the policy at issue was applicable when "CN *or a primary insurance carrier*[] had paid the [Retained Limit]." Lafarge's distinction is a distinction without a difference. Thus, even if Quebec law applied, this Court can declare that

36

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

neither the Umbrella Policies, nor the Canadian Umbrella Policies, cover defense expenses incurred prior to the satisfaction of the Retained Limit(s).

**VII.** REDACTED

Lafarge does not dispute that the Professional Services Exclusion is unambiguous. (SUMF ¶¶ 148, 328, 475; L. Br. 47-49.) Because Dr. Thomas's custom and practice opinions cannot properly inform the Court's interpretation of this unambiguous provision, the Court should grant the Member Companies' Motion to Strike. (L. Br. at 45-46); see also Schneider v. Cont'l Cas. Co., 989 F.2d 728 (4th Cir. 1993).

Lafarge ignores well-settled Virginia law in claiming that Dr. Thomas's custom and practice opinions can be admitted to "help the Court assess whether LCI provided professional services in the relevant industry during the relevant period," even though the Professional Services exclusion is unambiguous. (L. Reply at 39.) In Schneider, the Fourth Circuit held under Virginia law that the district court improperly admitted custom and practice expert testimony on the issue of whether an unambiguous exclusion provision in an insurance policy barred coverage. See 989 F.2d at 730. In doing so, the Schneider court explained the basic Virginia law principles that require excluding Dr. Thomas's opinions here:

> If the text of the agreement is unambiguous, then the court is without authority to resort to extrinsic evidence in interpreting its meaning. The district court essentially stood this basic contract principle on its head, considering the appellees' extrinsic evidence when it believed the language of the contract to be unambiguous and rejecting the appellant's argument because it was based solely on the plain language of the contract and was unsupported by extrinsic evidence. Not only does the party whose argument is supported by the plain language of the contract need no additional support, that party is under no obligation to rebut contrary extrinsic evidence in order to sustain its claim.

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

Id. at 732; see also Sparta, Inc. v. DTC Communs., Inc., No. No. 1:16-cv-01079, 2017 U.S. Dist. LEXIS 99354, at *8 (E.D. Va. June 26, 2017) ("[H]aving found that the contract is unambiguous . . . the Court will not consider any extrinsic evidence of the contracting parties' intent.").

Lafarge did not cite any cases applying Virginia law that support admission of Dr. Thomas's custom and practice opinions. Tellingly, in both cases that Lafarge relies on, Marx & Co. v. Diners' Club, Inc., 550 F.2d 505 (2d Cir. 1977) and Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33 (S.D.N.Y. 2016), the courts held that experts had improperly exceeded the bounds of permissible testimony by offering opinions on legal conclusions—another fatal flaw with Dr. Thomas's opinions.[17] Neither case supports Lafarge's claim that the Court can properly consider the extrinsic evidence of Dr. Thomas's custom and practice opinions when it is undisputed that the Professional Services Exclusion is unambiguous.[18]

As explained above, the Professional Services Exclusion bars coverage under the Umbrella Policies as a matter of law. REDACTED

REDACTED

---

[18]Neither Marx nor Scott involved application of Virginia law or the issue of whether extrinsic evidence should be permitted to inform an interpretation of an unambiguous policy provision.

38

CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER

## VIII.   DAVID AHEARN'S AND JOSEPH MONTELEONE'S EXPERT OPINIONS ARE ADMISSIBLE.

This Court should strike all expert opinions in this case because the Umbrella Policies are unambiguous.  But if the Court determines that Dr. Thomas's custom and practice opinions are admissible, Mr. Ahearn and Mr. Monteleone's rebuttal opinions should be admitted too.

Lafarge ignores several key points made by the Member Companies that are fatal to Lafarge's claim that Mr. Ahearn's and Monteleone's expert reports were untimely.  First, Lafarge failed to even address the Member Companies' point that the express terms of the Scheduling Order gave the Member Companies until May 3, 2017 to disclose its rebuttal reports because Lafarge provided Dr. Thomas's report as support for its claims.  Second, because the Member Companies did not "intend" as of March 20, 2017 "to offer expert testimony" in this case, the express terms of the Scheduling Order provide that they were not required to disclose Mr. Ahearn or Mr. Monteleone by that date; Lafarge's claim that this language from the Scheduling Order is "irrelevant" is baseless.  Third, Lafarge's argument against waiver ignores that the Member Companies spent significant time and resources completing their expert reports after Lafarge became aware that rebuttal reports were being prepared and expressed no objection.  Last, Lafarge does not mention that it was afforded an opportunity to submit rebuttal reports to the Member Companies' expert reports, and it chose not to do so.  Lafarge experienced no prejudice that warrants striking Mr. Ahearn's and Mr. Monteleone's expert reports.

## CONCLUSION

For these reasons, the Member Companies respectfully request that the Court enter judgment that the Umbrella Policies' Professional Services Exclusion bars coverage for the Trois-Rivières Litigation. This dispositive issue resolves the entire matter.  To the extent this Court finds it necessary to even consider the Member Companies' additional arguments, they request

39

**CONFIDENTIAL – SERVICE COPY SUBJECT TO PROTECTIVE ORDER**

declarations that (1) there is no insurance coverage available after March 2006; (2) REDACTED damages to a single property cannot trigger coverage under more than one Umbrella Policy; and (3) there is no obligation to pay defense expenses incurred prior to triggering the Umbrella Policies.

REDACTED

Dated: September 1, 2017

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

By: /s/ Mark D. Sheridan

Mark D. Sheridan
mark.sheridan@squirepb.com
Squire Patton Boggs (US) LLP
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: 973-848-5600

Attorneys for Defendant American Home
Assurance Company, AIG Insurance
Company of Canada, and Lexington
Insurance Company