UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/31/2018

LAFARGE CANADA INC. AND
LAFARGE NORTH AMERICA, INC.,

Plaintiffs,

v.

AMERICAN HOME ASSURANCE
COMPANY, AIG INSURANCE COMPANY
OF CANADA, and LEXINGTON
INSURANCE COMPANY,

Defendants.

No. 15-CV-8957 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs Lafarge Canada Inc. ("LCI") and Lafarge North America, Inc. ("LNA") (collectively, "Lafarge") bring this declaratory-judgment action against their insurers (collectively, the "Insurers"). Lafarge is Canada's largest provider of construction materials, and it filed this action seeking declaratory relief with respect to the Insurers' duty to defend and indemnify it against potential liability from a mass tort litigation currently pending in Quebec, Canada. Lafarge and the Insurers have now both moved for summary judgment, each asking for declarations regarding the Insurers' duties towards Lafarge. After reviewing the parties' submissions and the other filings in the case, the Court finds certain disputes to be unripe, declines to exercise its discretionary Declaratory Judgment Act ("DJA") jurisdiction as to the others at this time, and stays this case pending further developments in the underlying litigation.

# BACKGROUND[1]

The facts underlying this action are complex and ongoing, and they began, and will eventually end, in the Canadian province of Quebec. A large group of Canadian plaintiffs brought suit against parties they allege were responsible for significant property damage to their homes. This damage eventually prompted approximately 240 lawsuits that became the ongoing Canadian mass tort litigation ("the Canadian litigation" or "the underlying litigation"). Specifically, the Canadian plaintiffs allege that concentrations of a mineral called pyrrhotite caused defects in the concrete used to build their homes, which in turn led to cracking and other serious damage. The parties in the underlying litigation later came to the consensus that oxidation of the pyrrhotite spurred the concrete's deterioration.

The defendants in the Canadian litigation included entities such as B&B Quarry (the alleged source of the pyrrhotite), SNC-Lavalin (a construction company), and other participants in the construction of the damaged homes. In 2012, a Quebec court consolidated roughly 70 of the lawsuits into a so-called "First Wave." None of those suits named Lafarge—a company that primarily manufactures and distributes cement and other construction materials—as a defendant, and an attempt to insert Lafarge's Canadian business, LCI, into the First Wave was unsuccessful. In other words, Lafarge is not a party to the First Wave of the Canadian litigation. In 2014, the Quebec court issued an approximately $130 million judgment against the First-Wave defendants, holding them jointly and severally liable. The Quebec court found SNC-Lavalin liable for about 70% of the damages. All the First-Wave defendants have appealed the judgment.

In 2012, well before the Quebec trial court rendered that First-Wave judgment, SNC-Lavalin and one of its geologists separately sued LCI for contribution for some of its First-Wave

---

[1] Although many facts are in dispute, those contained herein are undisputed unless otherwise noted. *See* Dkts. 66, 73, 76, 86.

liability. Shortly after the First-Wave judgment, SNC-Lavalin expanded its claims in that suit, seeking to hold LCI liable for contribution for the First-Wave claims not raised in its earlier contribution action. All the contribution claims are still pending in the Quebec court, and the First-Wave judgment remains on appeal.

Unfinished as those proceedings may be, they constitute only (as their name suggests) the first wave of lawsuits with claims relating to defective concrete in the Canadian litigation. A Quebec court is currently in the preliminary stages of consolidating the remaining lawsuits relating to the damages allegedly caused by pyrrhotite, as well as other related lawsuits that continue to be filed, into a "Second Wave." A number of the Second-Wave suits have named Lafarge as a defendant or third-party defendant. The plaintiffs in those suits contend that LCI wrongly informed one of the concrete-supplier defendants that the material containing pyrrhotite was suitable for use in concrete, that LCI failed to warn about the dangers posed by the materials, and that LCI failed to prevent the use of the materials. LCI denies all liability relating to any claims in the Canadian litigation and has not been found liable or entered into any settlement. The Quebec court has yet to set a trial date for the Second Wave.

Lafarge's North American entity, LNA, is headquartered in Virginia and is the parent company of LCI, which is headquartered in Quebec. LCI took out a number of different types of insurance policies from 2001 to 2012 from the Insurers, which include Defendants Lexington Insurance Company ("Lexington"), American Home Assurance Company (American Home"), and AIG Insurance Company of Canada ("AIG Canada"). From April 1, 2001, to July 1, 2012, twelve consecutive "primary policies" issued by American Home and AIG Canada to LCI covered property-damage liability, applied to the first dollar of loss, and provided that the insurer would defend any suit against the insured that alleged covered damage. Notably, however, these policies

were not true insurance policies, because they provided for no real transfer of risk from insured to insurer. Lafarge affiliates will reimburse American Home or AIG Canada for whatever costs those insurers are prompted to pay. The parties represent that this practice, known as "fronting," is common in commercial insurance and was used here to satisfy Canadian statutory obligations.

LCI also had genuine insurance coverage. From 2004 to 2012, LCI was provided umbrella general liability coverage by Lexington, which issued nine policies to LNA (in Virginia), and by AIG Canada, which issued two policies to LCI (in Quebec) (collectively the "umbrella policies"). Because LCI is a wholly-owned subsidiary of LNA, it is a named insured party in all 11 of the umbrella policies. The two policies issued directly to LCI were for the periods from April 1, 2004, to April 1, 2005, and from July 1, 2011, to July 1, 2012. For those periods, LCI was insured both under the policies issued to it directly and under the policies issued to LNA. The umbrella policies cover property damage, but only kick in when LCI pays more than C$2 million per occurrence for the type of loss—not counting defense costs—covered by the policies.[2] That sum, C$2 million, is what is known as the "retained limit" of the policies. This retained limit functions, as Lafarge puts it, essentially as an insurance deductible.

American Home and AIG Canada are currently providing a defense to LCI in the Canadian litigation under the primary policies, even while they have been reserving their rights to argue that they are not obligated to do so. When Lafarge asked the Insurers to confirm that the umbrella policies covered LCI's potential liability in the Canadian litigation, the Insurers declined to provide such confirmation.

On November 16, 2015, Lafarge filed this action seeking declaratory relief. Specifically, Lafarge's complaint seeks declarations (1) that the umbrella policies cover LCI's potential

---

[2] Canadian dollar amounts are represented by "C$" preceding the number.

4

liabilities relating to the Canadian litigation; and (2) that, if LCI is liable at all in the Canadian litigation, its liability constitutes a single occurrence. The Insurers answered, alleging a variety of defenses. *See* Dkt. 23.

After discovery, both Lafarge and the Insurers moved for summary judgment as to declaratory relief and, at the Court's request, filed supplemental briefing in support of their motions. Lafarge argues that Quebec law applies to interpreting all the insurance policies at issue, and that the Insurers owe it a duty to defend and to indemnify it in the Canadian litigation. Relating specifically to indemnification, Lafarge further contends that the claims against it in the Canadian litigation constitute only one occurrence, that it is entitled to coverage for each claim under each triggered policy, and that it is entitled to allocate defense costs between the primary and umbrella policies. The Insurers oppose Lafarge's requested declarations and seek a number of their own. They argue that Virginia law applies to the umbrella policies issued there and that they have no duty to defend or indemnify Lafarge because a "professional services exclusion" in the policies bars all coverage. Alternatively, they argue that the exclusion for "expected or intended damage" bars most coverage, that only one umbrella policy can apply to each underlying claim, and that the umbrella policies do not cover any defense costs that Lafarge incurs before Lafarge's liability reaches the retained limit and thereby triggers the umbrella policies. The Insurers also argue that the bulk of the relief requested by Lafarge would constitute an advisory opinion ruling on matters not yet ripe for declaratory judgment because of the ongoing and unsettled state of the Canadian litigation.

At the heart of this dispute is the interpretation and interaction of the primary and umbrella policies: Lafarge seeks confirmation that it will be protected by more than just the primary policies' fronting arrangement—it wants the benefit of the genuine economic-risk transfer of the umbrella

policies. The Insurers want just the opposite.[3] Given the state of the underlying Canadian litigation, this Court must confront whether this case presents any ripe disputes and, if so, whether the Court should exercise its discretionary DJA jurisdiction over those disputes. Only then can the Court turn to the substance underlying the parties' summary-judgment motions.

## LEGAL STANDARDS

### I.    Summary Judgment

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, "a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Abrams v. RSUI Indemnity Co.*, 272 F. Supp. 3d 636, 639 (S.D.N.Y. 2017). The relevant substantive law will identify which facts are material. *Id.* "When both sides have moved for summary judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (internal quotation and citation omitted).

### II.    Declaratory-Judgment Actions

#### A.    Ripeness

Jurisdiction for declaratory-judgment actions "exists only if there is an 'actual controversy.'" *E.R. Squibb & Sons, Inc. v. Lloyd's & Companies*, 241 F.3d 154, 177 (2d Cir. 2001) (quoting 28 U.S.C. § 2201(a)). This requirement is coextensive with the Constitution's Article III case or controversy standard. *See id.*; *U.S. Dep't of Treasury v. Official Comm. of Unsecured*

---

[3] The parties also dispute the admissibility of certain witnesses' testimony. Because the Court does not exercise jurisdiction at this time, it need not reach the issues related to those witnesses.

*Creditors of Motors Liquidation Co.*, 475 B.R. 347, 357 (S.D.N.Y. 2012). "A party seeking a declaratory judgment bears the burden of proving that the district court has jurisdiction." *E.R. Squibb & Sons, Inc.*, 241 F.3d at 177. "It is well-settled that the party bearing this burden must prove that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Fed. Ins. Co. v. SafeNet, Inc.*, 758 F. Supp. 2d 251, 261 (S.D.N.Y. 2010) (quoting *SR Int'l Bus. Ins. Co., Ltd. v. Allianz Ins. Co.*, 343 F. App'x 629, 631–32 (2d Cir. 2009)).

"In the context of an insurance dispute, a declaratory judgment action may be ripe even if the insured has not yet incurred any liability." *Id.* at 262. "That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action. . . . Indeed, litigation over insurance coverage has become the paradigm for asserting jurisdiction despite future contingencies that will determine whether a controversy ever actually becomes real." *Assoc. Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) (internal quotation and citations omitted). "[W]here liability is contingent, courts in this circuit traditionally examine the 'practical likelihood' that there will be some type of settlement or judgment against the insurer." *Fed. Ins. Co.*, 758 F. Supp. 2d at 262.

## B.    Discretion

Finding that a ripe, justiciable action exists does not end the inquiry. "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). "On its face, the statute provides that a court '*may* declare the rights and other legal relations of any interested party seeking such declaration.'" *Id.* (quoting 28 U.S.C. § 2201(a)). "In the declaratory judgment context, the normal principle that federal courts should

adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288. Thus, "[e]ven where the case or controversy requirement is met—that is, even when subject matter jurisdiction exists—a court may nevertheless decline to hear a declaratory judgment action in an exercise of discretion." *Motors Liquidation Co.*, 475 B.R. at 358. District courts specifically are vested "with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Wilton*, 515 U.S. at 289.

In evaluating whether to exercise this "broad discretion," district courts consider a range of non-exclusive, fact-intensive factors:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; . . . (2) whether a judgment would finalize the controversy and offer relief from uncertainty[;] . . . [(3)] whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata"; [(4)] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [(5)] whether there is a better or more effective remedy.

*Dow Jones & Co., Inc., v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003) (citations omitted). Other relevant considerations for deciding whether to exercise jurisdiction when a related proceeding is pending in another court include:

> (1) the scope of the pending state [or foreign] proceeding and the nature of the defenses available there; (2) whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding; (3) whether the necessary parties have been joined; (4) whether such parties are amenable to process in that proceeding[;] (5) avoiding duplicative proceedings; (6) avoiding forum shopping; (7) the relative convenience of the fora; (8) the order of filing; and (9) choice of law.

*TIG Ins. Co. v. Fairchild Corp.*, No. 07-CV-8250 (JGK), 2008 WL 2198087, at *2–3 (S.D.N.Y.

May 27, 2008) (citations omitted). Ultimately,

> [w]hen all the lines are drawn and the terms of limitation are spelled
> out, and when rules of caution are put to the test, however finely the
> distinctions cut, what remains of the courts' demarcation of their
> discretionary role is a case-by-case approach circumscribed by
> recognition that what the statute bestows upon them is discretion,
> not ambitions; that a free hand does not mean free rein, and that in
> practice, in giving expression to the confidence Congress reposed
> upon them, the courts' response should be measured and orderly.

*Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 436 (S.D.N.Y. 2002), *aff'd*, 346

F.3d 357 (2d Cir. 2003).

## DISCUSSION

The Court begins by examining whether the issues in this case constitute ripe controversies

and then turns to whether the relevant factors urge the exercise of DJA jurisdiction.[4]

## I. Ripeness

The parties dispute whether Lafarge's claims for indemnification and defense under its

insurance policies are ripe. "Courts often distinguish between the duty to defend and the duty to

indemnify in determining whether each issue posed in a declaratory judgment action is ripe for

adjudication," because the duties are usually triggered by different conditions. *See Atl. Cas. Ins.

Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 261 (S.D.N.Y. 2013). The duty to defend

generally "is triggered by the filing of a lawsuit," whereas the duty to indemnify generally "is

triggered by a determination of liability." *Id.* Thus, the Court addresses the issues with respect to

the duty to indemnify and the duty to defend separately.

---

[4] The Insurers' asserted exclusions are relevant to both duties, as a ruling that they apply would
nullify them both. For the sake of efficiency, the Court addresses these arguments in the context of the duty
to defend. *See* Ds' Supp. Mem. at 6 n.3 (Dkt. 106).

## A.  Duty to Indemnify

As explained above, ripeness requires "a substantial controversy, between parties with adverse legal interests, of sufficient immediacy and reality." *See Fed. Ins. Co.*, 758 F. Supp. 2d at 261. The existence of an actual controversy "is necessarily relative and demands corresponding flexibility"; the inquiry "is one of degree, to be determined on a case by case basis." *Dow Jones & Co., Inc.*, 237 F. Supp. 2d at 406 (citing *Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d 501, 504 (2d Cir. 1968)).

In insurance cases where liability is merely contingent, there must be a "practical likelihood" that some form of judgment or settlement will be forthcoming. *Fed. Ins. Co.*, 758 F. Supp. 2d at 262. More specifically, the duty to indemnify "turns not on the allegations of the complaint but on the actual liabilities as borne out by the facts." *Travelers Prop. Cas. Corp. v. Winterthur Int'l*, No. 02-CV-2406 (SAS), 2002 WL 1391920, at *6 (S.D.N.Y. June 25, 2002). "Where the facts on which the Court's decision depends have yet to unfold, a declaratory judgment action is 'not currently a justiciable and ripe controversy[.]'" *Id.* (quoting *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 676 (2d Cir. 1960)). In such situations, however, there is still a "possibility that at some future time a more complete development of the facts might lead to a different result." *Id.* (citation omitted).

"There is no *per se* rule" that underlying liability must be established before a court may rule on a declaratory action to establish the duty to indemnify. *Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 261. But courts regularly require the existence of liability before exercising DJA discretion over indemnity issues. *See, e.g.*, *FSP, Inc. v. Societe Generale*, No. 02-CV-4786 (GBD), 2003 WL 124515, at *4 (S.D.N.Y. Jan. 14, 2003) ("Claims concerning indemnification obligations . . . are not ripe for adjudication until liability has been imposed upon the party to be indemnified."). A

central concern is often the level of factual investigation that a premature indemnification ruling would require. *See, e.g., Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 261 ("Courts are concerned about becoming entrenched in a factual quagmire that has yet to be resolved in the underlying litigation."). Because the duty to indemnify is contingent on the insured's liability, resolving it "often requires consideration of the factual disputes that are also at issue in the underlying action." *Id.* "[W]here the key facts can and will be established in an underlying proceeding—the lack of ripeness is palpable." *Travelers Prop. Cas. Corp.*, 2002 WL 1391920, at *6.

Given the contentious and evolving nature of the Canadian litigation, Lafarge's indemnification controversy is not ripe at this time. Many critical threshold issues are presently unresolved. Lafarge continues to deny all liability, and the Quebec courts have yet to make factual findings on Lafarge's potential liability. No trial date has been set for the Second-Wave litigation. Meanwhile, Lafarge is not a party to the more advanced suits of the First Wave, which remain pending on appeal. Lafarge hopes that a declaration of its indemnity rights might assist in settlement negotiations. But that uncertain prospect is not enough to create a ripe controversy here. Furthermore, Lafarge asks the Court to find a duty to indemnify not only based on its as-yet-undetermined liability, but also based on other fact-intensive questions such as the number of occurrences, *i.e.*, how the underlying events will be tabulated for purposes of applying the terms of the insurance policies. The Quebec courts have not yet had an opportunity to evaluate the record and weigh in on these questions or on Lafarge's potential liability. It is thus premature to rule on the legal and factual contours of Lafarge's liability in the indemnity context.[5]

---

[5] The only indemnification disputes that the Insurers appear to think are ripe are how many umbrella policies might be triggered by the Canadian litigation and whether the umbrella policies cover defense costs incurred before the policies are triggered—though they also ask that the Court reach these issues only if it holds that the professional services exclusion does not apply. *See* Ds' Supp. Mem. at 3 n.2 (Dkt. 106). As discussed below, the Court is declining to exercise jurisdiction over the application of the exclusion at this time, and so will also defer ruling on these issues for now.

Lafarge cites cases in which courts have decided indemnification issues before liability was determined. *See, e.g., Assoc. Indem. Corp. v. Dow Chem. Co.*, 814 F. Supp. 613, 617 (E.D. Mich. 1993). As noted, however, numerous courts in this district have ruled otherwise employing a case-by-case approach, and the specific, premature circumstances here simply do not support the existence of a ripe controversy related to the duty to indemnify.[6] Admittedly, the size of the Canadian litigation lends some support to the practical likelihood that Lafarge may be found liable for some conduct at some point. *See Empire Fire & Marine Ins. Co. v. Elrac, Inc.*, No. 04-CV-10315 (GEL), 2006 WL 3734308, at *3 (S.D.N.Y. Dec. 18, 2006). But that speculative prospect pales in comparison to the complexity and uncertainties remaining here.

The underlying litigation may yet give rise to a ripe indemnification controversy if and when the Quebec courts determine issues establishing a "practical likelihood" of some form of liability against Lafarge. *See Fed. Ins. Co.*, 758 F. Supp. 2d at 262. For example, the Quebec courts may eventually determine how Lafarge is liable, if at all, for what acts or omissions, and whether, under Quebec law, such conduct was a single event or many. Until the Quebec courts make at least some of those determinations, however, "the lack of ripeness is palpable." *Travelers Prop. Cas. Corp.*, 2002 WL 1391920, at *6.

### B.     Duty to Defend

The disputes surrounding the Insurers' duties to defend Lafarge in the Canadian litigation are ripe, at least to the extent they revolve around the primary insurance policies. Those disputes

---

[6] In the Michigan case, which involved more than declaratory relief, the district court ruled on the number of occurrences pursuant to an "unusual" stipulation between the parties in part because of the availability of discovery in the underlying Canadian litigation and the court's previous extensive handling of the occurrence at issue. *See Assoc. Indem. Corp.*, 814 F. Supp. at 617. Prior to that stipulation, the case "was put on the back-burner pending resolution in Canada of the underlying claims." *Id.* at 616. The Court notes these differences primarily to highlight the fact-intensive nature of the inquiry as to whether a ripe controversy exists.

are of sufficient immediacy and reality because the Insurers are currently providing a defense to Lafarge under those policies. *See Atl Cas. Ins. Co.*, 918 F. Supp. 2d at 261 (finding "no doubt" that a dispute concerning the duty to defend was an active controversy because the insurer was providing the insured with a defense in the underlying action). The ripeness of the duty-to-defend disputes involving the umbrella insurance policies is significantly less clear, mainly because that duty may not be triggered until after Lafarge's liability exceeds the retained limit in those policies. As explained above, such liability is speculative at this point. The Court need not resolve this question, however, because it is declining to exercise its discretionary jurisdiction under the DJA for the reasons explained below. For the purposes of this Opinion, the Court assumes that all the duty-to-defend disputes presented here are ripe.

## II.    Declaratory Judgment Act Discretion

As noted above, courts in this Circuit consider a wide range of "not exclusive" factors to guide their DJA discretion. *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Warrantech Corp.*, No. 00-CV-5007 (NRB), 2001 WL 194903, at *3 (S.D.N.Y. Feb. 27, 2001). These factors include the usefulness and potential certainty provided by a declaratory judgment, as well as the interest in avoiding friction with sovereign legal systems, the scope of the different proceedings, the order of filing, and the choice of law. *See, e.g., Dow Jones & Co., Inc.*, 346 F.3d at 359–60; *TIG Ins. Co.*, 2008 WL 2198087, at *2–3. The goal of this approach is a "measured and orderly," case-by-case analysis to best exercise the Court's "unique and substantial" discretion in this arena. *See Dow Jones & Co., Inc.*, 237 F. Supp. 2d at 434, 436 (citation omitted).

In the context of declaratory actions related to foreign law and foreign proceedings, a court in this Circuit has observed that two factors create a general governing principle: "in each case the forum that the court determined, in the exercise of its declaratory judgment discretion, to be the

appropriate forum, was the forum where [1] the underlying dispute had its principal origins and [2] the primary controlling legal issues were to be governed by the substantive law of that forum." *In re Air Crash Near Nantucket Island, Massachusetts, on Oct. 31, 1999*, 392 F. Supp. 2d 461, 473 (E.D.N.Y. 2005). For the reasons explained below, and even if all the claims in this action were ripe, the Court presently declines to exercise its discretionary DJA jurisdiction over this case.

## A. Duty to Indemnify

The Court turns first to the indemnification issues. Assuming for the sake of argument that they were in fact ripe, the procedural posture of the Canadian litigation limits this Court's ability to issue a ruling that would serve a useful purpose or finalize the controversy. Lafarge's liability might never arise and, even if it does, the Court will be in a far better position to rule on how that liability affects insurance coverage when the court closest to the full factual record—the Quebec court—has had the opportunity to weigh in. *See, e.g., Fed. Ins. Co. v. Garner*, No. 15-CV-184 (DAB), 2016 WL 3554929, at *7 (S.D.N.Y. June 20, 2016) (finding a declaratory-judgment action regarding the duty to indemnify "premature" because it had "many unresolved issues in common with the Underlying Actions, such as [the insured's] liability"); *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, 590 F. Supp. 187, 192 (S.D.N.Y. 1984) (similar). The Canadian courts are already familiar with the underlying facts from the First Wave and are now progressing to the specific facts related to Lafarge's conduct. *Cf., e.g., A & E Television Networks v. Genuine Entm't, Inc.*, No. 09-CV-7422 (RJH), 2010 WL 2308092, at *3 (S.D.N.Y. June 10, 2010) (declining to exercise jurisdiction where the underlying state case had "progressed deep into discovery"). This Court, rather than duplicate those ongoing efforts, need only wait to reap their benefits and consider the record established there. This approach will help prevent a situation in which, as the Insurers note, "alternate conclusions [are reached] on a different record." Ds' Supp. Mem. at 8

14

(Dkt. 106); *cf. Travelers Indem. Co. v. Philips Elecs. N. Am. Corp.*, No. 02-CV-9800 (WHP), 2004 WL 193564, at *3 (S.D.N.Y. Feb. 3, 2004) ("Continuing this action in the face of the procedurally advanced [state] action would cause . . . vexatious waste of judicial resources and gratuitous interference[.]" (internal quotations omitted)).

Plaintiffs argue that the Quebec courts would be willing to accept and enforce any judgment that this Court issues. In fact, Plaintiffs appear to contend that the Quebec courts will respect this Court's factual findings even if they are inconsistent with their own. *See* Ps' Supp. Mem. at 1–2, 4 (Dkt. 103). And it is true that the two records are being developed for different purposes at present—insurance coverage here, and liability in Quebec. Nonetheless, the potential creation of overlapping, and possibly inconsistent, factual records may well create friction with the Canadian courts—a possibility that gives this Court serious pause.

The risk of friction here also extends to this case's legal questions. The courts involved in the Canadian litigation are grappling not only with the facts and law surrounding the pyrrhotite damage, but also the implications for Canadian insurance law. For example, Lafarge cites to a portion of the First-Wave judgment in support of its arguments here as to how many policies might be triggered by the claims in the Canadian litigation under Quebec law. *See* Ps' Mem. at 15 & n.9 (Dkt. 65) (citing *DeGuise v. Montminy*, 2014 QCCS 2672, at ¶¶ 1917–34 (Can. Que. Super. Ct. Jun 12, 2014)). As Lafarge acknowledges, that judgment remains on appeal. *Id.* Lafarge also asserts that the "Quebec courts have not addressed the allocation of multi-year losses under multiple policies" in relation to the insurance language at issue here. Ps' Mem. Opp. at 15–16 (Dkt. 75). Lafarge is thus asking this Court to rule on issues of Quebec law that appear unsettled in the

Quebec courts.[7] The Court deems it inappropriate to wade into these unfolding Canadian legal issues at this time.

Lafarge, in arguing that this case will not create such factual or legal friction, cites a number of abstention cases that weigh international comity according to the test developed by the Supreme Court in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). But *Colorado River*'s test is not the operative standard for deciding DJA jurisdiction. *See generally Youell v. Exxon Corp.*, 74 F.3d 373, 375 (2d Cir. 1996). In the DJA context, international comity and potential friction with sovereign legal systems are merely additional factors to weigh in a far more flexible balancing. *See id.*; *see also Dow Jones & Co.*, 346 F.3d at 359–60 (noting that one factor among many in the DJA discretion analysis is "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"). In a case Lafarge cites from Texas that did wrestle with DJA jurisdiction, the court found it highly relevant—in line with the "principal origins" analysis of *In re Air Crash*, 392 F. Supp. 2d at 473—that parties, witnesses, and key pieces of evidence had close ties to Texas, rather than Germany, where the other, subsequent, action was pending. *BBC Chartering & Logistic GMBH & Co., KG v. Suzlon Wind Energy Corp.*, No. CIV.A. H-05-04128, 2006 WL 1007524, at *5 (S.D. Tex. Apr. 18, 2006); *cf. Aruba Enters. N.V. v. Belfonti*, No. 3:07-CV-1297 (JCH), 2008 WL 185526, at *4 (D. Conn. Jan. 17, 2008) (exercising jurisdiction in part because the underlying dispute "had the most significant relationship with Connecticut"). Here, the underlying events all occurred in Quebec.

---

[7] That Lafarge asks this Court to consider the on-appeal First-Wave judgment as a precedent of Canadian insurance law but to ignore its factual findings because Lafarge was not a party to it is another indication that a ruling from this Court at present will confuse the factual and legal proceedings at issue. *See* Ps' Mem. at 15 n.9 (Dkt. 65).

The choice of law question is also a factor in its own right that weighs against DJA jurisdiction here. *See, e.g., Travelers Indem. Co.*, 2004 WL 193564, at *3 (noting that the application of state law and the absence of federal issues weighs "heavily in favor of abstention"); *Nat'l Union Fire Ins. Co.*, 2001 WL 194903, at *3 ("Significantly, this case does not present a question of federal law."); *Reliance Ins. Co. of Illinois v. Multi-Fin. Sec. Corp.*, No. 94-CV-6971 (SS), 1996 WL 61763, at *3 (S.D.N.Y. Feb.13, 1996) ("Tipping heavily in favor of abstention in this case . . . is the fact that state law will govern the outcome of this action."); *cf. Aruba Enters. N.V.*, 2008 WL 185526, at *4 (D. Conn. Jan. 17, 2008) (exercising jurisdiction in part because "Connecticut law would likely govern the dispute"). It is undisputed that Quebec law will apply to disputes concerning at least some of the policies here, and, though the Court takes no position on the question, it might apply to all of them. New York and federal law, in any event, do not apply to any of the policies.

There is no doubt that insurance cases, in the abstract, can present appropriate circumstances for declaratory relief, because parties often find it useful to know their rights, duties, or vulnerabilities in advance of an underlying judgment. *See Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 738 (2d Cir. 1992); *Assoc. Indem. Corp.*, 961 F.2d at 35. But the courts' discretion in exercising jurisdiction in these cases is clear. The specific circumstances are what govern the exercise of discretion, and the ones here do not support it.

Lafarge correctly notes that the Canadian litigation does not presently involve the Insurers or the insurance policies at issue here, and that the lack of a directly parallel action pending in another court may weaken the force of the discretionary factors. Lafarge is thinking too categorically, however, because, even if this case is not directly parallel to the underlying litigation, the factual and legal issues in both cases overlap significantly. First, the facts underlying this action

are the same as many of those being adjudicated in Canada. Second, insurance law is deeply enmeshed in the Canadian litigation. The First-Wave suits dealt with insurance-law questions similar to those here—as Plaintiffs know, since they cite the First Wave judgment as precedent in support of their arguments in this case. Third, the procedural posture of the Canadian litigation makes it too early to know whether any Second-Wave claims will be brought directly against the Insurers here. The fact that claims were brought against insurers in the First Wave makes it at the very least a distinct possibility. Lafarge contends that, even if some insurers were brought into the Second-Wave litigation, personal jurisdiction would extend over only Defendants American Home and AIG Canada and two of the eleven umbrella policies (specifically, the two policies that AIG Canada issued to LCI). In other words, Lafarge contends that the Quebec court would lack personal jurisdiction over LNA and Lexington. *See* Ps' Supp. Mem. at 2 (Dkt. 103). As Lafarge admits, however, all the umbrella policies are "materially the same" with "substantially identical[]" wording as they relate to this case. Ps' Mem. at 2, 7–8 (Dkt. 65). Thus, a Quebec court's ruling on how Quebec law applies to even a subset of the policies and issues present here would of course be highly relevant. Lafarge next suggests that a Quebec court might stay the underlying action in anticipation of a ruling from this Court under Quebec Civil Code § 3137. *See* Ps' Supp. Mem. at 4–5 (Dkt. 103). Were that to occur, this Court would readily consider such a development in further analyzing its discretionary jurisdiction. At present, however, the overlapping issues of law and fact weigh in favor of declining jurisdiction.

Lastly, Lafarge relies on the Second Circuit's case *Continental Casualty Co.*, 977 F.2d 734, to argue that DJA jurisdiction is appropriate here. But that 1992 case was decided before the Supreme Court gave the district courts "unique and substantial" DJA discretion in *Wilton*, 515 U.S. at 289–90, and the Second Circuit thus applied a standard more stringent than courts do today,

*see Continental Casualty Co.*, 977 F.2d at 737 (applying the categorical rule that "a court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding," rather than applying a multi-factor discretionary analysis). For all those reasons, even if the indemnification issues presented ripe controversies, the Court would not presently exercise its DJA jurisdiction to rule on them.

### B.      Duty to Defend

The Court next weighs whether to exercise jurisdiction over the remaining disputes regarding the duty to defend. "Because the duty to defend is often decided on the basis of the four corners of the underlying complaint and the terms of the insurance policy, it can frequently be resolved without factual investigation." *Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 261. Such is not the case here, at least for now.

The Insurers argue that a professional services exclusion in the umbrella policies applies to all, and an expected-or-intended-damages exclusion applies to most, of Lafarge's relevant conduct. The professional services exclusion states that the policies do not apply to liability arising from the performance of "professional services." Dkt. 86-1 at 6–7.[8] The expected-or-intended-damages exclusion provides that the umbrella policies do not apply to property damage "expected or intended from the standpoint of the Insured." *Id.* at 8.[9] The Insurers contend that all conduct for which Lafarge might be held liable was professional in nature, and that, beginning in March 2006,

---

[8] Two "substantially similar" exclusions govern the 2004 policy from Lexington and the rest of the umbrella policies. Dkt. 86-1 at 6–7.

[9] The prerequisites needed to trigger these exclusions are disputed and the Court's brief recitation here of when the exclusions apply is in no way intended to reflect the Court's ultimate position on these issues.

Lafarge "reasonably anticipated and/or expected" future damage. Ds' Mem. at 2–3 (Dkt. 69). The Insurers thus assert that these exclusions bar Lafarge from benefiting from the defense (or any other) portions of their policies. *See* Ds' Supp. Mem. at 3 (Dkt. 106).

To rule on the duty to defend, the Court is thus called upon to characterize the underlying facts so that it may evaluate the nature of the conduct alleged and whether it fits wholly or in part within one or both exclusions. But the parties vigorously dispute the nature of the record, including what conduct might give rise to Lafarge's liability and the consistency (or lack thereof) between certain factual assertions made here and related facts already found in the First-Wave litigation. *Compare, e.g.*, Ps' Mem. Opp. at 25–32, 39 (Dkt. 75), *with* Ds' Reply Mem. at 1, 8 (Dkt. 85) *and* Ds' Supp. Mem. at 8 (Dkt. 106).

Because the Quebec courts have yet to engage in such characterizations, the Court is wary of doing so. For example, this Court could rule that one of the two exclusions applied and barred insurance coverage after characterizing what the facts in our record allege to have occurred. But a Quebec court, in determining Lafarge's liability based on a different, evolving record, might view the allegations in a different light. Indeed, the Insurers acknowledge that future factual findings in Quebec may "solidify the application" of the professional services exclusion. Ds' Supp. Mem. at 8 (Dkt. 106). Implicitly, such findings might also undermine its application. Ruling prematurely here would add confusion, not clarity. Additionally, because this Court is not exercising jurisdiction over the indemnification issues both because of ripeness and DJA suitability, a ruling on the duty to defend would only finalize the controversy if the Court sided fully with the Insurers. To do so now would risk duplicative or contradictory fact finding—a risk that cautions strongly against the exercise of discretionary jurisdiction for both duties at present. *See Nationwide Ins. v. Zavalis*, 52 F.3d 689, 694 (7th Cir. 1995) (noting that, when underlying facts and the nature of the

insured's conduct are disputed, "the court presiding over the declaratory action typically cannot decide" the duty to defend without resolving disputes better left to the court in the underlying action); *Dresser-Rand Co. v. Ingersoll Rand Co.*, No. 14-CV-7222, 2015 WL 4254033, at *9 (S.D.N.Y. July 14, 2015) (finding adjudication of a duty to defend premature when coextensive with an unripe duty to indemnify). As discussed, the Quebec courts have a fuller record and a greater ability to develop it and, through their adjudication of the Second Wave of the Canadian litigation, are in the process of doing so. The Quebec courts should be given a chance to construe the allegations and conduct at issue, whether at a trial or in pretrial rulings. Once they do, this Court may be in a substantially better position to proceed with determining at least the duty to defend.

Finally, for both duties, the parties have not shown why, in the face of the obstacles and potential pitfalls discussed, the exercise of declaratory jurisdiction is warranted. Until the Quebec courts find Lafarge liable—if ever—in such a manner that triggers the umbrella policies, the Insurers will be providing a defense that costs them nothing because of the fronting arrangement. Meanwhile, the risk of duplicative and possibly conflicting fact-finding will grow smaller as the Canadian litigation progresses. Accordingly, the Court concludes that the measured and orderly response called for on the facts of this case, at present, is a stay while the Canadian litigation develops.

## CONCLUSION

For the reasons stated above, the Court finds that neither the duty-to-defend dispute nor the duty-to-indemnify dispute is presently suitable for discretionary DJA jurisdiction. This case is hereby stayed. The parties are directed to meet and confer about the appropriate length of the stay and what progress in the Canadian litigation might alleviate the Court's concerns outlined in this

Opinion. The parties are further ordered to appear at a conference on the matter on April 25, 2018 at 11:00 a.m., and to notify the Court on the results of their discussions one week prior.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkt. 52 and Dkt. 53.

SO ORDERED.

Dated:     March 31, 2018
           New York, New York

Ronnie Abrams
United States District Judge